## UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CONSUMER FINANCIAL PROTECTION
BUREAU and THE PEOPLE OF THE STATE OF
NEW YORK, by LETITIA JAMES, Attorney General
of the State of New York,

        Plaintiffs,

        v.

CREDIT ACCEPTANCE CORPORATION,

        Defendant.

Case No. 23 Civ. 0038

## **COMPLAINT**

Plaintiffs the Consumer Financial Protection Bureau and the People of the State of New York, by Letitia James, the Attorney General of the State of New York, bring this action against Credit Acceptance Corporation ("CAC" or "the Company") and allege as follows:

## **INTRODUCTION**

1.      Credit Acceptance Corporation makes predatory loans to millions of financially vulnerable consumers trying to buy a used vehicle. CAC's loans carry exorbitant interest rates, are loaded with expensive add-on products, and saddle borrowers with debts that even CAC believes the borrowers often cannot afford to repay in full. CAC aggressively markets itself as an alternative for consumers with limited credit options and touts its loans as a way for consumers to build their credit and gain financial freedom. But CAC is often setting up consumers to fail.

2.      CAC sets the interest rates affiliated dealers must charge on it loans—typically about 22%, which is at or near the maximum rate allowed in many states. But those extremely high interest rates often don't reflect how much consumers are really paying for a CAC loan.

This is because CAC's business model pushes dealers to manipulate the prices of vehicles sold to CAC borrowers, hiding an additional cost of credit in the principal amount financed by the loan.

3.     CAC has created a complex algorithm to predict how much it will collect from consumers over the life of a loan—not just from consumers' monthly payments, but also from potential collection efforts, repossessions, auctions, and deficiency judgments if the consumer defaults. CAC scores each loan using this algorithm, but it does not use its score to determine whether to offer a loan to the consumer, whether the consumer can afford the loan, or what interest rate to offer. CAC's lending model is indifferent as to a consumers' ability to repay loans in full. CAC instead uses this score to predict how much money it expects to collect on the loan.

4.     CAC then uses the projected collections to decide how much to pay its dealers. CAC pays dealers less for loans with lower scores because they are riskier, and CAC predicts it will collect less. Because CAC sets the interest rate for the loan and that interest rate does not change based on borrower risk, CAC's lending model incentivizes dealers to sell cars at inflated prices, which increases the amount CAC pays the dealer.

5.     This means the principal amounts in CAC loans are often artificially inflated and far exceed the amount CAC expects to collect on the loan or has paid to its dealers. And because CAC has shifted the cost of the credit into the principal amount instead of the interest rate, consumers do not know they are paying these hidden costs of credit to finance their vehicles.

6.     The true cost of CAC credit is higher than what is disclosed on the CAC loan agreements, so many of the loans actually exceed state usury caps. In New York alone, more than 84% of CAC loans exceeded the 25% penal usury cap.

7.     CAC also incentivizes dealers to add products like vehicle service contracts and guaranteed asset protection onto the loan during the sales transaction by further increasing the

dealer's payout on the loan for each product they add. CAC creates these financial incentives for its dealers and makes it easy for dealers to add products to consumers' loans, but then turns a blind eye when, in many instances, dealers hide the add-on products in loan paperwork or fail to disclose to borrowers that add-on products are included in their loan agreements. In fact, 90% of CAC loans include a CAC-approved add-on product, often adding thousands of dollars to consumers' already inflated principal amounts. CAC has made hundreds of millions of dollars from the sale of these add-on products.

8.      It is unsurprising, then, that CAC predicts from the outset that many consumers will be unable to repay their loans in full. But by structuring its lending model in this way, the Company can collect more from consumers than it pays dealers regardless of whether consumers can ultimately pay off their loans. For more than 39% of loans nationwide, and for about 25% of New York loans, CAC's algorithm projected that it would not collect the full amount financed by the loan. Yet CAC anticipated making money on these clearly unaffordable loans because the amount of money CAC actually put at risk was substantially less than the loan principal.

9.      Consumers, on the other hand, do not understand that CAC is setting them up to fail. They do not know about, and certainly do not have access to, the extensive predictive data CAC is using to make loans to consumers regardless of whether they can afford them and in circumstances where CAC is predicting that they will not repay the loan in full.

10.     As a result of CAC's lending model, many consumers who receive CAC loans to buy their vehicles default, and when they do, the consequences are severe. Consumers experience a cascade of harms, including losing their vehicles and losing any trade-in value, down payments, or other payments they have made. Consumers face an average post-auction debt of about $8,500, which CAC often continues to collect by suing borrowers. And because

their loan agreements included an artificially inflated amount financed, consumers who try to sell their vehicle or whose vehicles are repossessed and auctioned find that the proceeds of the sale do little to help pay off their debt.

11. Plaintiffs allege that CAC engaged in deceptive and abusive acts or practices in violation of the Consumer Financial Protection Act of 2010 (the "CFPA"), 12 U.S.C. §§ 5531(a), 5536(a)(1), 5536(a)(3), by obscuring the cost of credit for auto loans and taking unreasonable advantage of consumers' lack of understanding of the risk of default and the severity of the consequences, as well as their inability to protect their interests, and for providing substantial assistance to dealers, even though CAC knew or should have known the dealers were misrepresenting the voluntary nature of add-on products.

12. Plaintiff New York State Office of the Attorney General ("OAG") also alleges that CAC has violated New York Executive Law § 63(12) by engaging in repeated and persistent fraudulent and illegal conduct, including misstating the cost of credit, entering into unconscionable contractual terms, and violating the state-law statutory disclosure regimes set out in the New York Personal Property Law. CAC likewise violated New York General Business Law ("GBL") § 349 by engaging in these same deceptive business practices.

13. Finally, Plaintiff OAG alleges that because CAC violated the CFPA and New York law, CAC also violated the Martin Act, New York GBL § 352 *et. seq*. Specifically, CAC offloaded its high-cost loans and their associated risks from its books by securitizing portfolios of loans and selling those securities to unwitting investors, thereby obtaining financing to engage in additional abusive and deceptive lending practices. To do so, CAC falsely represented to bookrunners, investors and rating agencies that the underlying loans complied with all applicable state and federal disclosure and consumer protection laws. They did not.

## JURISDICTION & VENUE

14.     This Court has subject-matter jurisdiction over this action because it is brought under "federal consumer financial law," 12 U.S.C. § 5565(a)(1), presents a federal question, 28 U.S.C. § 1331, and is brought by an agency of the United States, 28 U.S.C. § 1345. This Court has supplemental jurisdiction over the state-law claims because they form part of the same case or controversy with the federal claims. 28 U.S.C. § 1367(a).

15.     This Court has personal jurisdiction over CAC because the causes of action arise from CAC's conduct of business in this state; because CAC contracts to provide goods or services in this state; and because CAC has committed tortious acts within and without this state causing injury to persons or property within this state. 12 U.S.C. § 5564(f); CPLR 302.

16.     Venue is proper in this district because a substantial amount of the transactions, acts, practices, and courses of conduct at issue occurred within this district and because CAC conducts business in this district. 28 U.S.C. § 1391(b)(2); 12 U.S.C. § 5564(f).

## PARTIES

17.     The Consumer Financial Protection Bureau is an independent agency of the United States charged with regulating the offering and provision of consumer financial products and services under federal consumer financial laws (12 U.S.C. § 5491(a)) and has independent litigating authority to enforce federal consumer financial laws, including the CFPA, 12 U.S.C. §§ 5564(a)–(b), 5481(12), (14).

18.     The People of the State of New York, by their attorney, Letitia James, the New York Attorney General, are authorized to initiate civil actions in federal court to enforce provisions of the CFPA, *id.* § 5552 and are authorized to take action to enjoin repeated and persistent fraudulent and illegal conduct under New York Executive Law § 63(12), deceptive

business practices under New York GBL § 349, and fraudulent and deceptive practices in the origination, issuance, and sale of securities under New York GBL § 352.

19.     Defendant CAC is an auto finance lender in the subprime market incorporated in Michigan and headquartered at 25505 W 12 Mile Road, Southfield, Michigan 48034. Since 2015 or earlier, CAC has done business in New York.

20.     Plaintiff OAG has provided CAC with notice as specified in GBL § 349.

21.     At all times relevant to this Complaint, CAC was a covered person because it purchased, acquired, and serviced auto-finance loans made by dealers and because it collected debt. 12 U.S.C. § 5481(6), 15(A)(I), 15(A)(x). These loans were "offered or provided for use by consumers primarily for personal, family, or household purposes." 12 U.S.C. § 5481(5).

## FACTUAL ALLEGATIONS

### CAC is a large subprime lender.

22.     CAC is one of the country's largest publicly traded auto lenders and does business with a network of more than 12,000 affiliated used-car dealers to offer loans to subprime and deep-subprime consumers.

23.     From November 2, 2015 to April 30, 2021 (the Covered Period), approximately 1.9 million consumers obtained loans from CAC and its affiliated used-car dealers. In 2020 alone, consumers obtained more than $4.9 billion in CAC-financed loans. New York represents one of CAC's top five markets by state, with hundreds of millions of dollars in loans originated annually.

24.     CAC's loans are expensive. Since 2015, the Company's loan agreements have disclosed an average APR nationwide of about 22%. In New York, CAC's loan agreements typically disclose an APR of 22.99% or 23.99%, just below the state's 25% penal usury cap.

**CAC uses its algorithmic lending model to project net collections
on future loans without assessing the borrowers' ability to repay.**

25.     CAC makes very expensive used-car loans to low-income consumers and those

with limited credit options without regard for whether they can reasonably afford to repay the

loans according to their terms. During the Covered Period, the median CAC borrower had a

FICO score of 546 and a yearly gross income of approximately $35,000.

26.     Rather than assess its borrowers' reasonable ability to repay their loans, CAC uses

the personal and financial data that it gathers from them to predict the net expected collections on

each loan. The net expected collections for each loan is expressed as a number from 0-100,

which CAC refers to as its borrower "score." Critically, the score considers not only payments

that CAC expects the borrower will make under the loan agreement, but also other amounts CAC

expects to collect on each loan if and when the loan goes bad. CAC's score thus takes into

consideration everything from the expected payment of late fees to the proceeds of post-

repossession auctions of a defaulted borrower's vehicle.

27.     The score represents CAC's best estimate, at origination, of the percentage of

total amounts owed that CAC expects to collect. As an example, consider this loan to borrower

Ms. B that originated in February 2016:

| TRUTH IN LENDING DISCLOSURES | | | | |
|---|---|---|---|---|
| **ANNUAL PERCENTAGE RATE** The cost of Your credit as a yearly rate. | **FINANCE CHARGE** The dollar amount the credit will cost You. | **Amount Financed** The amount of credit provided to You or on Your behalf. | **Total of Payments** The amount You will have paid after You have made all payments as scheduled. | **Total Sale Price** The total cost of Your purchase on credit, including Your down payment of $ 2,250.00     is $ 15,551.31 |
| 23.99 % | $ 5,009.21 | $ 8,292.10 | $ 13,301.31 | |

| Payment Schedule: Your payment schedule will be: | | |
|---|---|---|
| No. of Payments | Amount of Payments | When Payments Are Due |
| 51 | $ 260.81 | March 12, 2016   and same date of each following month. |

In this example, CAC gave the loan a score of 60.1, predicting that its net collections would be

$7,994 (or roughly 60% of the total of payments). Ms. B, in contrast, is obligated to pay

7

approximately $13,300 to CAC (in addition to trading in another vehicle to the dealer for a credit of $2,250).

