UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | |
|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU and THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | : : : : : |
| Plaintiffs, | :   Case No. 23 Civ. 0038 (JHR) |
| v. | : : |
| CREDIT ACCEPTANCE CORPORATION, | : : |
| Defendant. | : |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x


# MEMORANDUM OF LAW IN SUPPORT OF
## CREDIT ACCEPTANCE CORPORATION'S MOTION TO DISMISS

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP

Patrick G. Rideout
Jeffrey S. Geier
Christopher R. Fredmonski
One Manhattan West
New York, New York 10025
(212) 735-3000

Anand S. Raman (*pro hac vice*)
Darren M. Welch (*pro hac vice*)
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

*Attorneys for Defendant*
*Credit Acceptance Corporation*

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES .............................................................................................. iii

INTRODUCTION ............................................................................................................. 1

FACTUAL ALLEGATIONS ............................................................................................. 6

      A.      Credit Acceptance's Business ............................................................................. 6

      B.      Statutory and Regulatory Background ................................................................ 8

      C.      The Complaint's Exemplar Contract ................................................................ 11

      D.      The Complaint's Allegations ............................................................................ 13

LEGAL STANDARD ...................................................................................................... 14

ARGUMENT .................................................................................................................... 16

I.       THE CFPB'S MAINTENANCE OF THIS ACTION IS UNCONSTITUTIONAL ......... 16

II.     THE COMPLAINT DOES NOT STATE A CLAIM
        FOR DECEPTIVE ACTS OR PRACTICES OR "FRAUD" ........................................... 17

      A.      The Complaint Does Not Allege that Credit Acceptance
             Deceived Consumers About the Cost of Credit in Their Contracts ...................... 18

            1.      The Complaint Does Not Allege that
                   Credit Acceptance Deceived Any Consumers
                   Concerning the Alleged "Hidden Finance Charges" ............................... 18

            2.      The Complaint Fails to Plead Any "Hidden Finance Charges" ................. 20

            3.      TILA Forecloses Liability for Alleged "Hidden Finance Charges" .......... 25

      B.      Credit Acceptance's Marketing Statements Are Not Deceptive ........................... 27

      C.      Credit Acceptance Had No Duty to Disclose the Score ....................................... 28

III.    THE COMPLAINT DOES NOT ALLEGE THAT CREDIT
        ACCEPTANCE ENGAGED IN ANY ABUSIVE ACTS OR PRACTICES .................. 30

      A.      The Complaint Does Not—and Cannot—Allege that Credit Acceptance
             Took Unreasonable Advantage of Consumers' Lack of Understanding .............. 31

            1.      The Complaint Fails to Allege a Lack of Understanding ......................... 31

2. The Complaint Does Not Allege that Credit Acceptance Took Unreasonable Advantage of Consumers' Lack of Understanding.............35

B. Plaintiffs Fail to Allege that Credit Acceptance Took Unreasonable Advantage of Consumers' Inability to Protect Their Own Interests....................38

IV. THE COMPLAINT DOES NOT STATE A CLAIM FOR "SUBSTANTIAL ASSISTANCE" UNDER THE CFPA ........................................38

A. The Complaint Fails to Allege a Primary Violation Under the CFPA .................39

B. The Complaint Does Not Allege that Credit Acceptance Substantially Assisted Any Dealers in Any Alleged Wrongdoing ......................40

1. The Complaint Identifies No "Substantial Assistance" ............................41

2. The Complaint Does Not Allege Knowledge or Recklessness.................42

V. THE NYAG'S ANCILLARY STATE-LAW CLAIMS ALL FAIL................................44

A. New York's Usury Laws Do Not Apply to Retail Installment Sales ...................44

B. The NYAG's MVRISA Claims Fail as a Matter of Law........................................45

C. The NYAG's "Holder Rule" Claims Fail as a Matter of Law ..............................47

1. The NYAG's "Holder Rule" Claims Are Improper .................................48

2. The Complaint Is Devoid of Any Allegations Showing that the NYAG Is Entitled to Relief Under the "Holder Rule"..................49

D. The Complaint Fails to State a Claim Under the Martin Act ...............................50

CONCLUSION......................................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Alexiou v. Brad Benson Mitsubishi*,
    127 F. Supp. 2d 557 (D.N.J. 2000) ...................................................................................47

*Anderson v. Franklin*,
    No. 2:09-cv-11096, 2010 WL 742765 (E.D. Mich. Feb. 26, 2010) ................................37

*Arizona v. United States*,
    567 U.S. 387 (2012)..................................................................................................46, 47

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)............................................................................................. *passim*

*Bradshaw v. SLM Corp.*,
    No. C 12-06376 JSW, 2014 WL 12629968 (N.D. Cal. May 29, 2014)............................37

*California Public Employees' Retirement System v. WorldCom, Inc.*,
    368 F.3d 86 (2d Cir. 2004)..............................................................................................26

*CFPB v. All American Check Cashing, Inc.*,
    33 F.4th 218 (5th Cir. 2022) ...........................................................................................17

*CFPB v. D & D Marketing*,
    No. CV 15-9692 PSG (Ex), 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) ...................43

*CFPB v. Intercept Corp.*,
    No. 3:16-cv-144, 2017 WL 3774379 (D.N.D. Mar. 17, 2017)...................................36, 43

*CFPB v. ITT Educational Services, Inc.*,
    219 F. Supp. 3d 878 (S.D. Ind. 2015) ............................................................................36

*CFPB v. Law Offices of Crystal Moroney, P.C.*,
    No. 20-3471 (2d Cir. filed Oct. 7, 2020) ........................................................................16

*CFPB v. Prime Marketing Holdings, LLC*,
    No. CV 16-07111-BRO (JEMx), 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) ..........15

*CFPB v. RD Legal Funding, LLC*,
    332 F. Supp. 3d 729 (S.D.N.Y. 2018), *amended on other grounds*,
    No. 17-CV-890 (LAP), 2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018),
    *vacated on other grounds*, 828 F. App'x 68 (2d Cir. 2020) ..................................... *passim*

*Community Financial Services Association of America, Ltd. v. CFPB*,
    51 F.4th 616 (5th Cir. 2022), *cert. granted*, No. 22-448, 2023 WL 2227658, *and*
    *cert denied*, No. 22-663, 2023 WL 2227679 (U.S. Feb. 27, 2023) .............................16, 17

*Copley v. Bactolac Pharmaceutical, Inc.*,
  No. 18-CV-575 (FB) (PK), 2021 WL 918313 (E.D.N.Y. Mar. 10, 2021) ......................18

*Das v. WMC Mortgage Corp.*,
  831 F. Supp. 2d 1147 (N.D. Cal. 2011) .............................................................30

*Davis v. HSBC Bank Nev., N.A.*,
  691 F.3d 1152 (9th Cir. 2012) ..........................................................31, 32, 34

*DPWN Holdings (USA), Inc. v . United Air Lines, Inc.*,
  747 F.3d 145 (2d Cir. 2014)...................................................................19

*Elson v. Black*,
  56 F.4th 1002 (5th Cir. 2023) ...............................................................15

*Ellis v. General Motors Acceptance Corp.*,
  160 F.3d 703 (11th Cir. 1998) ..............................................................43

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).........................................................................26

*FEC v. NRA Political Victory Fund*,
  6 F.3d 821 (D.C. Cir. 1993) .................................................................17

*Fink v. Time Warner Cable*,
  810 F. Supp. 2d 633 (S.D.N.Y. 2011).........................................................28

*Ford Motor Credit Co. v. Milhollin*,
  444 U.S. 555 (1980)......................................................................10, 30

*Garcia v. Chrysler Capital LLC*,
  No. 15 Civ. 5949 (ER), 2016 WL 5719792 (S.D.N.Y. Sept. 30, 2016) ...............44, 45, 46

*Glover v. Bob's Discount Furniture, LLC*,
  No. 20-cv-10924 (JGK), 2022 WL 3353454 (S.D.N.Y. Aug. 12, 2022)..........................19

*Green v. Levis Motors, Inc.*,
  179 F.3d 286 (5th Cir. 1999) ...............................................................43

*Greystone Bank v. Samsudeen*,
  No. 11-1162, 2012 WL 13034135 (D.N.J. June 14, 2012)......................................30

*Hayrioglu v. Granite Capital Funding, LLC*,
  794 F. Supp. 2d 405 (E.D.N.Y. July 5, 2011)...............................32, 34, 35, 36

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995).................................................................47

*Irby-Greene v. M.O.R., Inc.*,
    79 F. Supp. 2d 630 (E.D. Va. 2000) .........................................................................24, 25

*In re ITT Educational Services, Inc. Securities & Shareholder Derivatives Litigation*,
    859 F. Supp. 2d 572 (S.D.N.Y. 2012)................................................................................28

*Karakus v. Wells Fargo Bank, N.A.*,
    941 F. Supp. 2d 318 (E.D.N.Y. 2013) ...........................................................32, 34, 35, 37

*Karamath v. U.S. Bank, N.A.*,
    No. 11 CV 1557(NGG)(RML), 2012 WL 4327613 (E.D.N.Y. Aug. 29, 2012),
    *report and recommendation adopted*,
    2012 WL 4327502 (E.D.N.Y. Sept. 20, 2012) ................................................................37

*Kisor v. Wilkie*,
    139 S. Ct. 2400 (2019).....................................................................................................10

*Kruse v. Wells Fargo Home Mortgage, Inc.*,
    383 F.3d 49 (2d Cir. 2004)...............................................................................................32

*Lexmark International, Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014).........................................................................................................36

*Lorenzo v SEC*,
    139 S. Ct. 1094 (2019).....................................................................................................39

*Marino v. Countrywide Financial Corp.*,
    26 F. Supp. 3d 955 (C.D. Cal. 2014) ...............................................................................30

*Matsumura v. Benihana National Corp.*,
    542 F. Supp. 2d 245 (S.D.N.Y. 2008)..............................................................................15

*Matusovsky v. Merrill Lynch*,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002)........................................................................11, 22

*Mayfield v. General Electric Capital Corp.*,
    No. 97 CIV.2786(DAB), 1999 WL 182586 (S.D.N.Y. Mar. 31, 1999) .................9, 25, 26

*Miller v. Wells Fargo Bank, N.A.*,
    994 F. Supp. 2d 542 (S.D.N.Y. 2014)...................................................................... *passim*

*Moss v. BMO Harris Bank, N.A.*,
    258 F. Supp. 3d 289 (E.D.N.Y. 2017) .............................................................................19

*Muncy v. Centex Home Equity Co.*,
    No. 1:14CV00016, 2014 WL 5326436 (W.D. Va. Oct. 20, 2014)....................................37

*Myers v. Moore*,
    326 F.R.D. 50 (S.D.N.Y. 2018) .......................................................................49

*Napoleon v. 5665 Sunrise Highway Corp.*,
    18-CV-05703 (DG) (SIL), 2021 WL 3469991 (E.D.N.Y. July 7, 2021)..........................44

*National Association of Manufacturers v. Department of Defense*,
    138 S. Ct. 617 (2018).............................................................................29

*Natural Resources Defense Council v. Johnson*,
    461 F.3d 164 (2d Cir. 2006).......................................................................6

*Ogbolu v. Trustees of Columbia University*,
    No. 21-CV-1, 697 (JPO), 2022 WL 280934 (S.D.N.Y. Jan. 31, 2022) ...........................49

*Pelman ex rel. Pelman v. McDonald's Corp.*,
    396 F.3d 508 (2d Cir. 2006).......................................................................15

*Pennicott v. JPMorgan Chase Bank, N.A.*,
    21 Civ. 4575 (LGS), 2022 WL 4226025 (S.D.N.Y. Sept. 13, 2022)...............................48

*Pennsylvania v. Think Finance, Inc.*,
    No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016).....................................36

*Pension Benefit Guaranty Corp. ex rel. Saint Vincent Catholic Medical Centers*
    *Retirement Plan v. Morgan Stanley Investment Management Inc.*,
    712 F.3d 705 (2d Cir. 2013)............................................................14, 15, 20, 22

*People ex rel. Cuomo v. Wells Fargo Insurance Services, Inc.*,
    62 A.D.3d 404 (1st Dep't 2009), *aff'd*, 16 N.Y.3d 166 (2011) .................................15

*Pescia v. Auburn Ford-Lincoln Mercury Inc.*,
    68 F. Supp. 2d 1269 (M.D. Ala. 1999) ..........................................................20

*Poulin v. Balise Auto Sales, Inc.*,
    647 F.3d 36 (2d Cir. 2011)....................................................................21, 23, 24

*Pucilowski v. Spotfiy USA, Inc.*,
    21 Civ. 1653, 2022 WL 836797 (S.D.N.Y. Mar. 21, 2022),
    *aff'd*, No. 22-869-cv, 2022 WL 16842926 (2d Cir. Nov. 10, 2022)...............................11

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976)..............................................................................26

*Riviere v. Banner Chevrolet, Inc.*,
    184 F.3d 457 (5th Cir. 1999) .....................................................................9

*Rombach v. Chang*,
        355 F.3d 164 (2d Cir. 2004)......................................................................................15

*Salvate v. Automotive Restyling Concepts, Inc.*,
        Civ. No. 13-2898 ADM/FLN, 2014 WL 6901788 (D. Minn. Dec. 5, 2014)..............40, 42

*Schachter v. Sunrise Senior Living Management, Inc.*,
        No. 3:18-cv-00953 (JAM), 2020 WL 1274601 (D. Conn. Mar. 16, 2020) ......................19

*Securities Industry Association v. FRB*,
        468 U.S. 137 (1984)................................................................................................26

*Seila Law LLC v. CFPB*,
        140 S. Ct. 2183 (2020)..................................................................................10, 16, 17

*In re Sling Media Slingbox Advertising Litigation*,
        202 F. Supp. 3d 352 (S.D.N.Y. 2016)........................................................................28

*Stamm v. Barclays Bank*,
        960 F. Supp. 724 (S.D.N.Y. 1997) ...........................................................................32

*Upton v. Tribilcock*,
        91 U.S. 45 (1875)...................................................................................................32

*Utreras v. Aegis Funding Corp.*,
        No. 13-cv-00291 (DLI)(LB), 2013 WL 789614 (E.D.N.Y. Mar. 1, 2013) ......................37

*Utts v. Bristol-Myers Squibb Co.*,
        226 F. Supp. 3d 166 (S.D.N.Y. 2016).........................................................................49

*Vincent v. Money Store*,
        736 F.3d 88 (2d Cir. 2013)................................................................................. *passim*

*U.S. Department of Navy v. Federal Labor Relations Authority*,
        665 F.3d 1339 (D.C. Cir. 2012) ...........................................................................16, 17

*West Virginia v. EPA*,
        142 S. Ct. 2587 (2022)......................................................................................3, 26, 37

## CONSTITUTIONS AND STATUTES

U.S. Const. art. I, § 9, cl. 7 ...........................................................................................16

12 U.S.C. § 289(a)(3)(B) ...............................................................................................17

12 U.S.C. § 1681a(r)(5) .................................................................................................29

12 U.S.C. § 5481(12) ...........................................................................................10, 26, 29

12 U.S.C. § 5491(a) ........................................................................................10

12 U.S.C. § 5497 ......................................................................................16, 17

12 U.S.C. § 5511(a) ....................................................................................8, 26

12 U.S.C. § 5512(a) ......................................................................................10

12 U.S.C. § 5519 ....................................................................................*passim*

12 U.S.C. § 5531 ....................................................................................*passim*

12 U.S.C. § 5536(a) ....................................................................10, 26, 39, 40

12 U.S.C. § 5552 ............................................................................................11

12 U.S.C. § 5581 ............................................................................................10

12 U.S.C. § 5582(a) ......................................................................................10

15 U.S.C. § 1601(a) ........................................................................................8

15 U.S.C. § 1605(a) ........................................................................................9

15 U.S.C. § 1610(a)(1) ..................................................................................46

15 U.S.C. § 1631(b) ......................................................................................10

15 U.S.C. § 1638(a) ....................................................................................3, 9

15 U.S.C. § 1639c ........................................................................................36

15 U.S.C. § 1641(a) ................................................................................10, 25

15 U.S.C. § 1665e ........................................................................................36

15 U.S.C. § 1681m ........................................................................................29

15 U.S.C. § 7001 ..........................................................................................42

N.Y. Exec. Law § 63(12) ........................................................................18, 48