28.     CAC does not use the information it collects from potential borrowers, the score, or the projected net collections to assess the consumer's ability to repay loans in full.

29.     CAC claims that it requires proof of income for every borrower and will not approve a loan if the monthly payment exceeds 25% of the applicant's gross monthly income (this figure can be increased to 30% with manager approval). But CAC does not engage in any meaningful analysis for the purpose of developing loan terms that are likely to result in repayment in full by the borrower.

30.     CAC does not consider—or even require dealers to ask about—the borrower's recurring debt obligations, rent or mortgage payment, or any of the other necessary expenses an individual incurs each month, including the cost of food, healthcare, or childcare. Nor does CAC calculate the borrower's monthly debt-to-income ratio or residual income, and its payment-to-income guideline does not adjust according to an applicant's number of dependents. Without this additional information, the gross income figure provides little guidance in terms of an applicant's ability to repay in full the potential loan that is being offered.

31.     In the sample loan discussed above, CAC's paperwork indicates that Ms. B earned $9 per hour and took home approximately $950 every month. The paperwork suggests that Ms. B supported at least two minor children. CAC did not ask for clarification about Ms. B's dependents or her costs for housing, food, medical care, or childcare. Yet CAC approved her for a loan with monthly payments of $260 per month.

32.     CAC is unique among indirect auto finance lenders in that it does not vary its interest rate based on future performance of the loan, and it offers loans to nearly all consumers,

regardless of their estimated future performance. This sounds too good to be true, and it is. Instead of using a variable interest rate to compensate for increased risk, CAC inflates the principal for higher-risk borrowers.

**CAC's business model uses the borrower's score to set the payment to dealers, to the detriment of borrowers.**

33.    CAC requires its affiliated dealers to use the Company's proprietary software to produce the loan agreement that ultimately will be executed by the borrower.

34.    Dealers use CAC's software to manipulate data inputs, such as the selling price of the vehicle, loan terms, and whether add-on products are included. By varying these inputs, dealers can increase or decrease the amount CAC will pay the dealer for the loan (referred to herein as the "CAC Payment").

35.    That CAC Payment, plus down payment and any trade-in value, constitutes all, or substantially all, of the money that the dealer will ever receive in the transaction. This combined amount (referred to herein as the "Dealer Compensation") reflects the precise amount of money that a dealer required to sell a particular vehicle, on a particular day, to a particular borrower, and under particular market conditions. As such, Dealer Compensation is a reasonable proxy for the true cash price in a specific transaction, meaning the amount of money the dealer would require in an all-cash transaction.[1]

36.    In limited circumstances, CAC makes additional, and typically much smaller, payments to dealers' accounts, called earnout. These payments are available to only a portion of CAC's loan portfolio and are paid only if a group of loans made by the same dealer performs extremely well, which rarely occurs. During the Covered Period, less than 12% of all new CAC

---

[1]    In calculating CAC Payment and Dealer Compensation, Plaintiffs subtract deal fees paid by dealers to CAC because presumably dealers do not pay deal fees in sales to cash purchasers.

loans nationwide were part of a group of loans for which the dealers received earnout. And in New York, total earnout accounts for less than 2% of the value received by dealers across all CAC deals, with the majority of dealers receiving no earnout at all. In most cases, the CAC Payment is all the compensation the dealer will ever receive from CAC in the transaction.

37.     As a result, the linchpin of CAC's business model is determining the right CAC Payment to offer to the dealer at origination. The ideal payment will provide an acceptable profit margin to the dealer, thus inducing the dealer to complete the deal; as CAC noted in its annual financial disclosures: "typically the combination of the [CAC Payment] and the consumer's down payment provides the Dealer with a cash profit at the time of sale." Calculating the right CAC Payment amount also ensures likely profits for CAC.

38.     The score is an important factor in how CAC determines the CAC Payment to offer. After CAC uses the score to predict its net collections, it offers the dealer around 72% of that figure, on average. If the dealer agrees to the proposed CAC Payment and the consumer agrees to purchase the vehicle, then the loan is originated using loan documents and terms generated exclusively through CAC's software.

39.     This business model creates an incentive for CAC-affiliated dealers to maximize the total costs of a CAC-financed loan. CAC generally pays dealers less for lower-scoring loans and more for higher-scoring loans. But if dealers inflate the amount financed by selling the vehicle at an increased price or selling the consumer CAC-approved add-on products, then the CAC Payment to the dealers increases. And CAC's affiliated dealers can see the increased CAC Payment by manipulating data, such as which vehicle is sold or the selling price of the vehicle, in the Company's software program.

40.     CAC can collect more money than it pays to dealers even when borrowers default and their vehicles are repossessed. If CAC accurately predicts net collections on a loan, then CAC will collect more than enough money during the life of the contract to recoup the CAC Payment it paid to the dealer, plus some profit. And because the CAC Payment is usually less than the amount financed, the business model ensures that CAC can collect more money than it paid to the dealer even when borrowers fail to repay the amount financed.

41.     During the Covered Period, the nationwide average CAC Payment was about 22% less than the amount financed, meaning CAC needs to collect only about 78% of the amount financed to exceed the CAC Payment it made to the dealer. For New York loans, CAC needs to collect only a similar proportion of the amount financed, a difference that amounts to nearly $2,500 on average.

42.     CAC's boilerplate disclosure that it pays the dealer "a portion of the amount [the consumer] actually owe[s] under the" loan is inadequate to compensate for its deceptive and abusive practices.

43.     Pushing consumers into loan agreements they cannot afford is the engine that drives CAC's score-based business model. During the Covered Period, CAC forecasted an average score of 64 for borrowers nationwide and 66 for New York borrowers, meaning that, in aggregate, the Company projected its net collections would be 64 or 66 cents for each dollar of the total amounts owed on its loan agreements.

44.     Indeed, between roughly 25% (New York) and 39% (nationwide) of CAC's loans were so clearly unaffordable that CAC's projected collections were less than the amount financed, or purported principal. CAC's own historical loan outcome data (which it tracks methodically) support the conclusion that these loans were unaffordable: an analysis of loans in

New York between 2015 and 2020 where CAC projected to collect less than the amount financed, for example, shows that nearly 70% were (i) 60 days or more past due, (ii) repossessed, or (iii) sold at auction.

45.     Despite projecting at inception that (i) it will recoup only two of every three cents owed and (ii) total collections will be below principal for nearly 40% of its loans nationwide, CAC can make money on any consumer loan as long as it recoups more than the CAC Payment that it actually paid to the dealer.

### CAC, not the dealers, controls the financing process and the disclosures given to borrowers.

46.     CAC controls each material aspect of the vehicle financing process for consumers who enter into loans; the dealers play only a small and controlled role in CAC deals.

47.     Dealers use CAC's software, in real time, to calculate the CAC Payment based on several factors, including the loan term and the selling price of a particular vehicle to a prospective borrower with a particular score.

48.     When a consumer arrives on the lot, the dealer obtains identifying information about the consumer and enters it into CAC's software. At this stage, behind the scenes, CAC offers the dealer preliminary predictions about the size of the CAC Payment if the dealer were to sell particular vehicles, at particular price points, to the prospective borrower. Once a vehicle is selected, CAC allows dealers to manipulate, within set parameters, some factors such as the amount of the down payment, the length of the loan term, the selling price of the vehicle, and whether an add-on product will be included in the transaction. Based on how the dealer enters or adjusts these variables, the CAC software proposes a specific CAC Payment.

49.     Determining the CAC Payment to the dealer is crucial because, in most transactions, this upfront payment is the only money the dealer will ever receive from CAC.

50.     Through its software, CAC calculates the proposed loan terms, including the amount financed and APR for the loan, and ensures that it is the final arbiter of all material loan terms. The dealer cannot alter these terms but merely presents the CAC form loan agreement to the borrower. As the Company has stated: "Through our Dealer Service Center, we perform all significant functions relating to the processing of the Consumer Loan applications . . . . "

51.     CAC, through its software system, is responsible for determining the form and substance of financial disclosures provided to consumers in its loan agreements. Dealers affiliated with CAC license the use of this software through a written agreement, under which the dealers agree not to modify the software or create any derivative work or adaptations of the software. CAC policies require dealers to use this software to generate CAC loan agreements.

52.     CAC designs the loan agreements, including any required disclosures, and makes them available to affiliated dealers. CAC's software enables dealers to "create, electronically execute and print legally compliant Consumer Loan documents."

53.     CAC's role in creating the underlying loan agreement is prominently displayed on the face of the document. CAC loan agreements typically contain a reference to a CAC model form identifier and a CAC copyright stamp.

54.     CAC has assumed responsibility for ensuring that its loan agreements comply with state and federal disclosure requirements. CAC maintains a Compliance Committee that is concerned with the Company's compliance with various laws and regulations, including state disclosure regimes. And the Company's policy states that it will not acquire or purchase interests in loan agreements that are not in compliance with federal disclosure requirements.

**CAC's agreements contain deceptive, hidden finance charges.**

***CAC and its affiliated dealers place consumers into inflated
loan agreements that are unaffordable and lead to financial distress.***

55.     CAC's business model has predictable results: CAC's loans are more expensive than many other used-car loans because the selling prices of the vehicles are inflated much more than is typical in the used-car industry. These increases are designed to protect CAC against credit risk but are deceptively disclosed as principal.

56.     According to 2019 reports from the National Automotive Dealers Association (NADA), a typical domestic dealer has a markup of approximately 12% over cost on used vehicle sales. Using the portion of Dealer Compensation that is related to the sales price of the vehicle (excluding other costs such as add-ons) as a proxy for the vehicle selling price in an all-cash transaction, median markups of CAC loans nationwide during the Covered Period were about 17% (similar to the nationwide figures from NADA), which suggests that dealers receive a profit margin on CAC deals that is typical of the industry. By contrast, the median markup of the disclosed selling price of the vehicle in those transactions was slightly more than 50% over reported dealer cost. And that markup increased to about 77% when compared to Black Book or Blue Book wholesale value. These figures suggest that CAC borrowers pay a higher price for the vehicles than other purchasers, and CAC benefits.



57.     CAC claims that it caps the degree to which its dealers can inflate the price of vehicles. For example, since January 2019, CAC has restricted dealers from increasing the price beyond 115% of the highest Black Book or Blue Book value (i.e., best condition) for the make and model in question. But such a cap is far too high to provide meaningful protection to CAC borrowers; CAC does not check on the condition of the vehicle, and many CAC borrowers are in fact financing vehicles worth much less than the highest Black Book or Blue Book value.