N.Y. Gen. Bus. Law § 349(b) ......................................................................48

N.Y. Pers. Prop. Law  § 301(3) ....................................................................45

N.Y. Pers. Prop. Law  § 302 ..................................................................45, 46

N.Y. Pers. Prop. Law  § 303(1) ....................................................................44

## RULES AND REGULATIONS

12 C.F.R. § 1022.72(a) ........................................................................................................29

12 C.F.R. § 1022.74(e) ........................................................................................................29

12 C.F.R. § 1022.75(b) ........................................................................................................29

12 C.F.R. § 1026.17(a)(1) ...................................................................................................42

12 C.F.R. § 1026.2(a)(9) ...................................................................................9, 21, 23, 24

12 C.F.R. § 1026.4(a) .....................................................................................................9, 21

12 C.F.R. pt. 1026, supp. I, § 1026.4(a)(2) ................................................................10, 24

16 C.F.R. § 640.3(a) ...........................................................................................................29

16 C.F.R. § 640.5(e) ...........................................................................................................29

16 C.F.R. § 640.6(b)(2) .......................................................................................................29

Designated Transfer Date,
    75 Fed. Reg. 57,252 (Sept. 20, 2010) ...........................................................................10

Duties of Creditors Regarding Risk-Based Pricing Rule,
    86 Fed. Reg. 51,795 (Sept. 17, 2021) ............................................................................30

Payday, Vehicle Title, & Certain High-Cost Installment Loans,
    85 Fed. Reg. 44,382 (July 22, 2020) .............................................................31, 32, 35, 37

Truth in Lending: Official Staff Commentary,
    46 Fed. Reg. 50,288 (Oct. 9, 1981) ...............................................................................10

## OTHER AUTHORITIES

156 Cong. Rec. 13178-79 (2010) ..................................................................................11, 39

Governor's Approval Mem., Bill Jacket, L. 1980, c. 883 ...................................................44

N.Y. Assembly Bill A7866 (May 28, 2015) .......................................................................46

N.Y. Assembly Bill A4619 (Feb. 3, 2017) .........................................................................46

N.Y. Assembly Bill A4856 (Feb. 5, 2019) .........................................................................46

N.Y. Assembly Bill A7585 (May 10, 2019) .......................................................................45

N.Y. Assembly Bill A819 (Jan. 6, 2021) ...........................................................................45

N.Y. Assembly Bill A5997 (Mar. 4, 2021) ...................................................................46

N.Y. Senate Bill S5490A (May 14, 2015) ..................................................................46

N.Y. Senate Bill S5274 (Mar. 20, 2017) ....................................................................46

N.Y. Senate Bill S5947 (May 16, 2019) .....................................................................45

N.Y. Senate Bill S3237 (Jan. 28, 2021) ......................................................................45

Sponsor's Mem., Bill Jacket, L. 1980, c. 883 .............................................................44

CFPB, *Annual Performance Plan and Report, and Budget Overview*, at 8 (Feb. 2023),
    *available at* https://files.consumerfinance.gov/f/documents/cfpb_performance-
    plan-and-report_fy23.pdf. ..............................................................................16

CFPB, *How do I get and keep a good credit score?*,
    https://www.consumerfinance.gov/ask-cfpb/how-do-i-get-and-keep-a-good-
    credit-score-en-318/ .......................................................................................27

CFPB, *What is the difference between a credit report and a credit score?*,
    https://www.consumerfinance.gov/ask-cfpb/what-is-the-difference-between-a-
    credit-report-and-a-credit-score-en-2069/ .....................................................27

## <u>INTRODUCTION</u>

The Consumer Financial Protection Bureau ("CFPB") and Office of the New York Attorney General ("NYAG," collectively, "Plaintiffs"), in an increasingly familiar tack, are using this litigation to sidestep the legislative process and impose sweeping regulatory reform.  In this case, they take aim at the auto finance industry and target Credit Acceptance Corporation ("Credit Acceptance" or the "Company"), a company that offers financing solutions to auto dealers to allow them to sell vehicles to consumers.  The financing Credit Acceptance (and thousands of other similar financing companies) provides is essential to millions of Americans—especially those with poor or non-existent credit—who otherwise would be unable to purchase the cars they need to get to work and take care of their families.

Credit Acceptance is an *indirect* auto finance company.  This means that it does not make loans directly to consumers.  Rather, it pays to acquire retail installment contracts ("Contracts") from approved independent auto dealers ("Dealers") that those Dealers have entered into with their customers for the purchase of vehicles.  Credit Acceptance then services those Contracts. Outside the presence of Credit Acceptance, Dealers and consumers negotiate the material terms of the Contracts—*e.g.*, the vehicle's selling price, the Contract's term and the down payment or trade-in value.  The Company provides software to Dealers to facilitate origination of Contracts based on the information Dealers input about prospective transactions based on interactions with consumers.  However, as an indirect lender, Credit Acceptance has *no contact* with consumers about a vehicle purchase until *after* they finalize the terms of their agreements with Dealers and execute their Contracts, and the Dealers have assigned the Contracts to Credit Acceptance.

Against that backdrop, the Complaint challenges almost two million transactions on the basis that over 12,000 Dealers allegedly charged too much for used cars and sold lawful add-on

products (such as vehicle service contracts) too often.  But the CFPB is statutorily prohibited from regulating the Dealers it alleges set the high prices and sold the add-on products.  So, the Complaint takes aim at Credit Acceptance, one of the Dealers' financing sources, accusing the Company of engaging in repeated "deceptive" and "abusive" acts because the financing it provided to Dealers purportedly "allowed" or "incentivized" them to engage in the complained-of practices.  (*E.g.*, Compl. ¶¶ 175, 221.)  A central problem with Plaintiffs' efforts to hold Credit Acceptance liable for alleged *Dealer* practices, including the disclosures Dealers provide to consumers, is that the Complaint does not allege that Credit Acceptance controls the Dealers or has *any* interaction with consumers deciding whether and on what terms to buy a car.

Plaintiffs are left attempting to invent "deception" or "abuse" based on the conjecture that, before accepting assignment of Contracts, Credit Acceptance should have required Dealers to make different disclosures than the ones they provided, done more to assess consumers' ability to repay their Contracts or investigated the circumstances under which Dealers sold lawful add-on products.  These baseless theories all but ignore the comprehensive state and federal regimes that govern virtually every facet of the auto finance industry, including the federal Truth in Lending Act ("TILA") and its implementing regulation, Regulation Z, which mandate robust disclosures in consumer-credit transactions and clearly identify the parties responsible for making those disclosures—here, the Dealers.  The Complaint conspicuously does not allege that Credit Acceptance violated TILA or any specific mandate of the many other statutes and regulations governing all aspects of its business.  This is because the obligations Plaintiffs seek to impose on Credit Acceptance simply do not exist in the law.

Moreover, Plaintiffs eschew the express limitations on liability that exist under the current legal and regulatory regime—including TILA's limitations on assignee liability—and ask

this Court to use general statutory prohibitions on "deceptive" and "abusive" practices to create a fundamentally different legal framework for indirect auto finance.  In particular, Plaintiffs ask the Court to:  (i) rewrite the existing statutes and regulations governing consumer-credit disclosures; (ii) enact mandatory underwriting guidelines where no legislature has done so; and (iii) impose on assignees of commercial paper an unprecedented and impractical duty of oversight over the business operations of assignors.  But litigation against a private party is not the appropriate mechanism for state and federal executive agencies to resolve their disagreements with policy choices made by their respective legislatures.  *See West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) ("We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies.").[1]  In all events, the Complaint should be dismissed as a matter of law for numerous independent reasons:

*First*, as it relates to the CFPB, its prosecution of this action with unappropriated (and thus unconstitutional) funds is a threshold defect that requires its dismissal.  (*See infra* § I.)

*Second*, the Complaint asserts unprecedented theories of deceptive acts and practices under the Consumer Financial Protection Act of 2010 ("CFPA"), New York General Business Law ("GBL") § 349 and New York Executive Law ("EL") § 63(12).  To ensure that consumers receive meaningful disclosure of credit terms, Contracts must identify the "cash price"—*i.e.*, the price at which the Dealer, in the ordinary course of business, offers to sell a vehicle for cash— and the "finance charge," which is the cost of consumer credit.  *See* 15 U.S.C. § 1638(a). Plaintiffs contend that millions of Contracts assigned to Credit Acceptance were "deceptive" because they reflected a "cash price" equal to the actual vehicle selling price that was negotiated and agreed to by consumers and Dealers instead of a lower "cash price proxy" that Plaintiffs

---

[1] Unless otherwise noted, all emphasis is added and internal citations and quotation marks are omitted.

invented for this litigation.  According to Plaintiffs, the result is a "hidden finance charge" equal to the difference between the amount Credit Acceptance paid Dealers for the right to service the Contracts and the face value of the amount financed by the Contracts—*i.e.*, the "discount."

These deceptive-practices claims fail as a matter of law because:  (i) the Complaint does not (and cannot) allege that Credit Acceptance made any pre-origination statements to consumers whatsoever (much less deceptive ones) concerning the terms of their Contracts; (ii) the Complaint fails to compare Contracts allegedly containing a "hidden finance charge" with *actual, ordinary course* cash transactions, as is required to state a claim; (iii) Plaintiffs do not allege that any Dealer separately imposed the cost of a "discount" on any consumer, as would be required to plead a "hidden finance charge" under TILA and Regulation Z; (iv) adopting Plaintiffs' invented "cash price proxy" would lead to absurd and inconsistent results; and (v) they are foreclosed by TILA's limitations on assignee liability, since a "hidden" finance charge, by definition, cannot be apparent on the face of the assigned documents.  (*See infra* § II(A).)

Grasping for an actual deceptive act or practice, the Complaint attempts to twist beyond recognition the Company's statements that consumers can improve their credit scores with on-time payments.  The Complaint also seeks to create disclosure obligations that do not exist in the law, and asserts that Credit Acceptance deceived consumers because it did not disclose the internal risk assessment that it used to calculate the amounts paid to Dealers for assignment of Contracts—a metric that admittedly has no effect on the terms of consumers' Contracts.  Neither of these tactics supports a cognizable claim.  (*See infra* §§ II(B)-(C).)

*Third*, the Complaint rehashes its theories of "deception" to assert that Credit Acceptance "abused" consumers by taking unreasonable advantage of their supposed inability to understand the terms of their Contracts and avoid the risk of default.  Since Credit Acceptance has *no*

4

*contact* with consumers at the time of their vehicle purchase and plays *no role* in influencing

their purchasing decisions, the entire premise of this abusiveness theory is that consumers do not

read their Contracts and do not understand their finances, and thus should not be responsible for

their own choices.  The law says otherwise.  The Complaint also asserts that Credit Acceptance

took unreasonable advantage of consumers by failing to consider their ability to repay in the

manner *preferred* by Plaintiffs before accepting assignment of a Contract.[2]  Plaintiffs overlook

that, unlike in the mortgage and credit-card industries, no statute or regulation requires auto

finance companies to consider consumers' ability to repay or inquire into their debts and

expenses, much less prescribes a particular method for doing so.  The Court should decline

Plaintiffs' invitation to legislate such a major policy issue from the bench.  (*See infra* § III.)

 *Fourth*, in another effort to circumvent clear limitations on the CFPB's authority,

Plaintiffs attempt to hold Credit Acceptance liable under the CFPA for aiding and abetting

Dealers' alleged deceptive practices concerning add-on products.  Because auto dealers are

expressly exempt from the CFPB's jurisdiction and cannot be primarily liable for any CFPA

violations, there can be no secondary liability as a matter of law.  Even if this core legal defect

could be overlooked, Plaintiffs' aiding-and-abetting claim still would fail because the Complaint

is devoid of factual allegations supporting a plausible inference that: (i) Dealers engaged in the

alleged practices; (ii) the Company sought to bring about such practices; or (iii) acceptance of

assignment of Contracts containing add-on products was an "extreme departure" from the

Company's duty as an assignee, which, under TILA, is expressly limited to examining the face

of the assigned documents for obvious disclosure violations.  (*See infra* § IV.)

 *Fifth*, the NYAG's ancillary state-law claims fail as a matter of law.  The NYAG cannot

---

[2] Plaintiffs acknowledge (but brush aside) that Credit Acceptance requires all income to be verified and will not accept assignment of Contracts if consumers' payment-to-income ratio exceeds a set cap.  (*See* Compl. ¶ 29.)

use its general enforcement authority under EL § 63(12) to rewrite the New York Motor Vehicle Retail Instalment Sales Act ("MVRISA") and impose interest-rate limits that the New York Legislature intentionally removed from the statute more than thirty years ago.  (*See infra* § V(A).)  The NYAG likewise cannot amend the MVRISA through litigation to include new disclosure obligations that the New York Legislature has repeatedly considered but declined to enact—particularly when the NYAG is attempting to create statutory amendments through litigation that would be preempted by TILA.  (*See infra* § V(B).)  Nor can the NYAG step into the shoes of consumers under the so-called "Holder Rule" to hold Credit Acceptance liable for insufficiently pled Dealer practices.  (*See infra* § V(C).)  Finally, the NYAG's efforts to parlay its other claims into one for securities fraud fails with the other claims.  (*See infra* § V(D).)

## FACTUAL ALLEGATIONS[3]

### A.    Credit Acceptance's Business

Credit Acceptance is one of the country's largest publicly traded indirect auto finance companies, and one of many potential financing sources available to auto dealers to facilitate the sale of vehicles to consumers.  (*See* Compl. ¶¶ 22, 32.)  Credit Acceptance's financing programs allow Dealers to sell vehicles to consumers regardless of their credit history.  (*See id.* ¶¶ 22, 29, 91.)  Unlike direct financing, where a consumer obtains a loan directly from a lender and then uses the proceeds to purchase a vehicle, Credit Acceptance does not have direct contact with consumers about the terms of their vehicle purchases or financing.  (*See id.* ¶ 48.)  Rather, Credit Acceptance accepts assignment of Contracts negotiated and entered into between Dealers and their customers, and then services those Contracts.  (*See id.* ¶¶ 34-35, 48.)  Credit Acceptance does not sell cars or make loans directly to consumers.  (*See id.* ¶¶ 22, 48.)

---

[3] The factual allegations in the Complaint are accepted as true solely for purposes of this motion to dismiss.  *See Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).

Assignment of a Contract to Credit Acceptance stems from two distinct transactions.  In the first, the consumer and the Dealer negotiate and agree on the sale price of a vehicle and whether to include an optional add-on product, such as a vehicle service contract ("VSC") or guaranteed asset protection ("GAP"), as well as the terms of financing, with the Dealer financing the consumer's purchase.[4]  (*See id.* ¶¶ 38, 48.)  In the second transaction, the Dealer and Credit Acceptance agree on the terms of assignment of the Contract, including the amount that Credit Acceptance will pay the Dealer at the time of assignment (the "CAC Payment").  (*See id.*)[5]

To facilitate these transactions, Dealers submit application information from potential automobile purchasers through the Company's online Credit Approval Processing System ("CAPS").  (*See id.* ¶¶ 33, 48.)  Based on the information the Dealer inputs into CAPS, including the consumer's personal and financial information and the selling price of the vehicle (*see id.* ¶¶ 34, 47), and subject to the Company's compliance parameters, CAPS provides a range of financing options for Dealers as they negotiate the structure and terms of consumers' Contracts, should a Dealer wish to assign a Contract to Credit Acceptance.  (*See id.* ¶¶ 34, 48.)  If the consumer would like to finance the purchase of an add-on product, the Company provides Dealers with access to pre-approved products.  (*See id.* ¶ 113.)