58.     As a result of the inflated sales prices, CAC loan agreements are incredibly expensive for CAC borrowers. The median selling price for CAC consumers nationwide is over 77% greater than the Black Book or Blue Book wholesale value of the vehicle sold.

59.     CAC dealers almost always accept less in total Dealer Compensation from CAC deals than the total cost of the deal (minus interest) as disclosed to a CAC borrower, which suggests that the dealers would accept a similarly lower amount from an all-cash purchaser. Thus, Dealer Compensation is a reasonable proxy for the true cash-purchase price—that is, the precise amount of money that a dealer would have taken in order to sell a particular vehicle and add-on products, if applicable, on a particular day, to a particular borrower and in particular market conditions.

60.     The difference between the total disclosed cost of the CAC-financed transaction (minus interest) and the Dealer Compensation (as a proxy for the true amount dealers would have accepted in an all-cash purchase for a vehicle and add-on products, if applicable) constitutes a finance charge that is hidden from the borrower as part of the amount financed on a CAC loan agreement—it is an amount that a cash consumer would not have been charged.



61.    In Ms. B's loan discussed in paragraph 27 above, CAC predicted its net collections would be approximately $7,994. After gathering information about Ms. B and her creditworthiness, CAC paid the dealer approximately $5,614 for this loan, a critical aspect of the transaction that does not appear anywhere on the loan contract. That dollar figure, not the amount financed, is the amount CAC has put at risk for this loan, and CAC can profit (roughly speaking) if it collects more than that amount. CAC does not need to collect the full amount financed to profit.

62.    CAC repossessed Ms. B's vehicle twice (and charged Ms. B a total of $700 for the repossessions), sold the vehicle at auction for a net payment of $772, and then sued Ms. B for the remaining deficiency of $7,550. While Ms. B's finances were decimated, CAC profited. Throughout the lifetime of the loan, CAC's actual net collections exceeded $8,400, so it collected more than $2,800 after recouping the CAC Payment.



In this example, the Dealer Compensation was approximately $7,864, and Ms. B paid or promised to pay more than $10,500, excluding interest. Accordingly, the hidden cost in Ms. B's CAC loan was more than $2,600.



63.    This difference between Dealer Compensation and the amount a CAC-financed purchaser pays operates like traditional interest, protecting CAC from the increased risk posed by borrowers with lower-scoring loans. But instead of treating this difference as interest, CAC and its affiliated dealers present it as part of the inflated amount financed. And borrowers are obligated to pay CAC the full amount financed, including the hidden cost of the credit, and to pay interest on that full amount.

17

64.     By hiding the true cost of the credit being offered, CAC deprives consumers of the ability to make informed decisions, to compare financing options, or to avoid unconscionably high interest charges. And because CAC charges the disclosed interest on the full amount financed (which includes the hidden finance charge), borrowers are saddled with exceptionally high monthly payments, thereby increasing the risk of default and repossession.

### CAC deceives borrowers by calculating and disclosing the cost of credit without considering the hidden finance charge.

65.     The cost of credit for CAC's loans can be calculated by comparing (i) the disclosed total cost of the deal for CAC borrowers (minus interest) and (ii) the Dealer Compensation, then treating the difference between those numbers as a finance charge rather than as part of the amount financed. The true cost of CAC credit is higher than what is disclosed on the CAC loan agreements and often exceeds state usury caps.

66.     In New York, the maximum interest rate that may be charged is 25%. Penal Law § 190.4; Gen. Oblig. Law § 5-501. CAC loan agreements in New York consistently disclose an APR that is close to, but never in excess of, 25%—in particular, 22.99% or 23.99%.

67.     Nearly 90% of loans in New York during the Covered Period had a New York APR ("NY APR")[2] in excess of the 25% penal usury cap and about 30% of New York loans had a NY APR in excess of 40%. Overall, the median NY APR for CAC's loans in New York was approximately 34%. And even if estimated earnout (which is rarely earned) is added to the Dealer Compensation and not treated as part of the hidden finance charge, more than three quarters of New York loan agreements generated during this period had a NY APR in excess of 25%. The chart below presents the distribution of NY APRs for loans originated in New York:

---

[2]   To calculate the NY APR, Plaintiff OAG treated the difference between (i) the disclosed total cost of the deal for CAC borrowers (minus interest) and (ii) the Dealer Compensation as a finance charge, recalculating the APR using the same mechanical calculation used by CAC to calculate the APR disclosed on its loan agreements.



68. As shown above, in New York the NY APR in CAC transactions frequently exceeds criminal interest rate caps. But CAC conceals this cost of credit, thereby frustrating New York's public policy against charging excessive interest.

*By design, the relative size of the hidden finance charge is higher for CAC borrowers with lower-scoring loans than borrowers with higher-scoring loans.*

69. The hidden cost of credit in CAC transactions varies with borrower creditworthiness. As a result, borrowers with lower-scoring loans tend to pay more for their vehicles, relative to the vehicles' value, than borrowers with higher-scoring loans:



19

70.    Although CAC represents that it offers the same or very similar interest rates across borrowers, in fact the true cost of CAC credit—when recalculated to include the hidden finance charges—varies in the same manner as any other lender's interest rates to account for borrower creditworthiness based on factors such as credit score and payment to income ratio, a fact that also holds true when accounting for estimated earnout.





71.     By scaling the hidden cost of credit with borrower risk, CAC protects itself from increased risk posed by lower-scoring and lower-credit-score borrowers.

72.     Lower-scoring borrowers who are saddled with this hidden charge experience higher carrying costs, increasing the risk of default and repossession. And they are even more underwater on their loan than they would be otherwise, making it even harder for them to satisfy the loan by selling the vehicle and sending the proceeds to CAC.

73.     Although higher-risk borrowers may have expected to pay a higher interest rate in a transaction compared to lower-risk borrowers, CAC instead hid additional costs within an inflated amount financed to compensate for the increased credit risk.

**CAC's business model carries a high risk of harm to all borrowers.**

74.     Because of the inflated purchase prices and the high cost of credit, at the time of origination many CAC borrowers owe significantly more than the vehicle is worth. As a result, borrowers who encounter payment stress during the repayment term are unable to escape the loan by selling the vehicle to a third party and paying off the loan in full. Even if their vehicles are repossessed and sold by CAC at auction, the auction proceeds often do not satisfy the loans in full, and CAC later sues some of these borrowers for the deficiency balance on their loans.

75.     Thus, despite promises of paths to "financial freedom," high-cost loans saddle vulnerable borrowers with substantial debt and lasting consequences, often leaving consumers worse off than they were before they entered into a CAC loan agreement.

76.     As an initial matter, the hidden financing costs (and the interest charged thereon) make keeping up with loan payments much more expensive for consumers. During the Covered Period, nearly two million CAC loan agreements were executed nationwide, and a majority became delinquent at some point. More than half of CAC's borrowers became delinquent within the first year.

21

77.     And once consumers fall behind, CAC is aggressive in taking action.

78.     Within days of a missed payment, CAC will, as a matter of policy, disable consumers' vehicles through its GPS starter interruption devices. In New York, these devices were used on vehicles purchased through CAC loan agreements up until late 2018.

79.     If disabling vehicles doesn't result in renewed and increased payments, CAC turns to repossession and then auction. During the Covered Period, CAC repossessed more than a quarter of the vehicles it financed nationwide and resold at auction approximately 20% of vehicles financed nationwide. In New York, for loans that had a final maturity date that was on or before May 12, 2021, CAC eventually repossessed approximately 44% of the vehicles and resold at auction more than a third of the vehicles financed in New York.

80.     CAC repossesses vehicles quickly after delinquency. CAC loan agreements generally have terms of 60 to 72 months, yet of the repossessed and resold vehicles with loan agreements originated during the Covered Period, an average of less than two years passed from the time of origination to the time CAC resold the repossessed vehicle at auction. A quarter of those repossessed vehicles were auctioned in less than one year from origination.

81.     Moreover, while many consumers who receive multiple delinquency notices manage initially to pay off the sums necessary to avoid repossession, including late fees, they often succumb to failure to repay and repossession later. Fully 21% of all New York vehicles that were repossessed by CAC were ultimately repossessed more than once.

82.     CAC's auction sales often are insufficient to satisfy the debts owed, in which case CAC turns to post-auction collections. Nationwide, CAC's auction proceeds satisfied, on average, only 29% of the remaining amounts owed. And in New York, auction proceeds represent less than 28%, and sometimes as little as 1%, of the amounts still due. (In the sample

loan discussed in paragraph 27 above, the borrower purchased a 7-year-old Pontiac sedan with an odometer reading of over 82,000 miles and promised to pay $8,195.00 for the vehicle. Yet CAC sold the repossessed vehicle at auction for a net payment of $772.)

83. CAC makes up the difference through aggressive post-repossession collection efforts. CAC records show that, nationwide, the Company made over 138,000 referrals to debt collection attorneys.

84. More than one in every six of CAC's loans in New York between 2015 and 2021 that reached maturity on or before May 2021 resulted in CAC seeking and obtaining a judgment against that borrower. As summarized below, CAC has secured thousands of judgments against New York residents in New York courts each year:

| Year | Judgments |
|------|-----------|
| 2019 | 3,442 |
| 2018 | 3,686 |
| 2017 | 4,124 |
| 2016 | 4,222 |
| 2015 | 3,567 |
| 2014 | 3,089 |
| 2013 | 2,539 |

85. CAC's team of collection lawyers often secured judgments against borrowers by default. For example, during 2017 and 2018, only 40 of the thousands of New York borrowers sued by CAC were represented by counsel. Unsurprisingly, in that same time period, CAC obtained more than 7,000 default judgments in New York.

86. The human cost is enormous. Borrowers struggle to meet monthly payments that are beyond their reach, and they expend great effort to pay the late fees CAC imposes. Over and over, repossession, garnishment, and bankruptcy result. Consumers who lose their vehicles then sometimes lose their jobs and face family difficulties as well. But despite the significant human toll borne by consumers, CAC continues to profit.

87.     Even for borrowers who avoid delinquency or repossession, CAC's practices cause substantial harm. By hiding the true amount financed—and thus the true cost of the credit being offered—CAC deprives consumers of the ability to make informed decisions, to compare financing options, or to avoid unconscionably high interest charges.

### Vulnerable consumers with little or no credit suffer more significant harms from CAC's loans.

#### *CAC's aggressive marketing strategy targets vulnerable consumers with little or no credit.*

88.     While CAC inflicts a tremendous toll on its borrowers as a whole, CAC targets consumers with little or no credit.

89.     CAC controls the marketing of its loans and the core terms of its loan agreements.

90.     CAC advertises financing directly and indirectly by providing marketing materials and plans to its affiliated dealers and licensing the Company's key slogans, such as "WE CHANGE LIVES" or "GUARANTEED CREDIT APPROVAL." Under agreements between the Company and its affiliated dealers, the dealers also agree to adhere to the operational guidelines of CAC's financing program and ensure that sales staff are trained and certified through CAC's "University" training program.