Based on the information that the Dealer inputs into CAPS and the structure of the proposed transaction (*e.g.*, Contract term, monthly payment, down payment), Credit Acceptance

---

[4] VSCs are agreements to perform or pay for certain mechanical repairs or services.  (*See* Compl. ¶ 113.)  GAP waivers cover the difference between consumers' Contract balances and the amount covered by their primary auto insurance in the event of a total loss due to damage or theft.  (*See id.*)

[5] Although barely acknowledged in the Complaint, the nature of the CAC Payment depends on whether a Contract is assigned to Credit Acceptance under its "Portfolio Program" or its "Purchase Program."  (*See* Compl. ¶ 36.)  For Contracts assigned under the Portfolio Program, the CAC Payment is in the form of an advance of the Dealer's share of net collections, and the Dealer retains the opportunity to receive back-end "earnout" payments once the advance is recovered through net collections.  (*See id.* ¶¶ 36, 94.)  Under the Purchase Program, the CAC Payment is a single cash payment to the Dealer at the time of assignment; Credit Acceptance retains all net collections thereafter.

calculates the CAC Payment using an internal scoring model whose output is the "Score."  (*See id.* ¶¶ 3-4, 26, 34, 37-38, 47-48.)  The Score reflects the Company's estimate at origination of future net collections from all sources on a given Contract based on historical collections from a large population of Contracts with similar characteristics.  (*See id.* ¶¶ 26, 97.)  The Score does not affect the terms of a Contract, and Credit Acceptance does not use the Score to determine whether to approve a consumer's application for financing.  (*See id.* ¶¶ 3, 32.)

Once the consumer and the Dealer agree on Contract terms that are acceptable to each—subject to the Company's funding standards (*see id.* ¶¶ 29, 57)—CAPS generates the form documents and "any required disclosures" from the information entered by the Dealer in CAPS.  (*Id.* ¶ 52; *see also id.* ¶¶ 33-34, 47-48.)  After the consumer and the Dealer execute the Contract, the Dealer assigns it to the Company, which collects amounts due from the consumer.  (*See id.* ¶ 74.)  For liquidity, Credit Acceptance securitizes certain expected collections from Contracts for sale to institutional and accredited investors in private offerings.  (*See id.* ¶¶ 158-60.)

**B.**     <u>**Statutory and Regulatory Background**</u>

Comprehensive state and federal regimes govern virtually every facet of the auto finance industry.  The CFPB is constrained by the existing federal regimes, and must enforce these laws "consistently" and in a way that "ensure[s] that all consumers have access to markets for consumer financial products and services."  12 U.S.C. § 5511(a).  As relevant here, TILA and its implementing regulation, Regulation Z, govern consumer credit disclosures.  *See Vincent v. Money Store*, 736 F.3d 88, 105 (2d Cir. 2013).  Congress enacted TILA to "assure a meaningful disclosure of credit terms" and allow a consumer to "be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  15 U.S.C. § 1601(a).

**TILA's disclosure requirements.**  In connection with the sale of a vehicle on credit,

TILA requires an auto dealer[6] to disclose, *inter alia*, the (i) "amount financed," (ii) "finance charge," both as a dollar figure and an annual percentage rate, (iii) "total payments" equal to the sum of the amount financed and the finance charge, and (iv) "total sale price" of the vehicle, equal to the "cash price" of the vehicle, plus additional charges and the finance charge.  15 U.S.C. § 1638(a).  These terms have defined meanings, which Plaintiffs cannot alter in this case:

"Amount financed" is equal to (i) the "cash price" of the vehicle, plus (ii) authorized taxes and fees, plus (iii) the cost of any add-on product, less (iv) any consumer down payment and any trade-in value for the consumer's previous vehicle.  *See id.* § 1638(a)(2)(A).

"Cash price" is the price at which a dealer, "in the ordinary course of business, offers to sell" the vehicle for cash.  12 C.F.R. § 1026.2(a)(9).[7]

"Finance charge" is "the cost of consumer credit."  *Id.* § 1026.4(a).  It includes any charge "imposed directly or indirectly by the [dealer] as an incident to the extension of credit," 15 U.S.C. § 1605(a), or as "a condition of the extension of credit."  12 C.F.R. § 1026.4(a).  "It does not include any charge of a type payable in a comparable cash transaction."  *Id.*  According to the official interpretation of Regulation Z, "[c]harges absorbed by the [dealer] as a cost of doing business are not finance charges, even though the [dealer] may take such costs into consideration in determining the interest rate to be charged or the cash price of the property or

---

[6] TILA's obligations extend only to "creditors."  15 U.S.C. § 1638(a).  "TILA establishes a straightforward, objective inquiry for determining the identity of the creditor:  it is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness."  *Vincent*, 736 F.3d at 106 (quoting 15 U.S.C. § 1602(g)); *see also Riviere v. Banner Chevrolet, Inc.*, 184 F.3d 457, 461 (5th Cir. 1999) (car dealer to whom loan obligation was initially payable was the sole creditor even though loan was immediately assigned to a finance company); *Mayfield v. Gen. Elec. Cap. Corp.*, No. 97 CIV. 2786(DAB), 1999 WL 182586, at *3 (S.D.N.Y. Mar. 31, 1999) (finance company assignee was not a "creditor" under TILA).  The Complaint does not (and cannot) allege that Credit Acceptance is a "creditor" under TILA.

[7] Plaintiffs rely on a definition of "cash price" that does not exist in law.  They attempt to read out the terms "offers to sell" and "ordinary course of business" from this definition and re-define "cash price" as the minimum amount of money the Dealer purportedly "*would require*" to "sell a particular vehicle, on a particular day, to a particular borrower, and under particular market conditions."  (Compl. ¶ 35.)

service sold." 12 C.F.R. pt. 1026, supp. I, § 1026.4(a)(2).[8]  In that connection, "[a] discount imposed on a credit obligation when it is assigned by a [dealer] to another party is not a finance charge so long as the discount is not separately imposed on the consumer."  *Id.* § 1026.4(a)(2)(i).

**Limits on assignee liability.**  Because "creditors" (here, Dealers) are solely responsible for making the required disclosures, *see* 15 U.S.C. § 1631(b), TILA "imposes general liability only on creditors and greatly circumscribes the liability of assignees" for disclosure-related issues. *Vincent*, 736 F.3d at 105.  TILA allows the imposition of liability on an assignee, such as Credit Acceptance, only if a disclosure violation "is apparent on the face of the disclosure statement" or "other documents assigned."  15 U.S.C. § 1641(a).

**Enforcement powers and limitations.**  Through the CFPA, Congress created the CFPB and transferred to it the administration of TILA (along with 17 other existing federal statutes). *See* 12 U.S.C. §§ 5491(a), 5512(a), 5481(12).  Congress also enacted a new prohibition on "any unfair, deceptive, or abusive act or practice" by certain participants in the consumer-finance sector.  *Id.* § 5536.  Congress authorized the CFPB to implement that broad standard (and the 18 preexisting statutes placed under its purview) through binding regulations, *see id.* §§ 5531(b), 5581, and "vested the CFPB with potent enforcement powers."  *Seila Law LLC v. CFPB*, 140 S. Ct. 2183, 2193 (2020).  At the same time, the CFPA expressly excludes auto dealers from the CFPB's "rulemaking, supervisory, [and] enforcement" authority.  12 U.S.C. § 5519(a).  The legislative history reveals that "[t]he purpose of [this exclusion] was to protect third party auto

---

[8] The official interpretations of Regulation Z should be dispositive here.  *See Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 565 (1980); *see also generally Kisor v. Wilkie*, 139 S. Ct. 2400, 2414-18 (2019) (discussing framework for deference to agency interpretations of regulations).  This interpretation of Regulation Z has remained unchanged since it was initially adopted by the Federal Reserve Board in 1981, *see* Truth in Lending; Official Staff Commentary, 46 Fed. Reg. 50,288, 50,298 (Oct. 9, 1981) (codified at 12 C.F.R. pt. 227, supp. I, § 226.4(a)(2)), including after oversight for TILA and Regulation Z was transferred to the CFPB pursuant to the CFPA, effective July 21, 2011.  *See* 12 U.S.C. §§ 5512(a), 5481(12)(O), 5582(a); Designated Transfer Date, 75 Fed. Reg. 57,252 (Sept. 20, 2010).  Thus, even if the CFPB's funding structure is unconstitutional (*see infra* § I), this official interpretation of Regulation Z is still good law because it was initially promulgated by the Federal Reserve Board.

financing" and "preserve a variety of auto financing choices for consumers."  156 Cong. Rec.

13178 (2010) (statement of Sen. Brownback); *see also id.* at 13178-79 (expressing concern that,

without the auto dealer exemption, the CFPB would "engage in regulatory overreach that will

hurt our economy," including by "abolish[ing]" third-party auto financing).  Auto dealers remain

subject to federal oversight from the Federal Trade Commission ("FTC") and Federal Reserve

Board, including with respect to TILA.  *See* 12 U.S.C. § 5519(c).[9]

## C.  **The Complaint's Exemplar Contract**

The Complaint relies extensively on the Contract between Ms. B and a Michigan Dealer,

entered into more than seven years ago.  (*See* Ex. A.)[10]  As reflected in Ms. B's Contract, after

she selected a gray 2009 Pontiac G6 sedan on the Dealer's lot, Ms. B and the Dealer agreed to a

sale price of $8,195.  (*See id.* at 2.)  Ms. B also agreed to purchase a VSC for $1,631.  (*See id.* at

1-2.)  Ms. B made a $2,250 down payment towards her vehicle purchase, and agreed with the

Dealer to finance the balance:  $8,292.10 after taxes and fees.  (*See id.* at 1-2.)  Ms. B and the

Dealer agreed to a 51-month Contract term and a 23.99 annual percentage rate.  (*See id.* at 1.)

Based on the information that the Dealer input into CAPS, CAPS generated the form transaction

documents for the Dealer, including, among other things:  (1) a five-page retail installment

contract ("RIC") containing the terms of Ms. B's vehicle purchase; (2) her VSC; (3) a one-page

---

[9] Congress also authorized state attorneys general to bring civil actions under the CFPA after consultation with the CFPB.  *See* 12 U.S.C. § 5552(a)(1), (b)(1)(A).

[10] Exhibit A is attached to the Declaration of Patrick G. Rideout, dated March 14, 2023, filed contemporaneously herewith.  In ruling on a motion to dismiss, the Court "may consider documents attached to the complaint as exhibits, or incorporated by reference, as well as any documents that are integral to, or explicitly referenced in, the pleading." *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (citing *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991)); *see also Pucilowski v. Spotify USA, Inc.*, No. 21 Civ. 1653 (ER), 2022 WL 836797, at *3 (S.D.N.Y. Mar. 21, 2022) (considering agreement that was "central" to plaintiff's allegations, and thus "sufficiently integral to the complaint," "even if not incorporated by reference" (citing *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991)), *aff'd*, No. 22-869-cv, 2022 WL 16842926 (2d Cir. Nov. 10, 2022).  Ms. B's Contract is incorporated by reference in, integral to and explicitly referenced throughout the Complaint.  (*See* Compl. ¶¶ 27, 31, 42, 61-62, 82.)

"disclosure form" with additional acknowledgments; and (4) her hand-signed acknowledgment that she consented e-sign her transaction documents.  Credit Acceptance ultimately agreed to accept assignment and make an initial payment to the Dealer of $5,614, reflecting a $2,678 discount from the stated amount financed.  (*See* Compl. ¶ 61.)

The front page of Ms. B's RIC prominently includes the following TILA disclosure:

| TRUTH IN LENDING DISCLOSURES | | | | |
|---|---|---|---|---|
| **ANNUAL PERCENTAGE RATE** The cost of Your credit as a yearly rate. | **FINANCE CHARGE** The dollar amount the credit will cost You. | Amount Financed The amount of credit provided to You or on Your behalf. | Total of Payments The amount You will have paid after You have made all payments as scheduled. | Total Sale Price The total cost of Your purchase on credit, including Your down payment of |
| 23.99 % | $ 5,009.21 | $ 8,292.10 | $ 13,301.31 | $ 2,250.00 is $ 15,551.31 |

| Payment Schedule: Your payment schedule will be: | | |
|---|---|---|
| No. of Payments | Amount of Payments | When Payments Are Due |
| 51 | $ 260.81 | March 12, 2016   and same date of each following month. |

(*Id.* ¶ 27; Ex. A at 1.)  The second page includes an itemization of her $8,292.10 amount financed, including the agreed sale price of her car ($8,195.00), the cost of her VSC ($1,631.00) and applicable taxes and fees ($716.10), less her down payment ($2,250.00).  (*See* Ex. A at 2.)

Ms. B acknowledged in the "**OPTIONAL EXTENDED WARRANTY OR SERVICE CONTRACT**" section of her RIC that she was "not required to purchase" her VSC as a condition of buying her Pontiac G6 on credit, and confirmed that she "voluntarily elect[ed] to buy" the VSC to "cover[] the repair of certain major mechanical breakdowns . . . and related expenses."  (*Id.* at 1)  Ms. B again acknowledged in bold font that "**[t]he purchase of this Vehicle Service Contract is NOT a requirement to purchase or obtain financing**."  (*Id.* at 6.) The VSC is *always cancellable*, including for a full refund within the first thirty days.  (*Id.* at 8.)

And in the disclosure form selectively quoted in the Complaint (*see* Compl. ¶ 42), Ms. B made several acknowledgments relevant to the Complaint's claims:

> I understand that the price of the vehicle is the price which is set forth in the Contract and that I personally negotiated this price with the [Dealer].  . . . I further

represent that the [Dealer] did not quote me a lower cash price for the vehicle and that *the [Dealer] did not increase the price of the vehicle because I was purchasing the vehicle on credit* or because the Contract would be assigned to Credit Acceptance.

. . .

I understand that Credit Acceptance and the [Dealer] have an agreement that provides that *Credit Acceptance will pay the [Dealer] a portion of the amount I actually owe under the Contract and that this amount is sometimes referred to as a "discount."* . . . I understand that the [Dealer's] agreement with Credit Acceptance does not in any way affect the amount of my obligation under the Contract as I purchased [my car] on terms acceptable to me with full and complete knowledge that Credit Acceptance will advance to the [Dealer] only a portion of the amount I have actually agreed to pay and that Credit Acceptance will retain the "discount."

If the purchase of the vehicle includes [add-on] products, such as a service contract . . . , I understand that *I am not required to purchase these goods and services in order to buy the car on credit* . . . .

(Ex. A at 14.)  On the same form, the Dealer represented that it "explained the information" in the form to Ms. B "and that it has no knowledge, information or belief that would cause [it] to believe that any of [Ms. B's] representations . . . are inaccurate or incomplete."  (*Id.*)

After reviewing the terms of her Contract, including the risk of repossession and a collection action if she did not timely make the stated monthly payments (*see id.* at 3-4), Ms. B executed the Contract, paid the Dealer $2,250 in cash and drove her Pontiac G6 off the lot.

## D.    The Complaint's Allegations

The Complaint alleges that, despite not being a party to, and playing no role in, the negotiation of the Contracts voluntarily entered into between Dealers and their customers, Credit Acceptance "obscur[es] the cost of credit for auto loans and tak[es] unreasonable advantage of consumers' lack of understanding of the risk of default and the severity of the consequences," and "enter[s] into unconscionable contractual terms."  (Compl. ¶¶ 11-12.)  Even after separate, multi-year investigations, Plaintiffs are incapable of alleging facts that actually support those contentions.  Indeed, other than attacking interest rates that Plaintiffs concede are *legal* (*see id.*

13

¶ 2),[11] the Complaint makes plain that Plaintiffs are attempting to regulate *Dealer* practices *en masse* through litigation against a financing source—undoubtedly because Dealers are exempt from regulation under the CFPA.  *See* 12 U.S.C. § 5519(a).  The crux of the Complaint is that:

- *Dealers* "sell cars at inflated prices" (Compl. ¶ 4; *see also id.* ¶¶ 39, 175, 184);

- *Dealers* "hide . . . add-on products in [Contract] paperwork" and "fail to disclose [sic] to [consumers] that add-on products were included in their" Contracts (*id.* ¶ 219; *see also id.* ¶¶ 7, 129, 194, 200, 205, 221); and

- *Dealers* "[s]ell[] vehicles that malfunction shortly after purchase" (*id.* ¶¶ 194, 200, 205).