91.     As CAC's Chief Executive Officer wrote in the Company's 2019 annual report: "We provide auto loans to consumers regardless of their credit history." A typical online advertisement states:

> How does Credit Acceptance Change lives? . . . Dealers enrolled in our program can offer approval to anyone regardless of their credit history. So even if you have bad credit or no credit, you can still get into a reliable vehicle. . . . You can improve your credit simply by making on-time payments, [which will allow you to] move on to more traditional financing for your next major purchase.

92.     CAC's advertisements target consumers who may have been denied financing several times and are not likely to get approved by a traditional lender. As one advertisement

24

reads: "10 Dealerships. 10 Denials. 1 Easy Solution." CAC's marketing urges these consumers to sign up for financing by promising them a chance of a better financial future.

93.     CAC trains its dealers to take advantage of these consumers by making promises of "financial freedom." Mandatory tutorials known as Credit Acceptance "University" teach dealers that "[g]aining the customers trust early makes them more likely to trust the dealer." CAC-affiliated dealers are trained to further promise to consumers who come into the dealership that CAC's loans will "change their lives." CAC trains its dealers to emphasize that CAC is the consumer's only opportunity to secure financing, falsely tell consumers that CAC will provide financing at a reasonable rate and represent that CAC will help improve the consumer's credit with on-time payments.

94.     CAC also builds incentives into its agreements with dealers that limit the dealers' potential earnings in some situations unless the dealer has induced a minimum number of consumers to enter into CAC loan agreements. This incentivizes CAC-affiliated dealers to steer consumers toward loans with CAC rather than other alternatives. And dealers lose their rights to these extra, future earnings if they become inactive by not executing new CAC loan agreements.

95.     A near-final step in closing a deal is providing consumers a "Consumer Presentation Sheet" generated by CAC's software. After CAC determines the proposed loan terms, its software populates the term sheet and other documents. CAC requires its dealers to print out the term sheet and give it to the consumer. In giant letters, the Presentation Sheet reads: "Congratulations John Doe . . . You're Approved!" Then, in bold letters in the middle of the page it says: "Change Your Life with On-Time Payments!" It continues by holding out prospects of "financial freedom" for the borrower, or even home ownership: "After paying off your

contract with a history of on-time payments you'll have more financial freedom to: . . . Purchase a home, Obtain a major credit card."

96.     Together, CAC's communications and its dealer trainings are designed to build trust in CAC, confidence that the transaction will enhance the consumer's financial life, and the impression that CAC's interests are aligned with the borrower's full repayment of the loan.

*Through use of the score, CAC causes more*
*significant harm to vulnerable borrowers with little or no credit.*

97.     CAC's score is useful to the Company because it helps predict average loan outcomes for borrowers with similar characteristics. Predicting average loan outcomes is a less resource-heavy proposition than gathering the data necessary to calculate borrowers' residual income and predict individual borrowers' ability to repay their loans in full.

98.     By using the score as an underwriting shortcut, CAC can more cheaply predict net collections and scale its payments to dealers so that the Company is likely to make money from the loans, regardless of whether the borrowers can afford to repay them according to their terms.

99.     The inequities in loan outcomes based on score are exacerbated by the fact that, at the point of origination, borrowers with lower-scoring loans are even more under water on their loans with CAC than borrowers with higher-scoring loans.

100.     CAC's model facilitates loans to borrowers with lower-scoring loans that are larger, more expensive relative to the wholesale value of the vehicle, and less likely to be repaid than loans made to borrowers with higher-scoring loans. The model effectively ensures that the most at-risk borrowers will have no way to avoid the ensuing harms. Even worse, the model compounds this problem as scores decrease.

101.     Historical correlations between CAC's score and negative outcomes for borrowers strongly suggest that borrowers with lower-scoring loans will likely experience

negative outcomes, including delinquency, default, repossessions, auctions, and lawsuits.

102.   Borrowers with lower-scoring loans repay their loans on time less frequently than borrowers with higher-scoring loans.

103.   Distress for such borrowers begins early, as between October 2015 and May 2020, roughly 60% of CAC borrowers nationwide with scores below 70 and roughly 67% of borrowers nationwide with scores below 60 were more than a month behind on their payments on at least one occasion during the first year of the loan. As the chart below demonstrates, there is a clear relationship between the score assigned to a borrower and the frequency at which a 30-day delinquency or repossession occurs in the first year:



104.   Similarly, from November 2015 through April 2020, roughly 39% of CAC borrowers nationwide with scores below 70 and roughly 46% of borrowers nationwide with scores below 60 were more than 60 days behind on their payments on at least one occasion during the first year of repayment:



105.    CAC's business model includes a strong focus on collections. Excluding support personnel, it employs almost twice as many people in the servicing/collections arm of the business than the origination arm of the business—and CAC engages in aggressive collections practices when accounts are past-due. This includes collection on amounts owed under the loan agreements and collections of late and other fees charged by CAC.

106.    As with delinquency, the brunt of the effect of CAC's collections practices, such as repossession of the vehicle, is felt by borrowers with lower scores:



107.    Not surprisingly, borrowers with lower-scoring loans are much more likely than borrowers with higher-scoring loans to lose their vehicles in an auction.



108.    CAC is also more likely to refer accounts to attorneys for possible deficiency lawsuits if the loans have a lower score.

109.    If CAC borrowers with lower-scoring loans understood CAC's scoring and origination processes, including the fact that their loans were likely to be larger, more expensive, and less likely to be repaid in full than loans made to borrowers with higher-scoring loans, and that CAC could earn more money than it pays dealers even if borrowers failed to repay their loans in full, at least some of them would likely have opted not to take out a loan with CAC.

110.    Even borrowers who pay back their loans in full are harmed: they pay more in finance charges than disclosed, including interest at rates that exceed interest rate caps in states such as New York, and are deprived of the opportunity to fully understand the true cost of credit they are paying and potentially seek better terms from other dealers. In New York, hiding the cost of credit from borrowers while charging interest beyond the penal cap is unconscionable.

**CAC enjoys a similar profit margin across all loans, regardless
of score, and compensates for increased credit risk by incentivizing
dealers to inflate the principal even further for lower-scoring loans.**

111.    Guided by its scoring algorithm, CAC has created a system that generates a
positive profit margin from almost all its loans, including those made to the borrowers with the
lowest-scoring loans in its portfolio.

112.    CAC generally charges consumers in each state the same interest rate (often the
maximum interest rate allowed under state law) regardless of their loan score. Lower-scoring
loans usually pose a greater credit risk than higher-scoring loans, and CAC generally accounts
for this increased credit risk not by increasing the interest rate, but instead by incentivizing
dealers to even further inflate the principal. As a result, CAC has about the same (or higher)
profit margin[3] for lower-scoring loans as for higher-scoring loans, despite the fact that borrowers
with lower-scoring loans are much more likely to be delinquent early in the loan and suffer
repossession, auction, or other negative outcomes.



---

[3]  Plaintiffs calculate profit margin as total actual net collection minus the CAC Payment to the dealer plus the average,
subsequent payment from CAC, where applicable.

**CAC's model permits and encourages dealers to push costly
add-on products through deceptive tactics that CAC facilitates.**

*Add-on products benefit CAC.*

113.    CAC generally allows dealers to sell two pre-approved add-on products with its loans: a vehicle service contract ("VSC") that functions as a promise to repair or replace certain vehicle parts and a guaranteed asset protection ("GAP") product that ostensibly covers the amount borrowers owe after an insurance pay-out in the event the vehicle is stolen or totaled.

114.    The retail price for each product is included in the principal of the loan, so borrowers pay interest on the add-on product for the full duration of the loan (or until the borrower successfully cancels the product). A borrower's decision to purchase either of these products thus can significantly impact the overall and monthly costs of a CAC loan agreement.

115.    During the Covered Period, the VSC product had an average retail cost to the borrower of $1,545. If the product included roadside assistance, that cost increased by $4 per month. When interest costs are considered, the VSC added an average of $2,243 to the total amount due under the loan.

116.    During this same period, the GAP product had an average retail cost to the borrower of about $782. With financing, this added an average of $1,615 to the total amount due under the loan.

117.    Add-on products are profitable for CAC. In 2020, CAC received approximately $250 million for all add-on products nationwide, exclusive of interest income. Approximately $200 million of this total was from fees paid by borrowers, and approximately $50 million was from fees paid by third-party administrators. And CAC derives additional income from VSC products through its reinsurance subsidiary, which reinsures the VSC providers.

***CAC controls all aspects of the process for purchasing add-on products.***

118.    CAC created and controls the process for selling add-on products.

119.    CAC selects the third-party administrator for the add-on product and controls how much borrowers pay for the product. Further, CAC determines whether a particular borrower can purchase the GAP or VSC product (GAP is not available in New York, for example), and CAC informs dealers whether the products can be sold to the borrower.

120.    CAC also drafts the contract templates that will be signed by the borrower and the administrator and populates the form contract in preparation for the borrower's signature.

121.    CAC trains dealers on how to sell add-on products, including how to explain the products to borrowers and how to respond to borrower questions.

***CAC's business model incentivizes dealers to sell add-on products.***

122.    Dealers profit from including the sale of an add-on product in a transaction in several ways, including by receiving a flat commission from CAC for the sale, which is approximately $385 for VSC.

123.    CAC also assigns ratings to dealers through its dealer rating system. The rating that CAC assigns to each affiliated dealer affects the CAC Payment that CAC will offer to the dealer in a transaction—the better the dealer's rating, the higher the CAC Payment.

124.    And CAC tells its affiliated dealers that selling add-on products is an important part of managing the dealer's rating and can help protect the dealer's rating.

125.    When a dealer inputs a borrower's information into CAC's software, CAC calculates the borrower's score and uses the score to calculate how much the dealer would make if the dealer sold each vehicle on its lot to that particular borrower. The dealer sees a screen like the one below (but often listing many vehicles).

| Portfolio Program | | Ancillary Products | | Payment Informat |
|---|---|---|---|---|
| Initial Profit ⌄ | ⓘ Total Profit ⌄ | VSC | GAP | Term ⌄ | Monthly Pmt. ⌄ |
| 🛒 $4,665.00 | $5,287.63 | ✓ | ✓ | 66 | $469.58 |
| 🛒 $3,127.90 | $5,116.51 | ✓ | | 66 | $388.15 |
| 🛒 $2,315.90 | $4,874.35 | | ✓ | 66 | $376.72 |
| 🛒 $1,367.01 | $4,712.81 | | | 66 | $355.37 |
| 🛒 $4,051.82 ← | $4,601.82 | ✓ | ✓ | 60 | $458.38 |
| 🛒 $3,172.17 | $4,552.07 | ✓ | | 60 | $433.35 |
| 🛒 $2,463.77 | $4,450.99 | | ✓ | 60 | $401.05 |
| 🛒 $1,605.31 ← | $4,405.97 | | | 60 | $376.02 |
| 🛒 $4,043.43 | $4,528.24 | ✓ | ✓ | 60 | $427.72 |

126.   In the example above, the final four rows represent four variations of a potential transaction, depending on sales of VSC and GAP. As shown by the red arrow, if the dealer sold neither VSC or GAP, its initial, anticipated profit is displayed by CAC's software as $1,605.31. But if the dealer sold both VSC and GAP, as shown by the green arrow, the initial, anticipated profit is displayed as $4,051.82, a difference of $2,446.[4] While some portion of that increase goes to pay the VSC and GAP costs, the remaining additional profit is the result of a larger CAC Payment and a commission.