The Complaint does not allege that Dealers engaged in these practices as Credit Acceptance's agents or as part of a conspiracy with Credit Acceptance.  And, as set forth below, Plaintiffs' unsupportable claims against Credit Acceptance are contrary to well-settled law.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  "[T]his standard creates a 'two-pronged approach.'"  *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013).  First, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations."  *Iqbal*, 556 U.S. at 679.  A pleading that "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" will not suffice.  *Id.* at 678.  The Court need not "accept as true a legal conclusion couched as a factual allegation."  *Id.*

Second, a complaint must plead facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.*  "Importantly, the complaint must demonstrate 'more than a sheer possibility that a defendant has acted

---

[11] To get around this critical fact, the Complaint posits an alternative method for calculating finance charges that is irreconcilable with TILA and Regulation Z.  (*See* Compl. ¶¶ 34-35, 59-60; *infra* § II(A)(2)(b).)

unlawfully.'" *Pension Ben. Guar. Corp.*, 712 F.3d at 718.  If the pleaded facts "do not permit

the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it

has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed.

R. Civ. P. 8(a)(2)).  "Determining whether a complaint states a plausible claim for relief is a

context-specific task that requires the reviewing court to draw on its judicial experience and

common sense." *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (cleaned up).

      Although the Complaint fails even under Rule 8(a), it should be subject to Rule 9(b)

because its allegations "sound in fraud," *Rombach v. Chang*, 355 F.3d 164, 170-71 (2d Cir.

2004), including, in particular, those surrounding Plaintiffs' "hidden finance charge" theories of

deception under the CFPA and "fraud" under EL § 63(12).  (*See* Compl. ¶¶ 11-12, 175-76, 183-

84, 191-193, 199, 204, 212, 219, 226.)  *See also Matsumura v. Benihana Nat'l Corp.*, 542 F.

Supp. 2d 245, 251 (S.D.N.Y. 2008) (collecting cases).  Courts have applied heightened pleading

standards to claims like those asserted in the Complaint where proper.  *See CFPB v. Prime Mktg.

Holdings, LLC*, No. CV 16-07111-BRO (JEMx), 2016 WL 10516097, at *5 (C.D. Cal. Nov. 15,

2016) (applying Rule 9(b) to CFPA claims); *see also Elson v. Black*, 56 F.4th 1002, 1008 (5th

Cir. 2023) (applying Rule 9(b) to GBL § 349 claim); *People ex rel. Cuomo v. Wells Fargo Ins.

Servs., Inc.*, 62 A.D.3d 404, 405 (1st Dep't 2009) (failure to plead "fraud" under EL § 63(12)

with "particularity"), *aff'd*, 16 N.Y.3d 166 (2011); *but see Pelman ex rel. Pelman v. McDonald's

Corp.*, 396 F.3d 508, 511 (2d Cir. 2006) (holding that Rule 8(a) applies to GBL § 349 claims).[12]

---

[12] To be sure, courts have declined to apply Rule 9(b) to claims like those asserted in the Complaint, relying on the fact that the elements of the claims asserted differed from those of common law fraud.  *See, e.g.*, *Pelman*, 396 F.3d at 511; *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 768-69 (S.D.N.Y. 2018) (CFPA, GBL § 349 and EL § 63(12)), *amended on other grounds*, No. 17-CV-890 (LAP), 2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018), *vacated on other grounds*, 828 F. App'x 68 (2d Cir. 2020).  These cases, however, are inconsistent with *Rombach* insofar as the allegations in those cases sounded in fraud (as they do here).  *See Rombach*, 355 F.3d at 170-71. Indeed, *Rombach* held that Rule 9(b) "is cast in terms of the *conduct alleged*, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  *Id.* at 171.

## ARGUMENT

**I.  THE CFPB'S MAINTENANCE OF THIS ACTION IS UNCONSTITUTIONAL**

The CFPB should be dismissed from this action because its "self-actualizing, perpetual funding mechanism" is unconstitutional. *Cmty. Fin. Servs. Ass'n of Am. Ltd. v. CFPB*, 51 F.4th 616, 638, 641-42 (5th Cir. 2022) ("*CFSA*"), *cert. granted*, No. 22-448, 2023 WL 2227658 (Feb. 27, 2023).[13]  The Appropriations Clause of the United States Constitution commands that "[n]o money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. CONST. art. I, § 9, cl. 7.  Through this clause, "the Framers 'carefully separate[d] the "purse" from the "sword" by assigning to Congress and Congress alone the power of the purse.'" *CFSA*, 51 F.4th at 635.  "The Appropriations Clause is thus a bulwark of the Constitution's separation of powers among the three branches of the National Government." *U.S. Dep't of Navy v. Fed. Labor Rels. Auth.*, 665 F.3d 1339, 1347 (D.C. Cir. 2012) (Kavanaugh, J.).

Notwithstanding the "Appropriations Clause's 'straightforward and explicit command'" that Congress retain "*exclusive* power over the federal purse," *CFSA*, 51 F.4th at 637 (quoting *OPM v. Richmond*, 496 U.S. 414, 424 (1990)), the CFPB does not rely on annual appropriations for funding. *See* 12 U.S.C. § 5497(a).  Instead, each year, the CFPB can directly requisition from the Federal Reserve up to twelve percent of the Federal Reserve's "total operating expenses"— up to $750.9 million this year alone.[14] *Id.* § 5497(a)(1)-(2).  Making matters worse, the Federal Reserve "is itself funded outside the appropriations process through bank assessments," *Seila Law*, 140 S. Ct. at 2194, such that the CFPB is "double-insulated" from Congress's purse strings. *CFSA*, 51 F.4th at 640.  And unlike the Federal Reserve, which is required to remit surplus funds

---

[13] In addition to pending Supreme Court review, the issue is *sub judice* in the Second Circuit.  *See CFPB v. Law Offices of Crystal Moroney, P.C.*, No. 20-3471 (2d Cir., argued Jan. 18, 2022).

[14] *See* CFPB, *Annual Performance Plan and Report, and Budget Overview*, at 8 (Feb. 2023), *available at* https://files.consumerfinance.gov/f/documents/cfpb_performance-plan-and-report_fy23.pdf.

to the Treasury, *see* 12 U.S.C. § 289(a)(3)(B), the CFPB "may 'roll over' the self-determined

funds it draws *ad infinitum*," effectively creating a "permanently available" endowment "without

any further act of Congress."  *CFSA*, 51 F.4th at 639 (citing 12 U.S.C. § 5497(b)(1), (c)(1)).

 Not only is the CFPB's perpetual, self-funding mechanism outside the appropriations

process, but Congress also relinquished its power to review the CFPB's funding.  *See* 12 U.S.C.

§ 5497(a)(2)(C), (c)(2).  And now that the CFPB's Director is removable at the President's

pleasure, *see Seila Law*, 140 S. Ct. at 2192, the "purse" and the "sword" are completely unified

in the President's hands—"an abomination the Framers warned would destroy that division of

powers on which political liberty is founded."  *CFSA*, 51 F.4th at 640; *accord Seila Law*, 140 S.

Ct. at 2204; *U.S. Dep't of Navy*, 665 F.3d at 1347.  Since the CFPB is prosecuting this case

through an "improper use of unappropriated funds" in violation of the Appropriations Clause and

separation of powers, it should be dismissed as a party.  *CFSA*, 51 F.4th at 643; *accord CFPB v.

All Am. Check Cashing, Inc.*, 33 F.4th 218, 241 (5th Cir. 2022) (en banc) (Jones, J., concurring).

*See also FEC v. NRA Pol. Victory Fund*, 6 F.3d 821, 822 (D.C. Cir. 1993) (FEC lacked authority

to bring enforcement action because its composition violated separation of powers).

## II. THE COMPLAINT DOES NOT STATE A CLAIM  FOR DECEPTIVE ACTS OR PRACTICES OR "FRAUD"

 In the Complaint, Plaintiffs go to great lengths to cast lawful business conduct as

deceptive acts or practices under the CFPA and GBL § 349 and "fraud" under EL § 63(12).  "To

make out a *prima facie* case of deceptive acts or practices under the CFPA, the Complaint must

allege adequately '(1) a representation, omission or practice that, (2) is likely to mislead

consumers acting reasonably under the circumstances, and (3) that the representation, omission

or practice is material.'"  *RD Legal Funding*, 332 F. Supp. 3d at 772-73.  GBL § 349 requires

similar allegations.  *See Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 557 (S.D.N.Y.

2014) (collecting cases).  "Fraud" is defined in EL § 63(12) as "deception, misrepresentation, concealment, suppression, false pretense [or] false promise."  EL § 63(12).  As demonstrated below, the Complaint fails to allege that Credit Acceptance engaged in any deceptive acts or practices or "fraud" in violation of any of the above-enumerated statutes.

## A.      The Complaint Does Not Allege that Credit Acceptance Deceived Consumers About the Cost of Credit in Their Contracts

The Complaint asserts an unprecedented theory of consumer deception, whereby an indirect finance company violates the law if its "business model" "allow[s]" or "incentivizes" third parties (Dealers) to sell cars at prices Plaintiffs believe are too high.  (Compl. ¶¶ 2, 4, 175-76.)  Based on the allegedly "inflated" vehicle sale prices negotiated between Dealers and their customers, the Complaint asserts that *Credit Acceptance* "hid[]" the "true cost of credit" from consumers, and thus "misled" them as to the material terms of their Contracts.  (*Id.* ¶¶ 175-76.)  As shown below, the Complaint's theory of deception fails as a matter of law for at least three reasons.  Thus, Count I should be dismissed, as should Counts III, IV and V insofar as they are based on an alleged (i) failure to disclose the "true finance charge" or (ii) charging of interest in excess of the disclosed rate.  (*See id.* ¶¶ 175-76, 191(a), (c)-(d), 199(a), (c)-(d), 204(a), (c)-(d).)

### 1.      The Complaint Does Not Allege that Credit Acceptance Deceived Any Consumers Concerning the Alleged "Hidden Finance Charges"

First, the Complaint does not allege that Credit Acceptance made any misrepresentations or omissions to any consumer about the terms of any Contract.  *See RD Legal Funding*, 332 F. Supp. 3d at 772-73; *Miller*, 994 F. Supp. 2d at 557; EL § 63(12).  In fact, the Complaint does not even allege that Credit Acceptance had *any pre-assignment contact* with any consumer in connection with any of the approximately two million Contracts purportedly at issue in this case.  Courts routinely dismiss deceptive-practices claims under analogous circumstances.  *See, e.g.*, *Copley v. Bactolac Pharm., Inc.*, No. 18-CV-575 (FB) (PK), 2021 WL 918313, at *2 (E.D.N.Y.

Mar. 10, 2021) ("no contact at all between" consumers and defendant); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 309 (E.D.N.Y. 2017) (complaint did "not assert any contact between defendant or plaintiff whatsoever").

The Complaint cannot overcome this glaring deficiency by cursorily asserting that Credit Acceptance "controls each material aspect of the vehicle financing process for consumers" and "allow[s] and incentivize[s] dealers to sell vehicles at inflated prices." (Compl. ¶¶ 46, 175.) Conclusory allegations of "control" or "influence" over third-party actions through monetary "incentives" are insufficient to state a claim. *Schachter v. Sunrise Senior Living Mgmt., Inc.*, No. 3:18-cv-00953 (JAM), 2020 WL 1274601, at *5 (D. Conn. Mar. 16, 2020); *see also Glover v. Bob's Disc. Furniture, LLC*, No. 20-cv-10924 (JGK), 2022 WL 3353454, at *6-7 (S.D.N.Y. Aug. 12, 2022) ("entirely conclusory" allegations of mere "incentives to misrepresent the scope" of furniture protection plan were insufficient to state a claim).

Moreover, the Complaint's general assertion that Credit Acceptance "controls each material aspect" of the consumer transaction process (Compl. ¶ 46) is contradicted by the Complaint's more specific allegations showing that independent, third-party *Dealers*—not Credit Acceptance—maintain this control. *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*, 747 F.3d 145, 151-52 (2d Cir. 2014) (court may not accept as true "general allegations that are contradicted 'by the more specific allegations in the Complaint'"). The Complaint alleges that *Dealers* set the "cash prices" of the vehicles on their lots, communicate those prices to consumers and negotiate the terms of sale. (*See* Compl. ¶¶ 38-39, 46-48.) The Complaint also alleges that "the amount of the down payment, the length of the [Contract] term, the selling price of the vehicle, and whether an add-on product will be included in the transaction" are all input into CAPS *by the Dealer* after negotiating with the consumer. (*Id.* ¶ 48.) It is these material

inputs that CAPS uses to generate the form Contract documents.  (*See id.* ¶¶ 48, 51.)

What is left is the Company's performance of simple, "mechanical" math and generation

of form documents "behind the scenes" (*id.* ¶¶ 48, 67 n.2), neither of which can plausibly

deceive consumers or cause them injury.  *See Miller*, 994 F. Supp. 2d at 557 ("The plaintiff must

show that the *defendant's* material deceptive act caused the injury."); *see also Pension Ben.

Guar. Corp.*, 712 F.3d at 717-18 ("[T]he plaintiff must plead facts 'allow[ing] the court to draw

the reasonable inference that the *defendant* is liable for the misconduct alleged.'").[15]

### 2.    The Complaint Fails to Plead Any "Hidden Finance Charges"

Second, Plaintiffs' claims fail because they do not allege any facts supporting a plausible

inference that any Contract contained a "hidden finance charge."  Instead, Plaintiffs attempt to

circumvent their pleading burden by conjuring a "cash price proxy" theory of liability that is

foreclosed by both controlling Second Circuit precedent and the governing federal regulations.

### *(a)    The Complaint Does Not Allege Purchase Price Discrimination Based on Credit Status*

The gravamen of Plaintiffs' "hidden finance charge" claims is that millions of consumers

should have been told by Credit Acceptance that the selling prices they negotiated with

independent, third-party Dealers would have been lower if they had paid cash for their vehicles.

But Plaintiffs have not alleged actual facts, as they must, showing that any Dealer charged one of

these consumers a higher "cash price" for a vehicle *because* he or she financed the purchase.  As

discussed above (*see supra* at 9-10), a "finance charge" is "the cost of consumer credit"; it does

---

[15] The Complaint does not (and cannot) allege an agency relationship between Credit Acceptance and any Dealer to attribute the alleged deceptive practices to Credit Acceptance.  The fact that a finance company "tell[s] the dealer the terms of assignment that it will accept" is "not sufficient control to establish agency," particularly when the finance company does not control how the dealer "decides to sell its automobiles" or the "offer and acceptance process between the dealer and the consumer."  *Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F. Supp. 2d 1269, 1282-83 (M.D. Ala. 1999), *aff'd*, 31 F. App'x 202 (11th Cir. 2001).  This is true even when the dealer "used forms provided by" and "received instructions about how to fill out the forms from" the finance company and had access to the finance company's computer.  *Id.* at 1282.

not include any charge payable in a "comparable cash transaction."  12 C.F.R. § 1026.4(a).  To

state a claim that a car dealer has "bur[ied] hidden finance charges" in vehicle sale prices, a

complaint must allege "purchase price discrimination based on credit status."  *Poulin v. Balise*

*Auto Sales, Inc.*, 647 F.3d 36, 40 (2d Cir. 2011).  This requires factual allegations showing that

the dealer charged credit customers higher "cash" prices than it would have charged cash

customers in the ordinary course of business for the same or similar merchandise "*only because*

*they are buying on credit.*"  *Id.*; *see also* 12 C.F.R. § 1026.2(a)(9) (definition of "cash price").