127.   Further, CAC tracks the rates at which dealers include add-on products with their loans, and CAC provides those statistics to each of its dealers every month.

*As a result of CAC incentives, dealers frequently trick borrowers into purchasing add-on products for vehicles with CAC loan agreements.*

128.   CAC loan agreements commonly include the add-on products. Indeed, between November 2015 and April 2021, almost 90% of CAC loan agreements nationwide included one or both of the add-on products. And more than 65% of CAC-affiliated dealers included at least

---

[4]   "Total profit," as shown in the screenshot, is a speculative, best case number that is derived, in part, from Dealer Compensation plus the estimated additional payment that CAC may pay the dealer in the future. As alleged above, this additional payment is rarely earned.

one of the VSC or GAP products in more than 90% of CAC loan agreements, with a total of approximately 1.29 million loan agreements made during this period.

129.    Between January 2017 and August 2020, CAC received nationwide more than one-thousand consumer complaints related to add-on products, including complaints that dealers were requiring borrowers to purchase add-on products in order to obtain a CAC loan agreement. CAC also received complaints from borrowers who were unaware that an add-on product was included in their contract and discovered the product only after the transaction was completed.

130.    CAC knew or recklessly disregarded that some of its affiliated dealers told prospective borrowers that add-on products were mandatory to obtain financing. CAC also knew or should have known that some of its affiliated dealers added add-on products to borrowers' contracts without the borrowers' knowledge or consent.

### *CAC makes it easier, not harder, for dealers to trick consumers.*

131.    Despite the control CAC exercises over the purchase process for add-on products, CAC has done very little to remedy the problems of dealers requiring borrowers to purchase add-on products or hiding the add-on products in the financing paperwork.

132.    Indeed, CAC allows its dealers to use e-sign for almost all the loan documents, including the disclosure about add-on products. In 2019, for example, more than 96% of CAC loan agreements nationwide were completed using e-sign. Yet between January 2017 and August 2020, CAC received over 1,700 consumer complaints about the e-sign process, including over 1,100 complaints that the dealer wouldn't allow the borrower to control the mouse.

133.    After the loan documents are e-signed, dealers are supposed to print a copy for the borrower. But from October 2018 to March 2019, CAC received over 800 complaints from borrowers who claimed they did not receive a copy of their loan agreement from the dealer.

134.    Rather than taking steps to prevent the issues underlying these complaints, CAC sometimes makes it difficult for borrowers to cancel add-on products after origination by, among other things, demanding proof that the borrower was told the contract was mandatory.

135.    And CAC has done very little to penalize or reprimand dealers for requiring borrowers to purchase add-on products. Indeed, from 2017 to 2020, at least, CAC did not impose a single financial penalty on any dealer for stating that add-on products were required.

## ADDITIONAL OAG FACTUAL ALLEGATIONS

136.    In support of the state-law claims asserted in the Third, Fourth, Fifth, Sixth, and Eighth Causes of Action, Plaintiff OAG further alleges as follows:

### Additional Facts Concerning CAC Loan Agreement & Dealer Agreement Templates Used in New York.

137.    CAC templates for loan agreements used by the Company and its affiliated dealers in New York expressly define the terms "Us" and "We" to "mean Creditor-Seller [the dealer] and Creditor-Seller's assignee," the latter of which is separately defined as CAC.

138.    Though CAC is defined as the "Creditor-Seller's assignee" on its New York loan agreement, the actual assignment does not take place immediately. Per the terms of these loan agreements, the assignment occurs "pursuant to and in accordance with the terms and conditions set forth in the existing dealer agreement between Seller and Assignee."

139.    The templates for CAC's agreements with affiliated dealers in New York provide that an assignment is not legally effective until "such time as [CAC] receives and approves the related Contract Files" for the loan. As CAC has described in its own public filings: "For legal purposes, a Consumer Loan is considered to have been assigned to us after the following has occurred: [(i)] the consumer and Dealer have signed a Consumer Loan; and [(ii)] we have received the executed Consumer Loan contract and supporting documentation."

140.     Although CAC is defined as the Creditor-Seller's assignee on its New York loan agreements, borrowers' contractual obligations to CAC are immediate. In particular, the New York agreements state that borrowers have "agreed to buy the Vehicle from Us on credit"— meaning from CAC and the dealer—and that borrowers "promise[] to pay Us all amounts due" under the loan agreement. The loan agreements further provide that borrowers "agree[] to pay Us a credit service charge." All other terms and conditions of the loan agreements likewise flow to "Us" and "We"—meaning CAC and the dealer—rather than to a single party.

141.     CAC states in public filings that while it is not the immediate owner of the loan agreement, the borrower is immediately obligated to make payments under that agreement to CAC. Specifically, CAC's 2020 10-K states:

> Although the Dealer is named in the Consumer Loan contract, the Dealer generally does not have legal ownership of the consumer Loan for more than a moment and we, not the Dealer, are listed as lien holder on the vehicle title. Consumers are obligated to make payments on the Consumer Loan directly to us, and any failure to make such payments will result in our pursuing payment through collection efforts.

142.     The provisions of CAC's agreements are unlike those used by typical auto finance companies, which, based on a review by Plaintiff OAG, either (i) name only the dealer as the party to the loan agreement at the outset or (ii) include reference to the party being assigned the contract, but make clear that the assignee's rights are effective only "after assignment."

**Additional Facts Concerning CAC Disclosures on Loan Agreement Templates
Used in New York and New York State Disclosure Laws and Regulations.**

143.     To provide financing in New York, CAC uses a legal mechanism known under New York State law as a "Retail Installment Sale." Retail Installment Sales for motor vehicles are governed by Article 9 of New York's Personal Property Law ("PPL"), known as the New York Motor Vehicle Retail Installment Sales Act, which in turn incorporates the federal Truth in Lending Act ("TILA"), 15 U.S.C. § 1601 *et seq*., and regulations thereunder.

144.     Retail installment sales are secured by a "Retail Installment Contract" or RIC. The RIC is the documentation for CAC loan agreements originated in New York. And under New York law, the RIC must make any and all disclosures required by TILA. PPL § 302(5).

145.     Together, TILA and the PPL are designed to ensure accurate and complete disclosure on the face of the RIC to the prospective borrower of key transaction components.

146.     *First*, the RIC must disclose the total amount that the borrower will pay under the RIC, using the term "total of payments." 12 C.F.R. § 1026.18(h). This is equivalent to the "time sale price" under the PPL, which is defined as the combination of the "cash sale price of the motor vehicle, . . . insurance, official fees and credit service charge." PPL § 301(4). The "total of payments" or "time sale price" is the amount consumers understand is the total sum of money that they will pay over to CAC for the vehicle over the life of the loan agreement.

147.     *Second*, the RIC must disclose the portion of the "total of payments" that is the "amount financed." 12 C.F.R. § 1026.18(b). That amount is calculated by adding the "cash price" of the vehicle to "any other amounts that are financed by the creditor and are not part of the finance charge" and subtracting any down payment. *Id.* § 1026.18(b)(1) & (2). The "amount financed" is the amount that consumers understand to represent the loan principal.

148.     *Third*, the RIC must disclose an itemization of the "amount financed." *Id.* § 1026.18(c). For CAC's RICs in New York, this itemization includes a line item titled "Cash Price (including accessories and improvements to the Vehicle)." Under Article 9-a of the PPL, this disclosed line item represents the "cash sale price," which the PPL defines as "the cash sale price stated in the [RIC] for which the seller would sell to the buyer, and the buyer would buy from the seller, the motor vehicle . . . if the sale were a sale for cash." PPL § 301(6).

149.     *Fourth*, the RIC must disclose the "finance charge," both as a dollar amount and as an annual percentage rate, or APR. 12 C.F.R. § 1026.18(d) & (e). The "finance charge is the cost of consumer credit as a dollar amount"; it includes "any charge . . . incident to or a condition of the extension of credit" but excludes "any charge of a type payable in a comparable cash transaction." *Id*. § 1026.4(a). The New York law analogue is the "credit service charge," which is defined as the amount by which "the time sale price . . . exceeds the aggregate of the cash sale price," insurance and fees. PPL § 301(8). The "finance charge" or "credit service charge" is the amount that consumers understand to represent the interest or cost of credit.

150.     The PPL, by incorporating TILA, requires prominent disclosure on the RIC of the APR, the finance charge, the amount financed, the total of payments, the total sale price, and the payment schedule. Thus, loan agreements generated by CAC's software disclose an APR, finance charge, amount financed and total of payments on the first page of the RIC, and an itemization of the amount financed, including the disclosed "Cash Price (including accessories and improvements to the Vehicle)," on the second page of the RIC.

151.     However, as alleged above, the line item "Cash Price (including accessories and improvements to the Vehicle)" is substantially inflated and reflects markup over reported dealer cost that is out of line with industry norms. As a result, the total cost of the transaction disclosed on the RIC includes a hidden finance charge that should be disclosed as a "credit service charge" on CAC's RICs under the PPL. The RICs, however, do not disclose this amount as a credit service charge but hide it within the amount financed as a hidden finance charge.

152.     Further, because the APR disclosed on the RIC is calculated based on the disclosed amount financed and finance charges, it substantially understates the actual APR. Were the hidden finance charges described above (plus interest thereon) removed from the disclosed

amount financed and added to the disclosed finance charges, the new, accurately calculated APRs would routinely exceed the 25% penal cap and, in some cases, be in excess of 100%.