Here, not one of the Complaint's 226 paragraphs contains a factual allegation showing

that any of the 12,000 Dealers implicated in this case engaged in purchase price discrimination

based on credit status in any of the 1.9 million transactions ostensibly at issue.  (*See* Compl.

¶¶ 22-23.)  For example, with respect to "Ms. B's" Contract, Plaintiffs do not allege that the

Dealer advertised or offered to cash purchasers a sale price less than $8,195 for the 2009 Pontiac

G6 sold to Ms. B, or that the Dealer sold cars of the same vintage and condition for different

prices to cash buyers.  To the contrary, Ms. B's Contract, which the Complaint incorporates by

reference (*see supra* note 10), provides:  (i) the "cash price" of Ms. B's 2009 Pontiac G6 "is the

price which is set forth in the Contract"; (ii) she "personally negotiated this price" with the

Dealer; (iii) the Dealer "did not quote [her] a lower cash price for the vehicle"; and (iv) the

Dealer "did not increase the price of the vehicle because [she] was purchasing the vehicle on

credit or because the Contract would be assigned to Credit Acceptance."  (Ex. A at 14.)

The Complaint cannot overcome its failure to plead purchase price discrimination based

on credit status through conclusory averments that Credit Acceptance "incentivizes" Dealers to

"hid[e] an additional cost of credit in the principal amount financed" and that "[t]his hidden cost

appli[es] only to financing customers, not cash buyers."  (Compl. ¶¶ 2, 4, 175.)  "The relevant

pleading standards do not permit such general accusations of imprudence, unsupported by well-pleaded factual allegations." *Pension Ben. Guar. Corp.*, 712 F.3d at 724.[16]

   **(b)** *A "Cash Price Proxy" Is No Substitute for Factual Allegations*
     *Showing Purchase Price Discrimination Based on Credit Status*

   Unable to allege any actual credit-based price discrimination, the Complaint invents a

new test for pleading "hidden finance charges" that focuses on what indirect finance companies

paid to dealers to acquire and service Contracts pursuant to business-to-business arrangements.

Plaintiffs assert that the negotiated cash prices reflected on the face of the Contracts assigned to

Credit Acceptance should have been replaced by a "proxy for the true cash-purchase price" equal

to the sum of (i) the CAC Payment and (ii) any down payment or trade-in value received from

the consumer.  (Compl. ¶¶ 34-35, 59.)  The Complaint then asserts that a "hidden finance

charge" exists whenever the total cost to the consumer reflected in a Contract (*i.e.*, the sum of the

negotiated "cash price" for the vehicle, the cost of any add-on product and applicable taxes and

fees)[17] exceeds the amounts received by the Dealer.  (*See id.*)  Thus, Plaintiffs' theory is that a

"hidden finance charge" exists whenever the CAC Payment is less than the "amount financed"

by the consumer—*i.e.*, whenever the Company (or any indirect finance company) accepts

assignment of a Contract at a discount.  Ms. B's Contract is illustrative:



---

[16] Allegations that are contradicted by a document incorporated by reference in a complaint, like Ms. B's Contract (*see* Ex. A at 14), "are insufficient to defeat a motion to dismiss."  *Matusovsky*, 186 F. Supp. 2d at 400.

[17] This amount is also equal to the sum of the down payment, any trade-in value and the amount financed.  (*See* Compl. ¶¶ 60-62; Ex. A at 2.)  The Complaint refers to this amount variably as "the total disclosed cost of the CAC-financed transaction (minus interest)" and "the amount a CAC-financed purchaser pays."  (Compl. ¶¶ 60, 63.)

Plaintiffs' attempt to plead "hidden finance charges" based on their "cash price proxy" fails for at least two independent reasons. First, it is foreclosed by controlling authority. In *Poulin*, the Second Circuit rejected a similar effort to plead "hidden finance charges" by reference to a supposed "fair proxy" for vehicle cash prices: the market values listed in an industry guide. *Poulin*, 647 F.3d at 40. The court held that the complaint failed to state a claim because it "contain[ed] no information about the price charged to cash purchasers of automobiles of the same vintage as those purchased by plaintiffs," and thus alleged, at most, a "bad bargain." *Id.* Likewise here, the Complaint's "cash price proxy" fails because it shows only that consumers agreed to purchase vehicles at prices above what Plaintiffs contend a Dealer *should* have sold the vehicles for (*see* Compl. ¶¶ 35, 59)—*no matter the price for which any Dealer actually "offer[ed] to sell" a vehicle to a cash buyer "in the ordinary course of business."* 12 C.F.R. § 1026.2(a)(9) (definition of "cash price").[18] Similarly, the Complaint's attempt to suggest that Contracts include "hidden finance charges" because "the median markup of the disclosed selling price of the vehicle[s]"[19] is "more than is typical in the used-car industry" (Compl. ¶¶ 55-56) is precisely what *Poulin* rejected as insufficient. *Poulin*, 647 F.3d at 40.

Second, Plaintiffs' theory that a "hidden finance charge" exists whenever a finance company acquires a contract for less than the "amount financed" by the consumer—*i.e.*, at a "discount"—is contrary to settled law. The official interpretation of Regulation Z is clear that a discount on the amount financed is not a finance charge unless it is "separately imposed" on a

---

[18] Indeed, the Complaint says nothing about a different "cash price" that was offered to a consumer in the ordinary course of business, and, instead, attempts to reinvent the definition of "cash price" in Regulation Z based on a post-hoc analysis of amounts received by the Dealer from its financing source and the customer (in the form of a down payment and/or trade-in value). The sum is allegedly the minimum amount that the Dealer "required" to sell the vehicle "on a particular day, to a particular borrower, and under particular market conditions." (Compl. ¶ 35.)

[19] The Complaint erroneously interchanges the concepts of "markup" and "profit margin," which are very different metrics. (*See* Compl. ¶ 56.)

particular consumer in a specific transaction.  12 C.F.R. pt. 1026, supp. I, § 1026.4(a)(2).  Thus,

a complaint must allege facts showing that a dealer "separately imposed" the cost of the discount

on a consumer by charging the consumer "a higher price than the price charged to a cash

customer."  *Irby-Greene v. M.O.R., Inc.*, 79 F. Supp. 2d 630, 633 (E.D. Va. 2000) (citing *Walker*

*v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 932 (7th Cir. 1998)).[20]  But the Complaint does not

allege any facts showing that any Dealer increased the "cash price" of any of the millions of cars

at issue specifically to cover the cost of a discount in any transaction.  (*See supra* § II(A)(2)(a).)

Not only would replacing the clear and straightforward dictates of TILA and Regulation

Z with Plaintiffs' invented "cash price proxy" contravene established law, but it also would be

impossible to implement and lead to absurd outcomes.  For one, adoption of Plaintiffs' theory

would require the federal courts to make *post hoc* normative judgments about what vehicles

*should* cost based on a dealer's financing arrangements rather than assess what prices Dealers

actually offered to cash buyers in the ordinary course of business.  Thus, disclosure-based

liability could result solely from a federal court's determination that a consumer's vehicle

purchase was a "bad bargain"—an outcome the Second Circuit has rejected.  *Poulin*, 647 F.3d at

40.  Moreover, Plaintiffs' unprecedented theory would result in "cash prices" that depend on a

consumer's creditworthiness.[21]  Putting aside that this result is illogical, it would yield TILA

disclosures that violate TILA, as well as endless circularity, since the CAC Payment on which

Plaintiffs' "cash price" is not determined until a Dealer inputs a consumer's information into

---

[20] The court noted in *Irby-Greene* that "[r]etail installment contracts are regularly assigned to assignees at a discount, especially when the buyer 'represents an increased credit risk.'"  *Irby-Greene*, 79 F. Supp. 2d at 631 n.2 (citing Thomas B. Hudson *et al.*, *Indirect Auto Fin. Dealer Comp. Litig.*, 54 Bus. Law 1301, 1307 (1999)).

[21] Plaintiffs' "cash price proxy" is based on the CAC Payment (*see* Compl. ¶ 59), which the Complaint alleges is contingent on the consumer's creditworthiness (*see id.* ¶¶ 3-4).  Thus, according to Plaintiffs' invented proxy, the "cash price" is based on the consumers' creditworthiness, rather than the price at which a Dealer, "in the ordinary course of business, offers to sell [a] vehicle for cash."  12 C.F.R. § 1026.2(a)(9).

CAPS along with the vehicle's cash price.  (*See id.* ¶¶ 34-35.)  Plaintiffs also provide no

explanation for what happens to the "cash price" and the purported legality of a Contract's

disclosures if a Dealer receives additional "earnout" payments in the future.  (*See id.* ¶¶ 36, 94.)

### 3.     TILA Forecloses Liability for Alleged "Hidden Finance Charges"

Next, even if the Complaint sufficiently alleges deception based on any "hidden finance

charge" (it does not), its credit-disclosure-based claims are foreclosed by TILA's well-

established limitations on assignee liability.  *See* 15 U.S.C. § 1641(a); *Vincent*, 736 F.3d at 105-

09.  As shown above (*see supra* at 8-11), TILA governs consumer credit disclosures.  TILA

"greatly circumscribes the liability of assignees" for credit-disclosure violations, *Vincent* 736

F.3d at 105, limiting liability to violations that are "apparent on the face of the disclosure

statement" and "other documents assigned."  15 U.S.C. § 1641(a).

"An assignee's sole duty under TILA is to examine the assigned documents for any

irregularities or illegalities, even if the assignee has knowledge that a creditor's contracting

practices may otherwise violate TILA."  *Irby-Greene*, 79 F. Supp. 2d at 633; *see also Mayfield*,

1999 WL 182586, at *4 ("An assignee's general knowledge of a dealer's practices does not

create a facially apparent violation." (collecting cases)).  Thus, "unless the contract itself reflects

that the cash price was increased to cover the cost of [a] discount," there is no assignee liability

under TILA for alleged "hidden finance charges."  *Irby-Greene*, 79 F. Supp. 2d at 634.[22]

The Complaint does not (and cannot) allege that any of the purported "hidden finance

charges" are apparent on the face of any of the documents assigned to the Company—otherwise

they would not be "hidden."  Instead, the Complaint suggests that Credit Acceptance *should have*

---

[22] In aptly describing TILA's limitations on assignee liability as "sensible," the *Irby-Greene* court explained that "a duty to inquire beyond the assigned documents would impede commerce" because "assignees are not in a position to know whether a given price was set in violation of TILA, as assignees often are not present at the transaction" and "do not participate in the negotiation."  *Irby-Greene*, 79 F. Supp. 2d at 634 n.12.

*known* about them because its business model "allow[s]" or "incentivizes dealers to sell cars at inflated prices." (Compl. ¶¶ 4, 175.) This is insufficient as a matter of law, as it "would eliminate the distinction between assignee and creditor liability that is clearly intended by 15 U.S.C. § 1641(a)." *Mayfield*, 1999 WL 182586, at *4; *accord Vincent*, 736 F.3d at 108.

Unsurprisingly, the Complaint conspicuously does not assert a TILA claim. Even so, Plaintiffs cannot circumvent TILA's limitations on assignee liability by artfully pleading their credit-disclosure-based claims under general consumer protection statutes. "[E]nabling legislation is generally not an open book to which [an] agency may add pages and change the plot line." *West Virginia*, 142 S. Ct. at 2609. The CFPA must be interpreted with TILA as "a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). "It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976).

By enacting a general prohibition on "any unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a), Congress did not express a clear intention to repeal TILA's specific limitations on assignee liability for credit-disclosure-based violations. *See Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 102 (2d Cir. 2004) ("clear intention" required to find implied repeal). Quite the contrary. Congress contemporaneously transferred the administration of TILA, including its limitation on assignee liability, to the CFPB, and directed that TILA be enforced "consistently" with the CFPA. 12 U.S.C. §§ 5511(a), 5481(12)(O). Because the Complaint's credit-disclosure-based claims would "frustrate the policy that Congress sought to implement" with TILA, the claims should be dismissed. *Sec. Indus. Ass'n v. FRB*, 468 U.S. 137, 143 (1984); *see also Vincent*, 736 F.3d at 109 (even if TILA's limitations on assignee liability

are "unwise" as a matter of public policy, a court may "not rewrite the text of the statute").[23]

**B.     Credit Acceptance's Marketing Statements Are Not Deceptive**

In addition, the NYAG alleges that Credit Acceptance engaged in deceptive practices and "fraud" by supposedly "[m]isrepresenting that financing vehicles with CAC would result in consumers improving their credit scores."  (Compl. ¶¶ 191(b), 199(b), 204(b).)  It is well-settled that a statement is not deceptive unless it is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Miller*, 994 F. Supp. 2d at 557 (quoting *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995)).

The NYAG cannot state a claim by twisting Credit Acceptance's slogan and marketing statements to say something they do not.  All Credit Acceptance states is that it offers "a *chance*" for consumers to "improve [their] credit" and "move on to more traditional financing"—nothing more.  (Compl. ¶¶ 91-92; *see also id.* ¶ 95 (same).)  Each marketing statement alleged in the Complaint is unequivocally conditional:  *if* a consumer makes on-time payments, *then* they will improve their credit and have more "financial freedom" with access to more traditional credit sources.  (*See id.* ¶¶ 90-95.)[24]  None of these statements could reasonably be read as a promise "that financing vehicles with CAC *would* result in consumers improving their credit scores."  (*Id.* ¶¶ 191(b), 199(b), 204(b).)  And the Complaint cannot allege that Credit Acceptance does not report to the three national credit bureaus or that consumers are unable to improve their credit and move on to more traditional financing if they make timely payments on their Contracts.

---

[23] As shown below (*see infra* § V(B)), any attempt by the NYAG to impose credit-disclosure-based assignee liability under GBL § 349 and EL § 63(12) where none exists under TILA would be preempted.

[24] It is common knowledge that consumers can increase their credit scores by making on-time payments on their debt obligations, and that better credit scores increase credit opportunities.  *See* CFPB, *How do I get and keep a good credit score?*, https://www.consumerfinance.gov/ask-cfpb/how-do-i-get-and-keep-a-good-credit-score-en-318/ (last visited Feb. 5, 2023); CFPB, *What is the difference between a credit report and a credit score?*, https://www.consumerfinance.gov/ask-cfpb/what-is-the-difference-between-a-credit-report-and-a-credit-score-en-2069/ (last visited Feb. 5, 2023).

In any event, Credit Acceptance's trade slogan, "WE CHANGE LIVES," and the purported promises of "financial freedom" (*id.* ¶¶ 90-95) are quintessential inactionable puffery that "do not provide any concrete representations" and thus cannot mislead a reasonable consumer. *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011); *see also In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012) (statement that "[o]ur single internal focus continues to be . . . helping our students improve their lives through high quality . . . education" was "typical corporate puffery").

The Complaint also does not allege that any consumer was injured as a result of any marketing statement—an independent basis for dismissal. *See Miller*, 994 F. Supp. 2d at 557-58 (dismissing claim under GBL § 349 when plaintiff "failed to plead how the[] allegedly deceptive acts or practices caused his alleged injury" because "[t]he causation element is essential"). Accordingly, Counts III, IV and V should be dismissed insofar as they are based on Credit Acceptance's marketing statements and trade slogan. (*See* Compl. ¶¶ 191(b), 199(b), 204(b).)