153.    In addition to disclosures on its loan agreements, as the "holder" of the consumer contracts, CAC is liable for claims and defenses that borrowers could assert against the dealers affiliated with CAC. Relevant language in New York loan agreements states:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

154.    Dealers affiliated with CAC engage in deceptive conduct in New York, including:

a.    Dealers repeatedly engage in high pressure sales practices to induce consumers to purchase vehicles financed by CAC. Dealers rush borrowers through the agreement signing process, providing consumers with insufficient opportunity to review the paperwork or understand the terms of the financing prior to their signing the agreement and are simply directed as to where to sign.

b.    Dealers pressure consumers who do not have the financial means to pay off an auto loan into signing unaffordable loan agreements.

c.    Dealers exert pressure on family and friends to co-sign loans, even when the borrower does not want to have the loan co-signed.

d.    Dealers often conceal the prices of vehicles financed by CAC or fail to disclose pricing information on the body of the vehicle. Instead, dealers tell consumers that the prices of the vehicles are not available because CAC is responsible for determining financials or that they may not pay in cash because CAC needs to earn money off the interest. As a result, consumers often do not receive pricing information until CAC is contacted by the dealer.

e.      Dealers also misrepresent the key financial terms of the purchase, including the cash sale price of the vehicle, the amount financed, the monthly payments, the required down payment, and the interest rates. Consumers often discover the total amount they need to borrow has increased significantly as has the interest rate and the borrower's monthly payments. Thus, the borrower's monthly payment can be double or more than what was represented by the dealer at the outset, as can the actual interest rate.

f.      Dealers push consumers to agree to direct debit payments for their loan agreements that frequently debit twice monthly without any credit for the early payments in the form of reductions in the monthly interest charge.

g.      Dealers also routinely fail to provide consumers with copies of their contracts with CAC, thereby concealing the improper and abusive contract terms. As a result, consumers often first learn the full cost of the vehicle and the stated interest rate only after the contract has been executed and the borrower has left the dealership. Upon receiving the contract in the mail thereafter, borrowers often immediately complain, without success, about being deceived regarding the true cost of the loan agreement.

h.      Finally, the vehicles sold frequently malfunction shortly after purchase, leaving consumers without a functioning vehicle. Consumers often take the vehicle back to the dealer for repairs that never happen, or the vehicle gets repossessed by CAC.

**Additional Facts Concerning CAC's Securitizations Practices.**

155.    CAC violates New York State's Martin Act by engaging in fraudulent and deceptive practices in the issuance, sale, and distribution of securities to the public by (i) repeatedly misrepresenting to investors, initial purchasers, and rating agencies that CAC's lending practices—and the resulting loans themselves—comply with state and federal law; (ii)

failing to disclose same; and (iii) engaging, as alleged above, in deceptive conduct in violation of the CFPA and New York's GBL, Executive Law and Personal Property Law.

156.    From 2015 to 2021, CAC securitized hundreds of millions of dollars in loans for vehicles sold to borrowers by affiliated dealers (the "CAC Securitizations"). For purposes of the Martin Act claim, loans in CAC Securitizations are referred to as "CAC Loans." Securitizing the CAC Loans was a critical part of CAC's business model: by securitizing the loans and selling the resulting notes, CAC not only obtained funding to finance more sales to borrowers, but also received substantial repayment on the loans while offloading risk associated with those loans onto investors that CAC misled. And even on the back-end CAC continued to engorge itself by requiring in the securitization transaction documents that CAC pocket the first six cents on the dollar of every loan repayment collected from borrowers as a servicing fee.

157.    Over the last six years, CAC securitized $7,335,402,000 worth of subprime auto notes. The CAC Securitizations include the following:

| CAC Securitization | Date | Notes | Amount |
|---|---|---|---|
| CAALT 2021-4 | October 19, 2021 | Class A Notes | $175,840,000 |
| | | Class B Notes | $26,337,000 |
| | | Class C Notes | $47,873,000 |
| CAALT 2021-3 | May 11, 2021 | Class A Notes | $330,950,000 |
| | | Class B Notes | $44,770,000 |
| | | Class C Notes | $74,280,000 |
| CAALT 2021-2 | February 9, 2021 | Class A Notes | $354,820,000 |
| | | Class B Notes | $51,880,000 |
| | | Class C Notes | $93,300,000 |
| CAALT 2020-3 | October 16, 2020 | Class A Notes | $428,660,000 |
| | | Class B Notes | $109,510,000 |
| | | Class C Notes | $61,830,000 |
| CAALT 2020-2 | July 15, 2020 | Class A Notes | $326,900,000 |
| | | Class B Notes | $94,400,000 |
| | | Class C Notes | $60,500,000 |

| CAC Securitization | Date | Notes | Amount |
|---|---|---|---|
| CAALT 2020-1 | February 11, 2020 | Class A Notes | $321,300,000 |
| | | Class B Notes | $94,600,000 |
| | | Class C Notes | $84,100,000 |
| CAALT 2019-3 | November 13, 2019 | Class A Notes | $237,500,000 |
| | | Class B Notes | $67,900,000 |
| | | Class C Notes | $46,300,000 |
| CAALT 2019-1 | February 12, 2019 | Class A Notes | $247,200,000 |
| | | Class B Notes | $83,200,000 |
| | | Class C Notes | $72,100,000 |
| CAALT 2018-3 | August 14, 2018 | Class A Notes | $235,500,000 |
| | | Class B Notes | $80,100,000 |
| | | Class C Notes | $82,700,000 |
| CAALT 2018-2 | May 15, 2018 | Class A Notes | $281,200,000 |
| | | Class B Notes | $92,500,000 |
| | | Class C Notes | $76,300,000 |
| CAALT 2018-1 | February 13, 2018 | Class A Notes | $323,000,000 |
| | | Class B Notes | $101,600,000 |
| | | Class C Notes | $75,400,000 |
| CAALT 2017-3 | October 17, 2017 | Class A Notes | $233,600,000 |
| | | Class B Notes | $62,800,000 |
| | | Class C Notes | $53,600,000 |
| CAALT 2017-2 | June 20, 2017 | Class A Notes | $316,400,000 |
| | | Class B Notes | $85,700,000 |
| | | Class C Notes | $47,900,000 |
| CAALT 2017-1 | February 14, 2017 | Class A Notes | $236,000,000 |
| | | Class B Notes | $65,500,000 |
| | | Class C Notes | $48,500,000 |
| CAALT 2016-3 | October 19, 2016 | Class A Notes | $227,500,000 |
| | | Class B Notes | $67,900,000 |
| | | Class C Notes | $54,600,000 |
| CAALT 2016-2 | May 4, 2016 | Class A Notes | $233,180,000 |
| | | Class B Notes | $68,210,000 |
| | | Class C Notes | $48,830,000 |

| CAC Securitization | Date | Notes | Amount |
|---|---|---|---|
| CAALT 2015-2 | August 12, 2015 | Class A Notes | $214,700,000 |
| | | Class B Notes | $66,338,000 |
| | | Class C Notes | $19,194,000 |
| CAALT 2015-1 | January 22, 2015 | Class A Notes | $208,000,000 |
| | | Class B Notes | $62,000,000 |
| | | Class C Notes | $30,600,000 |

***CAC securitizes its high-cost loans and sells the notes to third parties.***

158.    As the first step in the securitization process, CAC sets up two namesake entities: a limited liability company to serve as the "Seller" and a trust to serve as the "Issuer" for the CAC Securitizations. CAC directly owns 100% of the interests in the Seller and the Seller is the sole beneficial owner of the Issuer. CAC then sells its interests in the loans to the Seller and causes the Seller to transfer those interests to the Issuer. These transactions are memorialized by a Sale and Contribution Agreement and a Sale and Servicing Agreement, respectively.

159.    Thereafter, the Issuer sells Class A, B, and C notes (the "Offered Notes"), which are backed by CAC Loans made through affiliated dealers to financial institutions (the "Initial Purchasers"). These transactions are memorialized in an Initial Purchaser Agreement executed at the offices of a law firm on the Avenue of the Americas in New York City.

160.    The Initial Purchasers operate as placement agents, underwriters and bookrunners for the CAC Securitizations. In that role, the Initial Purchasers market and sell the Offered Notes to downstream purchasers (the "Investors"), including investors located in New York, through private placement memoranda ("PPM") that CAC causes the Issuer to prepare.

161.    Before being sold to Investors, the Offered Notes are rated by rating agencies located in New York (the "Rating Agencies"). In general, rating agencies provide opinions about credit risk of the security issuer and its ability and willingness to meet its financial obligations in full and on time. Investment grade ratings indicate a range of opinion from the highest rating,

AAA, which reflects "[e]xtremely strong capacity to meet financial commitments" to the lowest,
BBB, which reflects "[a]dequate capacity to meet financial commitments, but more subject to
adverse economic conditions." Many institutional investors will purchase asset-backed securities
only if a rating agency has rated the securities as investment grade.

162.    All of the Offered Notes identified in paragraph 157 above received investment
grade ratings, with most achieving "AAA" or the equivalent. CAC publishes the expected
investment grade ratings in the PPM and disseminates the PPM, through the Initial Purchasers, to
investors. Investors also were furnished with the Rating Agencies' credit opinions, which set
forth each Rating Agency's rationale for the ratings that it assigned to the Offered Notes.

### CAC materially misrepresented to investors, initial purchasers, and rating agencies that loans in the securitizations complied with applicable law.

163.    CAC misrepresented in the documents it drafted and caused to be furnished to the
Investors, Initial Purchasers and Rating Agencies that the CAC Loans complied with the law.
These representations were disseminated in the course of marketing, selling, and promoting the
Offered Notes and were material to a reasonable Investor, Initial Purchaser, or Rating Agency,
each of whom would consider CAC's assurances of legal compliance to be an important factor in
their decision to purchase the Offered Notes or participate in the securitization process.

164.    The PPMs—which were drafted by CAC and distributed to the Investors, Initial
Purchasers, and Rating Agencies—contained two related and fundamental misrepresentations.
First, in a section titled "Eligibility Criteria," CAC misrepresented that its loans were "created in
material compliance with all applicable requirements of law." Second, CAC misrepresented in
the PPMs that each loan "complies with all requirements of law in all material respects." Both of
these representations were false. In fact, as alleged herein, CAC Loans are made in violation of

the CFPA and New York's GBL, Executive Law and Personal Property Law. The PPMs also did not in any manner disclose that CAC was systematically violating the law.

165.    The documents underlying the securitization—including the Sale and Contribution Agreement, the Sale and Servicing Agreement, and the Initial Purchaser Agreement—repeat the misrepresentation that the consumer loans backing the CAC Securitizations complied with the law. These documents and their representations were specifically referenced in the PPMs and also were given to and considered by the Initial Purchasers and the Rating Agencies.

166.    In the Sales and Contribution Agreement, CAC states that it "will comply in all material respects with all Applicable Laws." CAC further represents that "[t]he consummation of the transactions contemplated by this Agreement and the other Basic Documents" will not "violate any law." And CAC independently represents that each "Eligible Loan," broadly defined, satisfies certain eligibility criteria, including compliance with applicable law.

167.    Separately, the Sales and Servicing Agreement sets forth the eligibility criteria for loans that are selected as collateral for the securitizations. In that document, CAC represents that it will select eligible loans to support the collateral in accordance with that agreement. And CAC further represents that, "at the time of the sale" of interests in the loans to the Issuer, each loan "was created in material compliance with all applicable requirements of law."

168.    The Initial Purchaser Agreement adopts the same eligibility criteria set forth in the Sales and Servicing Agreement; specifically, CAC represents in the Initial Purchaser Agreement that each loan "will meet the eligibility criteria described in the Sale and Servicing Agreement." The Initial Purchaser Agreement likewise represents that CAC's representations and warranties therein, including regarding legal compliance, are true and correct in all material respects.