## C.   Credit Acceptance Had No Duty to Disclose the Score

Finally, the NYAG alleges that Credit Acceptance misled consumers by failing to disclose to them its internal assessment, known as the "Score," which it uses to calculate the CAC Payment to the Dealer. (*See* Compl. ¶¶ 191(c), 199(c), 204(c).)  Under New York law, omissions may be actionable when a business "possesses material information that is relevant *to the consumer* and fails to provide this information." *In re Sling Media Slingbox Advert. Litig.*, 202 F. Supp. 3d 352, 359 (S.D.N.Y. 2016).  Information is "material" to consumers only if it is "likely to affect their choice of, or conduct regarding, a product." *Id.* at 360.

The Complaint lacks any factual allegations to support a plausible inference that the Score has any bearing on a *consumer's* decision to purchase a vehicle or finance that purchase on

the terms set forth in the Contract.  To the contrary, the Complaint alleges that the "[S]core is useful *to the Company*," which uses it "to decide how much to pay its dealers" for assignment of Contracts.  (Compl. ¶¶ 4, 97.)  The Complaint further alleges that the Score does *not* impact (i) the terms of a consumer's Contract (which are negotiated by the Dealer and the consumer), or (ii) whether Credit Acceptance will approve a consumer's credit application.  (*See id.* ¶¶ 3-4.)

In addition, Congress already has enacted a credit-risk disclosure regime through the Fair Credit Reporting Act ("FCRA"), and a creditor's internal business metrics are not part of that regime.  *See* 15 U.S.C. § 1681m.  Under FCRA and its implementing regulations,[25] if a creditor issues less favorable credit terms to a consumer based on the consumer's creditworthiness, as reflected in a consumer credit report (*e.g.*, a FICO score calculated by Experian), the creditor must make certain "risk-based pricing" disclosures.  *See id.* § 1681m(h); 12 C.F.R. § 1022.72(a); 16 C.F.R. § 640.3(a).[26]  Alternatively, the creditor can give a credit score disclosure to *all* consumers, regardless of the terms on which the creditor grants credit, which includes a consumer's credit score and additional general information about credit and credit scores.  *See* 12 C.F.R. § 1022.74(e); 16 C.F.R. § 640.5(e).  None of FCRA's disclosure obligations relate to a finance company assignee's internal credit risk assessments, like the Score, used to facilitate business-to-business transactions.  "Courts are required to give effect to Congress' express inclusions and exclusions."  *Nat'l Ass'n of Mfrs. v. Dep't of Defense*, 138 S. Ct. 617, 631 (2018).

Moreover, the regulations implementing FCRA explicitly provide that assignees of consumer credit contracts are *not* subject to FCRA's credit-risk disclosure requirements.  *See* 12 C.F.R. § 1022.75(b)(2); 16 C.F.R. § 640.6(b)(2).  Indeed, in a recent rulemaking, the FTC made

---

[25] FCRA is another one of the consumer protection statutes within the CFPB's jurisdiction, except with respect to automobile dealers, which fall under the jurisdiction of the FTC.  *See* 12 U.S.C. §§ 5481(12)(F), 5519.

[26] FCRA adopts TILA's definition of "creditor."  *See* 15 U.S.C. § 1681a(r)(5); (*see also supra* note 6).

clear that when a "motor vehicle dealer is the original creditor under a retail installment sales contract," a "finance company, which is an assignee, has *no duty* to provide a risk-based pricing notice to the consumer."  Duties of Creditors Regarding Risk-Based Pricing Rule, 86 Fed. Reg. 51,795, 51,805 (Sept. 17, 2021) (codified at 16 C.F.R. pt. 640).

Consistent with the above, courts routinely hold that financial institutions have no duty to disclose their internal assessments of a consumer's credit risk.  *See, e.g.*, *Marino v. Countrywide Fin. Corp.*, 26 F. Supp. 3d 955, 963 (C.D. Cal. 2014); *Greystone Bank v. Samsudeen*, Civ. No. 11-1162, 2012 WL 13034135, at *7 (D.N.J. June 14, 2012).  This is because a "lender's efforts to determine the creditworthiness . . . [of] a borrower are for the *lender's* protection, not the borrower's."  *Das v. WMC Mortg. Corp.*, 831 F. Supp. 2d 1147, 1161 (N.D. Cal. 2011).  The Court should similarly reject the NYAG's call to rewrite the balance that Congress, the FTC and the CFPB established between "complete disclosure and the need to avoid informational overload" reflected in the governing statutes and regulations, *Ford Motor Credit*, 444 U.S. at 568-69 (cleaned up), and dismiss Counts III, IV and V insofar as they are based on Credit Acceptance's alleged failure to disclose the Score.  (*See* Compl. ¶¶ 191(c), 199(c), 204(c).)

## III.    THE COMPLAINT DOES NOT ALLEGE THAT CREDIT ACCEPTANCE ENGAGED IN ANY ABUSIVE ACTS OR PRACTICES

In Count II, Plaintiffs attempt to repurpose the same allegations underlying their deception-based claims to assert a general "abusiveness" claim.  Congress was clear that "[t]he [CFPB] shall have *no authority* under [the CFPA] to declare an act or practice abusive" unless it "takes unreasonable advantage" of consumers' (A) "lack of understanding . . . of the material risks, costs or conditions" of a consumer financial product, or (B) "inability . . . to protect [their]

interests in selecting or using a consumer financial product."  12 U.S.C. § 5531(d)(2)(A)-(B).[27]

Plaintiffs assert that each of these independent tests for abusiveness has been satisfied because

Credit Acceptance:  (i) purportedly "allowed and incentivized dealers" to "artificially inflate[]"

the "selling price of vehicles it financed," and consumers "promised to pay much more to [Credit

Acceptance] than the net amount the [D]ealers received upfront for the deal"; and (ii) was

supposedly "indifferent to whether consumers are unable to repay" their Contracts, because it did

not disclose the Score to consumers or "use the [S]core to conduct an individualized ability-to-

pay analysis for its borrowers" or "seek additional information" to do so.  (Compl. ¶¶ 184-86.)

As set forth below, Plaintiffs have failed to allege facts that satisfy either prong of the

abusiveness standard for each of their unsupportable and unprecedented theories.  Thus,

Plaintiffs' request to create new law and declare such acts "abusive" should be rejected.

**A.**     **The Complaint Does Not—and Cannot—Allege that Credit Acceptance**
         **Took Unreasonable Advantage of Consumers' Lack of Understanding**

As it relates to Plaintiffs' claim of abusiveness under 12 U.S.C. § 5531(d)(2)(A), the

Complaint fails to allege facts supporting a plausible inference that (i) consumers lacked an

understanding about the material risks, costs or conditions of their Contracts, or (ii) Credit

Acceptance took unreasonable advantage of such an inability to understand.

**1.     The Complaint Fails to Allege a Lack of Understanding**

Whether consumers lack an understanding of the material risks, costs or conditions of

their Contracts turns on "whether the consumers had a free and informed choice."[28]  *Davis v.*

---

[27] The Complaint does not allege that Credit Acceptance took "unreasonable advantage of" consumers' "reasonable reliance" on Credit Acceptance "to act in the[ir] interests."  12 U.S.C. § 5531(d)(2)(C).

[28] The CFPB has determined that this element of abusiveness under 12 U.S.C. § 5531(d)(2)(A) "should be treated as similar to the requisite level of understanding for reasonable avoidability" under 12 U.S.C. § 5531(c)(1), which governs claims for "unfairness."  Payday, Vehicle Title, & Certain High-Cost Installment Loans, 85 Fed. Reg. 44,382, 44,422 (July 22, 2020) ("Payday Rule").  Agency interpretations promulgated pursuant to notice-and-

*HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012); *see also* Payday Rule, 85 Fed. Reg. at 44,395 ("[F]ree and informed consumer choice [i]s the best regulator of the market.").  "[A] reasonable consumer is responsible for reading and familiarizing herself with the terms of an agreement she freely enters into."  *Karakus v. Wells Fargo Bank, N.A.*, 941 F. Supp. 2d 318, 342 (E.D.N.Y. 2013); *see also Stamm v. Barclays Bank*, 960 F. Supp. 724, 731 (S.D.N.Y. 1997) (same); *accord Upton v. Tribilcock*, 91 U.S. 45, 50 (1875).  And a "reasonable consumer" should "know the state of her own finances and whether or not she can afford a certain monthly loan payment."  *Karakus*, 941 F. Supp. 2d at 340; *see also Hayrioglu v. Granite Cap. Funding, LLC*, 794 F. Supp. 2d 405, 412-13 (E.D.N.Y. 2011) (same).

For ordinary financial harms flowing from a consumer's own contractual non-compliance, a claim should be dismissed "if consumers 'have reason to anticipate the impending harm and the means to avoid it.'"  *Davis*, 691 F.3d at 1168-69 (quoting *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365-66 (11th Cir. 1988)).  And, it is "well-established that consumers can reasonably avoid injury through . . . 'anticipatory avoidance'" of an allegedly injurious contract.  Payday Rule, 85 Fed. Reg. at 44,397 (quoting *Orkin*, 849 F.2d at 1365); *see also Davis*, 691 F.3d at 1169 ("check the box" indication of "assent" to credit card terms "provided 'the means to avoid'" alleged injury from annual fee).  Each of Plaintiffs' theories fails.

### (a)   Plaintiffs' "Hidden Finance Charge" Theory Is Fatally Flawed

First, Plaintiffs cannot allege that consumers were deprived "of the ability to make informed decisions" merely because the "cash price" reflected on their Contracts was the selling price they negotiated with Dealers as opposed to the "cash price proxy" invented by Plaintiffs for

---

comment rulemaking are entitled to deference.  *See Kruse v. Wells Fargo Home Mortg., Inc.*, 383 F.3d 49, 58-59 (2d Cir. 2004) (citing *United States v. Mead Corp.*, 533 U.S. 218, 226-27, 230 (2001)).  Even if the CFPB's past actions are unconstitutional (*see supra* § I), the CFPB's rationale for merging the "lack of understanding" and "reasonable avoidability" standards is sound, and should govern here.  *See* Payday Rule, 85 Fed. Reg. at 44,421-42.

this litigation.  (Compl. ¶¶ 87, 184.)  As shown above (*see supra* § II(A)(2)), these "hidden finance charge" allegations fail as a matter of well-settled law.

Moreover, the suggestion that any consumer lacked an understanding as to the "material risks, costs or conditions" of a Contract, 12 U.S.C. § 5531(d)(2)(A), is belied by the Contracts themselves.  Consistent with TILA's express requirements, the Contracts clearly disclosed all of the material risks, costs and conditions of financing, including the (i) Contract term, (ii) monthly payment, (iii) total payments, (iv) security interest and (v) risk of late charges, repossession and sale in the event of nonpayment.  (*See* Compl. ¶ 27; Ex. A at 1-4.)  Plaintiffs do not allege that any Contract failed to reflect the bargain that the consumer struck with the Dealer.

The Complaint fails to allege any plausible reason consumers could not understand their Contracts or their financial situations, or make informed choices as to whether the benefits of owning a vehicle were worth the cost and risk of financing the transactions with their Contracts. Although the Complaint asserts that consumers should have been told how much Credit Acceptance paid to acquire their Contracts in its separate business-to-business arrangement with Dealers (*see* Compl. ¶¶ 63-64, 184), this amount did not impact the terms of their Contracts, and Credit Acceptance was under no obligation to disclose it.  Contracts also disclose that Credit Acceptance acquires them from Dealers at a "discount."  (*See id.* ¶ 42; Ex. A at 14.)

In addition, the suggestion that consumers could not reasonably avoid injury from inflated vehicle prices (*see* Compl. ¶ 175) belies sense.  The Complaint avers that "consumers were purchasing vehicles worth substantially less than the vehicles would fetch in a refinancing, resale, or when repossessed and sold at auction."  (*Id.* ¶ 185.)  But it does not (and cannot) allege that consumers were unable to ascertain this fact.  That vehicles were sold at a markup from the wholesale value—an everyday reality when purchasing a used vehicle in the United States—is

33

readily apparent to every single consumer based on the "cash price" disclosed in their Contracts. (*See id.* ¶ 56; Ex. A at 2.)  The Complaint does not allege that consumers were unable to consult publicly available websites or vehicle value guides, such as the Kelley Blue Book, to compare prices.  Nor do Plaintiffs allege that consumers were in any way prevented from finding a better price at another Dealer or obtaining financing elsewhere.  In any event, the consumers' acknowledgments that the "cash prices" stated in their Contracts reflected the prices negotiated with the Dealers (*see* Ex. A at 14) should be dispositive.  *See Davis*, 691 F.3d at 1169.[29]  Thus, even crediting the Complaint's erroneous "hidden finance charge" allegations, the Complaint does not allege facts supporting a plausible inference that consumers lacked the ability to understand their Contracts or financial situations.

> ### (b)  Plaintiffs Are Wrong to Suggest that a Finance Company Must Disclose Its Internal Risk Assessment to Consumers

Second, there is no merit to Plaintiffs' contention that consumers could not understand their Contracts or the magnitude of harm allegedly attributable to default because Credit Acceptance purportedly "us[ed] a lending model that is indifferent to whether consumers are unable to repay their loans in full and end up in default."  (Compl. ¶ 186.)  The Complaint speculates that, if consumers knew, based on the Score, that Credit Acceptance thought it might collect less than 100 percent of the total amounts owed under a Contract, "at least some of them would likely have opted not to" enter into their Contracts.  (*Id.* ¶ 109.)

---

[29] The Complaint also does not allege that any Contract failed to "ma[ke] clear what the[] monthly amounts would be" or that any consumer could not understand whether he or she could afford that monthly payment.  *Karakus*, 941 F. Supp. 2d at 340; *see also Hayrioglu*, 794 F. Supp. 2d at 411.  Even if a portion of consumers' "amount financed" were reallocated to the disclosed "finance charge" to account for a supposed "hidden finance charge," as the Complaint erroneously suggests should have been done (*see* Compl. ¶ 63), the consumers' monthly and total payments would not change from the amounts disclosed in their Contracts.  For example, if Ms. B's disclosed finance charge were increased by the $2,678 alleged "hidden cost of credit" (*id.* ¶ 62) and her amount financed were reduced by the same amount, the "total payments" owed on her Contract would still be $13,301.31, and her monthly payment would still be $260.81.  (*See id.* ¶ 27.)

As demonstrated above (*see supra* § III(A)(1)(a)), the Contracts clearly disclosed their terms and risks, including the risk of late charges, repossession and sale in the event of nonpayment.  (*See* Compl. ¶ 27; Ex. A at 1-4.)  The arguments *supra* apply with equal force here.  Moreover, it is consumers—*not Credit Acceptance*—who are in the best position to assess their Contracts, specific financial situations and stability of their current sources of income to evaluate whether they can afford the monthly payment stated on their Contracts.  *See Karakus*, 941 F. Supp. 3d at 341; *Hayrioglu*, 794 F. Supp. 2d at 411.

The Complaint appears to suggest that Credit Acceptance's failure to disclose the Score is "abusive" because subprime consumers are less likely than others to make on-time payments throughout the life of a Contract.  (*See* Compl. ¶¶ 100-02.)  But if a risk of nonpayment could render a Contract abusive *ab initio*, consumer finance would cease to exist.  No consumer financing source can guarantee repayment in full.  Not surprisingly, the CFPB has explained that when an alleged abusive practice "pertains to lender conduct when borrowers are making an initial decision to take out a new loan," the fact that "some borrowers" may "suffer financial harm" during the repayment cycle is insufficient to establish that consumers cannot "reasonably avoid injury."  Payday Rule, 85 Fed. Reg. at 44,397.  This reasoning applies here as well.  *See Hayrioglu*, 794 F. Supp. 2d at 413 ("the fact that the plaintiff sought and received a loan he could not afford does not mean that he" has a "claim against the party that made his mistake possible").

### 2. The Complaint Does Not Allege that Credit Acceptance Took Unreasonable Advantage of Consumers' Lack of Understanding

Even if the Complaint could allege that consumers lacked an understanding of any material risks or costs (and it cannot), Plaintiffs fail to allege that Credit Acceptance took "unreasonable advantage" of any such lack of understanding.  12 U.S.C. § 5531(d)(2).