169.   CAC's representation that the CAC Loans were "created in material compliance with all applicable requirements of law" is specifically referred to in the credit opinions issued by the Rating Agencies, which are disseminated to and reviewed by the Investors.

170.   After the Offered Notes are sold to the Investors, CAC collects monthly payments from borrowers on the underlying loans, and when a borrower fails to repay the loan in full—as CAC internally predicts many will—CAC repossesses vehicles, secures deficiency judgments and garnishes the wages of defaulting borrowers. For its role as servicer of the CAC Securitizations, CAC is paid six percent of collections on the loans as a servicing fee, which constitutes a priority payment to be collected before payments are distributed to the Investors.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION – CFPB & OAG
### 12 U.S.C. § 5531 (CFPA) (Deceptive Practices)

171.   Plaintiffs repeat and reallege the allegations in the preceding paragraphs.

172.   The CFPA grants authority to Plaintiff CFPB to bring civil actions to seek legal and equitable relief for violations of the CFPA, 12 U.S.C. § 5564(a), and further empowers state attorneys general to bring civil actions to enforce federal consumer laws against any company offering consumer financial products or services. 12 U.S.C. § 5552(a)(1).

173.   The CFPA prohibits covered persons or service providers from committing or engaging in a deceptive, unfair, or abusive act or practice under federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. § 5531(a). An act or practice is deceptive if it involves a material misrepresentation or omission that is likely to mislead consumers acting reasonably under the circumstances. Information is material to consumers if it is likely to affect a consumer's conduct regarding the product or service in question.

174.    CAC is offering a "consumer financial product or service"; CAC purchases, acquires and services loans and CAC collects debt. The Company therefore is a "covered person" within the meaning of the CFPA. 12 U.S.C. § 5481(5), (6), 15(A)(i) & 15(A)(x).

175.    CAC routinely generated CAC loan agreements that misstated key terms, including but not limited to the true principal, finance charge and true cost of the credit. By allowing and incentivizing dealers to sell vehicles at inflated prices, CAC misled borrowers as to the cost of credit of their loans while charging consumers substantially more than the stated APR. And the magnitude of that hidden cost of credit generally increased as borrower credit risk increased. This hidden cost applied only to financing customers, not cash buyers.

176.    Consumers reasonably believed the stated terms of the financing set forth on the face of the CAC loan agreements, including the disclosed selling price, amount financed, and finance charges, were accurately described. Consumers had no way of knowing that the loan agreements included a hidden price or that the selling price of the vehicle and amount financed were effectively inflated. CAC's hiding of the true cost of credit for its loan agreements prevented borrowers from comparing alternatives or seeking better financing terms.

177.    The terms set forth in CAC loan agreements were material to consumers' decision to enter into those loan agreements.

178.    CAC therefore has engaged in deceptive acts in connection with an offer or extension of credit in violation of the CFPA. 12 U.S.C. §§ 5531, 5536.

### SECOND CAUSE OF ACTION – CFPB & OAG
### 12 U.S.C. § 5531 (CFPA) (Abusive Practices)

179.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs above.

180.    The CFPA grants authority to Plaintiff CFPB to bring civil actions to seek legal and equitable relief for violations of the CFPA, 12 U.S.C. § 5564(a), and further empowers state

attorneys general to bring civil actions to enforce federal consumer laws against any company offering consumer financial products or services. 12 U.S.C. § 5552(a)(1).

181.    The CFPA prohibits covered persons or service providers from committing or engaging in a deceptive, unfair, or abusive act or practice under federal law in connection with any transaction with a consumer for a consumer financial product or service, or the offering of a consumer financial product or service. 12 U.S.C. § 5531(a). An act or practice is abusive if it "takes unreasonable advantage" of "a lack of understanding on the part of the consumer of the material risks, costs, or conditions of the product or service" or "takes unreasonable advantage" of "the inability of a consumer to protect the interests of the consumer in selecting or using a consumer financial product or service." 12 U.S.C. §§ 5531(d)(2)(A)–(B).

182.    CAC is offering a "consumer financial product or service;" CAC purchases, acquires and services loans and CAC collects debt. The Company therefore is a "covered person" within the meaning of the CFPA. 12 U.S.C. § 5481(5), (6), 15(A)(i) & 15(A)(x).

183.    CAC took unreasonable advantage of consumers' lack of understanding about: (i) the costs of the loans, which CAC obscured by hiding part of the cost of credit in the amount financed, (ii) the magnitude of the harm that would result upon default, and (iii) the risk of defaulting and suffering negative consequences as a result. CAC also took unreasonable advantage of consumers' inability to protect their own interests in selecting or using CAC's loans.  Consumers with lower-scoring loans were particularly affected by CAC's practices.

184.    CAC allowed and incentivized dealers to increase the disclosed selling price of vehicles it financed, hiding part of the loan cost from consumers. Borrowers thus promised to pay much more to CAC than the net amount the dealers received upfront for the deal. In doing so, CAC took unreasonable advantage of this lack of understanding and consumers' inability to

protect their interests and profited from loans that borrowers may not have taken out if they had understood the actual costs of the loan. And for borrowers in states with interest rate caps, such as New York, the hidden finance charge obscured the cost of credit, such that borrowers ended up in costlier, and therefore riskier, loans than what may have been available.

185.    By making loans that included artificially inflated amounts financed, CAC also took unreasonable advantage of consumers' lack of understanding of the magnitude of harm that would result upon default and their inability to protect their interests in avoiding these consequences. In reality, consumers were purchasing vehicles worth substantially less than the vehicles would fetch in a refinancing, resale, or when repossessed and sold at auction, leading to more severe consequences at default.

186.    In using a lending model that is indifferent to whether consumers are unable to repay their loans in full and end up in default, CAC took unreasonable advantage of consumers' lack of understanding of the risk of default, and the magnitude of harm in the event of default, as well as consumers' inability to protect their interests in selecting or using CAC's loans:

a.    CAC used its extensive data set, including the score and historical loan outcomes from other consumers who received loans from CAC, to predict expected net collections and ensure its profits. The score generated by CAC's data and algorithms predicted that a significant number of its borrowers, particularly consumers with lower-scoring loans, would be unable to pay their loans in full.

b.    CAC did not use the score to conduct an individualized ability-to-pay analysis for its borrowers, nor did CAC seek additional information in order to do so, but instead used the score to ensure that, even when consumers defaulted, it could still profit based on what it could collect after default. Because CAC set up its lending model to offset its risks so that it makes

almost as much money (and in some cases even more) if the borrower defaults, CAC had little incentive to make loans that borrowers would be able to repay in full.

      c.      Despite indifference to consumers' ability to repay loans in full, CAC encouraged dealers to gain borrowers' trust and presented its loans as a pathway to "financial freedom." CAC also represented to consumers that financing vehicles with CAC and making on-time payments would result in a consumer improving her credit and financial well-being, thereby conveying that CAC's loans were safe and borrowers likely would be able to repay them in full.

      187.     CAC therefore has engaged in abusive acts in connection with an offer or extension of credit in violation of the CFPA. 12 U.S.C. §§ 5531, 5536.

### THIRD CAUSE OF ACTION – OAG
### Executive Law § 63(12) (Fraud)

      188.     Plaintiff OAG repeats and realleges the allegations in the preceding paragraphs.

      189.     New York's Executive Law § 63(12) authorizes Plaintiff OAG to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent fraud in the carrying on, conducting, or transacting of business in the state of New York.

      190.     Executive Law § 63(12) defines fraud as "any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions."

      191.     CAC has repeatedly engaged in repeated fraudulent acts and practices in violation of Executive Law § 63(12) against borrowers in New York through its subprime auto loan origination, servicing and collection practices. These repeated fraudulent acts and practices include but are not limited to:

          a.     Misrepresenting key terms of the auto loans provided to consumers, including but not limited to the true principal amount, the true finance charge and the true interest rate;

b.  Misrepresenting that financing vehicles with CAC would result in consumers improving their credit scores when in fact many consumers were likely to fail to repay their loans and harm their credit score;

c.  Failing to disclose that CAC's algorithms and the score had forecast projected collections far below the total amounts owed under the loan agreement and potentially included in that projection amounts collected through late fees, repossession and wage garnishment;

d.  Charging ongoing interest rates that significantly exceed the rates set forth in the consumer's loan agreement; and

e.  Misrepresenting the true cash price of the vehicle.

192.  Further, CAC has repeatedly engaged in repeated fraudulent acts and practices in violation of Executive Law § 63(12) against borrowers in New York by using unconscionable loan agreements that conceal the true interest rate, charge interest rates that exceed New York's criminal interest rate caps and misstate other key terms of the parties' financing agreement.

193.  In addition, CAC has repeatedly engaged in repeated fraudulent acts and practices by making misrepresentations in PPMs, Sales and Contribution Agreements, Sales and Servicer Agreements, and Initial Purchaser Agreements used in the issuance and sale of securities that CAC's loans complied with all applicable law and failing to disclose that they did not.

194.  Finally, as the holder of consumer contracts, CAC also is responsible for the fraudulent acts and practices of its partner dealers, including but not limited to:

a.  Adding on vehicle service contracts without the knowledge or consent of consumers;

b.  Misrepresenting that vehicle service contracts were required to purchase a vehicle and requiring that dealers include vehicle service contracts even where not agreed to by the consumer; and

c.  Selling vehicles that malfunction shortly after purchase.

195.  CAC therefore has engaged in repeated and persistent fraudulent conduct in violation of Executive Law § 63(12).

## FOURTH CAUSE OF ACTION – OAG
### Executive Law § 63(12) (Illegality) (N.Y. GBL § 349)

196. Plaintiff OAG repeats and realleges the allegations in the preceding paragraphs.

197. New York's Executive Law § 63(12) authorizes Plaintiff OAG to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent illegality in the carrying on, conducting, or transacting of business in the state of New York.

198. New York's General Business Law prohibits deceptive acts and practices in the conduct of any business, trade, or commerce in the state of New York. GBL § 349(a).

199. CAC has repeatedly and persistently engaged in deceptive acts and practices in violation of the General Business Law against borrowers in New York through its subprime auto loan origination, servicing and collection practices. These deceptive acts and practices include but are not limited to:

    a. Misrepresenting key terms of the auto loans provided to consumers, including but not limited to the true principal amount, the true finance charge and the true interest rate;

    b. Misrepresenting that financing vehicles with CAC would result in consumers improving their credit scores when in fact many consumers were likely to fail to repay their loans and harm their credit score;

    c. Failing to disclose that CAC's algorithms and the score had forecast projected collections far below the total amounts owed under the loan agreement and potentially included in that projection amounts collected through late fees, repossession and wage garnishment;

    d. Charging ongoing interest rates that significantly exceed the rates set forth in the consumer's loan agreement; and

    e. Misrepresenting the true cash price of the vehicle.