The Complaint does not allege any causal nexus between Credit Acceptance's conduct

and any consumer's decision to enter into a Contract or default thereafter—a necessary element

of this claim.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33

(2014) (injuries must be proximately caused by defendant's violation of statute); *see also, e.g.*,

*CFPB v. Intercept Corp.*, No. 3:16-cv-144, 2017 WL 3774379, at *4 (D.N.D. Mar. 17, 2017)

(dismissing CFPA claim when complaint failed to plead injury).  Notably, Plaintiffs also do not

allege that Credit Acceptance—an *indirect* finance company that is not present at the dealership

(Compl. ¶¶ 32, 48)—"materially interfere[d] with the ability of a consumer to understand a term

or condition of" any Contract.  12 U.S.C. § 5531(d)(1).  Nor does the Complaint allege that

Credit Acceptance exercised undue influence over highly susceptible classes of consumers.  *Cf.*

*CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 916-17, 919 (S.D. Ind. 2015).

Allegations that Credit Acceptance "*allowed and incentivized* dealers to increase the

disclosed selling price of vehicles it financed" (Compl. ¶ 184), do not create even a "sheer

possibility that [Credit Acceptance] has acted unlawfully." *Iqbal*, 556 U.S. at 678; *see also*

*Pennsylvania v. Think Fin., Inc.*, No. 14-cv-7139, 2016 WL 183289, at *25 (E.D. Pa. Jan. 14,

2016) (CFPA claim was insufficient when complaint "fail[ed] to connect the [d]efendants'

incentivizing electronic payments with a lack of understanding on the part of the consumer").

Insofar as the Complaint asserts that Credit Acceptance "took unreasonable advantage"

of consumers by purportedly failing to "use the [S]core to conduct an individualized ability-to-

pay analysis for" consumers or "seek additional information in order to do so" (Compl.

¶ 186(b)), this theory also fails.  Unlike in the residential mortgage and credit card contexts, *see*

15 U.S.C. §§ 1639c, 1665e, Congress has not required auto finance companies to consider

consumer ability to repay.  Nor do any of the extensive credit-disclosure rules and regulations

require a finance company to disclose its internal risk assessment to consumers.  Courts have

rejected efforts by litigants to impose such obligations where none are imposed by statute.  *See,*
*e.g.*, *Anderson v. Franklin*, No. 2:09-cv-11096, 2010 WL 742765, at *8 (E.D. Mich. Feb. 26,
2010) (collecting cases); *accord Muncy v. Centex Home Equity Co.*, No. 1:14CV00016, 2014
WL 5326436, at *4 (W.D. Va. Oct. 20, 2014); *Bradshaw v. SLM Corp.*, No. C 12-06376 JSW,
2014 WL 12629968, at *4 (N.D. Cal. May 29, 2014).

It bears emphasis that the CFPB has not sought to promulgate such requirements through
notice-and-comment rulemaking.  Indeed, the CFPB recently *revoked* regulations, promulgated
less than three years prior, that declared "unfair" and "deceptive" the practice of making certain
payday, vehicle title and high-cost installment loans without reasonably determining consumer
ability to repay.  *See* Payday Rule, 85 Fed. Reg. at 44,382.  The CFPB's flip-flopping on an issue
with profound implications for the consumer credit markets underscores why major policy
decisions about the appropriate balance of consumer protection and access to credit are best left
to the elected legislature.  *See West Virginia*, 142 S. Ct. at 2609 ("We presume that 'Congress
intends to make major policy decisions itself, not leave those decisions to agencies.'").

Finally, as demonstrated above (*see supra* § II(B)), the Complaint cannot state a claim by
twisting Credit Acceptance's marketing statements beyond recognition into promises that
"CAC's loans were safe and borrowers likely would be able to repay them in full."  (Compl.
¶ 186(c).)  In any event, a consumer who "simply accepts another party's assertions that she will
be able to afford clearly stated monthly fees acts unreasonably if she cannot, in fact, afford those
payments."  *Karakus*, 941 F. Supp. 2d at 340; *accord Utreras v. Aegis Funding Corp.*, No. 13-
cv-00291 (DLI)(LB), 2013 WL 789614, at *3 (E.D.N.Y. Mar. 1, 2013); *Karamath v. U.S. Bank,
N.A.*, No. 11 CV 1557(NGG)(RML), 2012 WL 4327613, at *5 (E.D.N.Y. Aug. 29, 2012), *report
and recommendation adopted*, 2012 WL 4327502 (E.D.N.Y. Sept. 20, 2012).

**B.      Plaintiffs Fail to Allege that Credit Acceptance Took Unreasonable
Advantage of Consumers' Inability to Protect Their Own Interests**

The Court also should dismiss Plaintiffs' assertion that Credit Acceptance took

unreasonable advantage of consumers' inability to protect their own interests in violation of 12

U.S.C. § 5531(d)(2)(B).  (*See* Compl. ¶ 185.)  The pleading deficiencies that doom Plaintiffs'

lack-of-understanding theory apply equally here.  (*See supra* § III(A).)  In addition, the

Complaint does not contain a single factual allegation showing how or why consumers could not

protect their interests in connection with their Contracts.  (*See* Compl. ¶¶ 11, 183, 185-86.)  This

failure is fatal, as "[t]hreadbare recitals of the elements of a cause of action, supported by mere

conclusory statements, do not suffice."  *Iqbal*, 556 U.S. at 678.

Moreover, it is beyond dispute that consumers have myriad reasonable options to avoid

the supposed "injury" from nonpayment and protect their interests.  (*See supra* § III(A)(1)(a).)

That some consumers may "encounter payment stress during the repayment term" (Compl. ¶ 74)

does not mean that consumers could not protect their interests at the time of contracting.  Finally,

for the reasons set forth above (*see supra* § III(A)(2)), Plaintiffs fail to allege that Credit

Acceptance took "unreasonable advantage" of consumers' purported inability to protect their

own interests.  12 U.S.C. § 5531(d)(2).  Accordingly, Count II should be dismissed.

**IV.      THE COMPLAINT DOES NOT STATE A CLAIM
FOR "SUBSTANTIAL ASSISTANCE" UNDER THE CFPA**

In Count VII, the Complaint seeks to hold Credit Acceptance vicariously liable for the

alleged deceptive practices of independent, third-party Dealers because Credit Acceptance

purportedly "allow[ed]" Dealers obtaining financing through Credit Acceptance "to sell two pre-

approved add-on products."  (Compl. ¶ 113.)  The Complaint conspicuously fails to allege any

instance where Credit Acceptance was aware of misconduct *at the time of assignment*.  Rather,

Plaintiffs attempt to transform the financing of lawful add-on products into a "substantial

assistance" claim by contending that Credit Acceptance "turned a blind eye to trends" that supposedly should have alerted the Company to the fact that, for certain Contracts that had been assigned to Credit Acceptance, Dealers allegedly had "misrepresent[ed] the voluntary nature of add-on products," "hid[] the add-on products in loan paperwork" and "fail[ed] to disclosure [sic] to [consumers] that add-on products were included in their" Contracts.  (*Id.* ¶¶ 219, 221).

To state a claim, Plaintiffs must plead facts showing that Credit Acceptance "knowingly or recklessly provide[d] substantial assistance to a covered person" that violated the CFPA's prohibition of unfair, deceptive and abusive acts or practices.  12 U.S.C. § 5536(a)(3).  As set forth below, this claim fails for two separate and independent reasons.

## A.    <u>The Complaint Fails to Allege a Primary Violation Under the CFPA</u>

At the outset, Count VII should be dismissed because Credit Acceptance cannot be held secondarily liable for aiding and abetting Dealer conduct.  *See* 12 U.S.C. § 5519(a).  Under the CFPA, "substantial assistance" liability rises and falls with primary liability.  *See* 12 U.S.C. § 5536(a)(3).  The CFPA expressly prohibits the CFPB from "exercis[ing] any rulemaking, supervisory, enforcement or any other authority . . . over a motor vehicle dealer that is predominantly engaged in the sale and servicing of motor vehicles."  *Id.* § 5519(a); *see also* 156 Cong. Rec. 13178-79 (2010) (statement of Sen. Brownback) (discussing purpose of auto dealer exemption).  The Complaint does not allege that any Dealers that support Count VII are not "predominantly engaged in the sale and servicing of motor vehicle[s]" or that they are otherwise exempt from the CFPA's exclusion for auto dealers.  *See* 12 U.S.C. § 5519(a).  Because Dealers face no liability under the CFPA, Credit Acceptance cannot be held liable for aiding and abetting alleged Dealer violations of the CFPA.  *See Lorenzo v SEC*, 139 S. Ct. 1094, 1103-04 (2019).

Regardless, the Complaint lacks sufficient factual content to allow the Court to draw the

reasonable inference that any Dealers engaged in deceptive practices with respect to add-on products. *See Iqbal*, 556 U.S. at 678. The Complaint does not allege a single instance where any Dealer hid an add-on product in a Contract or failed to disclose that one was included in a Contract. (*See* Compl. ¶ 219.) Nor does the Complaint allege any specific instances where a Dealer told a consumer that an add-on product was a condition of financing. (*See id.*) Courts have rejected efforts to plead that auto dealers misrepresented the voluntary nature of an add-on product when, as here, "the documents signed by [the consumer] clearly state otherwise." *Salvate v. Auto. Restyling Concepts, Inc.*, Civ. No. 13-2898 ADM/FLN, 2014 WL 6901788, at *3 (D. Minn. Dec. 5, 2014). As shown in Ms. B's Contract, consumers receive and acknowledge *at least three separate disclosures* stating that add-on products are optional and not a condition of financing. (*See* Ex. A at 1, 6, 14; *supra* at 12-13.)

**B.    The Complaint Does Not Allege that Credit Acceptance**
       **Substantially Assisted Any Dealers in Any Alleged Wrongdoing**

Even assuming *arguendo* that the Complaint stated a claim for a primary CFPA violation, Count VII still should be dismissed because the Complaint fails to allege that Credit Acceptance provided "substantial assistance" to Dealers. To state a claim, "the Government must establish that the aider and abettor in some sort associated himself with the venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it succeed." *RD Legal Funding*, 332 F. Supp. 3d at 772. Credit Acceptance also must have provided substantial assistance "knowingly or recklessly." 12 U.S.C. § 5536(a)(3). Pleading "recklessness" requires allegations of "conduct that is highly unreasonable and represents an extreme departure from the standards of ordinary care." *RD Legal Funding*, 332 F. Supp. 3d at 772. Allegations of "[m]ere negligence" are insufficient to state a claim. *Id.*

### 1.      The Complaint Identifies No "Substantial Assistance"

Plaintiffs aver that Credit Acceptance provided "substantial assistance" to Dealers because it allegedly (i) "allows dealers to sell two pre-approved add-on products" and provides "financial incentives to dealers to include add-on products in CAC transactions," (ii) "created and controls the process for selling add-on products," and (iii) "allows its dealers to use e-sign" for add-on product disclosures.  (Compl. ¶¶ 113, 118, 132.)  This is insufficient to state a claim.

First, providing financing to Dealers, "without more," is not "substantial assistance."  *RD Legal Funding*, 332 F. Supp. 3d at 772.  Like the Complaint's other efforts to transform lawful incentives into unlawful conduct (*see supra* §§ II(A)(1), III(A)(2)), these allegations do not support an inference that the Company "incentivize[d]" Dealers to act *unlawfully* by either misrepresenting the voluntary nature of add-on products or sneaking them into Contracts without consumers' knowledge.  (Compl. ¶¶ 7, 219.)  And they certainly do not support an inference that Credit Acceptance "sought by [its] action" to help Dealers "succeed" in any such unlawful practices.  *RD Legal Funding*, 332 F. Supp. 3d at 772.

Second, the facts alleged do not support a plausible inference that Credit Acceptance "controls the process for selling add-on products."  (Compl. ¶ 118.)  The Complaint makes clear that *Dealers* negotiate and sell the add-on products, and Credit Acceptance has no interaction with consumers concerning such purchases.  (*See id.* ¶¶ 39, 122, 126; *supra* § II(A)(1).)  And the aspect of the process "determine[ed]" by Credit Acceptance—"the form and substance of financial disclosures provided to consumers" (*id.* ¶ 51)—should inhibit misconduct.  As reflected in Ms. B's Contract, consumers and Dealers attest that any add-on product purchases were voluntary and "not required" for Contracts assigned to Credit Acceptance.  (Ex. A at 14.)

Finally, allegedly "allow[ing]" electronic signatures on Contract documents does not

constitute substantial assistance.  (Compl. ¶ 132.)  Electronic signatures are expressly authorized

by federal law.  *See* 15 U.S.C. § 7001; 12 C.F.R. § 1026.17(a)(1).  And consumers acknowledge

in wet ink that they consented to electronic signatures.  (*See* Ex. A at 15 (Ms. B's consent).)

### 2. The Complaint Does Not Allege Knowledge or Recklessness

The Complaint also does not allege facts supporting a plausible inference that, at the time

Credit Acceptance accepted assignment of any Contract containing an add-on product, it either

(i) knew that the Dealer had engaged in the alleged misconduct or (ii) exhibited an "extreme

departure from the standards of ordinary care."  *RD Legal Funding*, 332 F. Supp. 3d at 772.

Plaintiffs allege that over *one million* Contracts potentially at issue in the Complaint

contained an add-on product.  (*See* Compl. ¶ 128.)  Yet they do not identify a single instance

where Credit Acceptance allegedly knew or recklessly disregarded Dealer misconduct prior to

accepting assignment.  The Contracts assigned to Credit Acceptance, including numerous Dealer

and consumer attestations as to the optional nature of the add-on products (*see supra* at 12-13),

foreclose any inference of knowledge or recklessness.  *See Salvate*, 2014 WL 6901788, at *3.

The Complaint generally avers that, *after origination*, Credit Acceptance received "more

than one thousand consumer complaints related to add-on products," *only some of* which

suggested that Dealers had required consumers "to purchase add-on products."  (Compl. ¶ 129.)

Based on these post-origination complaints, which concern less than 0.1 percent of the Contracts

allegedly at issue, the Complaint implausibly alleges that Credit Acceptance "turned a blind eye

to trends in consumer complaints" regarding the alleged Dealer practices.  (*Id.* ¶ 221.)  The

Complaint also faults Credit Acceptance for failing to "punish or reprimand dealer behavior."

(*Id.* ¶ 222.)  Plaintiffs' attempt to manufacture knowledge or recklessness by pointing to Credit

Acceptance's alleged failure to police Dealers suffers from numerous fatal defects.

First, it is illogical to suggest that Credit Acceptance acted knowingly or recklessly *at origination* based on an analysis of *post-origination* consumer complaints.  Second, in the truth-in-lending context, courts have repeatedly rejected attempts by plaintiffs to impose a "duty of inquiry" on *indirect* auto finance assignees, like Credit Acceptance, that are not at the dealerships or involved in any negotiation with consumers.  *See Green v. Levis Motors, Inc.*, 179 F.3d 286, 295 (5th Cir. 1999); *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 709-10 (11th Cir. 1999); (*supra* § II(A)(3)).  Plaintiffs identify no legal basis for imposing such a duty here.  And the Complaint fails to allege sufficient "information or factual detail" concerning any "red flags" that would have alerted Credit Acceptance to wrongdoing underlying any Contract *at the time of assignment*.  *Intercept*, 2017 WL 3774379, at *4.[30]

It bears emphasis that, despite the Complaint's efforts to assert that Credit Acceptance "controls the process for selling add-on products" (Compl. ¶ 118), this case is readily distinguishable from those where the "substantial assistance" providers were owners and officers that managed and controlled the primary violators' business operations.  *Cf. RD Legal Funding*, 332 F. Supp. 3d at 774 ("founder and owner" of each alleged primary violator had "substantial control over [their] operations"); *CFPB v. D & D Mktg.*, No. CV 15-9692 PSG (Ex), 2016 WL 8849698, at *12-14 (C.D. Cal. Nov. 17, 2016) (C-suite executives, founders and majority owner all had "significant responsibility in managing [the alleged primary violator] and its operations").  In stark contrast to these cases, the Complaint does not (and cannot) allege that Credit Acceptance had "significant responsibility in managing [Dealers] and [their] operations."  *D & D Mktg.*, 2016 WL 8849698, at *12.  Thus, knowledge or recklessness cannot plausibly be inferred.