200. In addition, as the holder of consumer contracts, CAC also is responsible for the deceptive acts and practices of its partner dealers, including but not limited to:

    a. Adding on vehicle service contracts without the knowledge or consent of consumers;

    b.     Misrepresenting that vehicle service contracts were required to purchase a vehicle and requiring that dealers include vehicle service contracts even where not agreed to by the consumer; and

    c.     Selling vehicles that malfunction shortly after purchase.

201.    CAC therefore has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

## FIFTH CAUSE OF ACTION – OAG
## General Business Law § 349 (Deceptive Practices)

202.    Plaintiff OAG repeats and realleges the allegations in the preceding paragraphs.

203.    New York's GBL authorizes Plaintiff OAG, when a person is engaged in or is about to engage in deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in New York, to bring an action on behalf of the People of New York to enjoin such practices and to obtain restitution. GBL § 349(a) & (b).

204.    CAC has engaged in deceptive acts and practices through its subprime auto loan origination, servicing, and collection practices that are likely to mislead a reasonable consumer acting reasonably. These deceptive acts and practices include but are not limited to:

    a.     Misrepresenting key terms of the auto loans provided to consumers, including but not limited to the true principal amount, the true finance charge and the true interest rate;

    b.     Misrepresenting that financing vehicles with CAC would result in consumers improving their credit scores when in fact many consumers were likely to fail to repay their loans and harm their credit score;

    c.     Failing to disclose that CAC's algorithms and the score had forecast projected collections far below the total amounts owed under the loan agreement and potentially included in that projection amounts collected through late fees, repossession and wage garnishment;

    d.     Charging ongoing interest rates that significantly exceed the rates set forth in the consumer's loan agreement; and

    e.     Misrepresenting the true cash price of the vehicle.

205.    In addition, as the holder of consumer contracts, CAC is also responsible for the deceptive acts and practices of its partner dealers, including but not limited to:

a.      Misrepresenting and/or concealing the true sales price of the vehicle and other financial terms;

b.      Misrepresenting that vehicle service contracts were required to purchase a vehicle and requiring that dealers include vehicle service contracts even where not agreed to by the consumer; and

c.      Selling vehicles that malfunction shortly after purchase.

206.    CAC therefore has engaged in deceptive practices in violation of GBL § 349.

### SIXTH CAUSE OF ACTION – OAG
### Executive Law § 63(12) (Illegality) (N.Y. PPL art. 9)

207.    Plaintiff OAG repeats and realleges the allegations in the preceding paragraphs.

208.    New York's Executive Law § 63(12) authorizes Plaintiff OAG to seek injunctive and other equitable relief when any individual or business engages in repeated and persistent illegality in the carrying on, conducting, or transacting of business in the state of New York.

209.    New York's Motor Vehicle Retail Installment Sales Act, PPL art. 9, governs the sale of motor vehicles to a consumer that is payable in more than two installments. PPL § 301(4).

210.    Retail installment sales must be memorialized in a RIC, which is required by law to contain specific and accurate disclosures, included all disclosures that are required by TILA. PPL § 302. The RICs used by CAC, however, do not disclose as part of the credit service charge the difference between the CAC Payment to the dealer and amount financed, despite CAC retaining that amount and that the amount is determined by CAC's assessment of credit risk. Instead, the credit service charge is improperly hidden as part of the stated amount financed.

211.    In addition, the PPL requires a "cash sale price stated in a retail installment contract for which the seller would sell to the buyer, and the buyer would buy from the seller, the motor vehicle . . . if the sale were a sale for cash instead of a retail installment sale." PPL §

301(6). CAC's RIC templates used in New York, however, disclose a "Cash Price (including accessories and improvements to the Vehicle)" that is inflated beyond industry standards and is much higher than the amount dealers would demand in an all-cash transaction. That lower amount, which is the statutory "cash sale price" under the PPL, is comparable to the Dealer Compensation, which is not disclosed on the RICs used by CAC in New York.

212.    CAC has repeatedly violated the PPL by mispresenting key terms of the financing it is providing consumers and failing to disclose the true cost of the credit. Thus, CAC has engaged in repeated and persistent illegal conduct in violation of Executive Law § 63(12).

### SEVENTH CAUSE OF ACTION – CFPB & OAG
### 12 U.S.C. § 5531 (CFPA) (Substantial Assistance)

213.    Plaintiffs repeat and reallege the allegations in the preceding paragraphs above.

214.    The CFPA grants authority to Plaintiff CFPB to bring civil actions to seek legal and equitable relief for violations of the CFPA, 12 U.S.C. § 5564(a), and further empowers state attorneys general to bring civil actions to enforce federal consumer laws against any company offering consumer financial products or services. 12 U.S.C. § 5552(a)(1).

215.    The CFPA prohibits any person from knowingly or recklessly providing substantial assistance to a covered person or service provider who is in violation of the CFPA. 12 U.S.C. § 5531(a)(3). It is a violation of the CFPA for any covered person or service provider to engage in any unfair, deceptive or abusive act or practice. 12 U.S.C. § 5536(a).

216.    CAC is offering a "consumer financial product or service;" CAC purchases, acquires and services loans and CAC collects debt. The Company therefore is a "covered person" within the meaning of the CFPA. 12 U.S.C. § 5481(5), (6), 15(A)(i) & 15(A)(x).

217.    CAC-affiliated dealers are offering a "consumer financial product or service" and therefore are "covered persons" within the meaning of the CFPA. 12 U.S.C. § 5481(5) & (6).

218.     CAC-affiliated dealers provide a material service to the Company by advertising to, negotiating with and facilitating entry into CAC loan agreements by consumers, and therefore are "service providers" within the meaning of the CFPA. 12 U.S.C. § 5481(26).

219.     Dealers affiliated with CAC engage in deceptive acts and practices by misrepresenting the voluntary nature of add-on products. Dealers affiliated with CAC also hide the add-on products in loan paperwork or fail to disclosure to borrowers that add-on products were included in their loan agreements. These acts and practices were deceptive, and dealers that engaged in these acts or practices violated 12 U.S.C. § 5531(a) and 5536(a)(1)(B).

220.     The cost of the add-on products frequently amounts to thousands of dollars and is material to the borrowers' decision to enter into a CAC loan agreement. And CAC effectively controlled all aspects of the purchasing process for add-on products.

221.     CAC provided clear financial incentives to dealers to include add-on products in CAC transactions. CAC also allowed its dealers to use an e-sign system despite numerous consumer complaints indicating that e-signing impaired the consumer's ability to review contractual agreements. And CAC turned a blind eye to trends in consumer complaints regarding dealers who told borrowers that add-on products were required.

222.     Further, while CAC had authority to punish or reprimand dealer behavior, CAC took almost no action designed to do so. And while CAC had the authority to terminate its business relationship with problematic dealers, it did not do so.

223.     Because CAC knew or should have known of the deceptive acts and practices of its affiliated dealers and both failed to adequately correct the behavior and continued to purchase or receive loans from these dealers, CAC knowingly or recklessly substantially assisted its dealers' conduct and therefore has violated the CFPA. 12 U.S.C. §§ 5536(a)(3).

## EIGHTH CAUSE OF ACTION – OAG
### General Business Law §§ 352 *et seq*. (Martin Act Securities Fraud)

224.    Plaintiff OAG repeats and realleges the allegations in the preceding paragraphs.

225.    New York's General Business Law Section 352 *et. seq*. authorizes Plaintiff OAG to seek injunctive and other equitable relief when any individual or business engages in fraud or deceptive practices in or relating to the issuance, sale, purchase or distribution of securities within the state. The statute defines securities broadly to include notes. It also defines fraudulent practices broadly to include any misrepresentation, concealment, suppression or false pretense, or any practice or course of business that operates as a fraud on a purchaser or seller.

226.    CAC violated the Martin Act by engaging in fraudulent and deceptive practices, making false and misleading representations, and omitting to disclose and concealing material information in disclosures it made and caused to be made to the Investors, Initial Purchasers, and Rating Agencies in the course of the issuance and sale of securities in New York and elsewhere. These fraudulent and deceptive practices included, without limitation: (i) making misrepresentations in PPMs, Sales and Contribution Agreements, Sales and Servicer Agreements, and Initial Purchaser Agreements used in the issuance and sale of securities that CAC Loans complied with all applicable law; (ii) engaging in deceptive conduct in violation of the CFPA and New York's GBL, Executive Law and Personal Property Law; and (iii) failing to disclose that the CAC Loans did not comply with all applicable law.

### DEMAND FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court issue an order and judgment pursuant to 12 U.S.C. 5565(a)(2), Executive Law § 63(12) and GBL § 349:

a.    Permanently enjoining Defendant, its agents, trustees, employees, successors, heirs, and assigns; and any other person under their direction or control, whether acting individually or in concert with others, or through any corporate or other entity or device through which one or more of them

57

may now or hereafter act or conduct business, from engaging in the fraudulent and illegal practices alleged herein;

b.      Ordering Defendant to provide an accounting of all consumers for whom Defendant provided financing;

c.      Ordering Defendant to provide restitution and damages to all injured consumers, whether known or unknown, at the time of the decision and order;

d.      Ordering the rescission or reformation of contracts obtained by fraud, misrepresentation or abusive practices;

e.      Ordering Defendant to disgorge all profits from the fraudulent and illegal practices alleged herein;

f.      Directing Defendant, under GBL § 350-d, to pay a civil penalty of $5,000 to the State of New York for each violation of GBL § 349;

g.      Directing Defendant to pay a civil penalty of $1,000,000 per day in which Defendant engaged in conduct that violated 12 U.S.C. § 5301 et seq., pursuant to 12 U.S.C. § 5565(c)(2);

h.      Awarding to Plaintiff OAG, under CPLR 8303(a)(6), costs in the amount of $2,000; and

i.      Granting such other and further relief as the Court deems just and proper.

Dated:      January 4, 2023      Respectfully submitted,

CONSUMER FINANCIAL      LETITIA JAMES
PROTECTION BUREAU      Attorney General of the State of New York

Eric Halperin
*Enforcement Director*      By: */s/ Christopher L. Filburn*
      Christopher L. Filburn
Richa Dasgupta      Assistant Attorney General
*Deputy Enforcement Director*      Bureau of Consumer Frauds & Protection
      28 Liberty Street, 20th Floor
Susan Torres      New York, New York 10005
*Assistant Litigation Deputy*      Tel.: 212.416.8303
      Email: christopher.filburn@ag.ny.gov
*/s/ Vanessa Buchko*
Vanessa Buchko      Of counsel:
Phillip Harris
Amy Mix      Jane M. Azia
*Enforcement Attorneys*      Bureau Chief
Consumer Financial Protection Bureau
1700 G Street, NW      Laura J. Levine
Washington, DC 20552      Deputy Bureau Chief
Telephone (Buchko): 202-295-7246
Telephone (Harris): 202-285-7439
Telephone (Mix): 202-256-1850
Fax: 202-435-7722
E-mail: Vanessa.Buchko@cfpb.gov
E-mail: Phillip.Harris@cfpb.gov
E-mail: Amy.Mix@cfpb.gov