---

[30] That Credit Acceptance received consumer complaints that certain Dealers "wouldn't allow the [consumer] to control the mouse" during the e-sign process or did not print a paper copy of the e-signed documents does not support a plausible inference that Credit Acceptance either knew or was reckless in not knowing that these Dealers were "hid[ing] the add-on products" in Contract paperwork.  (Compl. ¶¶ 132-33, 219.)

V.     **THE NYAG'S ANCILLARY STATE-LAW CLAIMS ALL FAIL**

In Counts III, IV, V, VI and VIII, the NYAG asserts four more theories of liability under

GBL § 349, EL § 63(12) and GBL § 352.  As shown below, each of these theories of liability

fails to state a claim as a matter of law, and should be dismissed.

A.     **New York's Usury Laws Do Not Apply to Retail Installment Sales**

The NYAG alleges that Credit Acceptance violated EL § 63(12) by accepting assignment

of "unconscionable" Contracts that "exceed New York's criminal interest rate caps."  (Compl.

¶ 192.)  As a threshold matter, this claim fails because it assumes that certain Contracts

incorporate "hidden finance charges," which the Complaint does not allege.  (*See supra*

§ II(A)(2).)[31]  This theory also fails because it is no more than an attempted end run around the

New York Legislature's determination in the MVRISA that New York's usury laws do not apply

to motor vehicle retail installment sales.  *See* N.Y. Pers. Prop. Law ("PPL") § 303(1).

"For over a century, New York courts have held that a sale of personal property on credit

is not subject to the state's usury laws."  *Garcia v. Chrysler Cap. LLC*, No. 15 Civ. 5949 (ER),

2016 WL 5719792, at *1 (S.D.N.Y. Sept. 30, 2016) (citing *Brooks v. Avery*, 4 N.Y. 225, 228

(1850)); *see also Napoleon v. 5665 Sunrise Highway Corp.*, No. 18-CV-05703 (DG) (SIL), 2021

WL 3469991, at *8 (E.D.N.Y. July 7, 2021) ("New York's usury laws do not apply to 'retail

[installment] contracts.'").  And since 1980, the MVRISA has "allow[ed] car dealers to collect a

credit charge at whatever rate the seller and buyer agreed upon."  *Garcia*, 2016 WL 5719792, at

*2 (citing N.Y. L. 1980, c. 883, §§ 73-74); *see also* PPL § 303(1).[32]  The MVRISA also provides

---

[31] Thus, there is no merit to the NYAG's assertion that any Contracts are "unconscionable" because they "conceal the true interest rate" or "misstate other key terms of the parties' financing agreement." (Compl. ¶ 192.)

[32] The 1980 amendment was part of a legislative reform effort "to deregulate the rates of interest on most forms of consumer credit" and expand the availability of consumer credit to New Yorkers.  Sponsor's Mem., Bill Jacket, L. 1980, c. 883, at 2; *see also* Governor's Approval Mem., Bill Jacket, L. 1980, c. 883, at 2.

for broad assignability of motor vehicle retail installment contracts, allowing a "financing agency" to "purchase a retail [installment] contract from a seller on such terms and conditions and for such price as may be mutually agreed upon."  PPL § 302(10)(a).[33]

Judge Ramos's well-reasoned decision in *Garcia* is directly on point.  There, the court applied the plain language of the MVRISA to reject a consumer's allegations that a finance company "'use[d] the form of [a retail installment contract] as an artifice' to disguise its intention to extend a usurious loan."  *Garcia*, 2016 WL 5719792, at *3.  The court reasoned that there was "no dispute that the [c]ontract was entered into by [the consumer] and [the dealer], that both parties agreed to the 26.32% credit charge, and that the [c]ontract resulted in a *bona fide* sale of a car."  *Id.* at *4.  It made no difference that the finance company "informed the [dealer] of the terms upon which it would purchase the [c]ontract" or that the contract "was immediately assigned to [the finance company] upon execution."  *Id.* at *4-5.

Efforts to enact legislation that would limit the maximum allowable credit service charge under New York law have repeatedly failed.[34]  Thus, "regardless of whether the MVRISA is sound policy," "the Legislature appears to have contemplated how to regulate vehicle credit sales, and yet did not enact the restrictions sought by" the NYAG.  *Id.* at *8.  The NYAG cannot use EL § 63(12) to "read into the statute restrictions that do not exist."  *Id.*

**B.      The NYAG's MVRISA Claims Fail as a Matter of Law**

In Count VI, the NYAG claims that Credit Acceptance violated EL § 63(12) by "repeatedly violat[ing]" the MVRISA.  (Compl. ¶ 212.)  The alleged violation of the MVRISA is

---

[33] The term "seller" is statutorily defined as the "person who sells a motor vehicle to a retail buyer under or subject to a retail [installment] contract."  PPL § 301(3).

[34] *See* N.Y. Senate Bill S3237 (Jan. 28, 2021); N.Y. Assembly Bill A819 (Jan. 6, 2021); N.Y. Senate Bill S5947 (May 16, 2019); N.Y. Assembly Bill A7585 (May 10, 2019).

that "[t]he [Contracts] used by [Credit Acceptance] . . . do not disclose as part of the credit service charge the difference between the CAC Payment . . . and amount financed"—*i.e.*, the discount. (*Id.* ¶ 210.) No such disclosure is required under the MVRISA. Indeed, since 2015, at least six attempts have been made in the New York Legislature in four different legislative sessions to amend the MVRISA to require disclosure of "all fees imposed by a lender upon the dealer or buyer related to financing the purchase of the motor vehicle," such as the assignment discount.[35] None has succeeded. The Court should reject the NYAG's efforts to use EL § 63(12) to amend the MVRISA to include disclosure obligations that have not been enacted by the New York Legislature. *See Garcia*, 2016 WL 5719792, at *8; (*supra* § V(A)).

The NYAG acknowledges that the MVRISA's disclosure requirements track those in TILA. (*See* Compl. ¶¶ 144-50); *see also* PPL § 302(5). As shown above (*see supra* § II(A)(2)), the Complaint fails to allege that any assignment discounts should have been disclosed under TILA. Insofar as the NYAG contends that the definition of "credit service charge" should be interpreted differently than the definition of "finance charge" in TILA, as implemented by Regulation Z (*see* Compl. ¶ 211), the NYAG's claim is foreclosed by the MVRISA and expressly preempted by TILA. *See* PPL § 302(5); 15 U.S.C. § 1610(a)(1).

This MVRISA-based claim under EL § 63(12) is also preempted because it seeks to impose assignee liability where TILA expressly precludes it. (*See supra* § II(A)(3).) "The ordinary principles of preemption include the well-settled proposition that a state law is preempted where it 'stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.'" *Arizona v. United States*, 567 U.S. 387, 406 (2012).

---

[35] N.Y. Assembly Bill A5997 (Mar. 4, 2021); N.Y. Assembly Bill A4856 (Feb. 5, 2019); N.Y. Senate Bill S5274 (Mar. 20, 2017); N.Y. Assembly Bill A4619 (Feb. 3, 2017); N.Y. Assembly Bill A7866 (May 28, 2015); N.Y. Senate Bill S5490A (May 14, 2015).

Congress enacted TILA's limitation on assignee liability to "eliminate confusion . . . as to the responsibilities of assignees." *Vincent*, 736 F.3d at 107.  Congress chose a "simpl[e] mechanical rule" by which creditors would be solely responsible for making TILA's required disclosures, and plaintiffs could not circumvent TILA's liability scheme by "claim[ing] that the assignee had 'knowledge' of the violation." *Id.* at 107-08.  Courts have thus held that TILA preempts state-law claims that would impose disclosure-based liability on assignees where none exists under TILA. *See, e.g.*, *Alexiou v. Brad Benson Mitsubishi*, 127 F. Supp. 2d 557, 564 (D.N.J. 2000).  Because the NYAG's interpretation of the MVRISA would "stand[] as an obstacle" to TILA's bright-line liability demarcations, Count VI should be dismissed. *Arizona*, 567 U.S. at 406.

## C.  **The NYAG's "Holder Rule" Claims Fail as a Matter of Law**

The NYAG also seeks to hold Credit Acceptance vicariously liable under EL § 63(12) and GBL § 349 for three alleged "fraudulent" and "deceptive" acts and practices of New York Dealers:  (i) "[a]dding on vehicle service contracts without the knowledge or consent of consumers"; (ii) "[m]isrepresenting that vehicle service contracts were required to purchase a vehicle"; and (iii) "[s]elling vehicles that malfunction shortly after purchase."  (Compl. ¶¶ 194, 200, 205.)[36]  The NYAG's claims rely on the "Holder Rule" notice in the Contracts:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.

(*Id.* ¶ 153.)  As shown below, the NYAG's attempt to step into the shoes of consumers and use the Holder Rule as a sword to find Credit Acceptance vicariously liable fails as a matter of law.

---

[36] The Complaint also asserts that the allegedly wrongful conduct of *Dealers* included "requiring that *dealers* include vehicle service contracts even where not agreed to by the consumer."  (Compl. ¶¶ 194, 200, 205.)  If this is intended to suggest that the Company requires Dealers to include VSCs even where not agreed to by the consumer, the specific allegations of the Complaint do not support that general, conclusory assertion.  (*See supra* § IV(B).) "General, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the complaint."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

### 1.     The NYAG's "Holder Rule" Claims Are Improper

As an initial matter, the NYAG lacks authority to pursue "Holder Rule" claims.  GBL

§ 349 provides that whenever "any person . . . *has engaged in or is about to engage in*" deceptive

acts or practices, the NYAG may bring suit "to enjoin *such unlawful acts or practices* and to

obtain restitution of any moneys or property obtained directly or indirectly *by any such unlawful*

*acts or practices*."  GBL § 349(b).  Similarly, EL § 63(12) provides that "[w]henever any *person*

*shall engage* in repeated fraudulent or illegal acts," the NYAG may commence an action seeking

relief concerning "*such business activity or of any fraudulent or illegal acts*."  EL § 63(12).

Under a plain reading of the statutes, the NYAG may pursue persons who have engaged

in unlawful acts or practices.  The statutes do not authorize vicarious liability claims, such as

those the NYAG seeks to pursue under the Holder Rule.  Indeed, an "essential" element of a

GBL § 349 claim is causation:  "[t]he plaintiff must show that *the defendant's* material deceptive

act caused the injury."  *Miller*, 994 F. Supp. 2d at 557.  But the Complaint is clear that it is

seeking redress under GBL § 349 and EL § 63(12) for the "acts and practices of . . . *dealers*,"

and not those of Credit Acceptance.  (Compl. ¶¶ 194, 200, 205.)  Consequently, Counts III, IV

and V should be dismissed as far as they hinge on Credit Acceptance's mere status "as the holder

of consumer contracts."  (*Id.* ¶¶ 194, 200, 205.)

Even if the NYAG's statutory authority could be deemed to encompass "Holder Rule"

claims, the NYAG's claims under EL § 63(12) still fail because they are not claims that any

consumer could ever have against a Dealer.  The Holder Rule is expressly limited to "claims and

defenses *which the debtor could assert* against the seller."  (*Id.* ¶ 153.)  But no debtor could

assert such claims under EL § 63(12), which "authorizes only the attorney general to take certain

actions, not private parties."  *Pennicott v. JPMorgan Chase Bank, N.A.*, No. 21 Civ. 4575 (LGS),

2022 WL 4226025, at *3 (S.D.N.Y. Sept. 13, 2022); *accord Ogbolu v. Trs. of Columbia Univ.*,

No. 21-CV-1697 (JPO), 2022 WL 280934, at *4 (S.D.N.Y. Jan. 31, 2022).  Thus, at a minimum,

the "Holder Rule" claims in Counts III and IV should be dismissed.  (Compl. ¶¶ 194, 200.)

### 2.      The Complaint Is Devoid of Any Allegations Showing that the NYAG Is Entitled to Relief Under the "Holder Rule"

The NYAG's "Holder Rule" claims also should be dismissed because the Complaint

simply "does not provide factual allegations sufficient 'to give [the Company] fair notice of what

the claim is and the grounds upon which it rests.'"  *Myers v. Moore*, 326 F.R.D. 50, 59 (S.D.N.Y.

2018) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 50 F.3d 117, 121 (2d Cir. 2007)).

For example, the NYAG asserts that New York Dealers "[s]ell[] vehicles that

malfunction shortly after purchase."  (Compl. ¶¶ 194(c), 200(c), 205(c).)  The Complaint

supports this conclusory assertion with another one (and nothing more):  "[T]he vehicles sold

frequently malfunction shortly after purchase, leaving consumers without a functioning vehicle.

Consumers often take the vehicle back to the dealer for repairs that never happen, or the vehicle

gets repossessed by CAC."  (*Id.* ¶ 154(h).)  While Rule 8 "does not require 'detailed factual

allegations,'" it certainly requires more than a "naked assertion" that unspecified New York

Dealers sold allegedly defective vehicles to unspecified New York consumers at some point in

the past seven years.  *Iqbal*, 556 U.S. at 678; *see also Utts v. Bristol-Myers Squibb Co.*, 226 F.

Supp. 3d 166, 186-87 (S.D.N.Y. 2016) ("A bare allegation that [a] product had a manufacturing

defect is too conclusory to plead a plausible claim or give the defendants fair notice.").

The two remaining "Holder Rule" claims related to New York Dealer practices with

respect to VSCs fare no better.  (*See* Compl. ¶¶ 194(a)-(b), 200(a)-(b), 205(a)-(b).)  While the

Complaint's allegations about add-on products on a national scale are insufficient to state a

plausible claim (*see supra* § IV(A)), allegations concerning New York VSCs are non-existent.

(*See* Compl. ¶¶ 128-29.)  The Complaint does not allege that (i) a single New York Contract contained a VSC, (ii) any New York consumers complained that a New York Dealer required them to purchase a VSC as a condition of financing or (iii) a single instance where a New York Dealer told a New York consumer that a VSC was a condition of financing.[37]

### D.     The Complaint Fails to State a Claim Under the Martin Act

Finally, in Count VIII, the NYAG attempts to bootstrap its allegations of deceptive and abusive consumer acts or practices into claims for securities fraud under the Martin Act.  (*See* Compl. ¶ 226.)  The NYAG contends that, based on the Complaint's other allegations, Credit Acceptance misrepresented in private securities offerings that the Contracts underlying the securities "complied with all applicable law."  (*Id.*)  Count VIII is entirely derivative of, and should be dismissed with, the other counts in the Complaint.  (*See supra* §§ II-IV, V(A)-(C).)

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint with prejudice.

Dated: New York, New York
     March 14, 2023

Anand S. Raman (*pro hac vice*)
Darren M. Welch (*pro hac vice*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000
anand.raman@skadden.com
darren.welch@skadden.com

Respectfully submitted,

  /s/ Patrick G. Rideout
Patrick G. Rideout
Jeffrey S. Geier
Christopher R. Fredmonski
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
patrick.rideout@skadden.com
jeffrey.geier@skadden.com
christopher.fredmonski@skadden.com

*Attorneys for Defendant*
*Credit Acceptance Corporation*

---

[37] Insofar as the NYAG's "Holder Rule" claims are based on any Dealer deceptive acts or practices not alleged in Counts III, IV or V, including the allegations listed in paragraph 154 of the Complaint, the Complaint similarly fails to plead facts sufficient to state a plausible claim.  *See Iqbal*, 556 U.S. at 678.