UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

| | | |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU and THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | : : : : : | |
| Plaintiffs, | : : | Case No. 23 Civ. 0038 (JHR) |
| v. | : : | |
| CREDIT ACCEPTANCE CORPORATION, | : : | |
| Defendant. | : | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## MEMORANDUM OF LAW IN SUPPORT OF
## CREDIT ACCEPTANCE CORPORATION'S REVISED MOTION TO DISMISS

SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP

Patrick G. Rideout
Jeffrey S. Geier
Christopher R. Fredmonski
One Manhattan West
New York, New York 10025
(212) 735-3000

Anand S. Raman (*pro hac vice*)
Darren M. Welch (*pro hac vice*)
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000

*Attorneys for Defendant*
*Credit Acceptance Corporation*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ iii

INTRODUCTION ..............................................................................................1

FACTUAL ALLEGATIONS .................................................................................7

    A.     Credit Acceptance's Business................................................................7

    B.     Statutory and Regulatory Background....................................................9

    C.     The Complaint's Exemplar Contract ...................................................12

    D.     The Complaint's Allegations .............................................................14

LEGAL STANDARD........................................................................................15

ARGUMENT .................................................................................................16

I.     THE COMPLAINT DOES NOT STATE A CLAIM
     FOR DECEPTIVE ACTS OR PRACTICES OR "FRAUD" ...........................17

    A.     The Complaint Does Not Allege that Credit Acceptance
          Deceived Consumers About the Cost of Credit in Their Contracts......................17

          1.     The Complaint Does Not Allege that
               Credit Acceptance Deceived Any Consumers
               Concerning the Alleged "Hidden Finance Charges" .................................18

          2.     The Complaint Fails to Plead Any "Hidden Finance Charges".................20

          3.     TILA Forecloses Liability for Alleged "Hidden Finance Charges" ..........26

    B.     Credit Acceptance's Marketing Statements Are Not Deceptive............................28

II.    THE COMPLAINT DOES NOT ALLEGE THAT CREDIT
     ACCEPTANCE ENGAGED IN ANY ABUSIVE ACTS OR PRACTICES ..................30

    A.     The Complaint Does Not—and Cannot—Allege that Credit Acceptance
          Took Unreasonable Advantage of Consumers' Lack of Understanding ..............31

          1.     The Complaint Fails to Allege a Lack of Understanding .........................31

          2.     The Complaint Does Not Allege that Credit Acceptance Took
               Unreasonable Advantage of Consumers' Lack of Understanding.............35

B.  Plaintiffs Fail to Allege that Credit Acceptance Took Unreasonable
Advantage of Consumers' Inability to Protect Their Own Interests ..................... 37

III.  THE COMPLAINT DOES NOT STATE A CLAIM
FOR "SUBSTANTIAL ASSISTANCE" UNDER THE CFPA ....................................... 38

A.  The CFPB Cannot Regulate Dealer
Conduct through Secondary Liability Claims ......................................................... 38

B.  The Complaint Fails to Allege a Primary Violation Under the CFPA ................. 39

C.  The Complaint Does Not Allege that Credit Acceptance
Substantially Assisted Any Dealers in Any Alleged Wrongdoing ....................... 40

1.  The Complaint Identifies No "Substantial Assistance" ............................ 40

2.  The Complaint Does Not Allege Knowledge or Recklessness ................. 41

IV.  THE CFPB'S PARTICIPATION IN THIS ACTION IS IMPROPER ............................ 43

V.  THE NYAG'S ANCILLARY STATE-LAW CLAIMS ALL FAIL ................................ 44

A.  New York's Usury Laws Do Not Apply to Retail Installment Sales ................... 44

B.  The NYAG's MVRISA Claims Fail as a Matter of Law ....................................... 46

C.  The NYAG's "Holder Rule" Claims Fail as a Matter of Law .............................. 47

1.  The NYAG's "Holder Rule" Claims Are Improper ................................. 48

2.  The Complaint Is Devoid of Any Allegations Showing
that the NYAG Is Entitled to Relief Under the "Holder Rule" ................. 49

D.  The Complaint Fails to State a Claim Under the Martin Act ............................... 50

CONCLUSION ..................................................................................................................... 50

<u>**TABLE OF AUTHORITIES**</u>

## CASES

*Alexiou v. Brad Benson Mitsubishi*,
    127 F. Supp. 2d 557 (D.N.J. 2000) ...................................................................47

*Anderson v. Franklin*,
    No. 2:09-cv-11096, 2010 WL 742765 (E.D. Mich. Feb. 26, 2010) ................................36

*Anderson v. General Motors Acceptance Corp.*,
    476 F. Supp. 2d 624 (N.D. Miss. 2007), *aff'd* 269 F. App'x 452 (5th Cir. 2008)..............6

*Archer v. Nissan Motor Acceptance Corp.*,
    633 F. Supp. 2d 259 (S.D. Miss. 2007), *aff'd*, 550 F.3d 506 (5th Cir. 2008).....................6

*Arizona v. United States*,
    567 U.S. 387 (2012)...................................................................................47

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).......................................................................... *passim*

*Baldwin v. Laurel Ford Lincoln-Mercury, Inc.*,
    32 F. Supp. 2d 894 (S.D. Miss. 1998)..............................................................19

*Beaudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc.*,
    160 S.W.3d 874 (Tenn. Ct. App. 2004) ...........................................................19

*Bradshaw v. SLM Corp.*,
    No. C 12-06376 JSW, 2014 WL 12629968 (N.D. Cal. May 29, 2014)...........................36

*California Public Employees' Retirement System v. WorldCom, Inc.*,
    368 F.3d 86 (2d Cir. 2004)...........................................................................27

*CFPB v. Community Financial Services Association of America*,
    601 U.S. 416 (2024)...................................................................................43

*CFPB v. D & D Marketing*,
    No. CV 15-9692 PSG (Ex), 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016) ...................43

*CFPB v. Intercept Corp.*,
    No. 3:16-cv-144, 2017 WL 3774379 (D.N.D. Mar. 17, 2017)...................................35, 42

*CFPB v. ITT Educational Services, Inc.*,
    219 F. Supp. 3d 878 (S.D. Ind. 2015) .............................................................35

*CFPB v. Nexus Services, Inc.*,
    No. 5:21-cv-00016, 2024 WL 1461382 (W.D. Va. Apr. 2, 2024)...................................43

iii

*CFPB v. Prime Marketing Holdings, LLC*,
    No. CV 16-07111-BRO (JEMx), 2016 WL 10516097 (C.D. Cal. Nov. 15, 2016) ...........16

*CFPB v. RD Legal Funding, LLC*,
    332 F. Supp. 3d 729 (S.D.N.Y. 2018), *amended on other grounds*,
    No. 17-CV-890 (LAP), 2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018),
    *vacated on other grounds*, 828 F. App'x 68 (2d Cir. 2020) ..................................... *passim*

*Chancellor v. Gateway Lincoln-Mercury, Inc.*,
    502 S.E.2d 799 (Ga. Ct. App. 1998).................................................................19

*Collins v. City University of New York*,
    No. 21 Civ. 9544 (NRB), 2023 WL 1818547 (S.D.N.Y. Feb. 8, 2023) ...........................43

*Copley v. Bactolac Pharmaceutical, Inc.*,
    No. 18-CV-575 (FB) (PK), 2021 WL 918313 (E.D.N.Y. Mar. 10, 2021) .......................18

*Credit Acceptance Corp. v. Traylor*,
    E2023005976, 2024 WL 2273522 (N.Y. Sup. Ct. Monroe Cnty. May 10, 2024).............44

*Davis v. HSBC Bank Nev., N.A.*,
    691 F.3d 1152 (9th Cir. 2012) .............................................................31, 32, 33

*In re Ditech Holding Corp.*,
    No. 19-10412 (JLG), 2023 WL 6397900 (S.D.N.Y. Sept. 29, 2023)...............................26

*In re DiVittorio*,
    670 F.3d 273 (1st Cir. 2012)......................................................................21

*DPWN Holdings (USA), Inc. v . United Air Lines, Inc.*,
    747 F.3d 145 (2d Cir. 2014).......................................................................19

*Elson v. Black*,
    56 F.4th 1002 (5th Cir. 2023) ....................................................................16

*Ellis v. General Motors Acceptance Corp.*,
    160 F.3d 703 (11th Cir. 1998) ...................................................................42

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000)................................................................................27

*Fink v. Time Warner Cable*,
    810 F. Supp. 2d 633 (S.D.N.Y. 2011).............................................................29

*Flatbush Auto Discount Corp. v. McCarthy-Bernhardt Buick, Inc.*,
    9 N.Y.2d 776 (1961) (per curiam) ...........................................................19, 45

*Ex parte Ford Motor Credit Co.*,
  717 So. 2d 781 (Ala. 1997) ...........................................................................................19

*Ford Motor Credit Co. v. Majors*,
  No. A04-1468, 2005 WL 1021551 (Minn. Ct. App. May 3, 2005) ...................................19

*Garcia v. Chrysler Capital LLC*,
  No. 15 Civ. 5949 (ER), 2016 WL 5719792 (S.D.N.Y. Sept. 30, 2016) ..........19, 44, 45, 46

*Glover v. Bob's Discount Furniture, LLC*,
  621 F. Supp. 3d 442 (S.D.N.Y. 2022)..............................................................................19

*Green v. Levis Motors, Inc.*,
  179 F.3d 286 (5th Cir. 1999) ..........................................................................................42

*Grimmett v. Sunlight Financial LLC*,
  No. 2:23-cv-00084, 2023 WL 6449447 (S.D. W. Va. Oct. 3, 2023)................................20

*Hayrioglu v. Granite Capital Funding, LLC*,
  794 F. Supp. 2d 405 (E.D.N.Y. July 5, 2011).................................................31, 33, 34, 35

*Hirsch v. Arthur Andersen & Co.*,
  72 F.3d 1085 (2d Cir. 1995)............................................................................................48

*Irby-Greene v. M.O.R., Inc.*,
  79 F. Supp. 2d 630 (E.D. Va. 2000) ....................................................................24, 26, 27

*In re ITT Educational Services, Inc. Securities & Shareholder Derivatives Litigation*,
  859 F. Supp. 2d 572 (S.D.N.Y. 2012)..............................................................................29

*Karakus v. Wells Fargo Bank, N.A.*,
  941 F. Supp. 2d 318 (E.D.N.Y. 2013) .................................................................31, 33, 37

*Kunert v. Mission Financial Services Corp.*,
  1 Cal. Rptr. 3d 589 (Ct. App. 2003) ...............................................................................19

*Lexmark International, Inc. v. Static Control Components, Inc.*,
  572 U.S. 118 (2014)........................................................................................................35

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244, 2273 (2024) ................................................................................. *passim*

*Lorenzo v SEC*,
  139 S. Ct. 1094 (2019)....................................................................................................39

*Mason v. General Finance Corp.*,
  542 F.2d 1226 (4th Cir. 1976) ........................................................................................21

v

*Matsumura v. Benihana National Corp.*,
    542 F. Supp. 2d 245 (S.D.N.Y. 2008)................................................................16

*Matusovsky v. Merrill Lynch*,
    186 F. Supp. 2d 397 (S.D.N.Y. 2002)..........................................................12, 23

*Mayfield v. General Electric Capital Corp.*,
    No. 97 CIV.2786(DAB), 1999 WL 182586 (S.D.N.Y. Mar. 31, 1999) .....................26, 27

*Miller v. Wells Fargo Bank, N.A.*,
    994 F. Supp. 2d 542 (S.D.N.Y. 2014)..................................................... *passim*

*Moss v. BMO Harris Bank, N.A.*,
    258 F. Supp. 3d 289 (E.D.N.Y. 2017) ............................................................18

*Muncy v. Centex Home Equity Co.*,
    No. 1:14CV00016, 2014 WL 5326436 (W.D. Va. Oct. 20, 2014) ...................................36

*Myers v. Moore*,
    326 F.R.D. 50 (S.D.N.Y. 2018) ...................................................................49

*Napoleon v. 5665 Sunrise Highway Corp.*,
    18-CV-05703 (DG) (SIL), 2021 WL 3469991 (E.D.N.Y. July 7, 2021)..........................44

*Natural Resources Defense Council v. Johnson*,
    461 F.3d 164 (2d Cir. 2006)........................................................................7

*Ogbolu v. Trustees of Columbia University*,
    No. 21-CV-1, 697 (JPO), 2022 WL 280934 (S.D.N.Y. Jan. 31, 2022) ...........................49

*Pelman ex rel. Pelman v. McDonald's Corp.*,
    396 F.3d 508 (2d Cir. 2006)......................................................................16

*Pennicott v. JPMorgan Chase Bank, N.A.*,
    21 Civ. 4575 (LGS), 2022 WL 4226025 (S.D.N.Y. Sept. 13, 2022)...............................49

*Pennsylvania v. Think Finance, Inc.*,
    No. 14-cv-7139, 2016 WL 183289 (E.D. Pa. Jan. 14, 2016)......................................36

*Pension Benefit Guaranty Corp. ex rel. Saint Vincent Catholic Medical Centers*
    *Retirement Plan v. Morgan Stanley Investment Management Inc.*,
    712 F.3d 705 (2d Cir. 2013)..............................................................15, 20, 22

*People ex rel. Cuomo v. Wells Fargo Insurance Services, Inc.*,
    62 A.D.3d 404 (1st Dep't 2009), *aff'd*, 16 N.Y.3d 166 (2011) .........................16

*Pescia v. Auburn Ford-Lincoln Mercury Inc.*,
    68 F. Supp. 2d 1269 (M.D. Ala. 1999) ...........................................................20

*Poulin v. Balise Auto Sales, Inc.*,
    647 F.3d 36 (2d Cir. 2011)..................................................................21, 24, 25

*Pucilowski v. Spotify USA, Inc.*,
    21 Civ. 1653, 2022 WL 836797 (S.D.N.Y. Mar. 21, 2022),
    *aff'd*, No. 22-869-cv, 2022 WL 16842926 (2d Cir. Nov. 10, 2022)................................12

*Radzanower v. Touche Ross & Co.*,
    426 U.S. 148 (1976)...............................................................................3, 27, 28

*Riviere v. Banner Chevrolet, Inc.*,
    184 F.3d 457 (5th Cir. 1999) ......................................................................10

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004)........................................................................16

*Salvate v. Automotive Restyling Concepts, Inc.*,
    Civ. No. 13-2898 ADM/FLN, 2014 WL 6901788 (D. Minn. Dec. 5, 2014)..............39, 42

*Schachter v. Sunrise Senior Living Management, Inc.*,
    No. 3:18-cv-00953 (JAM), 2020 WL 1274601 (D. Conn. Mar. 16, 2020) ......................19

*Scott v. Ford*,
    No. 109414, 2021 WL 303821 (Ohio Ct. App. Jan. 28, 2021).........................................19

*Securities Industry Association v. FRB*,
    468 U.S. 137 (1984)....................................................................................28

*Seila Law LLC v. CFPB*,
    591 U.S. 197 (2020).....................................................................................11

*Shu v. Toyota Motor Sales USA, Inc.*,
    669 F. Supp. 3d 888 (N.D. Cal. 2023) .............................................................16

*Stamm v. Barclays Bank*,
    960 F. Supp. 724 (S.D.N.Y. 1997) ................................................................31

*Thompson v. Connex Credit Union*,
    No. X03HHDCV20-6132115S, 2021 WL 1117166 (Conn. Super. Ct. Mar. 3, 2021)…19

*United States v. Phillips*,
    75 F. App'x 392 (6th Cir. 2003) ....................................................................25

*Upton v. Tribilcock*,
    91 U.S. 45 (1875).......................................................................................31

*Utreras v. Aegis Funding Corp.*,
    No. 13-cv-00291 (DLI)(LB), 2013 WL 789614 (E.D.N.Y. Mar. 1, 2013) ......................37

*Utts v. Bristol-Myers Squibb Co.*,
    226 F. Supp. 3d 166 (S.D.N.Y. 2016) ............................................................50

*Vincent v. Money Store*,
    736 F.3d 88 (2d Cir. 2013) ................................................... *passim*

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ........................................................ *passim*

## CONSTITUTION AND STATUTES

U.S. CONST. art. I, § 9, cl. 7 ...............................................................43

12 U.S.C. § 5481(12) ...............................................................10, 11, 28

12 U.S.C. § 5491(a) ...............................................................11

12 U.S.C. § 5497 ...............................................................43, 44

12 U.S.C. § 5511(a) ...............................................................9, 28

12 U.S.C. § 5512(a) ...............................................................11

12 U.S.C. § 5519 ........................................................ *passim*

12 U.S.C. § 5531 ........................................................ *passim*

12 U.S.C. § 5536(a) ........................................................ *passim*

12 U.S.C. § 5552 ...............................................................11

12 U.S.C. § 5581 ...............................................................11

12 U.S.C. § 5582(a) ...............................................................10

15 U.S.C. § 1601(a) ...............................................................9, 21

15 U.S.C. § 1605(a) ...............................................................10

15 U.S.C. § 1610(a)(1) ...............................................................47

15 U.S.C. § 1631(b) ...............................................................10

15 U.S.C. § 1638(a) ...............................................................4, 9, 10

15 U.S.C. § 1639c ...............................................................36

15 U.S.C. § 1641(a) ...............................................................10, 26

15 U.S.C. § 1665e .................................................................................................36

15 U.S.C. § 7001 ...................................................................................................41

N.Y. Exec. Law § 63(12) .................................................................................17, 18, 48

N.Y. Gen. Bus. Law § 349(b) .........................................................................18, 48

N.Y. Pers. Prop. Law § 301(3) ........................................................................45

N.Y. Pers. Prop. Law § 302 .......................................................................45, 46, 47

N.Y. Pers. Prop. Law § 303(1) ...................................................................44, 45

## RULES AND REGULATIONS

12 C.F.R. § 1026.17(a)(1) ..............................................................................41

12 C.F.R. § 1026.2(a)(9) ......................................................................10, 22, 25, 26

12 C.F.R. § 1026.4(a) ....................................................................................10, 21

12 C.F.R. pt. 1026, supp. I, § 1026.4(a)(2) ...............................................10, 24

Combating Auto Retail Scams Trade Regulation Rule,
  89 Fed. Reg. 590 (Jan. 4, 2024) (to be codified at 16 C.F.R. pt. 463) ............11, 12, 16, 20

Designated Transfer Date,
  75 Fed. Reg. 57,252 (Sept. 20, 2010) ...............................................................10

Order Postponing Effective Date of Final Rule Pending Judicial Review, *In re Combating
  Auto Retail Scams Trade Regulation Rule*,
  No. P204800 (FTC Jan. 18, 2024) ...................................................................12

Payday, Vehicle Title, & Certain High-Cost Installment Loans,
  85 Fed. Reg. 44,382 (July 22, 2020).......................................................... *passim*

Truth in Lending: Official Staff Commentary,
  46 Fed. Reg. 50,288 (Oct. 9, 1981)..................................................................10

## OTHER AUTHORITIES

156 Cong. Rec. 13178-79 (2010)...............................................................11, 38, 39

Governor's Approval Mem., Bill Jacket, L. 1980, c. 883............................................45

N.Y. Assembly Bill A7866 (May 28, 2015) ...............................................................46

N.Y. Assembly Bill A4619 (Feb. 3, 2017) ...............................................................46

N.Y. Assembly Bill A4856 (Feb. 5, 2019) ...................................................46

N.Y. Assembly Bill A7585 (May 10, 2019) ..............................................46

N.Y. Assembly Bill A0819 (Jan. 6, 2021) .................................................46

N.Y. Assembly Bill A5997 (Mar. 4, 2021)................................................46

N.Y. Assembly Bill A4485 (Feb. 16, 2023) ..............................................46

N.Y. Senate Bill S5490A (May 14, 2015) ................................................46

N.Y. Senate Bill S5274 (Mar. 20, 2017).................................................46

N.Y. Senate Bill S5947 (May 16, 2019) ..................................................46

N.Y. Senate Bill S3237 (Jan. 28, 2021) ..................................................46

N.Y. Senate Bill S4774 (Feb. 14, 2023) ..................................................46

Sponsor's Mem., Bill Jacket, L. 1980, c. 883 ...........................................45

CFPB, *How do I get and keep a good credit score?*,
https://www.consumerfinance.gov/ask-cfpb/how-do-i-get-and-keep-a-good-credit-score-en-318/ ...........................................................................29

CFPB, *What is the difference between a credit report and a credit score?*,
https://www.consumerfinance.gov/ask-cfpb/what-is-the-difference-between-a-credit-report-and-a-credit-score-en-2069/ ....................................29

CFPB, *Shopping for your auto loan*,
https://www.consumerfinance.gov/language/cfpb-in-english/shopping-for-your-auto-loan/ (last visited Aug. 13, 2024)...........................................33, 34

Federal Reserve Board, *Federal Reserve Banks Combined Financial Statements as of and for the Years Ended Dec. 31, 2023 and 2022 and Independent Auditors' Report* (Mar. 18, 2024) ......................................................43

Federal Reserve Board, *Federal Reserve Banks Combined Quarterly Fin. Report Unaudited* (Mar. 31, 2024) ..........................................................43

## INTRODUCTION

The Consumer Financial Protection Bureau ("CFPB") and Office of the New York Attorney General ("NYAG," collectively, "Plaintiffs"), in an increasingly familiar tack, are using this action to sidestep the legislative process and impose sweeping regulatory reform. They do so despite clear recent messaging from the Supreme Court that agency overreach will not survive judicial scrutiny. *See Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244, 2273 (2024) ("Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]"); *West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("[E]nabling legislation is generally not an open book to which the agency may add pages and change the plot line.").[1]

In this case, Plaintiffs take aim at the auto finance industry and target Credit Acceptance Corporation ("Credit Acceptance" or the "Company"), a company that offers financing solutions to auto dealers to allow them to sell cars to their customers. The financing that Credit Acceptance (and thousands of other similar financing companies) provides to dealers is essential to millions of Americans—especially those with poor or non-existent credit—who otherwise would be unable to purchase the cars they need to get to work and take care of their families.

Credit Acceptance is an *indirect* auto finance company. This means that it does not make loans directly to consumers. Rather, it pays to acquire retail installment contracts ("Contracts") from approved independent auto dealers ("Dealers") that those Dealers have entered into with their customers for the purchase of vehicles. Credit Acceptance then services those Contracts. Outside the presence of Credit Acceptance, Dealers and consumers negotiate the material terms of the Contracts—*e.g.*, the vehicle's selling price, the Contract's term and the down payment or trade-in value. The Company provides software to Dealers to facilitate origination of Contracts

---

[1] Unless otherwise noted, all emphasis is added and internal citations and quotation marks are omitted.

based on the information Dealers input about prospective transactions based on interactions with consumers.  It is undisputed that, as an indirect lender, Credit Acceptance has *no contact* with consumers about a vehicle purchase until *after* they finalize their agreements with Dealers and execute their Contracts, and the Dealers have assigned the Contracts to Credit Acceptance.

Against that backdrop, the Complaint challenges almost two million transactions on the basis that over 12,000 Dealers allegedly charged too much for used cars and sold lawful add-on products (such as vehicle service contracts) too often.  But the CFPB is statutorily prohibited from regulating the Dealers it alleges set the high prices and sold the add-on products.  So the Complaint targets Credit Acceptance, one of the Dealers' financing sources, accusing the Company of engaging in repeated "deceptive" and "abusive" acts because the financing it provided to Dealers purportedly "allowed" or "incentivized" them to engage in the complained-of practices.  (*E.g.*, Compl. ¶¶ 175, 221.)  A central problem with Plaintiffs' backdoor efforts to regulate alleged *Dealer* practices, including the disclosures Dealers provide to consumers, is that the Complaint does not allege that Credit Acceptance controls the Dealers or has *any* interaction with consumers deciding whether and on what terms to buy a car.

Plaintiffs are left trying to invent "deception" or "abuse" based on the faulty premise that, before accepting assignment of Contracts, Credit Acceptance should have required Dealers to make disclosures that are different from those mandated by the federal Truth in Lending Act ("TILA"), done more to assess consumers' ability to repay their Contracts or investigated the circumstances under which Dealers sold lawful add-on products.

As for the disclosure-based theories, the Complaint conspicuously does not allege that Credit Acceptance violated TILA or the New York Motor Vehicle Retail Instalment Sales Act ("MVRISA"), which incorporates TILA by reference.  The Complaint further elides that TILA

expressly precludes assignee liability for credit-disclosure-based issues. Plaintiffs have protested that "TILA is irrelevant" because they assert claims under general consumer-protection statutes (ECF No. 53 at 25), and they ask the Court to create a new disclosure regime for the auto finance industry that is *irreconcilable* with the existing TILA regime—a regime that the CFPB is charged with dutifully enforcing and one that creditors (*e.g.*, Dealers) and assignees have relied on for decades. For example, Plaintiffs contend that the Contracts should have disclosed a hypothetical "cash price proxy" invented by Plaintiffs for this litigation instead of the actual "cash price" required by TILA. If Plaintiffs are successful, industry participants will face a Catch 22: either (a) comply with Plaintiffs' invented disclosure regime and violate Congress's clear mandates, or (b) comply with TILA and face a lawsuit like this one. Plaintiffs cannot use delegated enforcement power to rewrite established rules. *See Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 153 (1976) ("[A] statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum.").

Plaintiffs similarly cannot use general statutory prohibitions on "deceptive" and "abusive" practices to ask the Court to enact mandatory underwriting guidelines where no legislature has done so or impose on assignees of commercial paper an unprecedented and impractical duty of oversight over the business operations of creditors. Both requests would completely upend the existing regulatory regime and, as a result, reduce consumer access to credit. These types of policy decisions should be left to the elected legislatures, and not executive agencies. *See West Virginia*, 597 U.S. at 723 ("We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies.").

The Complaint should be dismissed as a matter of law for several independent reasons:

*First*, the Complaint asserts unprecedented and meritless theories of deceptive acts and

practices under the Consumer Financial Protection Act of 2010 ("CFPA"), New York General Business Law ("GBL") § 349 and New York Executive Law ("EL") § 63(12). So that consumers receive meaningful disclosure of credit terms, Contracts must identify the "cash price"—*i.e.*, the price at which the Dealer, in the ordinary course of business, offers to sell a vehicle for cash—and the "finance charge," which is the cost of consumer credit. *See* 15 U.S.C. § 1638(a). Plaintiffs contend that millions of Contracts were "deceptive" because they reflected a "cash price" equal to the actual vehicle selling price that was agreed to by consumers and Dealers, as TILA requires, instead of Plaintiffs' newly invented "cash price proxy" that has no foundation in TILA. According to Plaintiffs, the Contracts contain a "hidden finance charge" equal to the difference between the amount that Credit Acceptance paid Dealers to acquire the Contracts and the face value of the amount financed by the Contracts—the "discount."

Plaintiffs' deceptive-practices claims fail as a matter of law because: (i) the Complaint does not (and cannot) allege that Credit Acceptance made any pre-origination statements to consumers whatsoever (much less deceptive ones) concerning the terms of their Contracts; (ii) the Complaint fails to compare Contracts allegedly containing a "hidden finance charge" with *actual, ordinary course* cash transactions, as would be required to plead a "hidden finance charge" under TILA and Regulation Z; (iii) Plaintiffs do not allege, as they must, that any Dealer separately imposed the cost of a "discount" on any consumer; (iv) adopting Plaintiffs' invented "cash price proxy" would lead to absurd and inconsistent results; and (v) they are foreclosed by TILA's limitations on assignee liability, since a "hidden" finance charge, by definition, cannot be apparent on the face of the assigned documents. (*See infra* § I(A).) Grasping for an act that was actually deceptive, the Complaint twists beyond recognition the Company's statements that consumers can improve their credit scores with on-time payments. Plaintiffs cannot state a claim

by attacking statements that differ from those actually made by the Company.  (*See infra* § I(B).)

*Second*, the Complaint rehashes its "deception" theories and asserts that Credit Acceptance "abused" consumers by taking unreasonable advantage of their supposed inability to understand their Contracts and avoid the risk of default.  Since Credit Acceptance has *no contact* with consumers at the time of their vehicle purchase and plays *no role* in influencing their purchasing decisions, the entire premise of this theory is that consumers do not read their Contracts or understand their finances, and thus should not be responsible for their own choices. The law says otherwise.  The Complaint also asserts that Credit Acceptance took unreasonable advantage of consumers by failing to consider (in the manner preferred by Plaintiffs) consumers' ability to make their installment payments before accepting assignment of certain Contracts.[2] Plaintiffs overlook that, while Congress has required consideration of consumer ability to repay in the mortgage and credit-card industries, it has not done so in the auto industry, much less prescribed a particular method for doing so.  The Court should decline Plaintiffs' invitation to legislate such a major policy issue from the bench.  (*See infra* § II.)

*Third*, in another effort to circumvent clear limitations on the CFPB's authority, Plaintiffs attempt to hold Credit Acceptance liable under the CFPA for aiding and abetting Dealers' alleged deceptive practices concerning add-on products.  Because auto dealers are expressly exempt from the CFPB's jurisdiction, the CFPB cannot enforce the CFPA against Dealers, and thus the CFPB cannot hold Credit Acceptance secondarily liable for alleged Dealer conduct as a matter of law.  Plaintiffs' "substantial assistance" claim also fails because the Complaint lacks factual allegations supporting a plausible inference that: (i) Dealers engaged in the alleged deceptive practices; (ii) the Company sought to bring about such practices; or (iii) acceptance of

---

[2] Plaintiffs acknowledge (but brush aside) that Credit Acceptance requires all income to be verified and will not accept assignment of Contracts if consumers' payment-to-income ratio exceeds a set cap.  (*See* Compl. ¶ 29.)

assignment of Contracts containing add-on products was an "extreme departure" from the Company's duty as an assignee, which, under TILA, is limited to examining the face of the assigned documents for obvious disclosure violations. (*See infra* § III.)

*Fourth*, the CFPB's participation in this lawsuit is improper. Because the Federal Reserve System has been operating at a deficit, the CFPB is not funding this lawsuit with appropriated funds, and the CFPB is acting outside of its statutory authority. (*See infra* § IV.)

*Fifth*, the NYAG's ancillary state-law claims fail as a matter of law. The NYAG cannot use its general enforcement authority under EL § 63(12) to rewrite the MVRISA and impose interest-rate limits that the New York Legislature intentionally removed from the statute more than thirty years ago. (*See infra* § V(A).) The NYAG likewise cannot amend the MVRISA through litigation to include new disclosure obligations that the New York Legislature has repeatedly considered but declined to enact—particularly when the NYAG is attempting to create statutory amendments through litigation that TILA would preempt. (*See infra* § V(B).) Nor can the NYAG step into the shoes of consumers under the so-called "Holder Rule" to hold Credit Acceptance liable for insufficiently pled Dealer practices. (*See infra* § V(C).) Finally, the NYAG's efforts to parlay its other claims into one for securities fraud fails with the other claims. (*See infra* § V(D).)

At bottom, the Court should reject Plaintiffs' invitation to "don its legislative cap and presume to make illegal by judicial fiat" what otherwise are lawful, regulated business practices. *Anderson v. Gen. Motors Acceptance Corp.*, 476 F. Supp. 2d 624, 626 (N.D. Miss. 2007), *aff'd*, 269 F. App'x 452 (5th Cir. 2008); *see also Archer v. Nissan Motor Acceptance Corp.*, 633 F. Supp. 2d 259, 269 (S.D. Miss. 2007) (noting "repeated[] reject[ion]" of claims against auto lenders that failed to allege specific statutory violations), *aff'd*, 550 F.3d 506 (5th Cir. 2008).

# FACTUAL ALLEGATIONS[3]

## A.     Credit Acceptance's Business

Credit Acceptance is one of the country's largest publicly traded indirect auto finance companies, and one of many potential financing sources available to auto dealers to facilitate the sale of cars to their customers.  (*See* Compl. ¶¶ 22, 32.)  Credit Acceptance's financing programs allow Dealers to sell vehicles to consumers regardless of their credit history.  (*See id.* ¶¶ 22, 29, 91.)  Unlike direct financing, where a consumer obtains a loan directly from a lender and then uses the proceeds to purchase a vehicle, Credit Acceptance does not have direct contact with consumers about the terms of their vehicle purchases or financing.  (*See id.* ¶ 48.)  Rather, Credit Acceptance accepts assignment of Contracts negotiated and entered into between Dealers and their customers, and then services those Contracts.  (*See id.* ¶¶ 34-35, 48.)  Credit Acceptance does not sell cars or make loans directly to consumers.  (*See id.* ¶¶ 22, 48.)

Assignment of a Contract to Credit Acceptance stems from two distinct transactions.  In the first, the consumer and the Dealer negotiate and agree on the sale price of a vehicle and whether to include an optional add-on product, such as a vehicle service contract ("VSC") or guaranteed asset protection ("GAP"), as well as the terms of financing, with the Dealer financing the consumer's purchase.  (*See id.* ¶¶ 38, 48.)[4]  In the second transaction, if the Dealer chooses to use Credit Acceptance (rather than a competitor) as a financing source, the Dealer and Credit Acceptance agree on the terms of assignment of the Contract, including the amount that Credit

---

[3] Plaintiffs' factual allegations are accepted as true solely for purposes of this motion to dismiss.  *See Nat. Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006).

[4] VSCs are agreements to perform or pay for certain mechanical repairs or services.  (*See* Compl. ¶ 113.)  GAP waivers cover the difference between consumers' Contract balances and the amount covered by their primary auto insurance in the event of a total loss due to damage or theft.  (*See id.*)

Acceptance will pay the Dealer at the time of assignment ("CAC Payment").  (*See id.*)[5]

To facilitate these transactions, Dealers submit application information from potential customers through the Company's online Credit Approval Processing System ("CAPS").  (*See id.* ¶¶ 33, 48.)  Based on the information that the Dealer inputs into CAPS, including the consumer's personal and financial information and the selling price of the vehicle (*see id.* ¶¶ 34, 47), and subject to the Company's compliance parameters, CAPS provides a range of financing options for the Dealer as it negotiates the structure and terms of the consumer's Contract, should the Dealer wish to assign the Contract to Credit Acceptance.  (*See id.* ¶¶ 34, 48.)  If the consumer would like to finance the purchase of an add-on product, the Company provides Dealers with access to pre-approved products.  (*See id.* ¶ 113.)

Based on the information that the Dealer inputs into CAPS and the structure of the proposed transaction (*e.g.*, Contract term, monthly payment, down payment), Credit Acceptance calculates the CAC Payment using an internal scoring model whose output is the "Score."  (*See id.* ¶¶ 3-4, 26, 34, 37-38, 47-48.)  The Score reflects the Company's estimate at origination of future net collections from all sources on a given Contract based on historical collections from a large population of Contracts with similar characteristics.  (*See id.* ¶¶ 26, 97.)  The Score does not affect the terms of a Contract, and Credit Acceptance does not use the Score to determine whether to approve a consumer's application for financing.  (*See id.* ¶¶ 3, 32.)

Once the consumer and the Dealer agree on Contract terms that are acceptable to each— subject to the Company's compliance parameters (*see id.* ¶¶ 29, 57)—CAPS generates the form

---

[5] Although barely acknowledged in the Complaint, the nature of the CAC Payment depends on whether a Contract is assigned to Credit Acceptance under its "Portfolio Program" or its "Purchase Program."  (*See* Compl. ¶ 36.)  For Contracts assigned under the Portfolio Program, the CAC Payment is in the form of an advance of the Dealer's share of net collections, and the Dealer retains the opportunity to receive back-end "earnout" payments once the advance is recovered through net collections.  (*See id.* ¶¶ 36, 94.)  Under the Purchase Program, the CAC Payment is a single cash payment to the Dealer at the time of assignment; Credit Acceptance retains all net collections after that.

documents and "any required disclosures" from the information entered by the Dealer in CAPS. (*Id.* ¶ 52; *see also id.* ¶¶ 33-34, 47-48.)  After the consumer and the Dealer execute the Contract, the Dealer assigns it to the Company, which collects amounts due from the consumer.  (*See id.* ¶ 34.)  For liquidity, Credit Acceptance securitizes certain expected collections from Contracts for sale to institutional and accredited investors in private offerings.  (*See id.* ¶¶ 158-60.)

**B.**     **Statutory and Regulatory Background**

Comprehensive state and federal regimes govern virtually every facet of the auto finance industry.  The CFPB is constrained by the existing federal regimes, and must enforce these laws "consistently" and in a way that "ensur[es] that all consumers have access to markets for consumer financial products and services."  12 U.S.C. § 5511(a).  As relevant here, TILA and its implementing regulation, Regulation Z, govern consumer credit disclosures.  *See Vincent v. Money Store*, 736 F.3d 88, 105 (2d Cir. 2013).  Congress enacted TILA to "assure a meaningful disclosure of credit terms" and allow a consumer to "be able to compare more readily the various credit terms available to him and avoid the uninformed use of credit."  15 U.S.C. § 1601(a).

**TILA's disclosure requirements.**  In connection with the sale of a vehicle on credit, TILA requires an auto dealer to disclose, *inter alia*, the (i) "amount financed," (ii) "finance charge," both as a dollar figure and an annual percentage rate, (iii) "total of payments" equal to the sum of the amount financed and the finance charge, and (iv) "total sale price" of the vehicle, equal to the "cash price" of the vehicle, plus additional charges and the finance charge. 15 U.S.C. § 1638(a).  These terms have defined meanings, which Plaintiffs cannot alter here:

"Amount financed" is equal to (i) the "cash price" of the vehicle, plus (ii) authorized taxes and fees, plus (iii) the cost of any add-on product, less (iv) any consumer down payment and trade-in value for the consumer's previous vehicle.  *See id.* § 1638(a)(2)(A).

"Cash price" is the price at which a dealer, "in the ordinary course of business, offers to sell" the vehicle for cash. 12 C.F.R. § 1026.2(a)(9).

"Finance charge" is "the cost of consumer credit." *Id.* § 1026.4(a). It includes any charge "imposed directly or indirectly by the [dealer] as an incident to the extension of credit," 15 U.S.C. § 1605(a), or as "a condition of the extension of credit." 12 C.F.R. § 1026.4(a). "It does not include any charge of a type payable in a comparable cash transaction." *Id.* According to the official interpretation of Regulation Z, "[c]harges absorbed by the [dealer] as a cost of doing business are not finance charges, even though the [dealer] may take such costs into consideration in determining the interest rate to be charged or the cash price of the property or service sold." 12 C.F.R. pt. 1026, supp. I, § 1026.4(a)(2).[6] In that connection, "[a] discount imposed on a credit obligation when it is assigned by a [dealer] to another party is not a finance charge so long as the discount is not separately imposed on the consumer." *Id.* § 1026.4(a)(2)(i).

**Limits on assignee liability.** Because "creditors" (here, Dealers) are solely responsible for making the required disclosures, *see* 15 U.S.C. § 1631(b), TILA "imposes general liability only on creditors and greatly circumscribes the liability of assignees" for disclosure-related issues. *Vincent*, 736 F.3d at 105.[7] TILA allows the imposition of liability on an assignee, such as Credit Acceptance, only if a disclosure violation "is apparent on the face of the disclosure statement" or "other documents assigned." 15 U.S.C. § 1641(a).

---

[6] This interpretation of Regulation Z has remained unchanged and has been relied on by industry participants since it was initially adopted by the Federal Reserve Board in 1981, *see* Truth in Lending; Official Staff Commentary, 46 Fed. Reg. 50,288, 50,298 (Oct. 9, 1981) (codified at 12 C.F.R. pt. 226, supp. I, § 226.4(a)(2)), including after Congress transferred oversight for TILA and Regulation Z to the CFPB in the CFPA, effective July 21, 2011. *See* 12 U.S.C. §§ 5512(a), 5481(12)(O), 5582(a); Designated Transfer Date, 75 Fed. Reg. 57,252 (Sept. 20, 2010).

[7] TILA's obligations extend only to "creditor[s]." 15 U.S.C. § 1638(a). "TILA establishes a straightforward, objective inquiry for determining the identity of the creditor: it is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness." *Vincent*, 736 F.3d at 106 (quoting 15 U.S.C. § 1602(g)); *see also Riviere v. Banner Chevrolet, Inc.*, 184 F.3d 457, 461 (5th Cir. 1999) (car dealer was the sole creditor even though loan was immediately assigned to a finance company). The Complaint does not (and cannot) allege that Credit Acceptance is a "creditor" under TILA.

**Enforcement powers and limitations.** Through the CFPA, Congress created the CFPB and transferred to it the administration of TILA (along with 17 other existing federal statutes). *See* 12 U.S.C. §§ 5491(a), 5512(a), 5481(12). Congress also enacted a new prohibition on "any unfair, deceptive, or abusive act or practice" by certain participants in the consumer-finance sector. *Id.* § 5536(a). Congress authorized the CFPB to implement that broad standard (and the 18 preexisting statutes placed under its purview) through binding regulations, *see id.* §§ 5531(b), 5581, and "vested the CFPB with potent enforcement powers." *Seila Law LLC v. CFPB*, 591 U.S. 197, 206 (2020). At the same time, the CFPA expressly excludes auto dealers from the CFPB's "rulemaking, supervisory, [and] enforcement" authority. 12 U.S.C. § 5519(a). The legislative history reveals that "[t]he purpose of [this exclusion] was to protect third party auto financing" and "preserve a variety of auto financing choices for consumers." 156 Cong. Rec. 13,178 (2010) (statement of Sen. Brownback); *see also id.* at 13,178-79 (expressing concern that, without the auto dealer exemption, the CFPB would "engage in regulatory overreach that will hurt our economy," including by "abolish[ing]" third-party auto financing).

Auto dealers remain subject to federal oversight from the Federal Trade Commission ("FTC") and Federal Reserve Board, including with respect to TILA. *See* 12 U.S.C. § 5519(c).[8] In that connection, the FTC recently finalized the Combating Auto Retail Scams ("CARS") Rule to prohibit unscrupulous dealer practices like those on which the Complaint focuses. *See* Combating Auto Retail Scams Trade Regulation Rule, 89 Fed. Reg. 590 (Jan. 4, 2024) (to be codified at 16 C.F.R. pt. 463). Among other things, the CARS Rule:

- prohibits car dealers from making misrepresentations about material information, including the costs or terms of buying or financing a vehicle and any costs, limitations or benefits of an add-on product or service;

---

[8] Congress also authorized state attorneys general to bring civil actions under the CFPA after consultation with the CFPB. *See* 12 U.S.C. § 5552(a)(1), (b)(1)(A).

- requires dealers to clearly disclose the offering price—*i.e.*, the full cash price for which the dealer will sell or finance the vehicle to any consumer, excluding only required government charges (*e.g.*, taxes, registration costs, etc.);

- makes it illegal for dealers to charge consumers for add-ons that do not provide a benefit; and

- requires dealers to obtain consumers' express, informed consent before charging them for anything.

*See id.* at 613, 615, 636, 645, 651. Enforcement of this new proposed rule would fall outside the power that has been delegated to the CFPB in the CFPA.[9]

## C. The Complaint's Exemplar Contract

The Complaint relies extensively on the Contract between Ms. B and a Michigan Dealer, entered into more than eight years ago. (*See* Ex. A.)[10] As reflected in Ms. B's Contract, after she selected a gray 2009 Pontiac G6 sedan on the Dealer's lot, Ms. B and the Dealer agreed to a sale price of $8,195. (*See id.* at 2.) Ms. B also agreed to purchase a VSC for $1,631. (*See id.* at 1-2.) Ms. B made a $2,250 down payment and agreed with the Dealer to finance the balance: $8,292.10 after taxes and fees. (*See id.*) Ms. B and the Dealer agreed to a 51-month Contract term and a 23.99 annual percentage rate. (*See id.* at 1.) Based on the information that the Dealer input into CAPS, CAPS generated the form transaction documents for the Dealer, including: (1) a five-page retail installment contract ("RIC") containing the terms of Ms. B's vehicle purchase; (2) her VSC; (3) a one-page "disclosure form" with additional acknowledgments; and

---

[9] The FTC has postponed the effective date of the CARS Rule to allow for judicial review. *See* Order Postponing Effective Date of Final Rule Pending Judicial Review, *In re Combating Auto Retail Scams Trade Regulation Rule*, No. P204800 (FTC Jan. 18, 2024), https://www.ftc.gov/system/files/ftc_gov/pdf/P204800CARSExtensionOrder.pdf.

[10] Exhibit A is attached to the Declaration of Patrick G. Rideout, dated March 14, 2023. (*See* ECF No. 36.) In ruling on a motion to dismiss, the Court "may consider documents attached to the complaint as exhibits, or incorporated by reference, as well as any documents that are integral to, or explicitly referenced in, the pleading." *Matusovsky v. Merrill Lynch*, 186 F. Supp. 2d 397, 400 (S.D.N.Y. 2002) (citing *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991)); *accord Pucilowski v. Spotify USA, Inc.*, No. 21 Civ. 1653 (ER), 2022 WL 836797, at *3 (S.D.N.Y. Mar. 21, 2022), *aff'd*, No. 22-869-cv, 2022 WL 16842926 (2d Cir. Nov. 10, 2022). Ms. B's Contract is incorporated by reference in, integral to and explicitly referenced throughout the Complaint. (*See* Compl. ¶¶ 27, 31, 42, 61-62, 82.)

(4) her hand-signed acknowledgment that she consented to e-sign her transaction documents.
Credit Acceptance ultimately agreed to accept assignment and make an initial $5,614 payment to
the Dealer, reflecting a $2,678 discount from the stated amount financed.  (*See* Compl. ¶ 61.)

The front page of Ms. B's RIC prominently includes the following TILA disclosure:

| TRUTH IN LENDING DISCLOSURES | | | | |
|---|---|---|---|---|
| **ANNUAL PERCENTAGE RATE** The cost of Your credit as a yearly rate. | **FINANCE CHARGE** The dollar amount the credit will cost You. | **Amount Financed** The amount of credit provided to You or on Your behalf. | **Total of Payments** The amount You will have paid after You have made all payments as scheduled. | **Total Sale Price** The total cost of Your purchase on credit, including Your down payment of $ 2,250.00 is |
| 23.99 % | $5,009.21 | $8,292.10 | $13,301.31 | $15,551.31 |

| Payment Schedule: Your payment schedule will be: | | |
|---|---|---|
| No. of Payments | Amount of Payments | When Payments Are Due |
| 51 | $260.81 | March 12, 2016  and same date of each following month. |

(*Id.* ¶ 27; Ex. A at 1.)  The second page includes an itemization of her $8,292.10 amount
financed, including the agreed sale price of her car ($8,195.00), the cost of her VSC ($1,631.00)
and applicable taxes and fees ($716.10), less her down payment ($2,250.00).  (*See* Ex. A at 2.)

Ms. B acknowledged in the "**OPTIONAL EXTENDED WARRANTY OR SERVICE
CONTRACT**" section of her RIC that she was "not required to purchase" her VSC and that she
"voluntarily elect[ed] to buy" the VSC.  (*Id.* at 1)  Ms. B again acknowledged in bold font that
"**[t]he purchase of this Vehicle Service Contract is NOT a requirement to purchase or
obtain financing**."  (*Id.* at 6.)  And in the disclosure form selectively quoted in the Complaint
(*see* Compl. ¶ 42), Ms. B made several acknowledgments relevant to the Complaint's claims:

> I understand that the price of the vehicle is the price which is set forth in the
> Contract and that I personally negotiated this price with the [Dealer].  . . . I further
> represent that the [Dealer] did not quote me a lower cash price for the vehicle and
> that *the [Dealer] did not increase the price of the vehicle because I was purchasing
> the vehicle on credit* or because the Contract would be assigned to Credit
> Acceptance.  . . . I understand that Credit Acceptance and the [Dealer] have an
> agreement that provides that *Credit Acceptance will pay the [Dealer] a portion of
> the amount I actually owe under the Contract and that this amount is sometimes
> referred to as a "discount."* . . . I understand that the [Dealer's] agreement with
> Credit Acceptance does not in any way affect the amount of my obligation under

> the Contract as I purchased [my car] on terms acceptable to me with full and complete knowledge that Credit Acceptance will advance to the [Dealer] only a portion of the amount I have actually agreed to pay and that Credit Acceptance will retain the "discount." If the purchase of the vehicle includes [add-on] products, such as a service contract . . . , I understand that *I am not required to purchase these goods and services in order to buy the car on credit . . . .*

(Ex. A at 14.) The Dealer also represented that it "explained the information" in the form to Ms. B "and that it has no knowledge, information or belief that would cause [it] to believe that any of [Ms. B's] representations . . . are inaccurate or incomplete." (*Id.*)

After reviewing the terms of her Contract, including the risk of repossession and a collection action if she did not timely make the stated monthly payments (*see id.* at 3-4), Ms. B executed the Contract, paid the Dealer $2,250 in cash and drove her Pontiac G6 off the lot.

## D.   The Complaint's Allegations

The Complaint alleges that, despite not being a party to, and playing no role in, the negotiation of the Contracts voluntarily entered into between Dealers and their customers, Credit Acceptance "obscur[es] the cost of credit for auto loans and tak[es] unreasonable advantage of consumers' lack of understanding of the risk of default and the severity of the consequences," and "enter[s] into unconscionable contractual terms." (Compl. ¶¶ 11-12.) Even after separate, multi-year investigations, Plaintiffs cannot allege facts that actually support those contentions. Indeed, other than attacking interest rates that Plaintiffs concede are *legal* (*see id.* ¶ 2), the Complaint makes plain that Plaintiffs are trying to regulate *Dealer* practices *en masse* through litigation against a financing source—undoubtedly because Dealers are exempt from the CFPB's jurisdiction. *See* 12 U.S.C. § 5519(a). The crux of the Complaint is that:

- *Dealers* "sell cars at inflated prices" (Compl. ¶ 4; *see also id.* ¶¶ 39, 175, 184);

- *Dealers* "hide . . . add-on products in [Contract] paperwork" and "fail to disclosure [sic] to [consumers] that add-on products were included in their" Contracts (*id.* ¶ 219; *see also id.* ¶¶ 7, 129, 194, 200, 205, 221); and

14

- *Dealers* "[s]ell[] vehicles that malfunction shortly after purchase" (*id.* ¶¶ 194, 200, 205).

The Complaint does not allege that Dealers engaged in these practices as Credit Acceptance's agents or as part of a conspiracy with Credit Acceptance. And, as set forth below, Plaintiffs' unsupportable claims against Credit Acceptance are contrary to well-settled law.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "[T]his standard creates a 'two-pronged approach.'" *Pension Ben. Guar. Corp. ex rel. St. Vincent Cath. Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717 (2d Cir. 2013). First, "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal*, 556 U.S. at 679. A pleading that "tenders naked assertion[s] devoid of further factual enhancement" will not suffice. *Id.* at 678. The Court need not "accept as true a legal conclusion couched as a factual allegation." *Id.*

Second, a complaint must plead facts "allow[ing] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Importantly, the complaint must demonstrate 'more than a sheer possibility that a defendant has acted unlawfully.'" *Pension Ben. Guar. Corp.*, 712 F.3d at 718. If the pleaded facts "do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)). "Determining whether a complaint states a plausible claim for relief is a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Pension Ben. Guar. Corp.*, 712 F.3d at 718 (cleaned up).

Although the Complaint fails even under Rule 8(a), it should be subject to Rule 9(b)'s heightened standards because its allegations "sound in fraud," *Rombach v. Chang*, 355 F.3d 164,

170-71 (2d Cir. 2004), including, in particular, those surrounding Plaintiffs' "hidden finance charge" theories of deception under the CFPA and GBL § 349 and "fraud" under EL § 63(12). (*See* Compl. ¶¶ 11-12, 175-76, 183-84, 191-193, 199, 204, 212, 219, 226.)  *See also Matsumura v. Benihana Nat'l Corp.*, 542 F. Supp. 2d 245, 251 (S.D.N.Y. 2008) (collecting cases).  Courts have applied heightened pleading standards to claims like those asserted in the Complaint.[11]

## ARGUMENT

As the Supreme Court has repeatedly made clear, executive agencies do not have unbridled authority.  *See, e.g.*, *West Virginia*, 597 U.S. at 723 ("Agencies have only those powers given to them by Congress.")  Rather, agencies are constrained by the policy choices reflected in the statutes that they are charged with enforcing, and "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Loper Bright*, 144 S. Ct. at 2273.  Here, Credit Acceptance's alleged acts would not give rise to liability under the existing regulatory regime.  Undeterred, Plaintiffs have tried to invent a new regime—with new and contradictory obligations—by invoking general statutory prohibitions on "deceptive" and "abusive" practices and "fraud."  Endorsing Plaintiffs' theories in this case would have a chilling effect that would drastically change how auto finance operates and severely restrict opportunities for consumers to purchase vehicles.  *See* CARS Rule, 89 Fed. Reg. at 592

---

[11] *See CFPB v. Prime Mktg. Holdings, LLC*, No. CV 16-07111-BRO (JEMx), 2016 WL 10516097, at *5 (C.D. Cal. Nov. 15, 2016) (applying Rule 9(b) to CFPA claims); *see also Elson v. Black*, 56 F.4th 1002, 1008 (5th Cir. 2023) (applying Rule 9(b) to GBL § 349 claim); *Shu v. Toyota Motor Sales USA, Inc.*, 669 F. Supp. 3d 888, 897 (N.D. Cal. 2023) (same); *People ex rel. Cuomo v. Wells Fargo Ins. Servs., Inc.*, 62 A.D.3d 404, 405 (1st Dep't 2009) (failure to plead "fraud" under EL § 63(12) with "particularity"), *aff'd*, 16 N.Y.3d 166 (2011).  To be sure, courts have declined to apply Rule 9(b) to claims like those asserted in the Complaint, relying on the fact that the elements of the claims asserted differed from those of common law fraud.  *See, e.g.*, *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005) (holding that Rule 8(a) applies to GBL § 349 claims); *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 768-69 (S.D.N.Y. 2018) (CFPA, GBL § 349 and EL § 63(12)), *amended on other grounds*, No. 17-CV-890 (LAP), 2018 WL 11219167 (S.D.N.Y. Sept. 12, 2018), *vacated on other grounds*, 828 F. App'x 68 (2d Cir. 2020).  These cases, however, are inconsistent with *Rombach,* which held that Rule 9(b) "is cast in terms of the *conduct alleged*, and is not limited to allegations styled or denominated as fraud or expressed in terms of the constituent elements of a fraud cause of action."  *Rombach*, 355 F.3d at 170-71.

(describing the "essential" nature of vehicles).[12]  Because the sweeping reforms that Plaintiffs ask the Court to implement carry "economic and political significance," there is "reason to hesitate before concluding that Congress [or the New York Legislature] meant to confer such authority."  *West Virginia*, 597 U.S. at 721.  As shown below, the Court should reject Plaintiffs' efforts to rewrite the rules to invent claims where none exist.  *See id.* at 723 ("We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies.").

## I.  THE COMPLAINT DOES NOT STATE A CLAIM FOR DECEPTIVE ACTS OR PRACTICES OR "FRAUD"

In the Complaint, Plaintiffs go to great lengths to cast lawful business conduct as deceptive acts or practices under the CFPA and GBL § 349 and "fraud" under EL § 63(12).  "To make out a *prima facie* case of deceptive acts or practices under the CFPA, the Complaint must allege adequately '(1) a representation, omission or practice that, (2) is likely to mislead consumers acting reasonably under the circumstances, and (3) that the representation, omission or practice is material.'"  *RD Legal Funding*, 332 F. Supp. 3d at 772-73.  GBL § 349 requires similar allegations.  *See Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 557 (S.D.N.Y. 2014) (collecting cases).  "Fraud" is defined in EL § 63(12) as "deception, misrepresentation, concealment, suppression, false pretense [or] false promise."  EL § 63(12).  As demonstrated below, the Complaint fails to allege that Credit Acceptance engaged in any deceptive acts or practices or "fraud" in violation of any of the above-enumerated statutes.

### A.  The Complaint Does Not Allege that Credit Acceptance Deceived Consumers About the Cost of Credit in Their Contracts

The Complaint asserts an unprecedented theory of consumer deception, whereby an

---

[12] *Amici* have explained in detail how the legal theories advanced by Plaintiffs in this case "threaten to undermine the well-established commercial relationships in the indirect vehicle finance industry and significantly restrict the availability of credit to consumers, including those in the subprime market."  (ECF No. 52 at 23.)

indirect finance company violates the law if its "business model" "allow[s]" or "incentivizes" third parties (Dealers) to sell cars at prices Plaintiffs believe are too high. (Compl. ¶¶ 2, 4, 175-76.) Based on the allegedly "inflated" vehicle sale prices negotiated between Dealers and their customers, the Complaint asserts that *Credit Acceptance* "hid[]" the "true cost of credit" from consumers, and thus "misled" them as to the material terms of their Contracts. (*Id.* ¶¶ 175-76.) As shown below, the Complaint's theory of deception fails as a matter of law for at least three reasons. Thus, Count I should be dismissed, as should Counts III, IV and V insofar as they are based on an alleged (i) failure to disclose the "true finance charge" or (ii) charging of interest in excess of the disclosed rate. (*See id.* ¶¶ 175-76, 191(a), (c)-(d), 199(a), (c)-(d), 204(a), (c)-(d).)

> **1.** **The Complaint Does Not Allege that Credit Acceptance Deceived Any Consumers Concerning the Alleged "Hidden Finance Charges"**

First, the Complaint does not allege that Credit Acceptance "engage[d] in any . . . deceptive . . . act or practice," such as by making a misrepresentation or omission to any consumer about the terms of any Contract. 12 U.S.C. § 5536(a)(1)(B); *see also* GBL § 349(a)-(b) (claim must allege that a "person . . has engaged in" "[d]eceptive acts or practices"); EL § 63(12) (person must "engage in repeated fraudulent or illegal acts"). In fact, the Complaint does not allege that Credit Acceptance had *any pre-assignment contact* with a consumer about any of the near-two million Contracts at issue. Courts routinely dismiss deceptive-practices claims under analogous circumstances. *See, e.g.*, *Copley v. Bactolac Pharm., Inc.*, No. 18-CV-575 (FB) (PK), 2021 WL 918313, at *2 (E.D.N.Y. Mar. 10, 2021) ("no contact at all between" consumers and defendant); *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 309 (E.D.N.Y. 2017) (complaint did "not assert any contact between defendant or plaintiff whatsoever").

The Complaint cannot overcome this glaring deficiency by cursorily asserting that Credit Acceptance "controls each material aspect of the vehicle financing process for consumers" and

"allow[s] and incentivize[s] dealers to sell vehicles at inflated prices."  (Compl. ¶¶ 46, 175.)

Conclusory allegations of "control" or "influence" over third-party actions through monetary

"incentives" are insufficient to state a claim.  *Schachter v. Sunrise Senior Living Mgmt., Inc.*, No.

3:18-cv-00953 (JAM), 2020 WL 1274601, at *5 (D. Conn. Mar. 16, 2020); *see also Glover v.

Bob's Disc. Furniture, LLC*, 621 F. Supp. 3d 442, 453 (S.D.N.Y. 2022) ("entirely conclusory"

allegations of mere "incentives to misrepresent the scope" of furniture protection plan were

insufficient to state a claim).  Were the law otherwise, the fact that a higher price results in more

profit for the seller would make almost all transactions deceptive.  This, of course, is not the

case, and courts routinely reject claims characterizing as "deceptive" a failure to disclose the

terms of a business-to-business transaction between an auto dealer and an assignee.[13]  That

Credit Acceptance informs Dealers of the terms at which it would accept assignment of a

Contract (*see* Compl. ¶ 38) does not transform an otherwise lawful and *bona fide* car sale into a

deceptive device.  *See, e.g.*, *Flatbush Auto Disc. Corp. v. McCarthy-Bernhardt Buick, Inc.*, 9

N.Y.2d 776, 777 (1961) (per curiam); *accord Garcia v. Chrysler Cap. LLC*, No. 15 Civ. 5949

(ER), 2016 WL 5719792, at *4-5 (S.D.N.Y. Sept. 30, 2016).

Moreover, the Complaint's general assertion that Credit Acceptance "controls each

material aspect" of the consumer transaction process (Compl. ¶ 46) is contradicted by the

Complaint's more specific allegations showing that independent, third-party *Dealers*—not Credit

Acceptance—maintain this control.  *See DPWN Holdings (USA), Inc. v. United Air Lines, Inc.*,

---

[13] *See, e.g.*, *Baldwin v. Laurel Ford Lincoln-Mercury, Inc.*, 32 F. Supp. 2d 894, 900 (S.D. Miss. 1998); *Thompson v. Connex Credit Union*, No. X03HHDCV20-6132115S, 2021 WL 1117166, at *1 (Conn. Super. Ct. Mar. 3, 2021); *Scott v. Ford*, No. 109414, 2021 WL 303821, at *2-3 (Ohio Ct. App. Jan. 28, 2021); *Ford Motor Credit Co. v. Majors*, No. A04-1468, 2005 WL 1021551, at *6-7 (Minn. Ct. App. May 3, 2005); *Beaudreau v. Larry Hill Pontiac/Oldsmobile/GMC, Inc.*, 160 S.W.3d 874, 881 (Tenn. Ct. App. 2004); *Kunert v. Mission Fin. Servs. Corp.*, 1 Cal. Rptr. 3d 589, 606 (Ct. App. 2003); *Chancellor v. Gateway Lincoln-Mercury, Inc.*, 502 S.E.2d 799, 804-05 (Ga. Ct. App. 1998); *Ex parte Ford Motor Credit Co.*, 717 So. 2d 781, 786-87 (Ala. 1997).

747 F.3d 145, 151-52 (2d Cir. 2014) (court may not accept as true "general allegations that are contradicted by more specific allegations in the Complaint").[14]  The Complaint alleges that *Dealers* set the "cash prices" of the vehicles on their lots, communicate those prices to consumers and negotiate the terms of sale.  (*See* Compl. ¶¶ 38-39, 46-48.)  The Complaint also alleges that "the amount of the down payment, the length of the [Contract] term, the selling price of the vehicle, and whether an add-on product will be included in the transaction" are all input into CAPS *by the Dealer* after negotiating with the consumer.  (*Id.* ¶ 48.)  It is these material inputs that CAPS uses to generate the form Contract documents.  (*See id.* ¶¶ 48, 51.)[15]

What is left is the Company's performance of simple, "mechanical" math and generation of form documents "behind the scenes" (*id.* ¶¶ 48, 67 n.2), neither of which can plausibly deceive consumers or cause them injury.  *See Miller*, 994 F. Supp. 2d at 557 ("The plaintiff must show that the *defendant's* material deceptive act caused the injury."); *see also Pension Ben. Guar. Corp.*, 712 F.3d at 717-18 ("[T]he plaintiff [must] plead facts allowing the court to draw the reasonable inference that the *defendant* is liable for the misconduct alleged.").[16]

## 2. The Complaint Fails to Plead Any "Hidden Finance Charges"

Second, Plaintiffs' claims fail because they do not allege any facts supporting a plausible

---

[14] This "control" theory is irreconcilable with the Complaint's "incentives" theory: if Credit Acceptance "controlled" selling prices, there would be no need to economically "incentivize" Dealers to inflate them.

[15] To the extent that Plaintiffs take issue with how certain *Dealers* obtain these inputs, the CFPB should refer the issue to the FTC or the NYAG should look into the matter at source of the perceived issue.  *Cf.* CARS Rule, 89 Fed. Reg. at 590 (FTC-promulgated reforms to address practices of unscrupulous auto dealers).

[16] The Complaint does not (and cannot) allege an agency relationship between Credit Acceptance and any Dealer to attribute the alleged deceptive practices to Credit Acceptance.  That a finance company "tell[s] the dealer the terms of assignment that it will accept" is "not sufficient control to establish agency," particularly when the finance company does not control how the dealer "decides to sell its automobiles" or the "offer and acceptance process between the dealer and the consumer."  *Pescia v. Auburn Ford-Lincoln Mercury Inc.*, 68 F. Supp. 2d 1269, 1282-83 (M.D. Ala. 1999), *aff'd*, 31 F. App'x 202 (11th Cir. 2001).  This is true even when the dealer "used forms provided by" and "received instructions about how to fill out the forms from" the finance company and had access to the finance company's computer.  *Id.* at 1282.  Mere "influence" through "financial incentives" is not enough to plead agency.  *Grimmett v. Sunlight Fin. LLC*, No. 2:23-cv-00084, 2023 WL 6449447, at *7 (S.D. W. Va. Oct. 3, 2023).

inference that any Contract contained a "hidden finance charge."  Instead, Plaintiffs attempt to circumvent their pleading burden by conjuring a "cash price proxy" theory of liability that is foreclosed by both controlling Second Circuit precedent and governing federal regulations.

### (a)   The Complaint Does Not Allege Purchase Price Discrimination Based on Credit Status

The gravamen of Plaintiffs' "hidden finance charge" claims is that Credit Acceptance should have told millions of consumers that the selling prices they negotiated with independent, third-party Dealers without ever communicating with Credit Acceptance were higher than the prices that the Dealers would have charged a cash customer for the same vehicles.  But Plaintiffs have not alleged actual facts, as they must, showing that any Dealer charged one of these consumers a higher "cash price" for a vehicle *because* he or she financed the purchase.  As discussed above (*see supra* at 9-10), a "finance charge" is "the cost of consumer credit"; it does not include any charge payable in a "comparable cash transaction."  12 C.F.R. § 1026.4(a).

To state a claim that a car dealer has "bur[ied] hidden finance charges" in vehicle sale prices, a complaint must allege "purchase price discrimination based on credit status."  *Poulin v. Balise Auto Sales, Inc.*, 647 F.3d 36, 37, 40 (2d Cir. 2011).  This requires factual allegations showing that the dealer charged credit customers higher "cash" prices than it would have charged cash customers in the ordinary course of business for the same or similar merchandise "*only because they are buying on credit*."  *Id.* at 40.  *Poulin*'s pleading requirements flow directly from the definition of "cash price" in Regulation Z, which since 1969 has provided a clear and workable definition that must be applied consistently in view of TILA's purpose:[17]

> [T]he price at which a creditor, in the ordinary course of business, offers to sell for cash property or service that is the subject of the transaction.  At the creditor's

---

[17] *See* 15 U.S.C. § 1601(a).  Congress intended for TILA to promote the informed use of credit by consumers through a *uniform* system of disclosures—one that does not vary by creditor or jurisdiction.  *See, e.g.*, *In re DiVittorio*, 670 F.3d 273, 287 (1st Cir. 2012); *Mason v. Gen. Fin. Corp.*, 542 F.2d 1226, 1231-32 (4th Cir. 1976).

option, the term may include the price of accessories, services related to the sale, service contracts and taxes and fees for license, title and registration. The term does not include any finance charge.

12 C.F.R. § 1026.2(a)(9). Thus, the "cash price" is based on the amount the Dealer actually *offers* to sell the vehicle *in the ordinary course of business. Id.*

Here, not one of the Complaint's 226 paragraphs contains a factual allegation showing that any of the 12,000 Dealers whose alleged conduct is implicated here engaged in purchase price discrimination based on credit status in any of the 2 million transactions ostensibly at issue. (*See* Compl. ¶¶ 22-23.) For example, with respect to "Ms. B's" Contract, Plaintiffs do not allege that the Dealer advertised or offered to cash purchasers a sale price less than $8,195 for the 2009 Pontiac G6 sold to Ms. B, or that the Dealer sold cars of the same vintage and condition for different prices to cash buyers. Rather, Ms. B's Contract, which the Complaint incorporates by reference (*see supra* note 10), provides: (i) the "cash price" of Ms. B's 2009 Pontiac G6 "is the price which is set forth in the Contract"; (ii) she "personally negotiated this price" with the Dealer; (iii) the Dealer "did not quote [her] a lower cash price for the vehicle"; and (iv) the Dealer "did not increase the price of the vehicle because [she] was purchasing the vehicle on credit or because the Contract would be assigned to Credit Acceptance." (Ex. A at 14.)

The Complaint cannot overcome its failure to plead purchase price discrimination based on credit status through conclusory averments that Credit Acceptance "incentivizes" Dealers to "hid[e] an additional cost of credit in the principal amount financed" and that "[t]his hidden cost appli[es] only to financing customers, not cash buyers." (Compl. ¶¶ 2, 4, 175.) "The relevant pleading standards do not permit such general accusations of imprudence, unsupported by well-pleaded factual allegations." *Pension Ben. Guar. Corp.*, 712 F.3d at 724.[18]

_____

[18] Allegations that are contradicted by a document incorporated by reference in a complaint, like Ms. B's Contract

### (b) A "Cash Price Proxy" Is No Substitute for Factual Allegations Showing Purchase Price Discrimination Based on Credit Status

Unable to allege any actual credit-based price discrimination, the Complaint invents a new test for pleading "hidden finance charges" that focuses on what indirect finance companies pay to dealers to acquire and service Contracts pursuant to business-to-business arrangements. Plaintiffs assert that the negotiated cash prices reflected on the face of the Contracts assigned to Credit Acceptance should have been replaced by an imagined "proxy for the true cash-purchase price" equal to the amounts a Dealer *may receive* from two distinct transactions: (1) the down payment paid by the consumer and (2) the initial amount paid by Credit Acceptance to acquire a Contract (the CAC Payment). (*See* Compl. ¶¶ 34-35, 59.) The Complaint then asserts that a "hidden finance charge" exists whenever the total cost to the consumer reflected in a Contract (the sum of the negotiated "cash price" for the vehicle, the cost of any add-on product and applicable taxes and fees)[19] exceeds the amounts received by the Dealer. (*See id.*)

Put differently, Plaintiffs assert that a "hidden finance charge" exists whenever the CAC Payment is less than the "amount financed" by the consumer—*i.e.*, whenever the Company accepts assignment of a Contract at a discount. Ms. B's Contract is illustrative:



Plaintiffs' attempt to plead "hidden finance charges" based on their "cash price proxy" is

---

(*see* Ex. A at 14), "are insufficient to defeat a motion to dismiss." *Matusovsky*, 186 F. Supp. 2d at 400.

[19] This amount is also equal to the sum of the down payment, any trade-in value and the amount financed. (*See* Compl. ¶¶ 60-62; Ex. A at 2.) The Complaint refers to this amount variably as "the total disclosed cost of the CAC-financed transaction (minus interest)" and "the amount a CAC-financed purchaser pays." (Compl. ¶¶ 60, 63.)

contrary to controlling law. A discount on the amount financed is not a finance charge unless it is "separately imposed" on a particular consumer in a specific transaction. 12 C.F.R. pt. 1026, supp. I, § 1026.4(a)(2). Thus, a complaint must allege facts showing that a dealer "separately imposed" the cost of the discount on a consumer by charging the consumer "a higher price than the price charged to a cash customer." *Irby-Greene v. M.O.R., Inc.*, 79 F. Supp. 2d 630, 633 (E.D. Va. 2000) (citing *Walker v. Wallace Auto Sales, Inc.*, 155 F.3d 927, 932 (7th Cir. 1998)).[20] The Complaint, however, does not allege any facts showing that any Dealer increased the "cash price" of any of the millions of cars at issue specifically to cover the cost of a discount.

Plaintiffs cannot avoid their pleading failure by arguing that TILA is "irrelevant," "inapplicable and counterfactual" and merely "a disclosure statute." (ECF No. 53 at 20, 24-30.) At bottom, Plaintiffs' claims attack the sufficiency of the TILA-mandated disclosures (even if framed under the CFPA and New York law), and attempt to impose new, contradictory disclosure obligations. Such claims cannot stand given that they are directly at odds with TILA. *See Loper Bright*, 144 S. Ct. at 2273 ("[W]hen a particular statute delegates authority to an agency . . . , courts must . . . ensur[e] that the agency acts within it.").

In *Poulin*, the Second Circuit rejected an effort to plead "hidden finance charges" by reference to a "fair proxy" for cash prices: the market values in an industry guide. *Poulin*, 647 F.3d at 37, 40. The court held that the complaint failed to state a claim because it "contain[ed] no information about the price charged to cash purchasers of automobiles of the same vintage as those purchased by plaintiffs," and thus alleged, at most, a "bad bargain." *Id.* at 40. Here, the Complaint's "cash price proxy" likewise fails because it shows only that consumers agreed to

---

[20] The court noted in *Irby-Greene* that "[r]etail installment contracts are regularly assigned to assignees at a discount, especially when the buyer represents an increased credit risk." *Irby-Greene*, 79 F. Supp. 2d at 631 n.2 (citing Thomas B. Hudson *et al.*, *Indirect Auto Fin. Dealer Comp. Litig.*, 54 Bus. Law 1301, 1307 (1999)).

purchase vehicles at prices above what Plaintiffs contend a Dealer *should* have sold the vehicles for (*see* Compl. ¶¶ 35, 59)—*no matter the price for which any Dealer actually "offer[ed] to sell" a vehicle to a cash buyer "in the ordinary course of business."* 12 C.F.R. § 1026.2(a)(9). An actual, ordinary course offer is the only relevant metric.[21] Plaintiffs' suggestion that Contracts include "hidden finance charges" because "the median markup of the disclosed selling price of the vehicle[s]" is "more than is typical in the used-car industry" (Compl. ¶¶ 55-56) is precisely what *Poulin* rejected as insufficient. *Poulin*, 647 F.3d at 40.[22]

Not only would replacing the clear and straightforward dictates of TILA and Regulation Z with Plaintiffs' invented "cash price proxy" contravene established law, but it also would be impossible to implement and lead to absurd outcomes. For one, adoption of Plaintiffs' theory would require the federal courts to make *post hoc* normative judgments about what vehicles *should* cost based on a dealer's financing arrangements rather than assess what prices dealers actually offered to cash buyers in the ordinary course of business. Thus, disclosure-based liability could result solely from a federal court's determination that a consumer's vehicle purchase was a "bad bargain"—an outcome the Second Circuit has rejected. *Poulin*, 647 F.3d at 40. Moreover, Plaintiffs' unprecedented theory would result in "cash prices" that depend on a consumer's creditworthiness. Putting aside that this result is illogical, it would yield TILA disclosures that violate TILA, as well as endless circularity, since the CAC Payment on which

---

[21] The Sixth Circuit has aptly described the relationship between industry guides and actual market value:

> [T]he price obtained by the dealership when it sells a car is, definitionally, its market value. The Blue Book and similar publications do not *determine* value, but *report* value across the market as a whole. In a functioning free market, value is determined by the interplay of supply and demand, and that interplay leads to different values in different places at different times for similar items. There is no better way to determine the value of a vehicle from a given auto dealer at a given point in time than the price agreed upon by buyer and seller.

*United States v. Phillips*, 75 F. App'x 392, 396 (6th Cir. 2003) (emphasis in original).

[22] The Complaint erroneously interchanges the distinct concepts of "markup" and "profit margin." (Compl. ¶ 56.)

Plaintiffs' "cash price" is based is not determined until a Dealer inputs a consumer's information into CAPS along with the vehicle's cash price.  (*See* Compl. ¶¶ 34-35.)[23]  Plaintiffs also do not explain what happens to the "cash price" and the purported legality of a Contract's disclosures if a Dealer receives additional "earnout" payments in the future.  (*See id.* ¶¶ 36, 94.)

### 3.    TILA Forecloses Liability for Alleged "Hidden Finance Charges"

Next, even if the Complaint sufficiently alleges deception based on any "hidden finance charge" (it does not), its credit-disclosure-based claims are foreclosed by TILA's well-established limitations on assignee liability.  *See* 15 U.S.C. § 1641(a); *Vincent*, 736 F.3d at 105-09.  As shown above (*see supra* at 9-10), TILA governs consumer credit disclosures.  TILA "greatly circumscribes the liability of assignees" for credit-disclosure violations, *Vincent* 736 F.3d at 105, limiting liability to violations that are "apparent on the face of the disclosure statement" and "other documents assigned."  15 U.S.C. § 1641(a); *see also In re Ditech Holding Corp.*, No. 19-10412 (JLG), 2023 WL 6397900, at *7-8 (S.D.N.Y. Sept. 29, 2023).

"An assignee's sole duty under TILA is to examine the assigned documents for any irregularities or illegalities, even if the assignee has knowledge that a creditor's contracting practices may otherwise violate TILA."  *Irby-Greene*, 79 F. Supp. 2d at 633; *see also Mayfield v. Gen. Elec. Cap. Corp.*, No. 97 CIV. 2786(DAB), 1999 WL 182586, at *4 (S.D.N.Y. Mar. 31, 1999) (collecting cases).  Thus, "unless the contract itself reflects that the cash price was increased to cover the cost of [a] discount," there is no assignee liability under TILA for alleged "hidden finance charge[s]."  *Irby-Greene*, 79 F. Supp. 2d at 634.[24]

---

[23] Plaintiffs' "cash price proxy" is based on the CAC Payment (*see* Compl. ¶ 59), which the Complaint alleges hinges on the consumer's creditworthiness (*see id.* ¶¶ 3-4).  Thus, according to Plaintiffs' invented proxy, the "cash price" is based on the consumers' creditworthiness, rather than the price at which a Dealer, "in the ordinary course of business, offers to sell [a vehicle] for cash."  12 C.F.R. § 1026.2(a)(9).

[24] In aptly describing TILA's limitations on assignee liability as "sensible," the *Irby-Greene* court explained that "a

The Complaint does not (and cannot) allege that any of the purported "hidden finance charges" are apparent on the face of any of the documents assigned to the Company—otherwise they would not be "hidden." Instead, the Complaint suggests that Credit Acceptance *should have known* about them because its business model "allow[s]" or "incentivizes dealers to sell cars at inflated prices." (Compl. ¶¶ 4, 175.) This is insufficient as a matter of law, as it "would eliminate the distinction between assignee and creditor liability that is clearly intended by 15 U.S.C. § 1641(a)." *Mayfield*, 1999 WL 182586, at *4; *accord Vincent*, 736 F.3d at 108.

Plaintiffs cannot circumvent TILA's limitations on assignee liability by artfully pleading their credit-disclosure-based claims under general consumer protection statutes without invoking TILA. "[E]nabling legislation is generally not an open book to which [an] agency may add pages and change the plot line." *West Virginia*, 597 U.S. at 723. The CFPA must be interpreted with TILA as "a symmetrical and coherent regulatory scheme." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). "It is a basic principle of statutory construction that a statute dealing with a narrow, precise, and specific subject is not submerged by a later enacted statute covering a more generalized spectrum." *Radzanower*, 426 U.S. at 153.

By enacting a general prohibition on "any unfair, deceptive, or abusive act or practice," 12 U.S.C. § 5536(a)(1)(B), Congress did not express a clear intention to repeal TILA's specific limitations on assignee liability for credit-disclosure-based violations. *See Cal. Pub. Emps.' Ret. Sys. v. WorldCom, Inc.*, 368 F.3d 86, 102 (2d Cir. 2004) ("clear intention" required to find implied repeal). Quite the contrary. Congress contemporaneously transferred the administration of TILA, including its limitation on assignee liability, to the CFPB, and directed that TILA be

---

duty to inquire beyond the assigned documents would impede commerce" because "assignees are not in a position to know whether a given price was set in violation of TILA, as assignees often are not present at the transaction" and "do not participate in the negotiation." *Irby-Greene*, 79 F. Supp. 2d at 633 n.12.

enforced "consistently" with the CFPA.  12 U.S.C. §§ 5511(a), 5481(12)(O).  Congress was also clear that the CFPA shall not "be construed as modifying, limiting or superseding the operation of any provision of Federal law" applicable to Dealers, including TILA.  *Id.* § 5519(c).  Plaintiffs thus cannot replace TILA's specific mandates or rewrite its definitions to advance their claims. *See Radzanower*, 426 U.S. at 153; *see also Loper Bright*, 144 S. Ct. at 2261 (it is "the responsibility of the court to decide whether the law means what the agency says").  Because the Complaint's credit-disclosure-based claims would "frustrate the policy that Congress sought to implement" with TILA, the claims should be dismissed.  *Sec. Indus. Ass'n v. FRB*, 468 U.S. 137, 143 (1984); *see also Vincent*, 736 F.3d at 109 (even if TILA's limitations on assignee liability are "unwise" as a matter of public policy, a court may "not rewrite the text of the statute").[25]

## B.     Credit Acceptance's Marketing Statements Are Not Deceptive

The NYAG also alleges that Credit Acceptance engaged in deceptive practices and "fraud" by supposedly "[m]isrepresenting that financing vehicles with CAC would result in consumers improving their credit scores."  (Compl. ¶¶ 191(b), 199(b), 204(b).)  A statement is not deceptive unless it is "likely to mislead a reasonable consumer acting reasonably under the circumstances."  *Miller*, 994 F. Supp. 2d at 557 (quoting *Oswego Laborers' Loc. 214 Pension Fund v. Marine Midland Bank, N.A.*, 85 N.Y.2d 20, 26 (1995)).

The NYAG cannot state a claim by twisting Credit Acceptance's slogan and marketing statements to say something they do not.  All Credit Acceptance states is that it offers "a *chance*" for consumers to "improve [their] credit" and "move on to more traditional financing"—nothing more.  (Compl. ¶¶ 91-92; *see also id.* ¶ 95 (same).)  Each alleged marketing statement is unequivocally conditional: *if* a consumer makes on-time payments, *then* they will improve their

---

[25] Any attempt by the NYAG to impose credit-disclosure-based assignee liability under GBL § 349 and EL § 63(12) where none exists under TILA would be preempted.

credit and have more "financial freedom" with access to more traditional credit sources.  (*See id.* ¶¶ 90-95.)  None of these statements could reasonably be read as a promise "that financing vehicles with CAC *would* result in consumers improving their credit scores."  (*Id.* ¶¶ 191(b), 199(b), 204(b).)  The statements are not any less true because the Company allegedly projects that at least some consumers will not fulfill their payment obligations.  (*See, e.g.*, *id.* ¶¶ 26-27.)

Notably, the CFPB publishes near-identical statements to consumers:

| Alleged Credit Acceptance Statements | CFPB's Published Consumer Guidance[26] |
|---|---|
| "You can improve your credit simply by making on-time payments, [which will allow you to] move on to more traditional financing for your next major purchase."  (Compl. ¶ 91 (alteration in original).) | "How do I get and keep a good credit score?  There is no secret formula to building a strong credit score, but there are some guidelines that can help.  Pay your loans on time, every time." |
| "Change Your Life with On-Time Payments!  . . . After paying off your contract with a history of on-time payments you'll have more financial freedom to: . . . Purchase a home, Obtain a major credit card."  (*Id.* ¶ 95 (second alteration in original).) | "Your credit score, as well as the information on your credit report, are important for determining whether you'll be able to get a mortgage, credit card, auto loan, or other credit product, and the rate you'll pay. . . . Higher scores reflect a better loan paying history and make you eligible for lower interest rates." |

Plaintiffs cannot credibly contend that the challenged statements are useful to consumers if published by the CFPB but deceptive when uttered by Credit Acceptance.

In any event, Credit Acceptance's trade slogan, "WE CHANGE LIVES," and purported promises of "financial freedom" (Compl. ¶¶ 90-95) are quintessential puffery that "do not provide any concrete representations" and thus cannot mislead a reasonable consumer.  *Fink v. Time Warner Cable*, 810 F. Supp. 2d 633, 644 (S.D.N.Y. 2011); *see also, e.g.*, *In re ITT Educ. Servs., Inc. Sec. & S'holder Derivatives Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012).  The

---

[26] *See* CFPB, *How do I get and keep a good credit score?*, https://www.consumerfinance.gov/ask-cfpb/how-do-i-get-and-keep-a-good-credit-score-en-318/ (last visited August 13, 2024); CFPB, *What is the difference between a credit report and a credit score?*, https://www.consumerfinance.gov/ask-cfpb/what-is-the-difference-between-a-credit-report-and-a-credit-score-en-2069/ (last visited August 13, 2024).

Complaint also does not allege that any consumer was injured as a result of any marketing statement—an independent basis for dismissal. *See Miller*, 994 F. Supp. 2d at 557-58 (dismissing claim under GBL § 349 when plaintiff "failed to plead how the[] allegedly deceptive acts or practices caused his alleged injury" because "[t]he causation element is essential").[27]

## II. THE COMPLAINT DOES NOT ALLEGE THAT CREDIT ACCEPTANCE ENGAGED IN ANY ABUSIVE ACTS OR PRACTICES

In Count II, Plaintiffs attempt to repurpose the same allegations underlying their deception-based claims to assert a general "abusiveness" claim. Congress was clear that "[t]he [CFPB] shall have *no authority* under [the CFPA] to declare an act or practice abusive" unless it "takes *unreasonable advantage*" of consumers' (A) "lack of understanding . . . of the *material risks, costs or conditions*" of a consumer financial product, or (B) "*inability . . . to protect* [their] interests in selecting or using a consumer financial product." 12 U.S.C. § 5531(d)(2)(A)-(B).[28] Plaintiffs assert that each of these independent tests for abusiveness has been satisfied because Credit Acceptance: (i) purportedly "allowed and incentivized dealers" to "artificially inflate[]" the "selling price of vehicles it financed," and consumers "promised to pay much more to [Credit Acceptance] than the net amount the [D]ealers received upfront for the deal"; and (ii) was supposedly "indifferent to whether consumers are unable to repay" their Contracts, because it did not disclose the Score to consumers or "use the [S]core to conduct an individualized ability-to-pay analysis for its borrowers" or "seek additional information" to do so. (Compl. ¶¶ 184-86.)

As shown below, Plaintiffs have failed to allege facts that satisfy either prong of the

---

[27] Plaintiffs previously abandoned any standalone claim related to Credit Acceptance's purported failure to disclose the Score—an internal scoring metric that Credit Acceptance uses to calculate the CAC Payment to the Dealer. (*See* Compl. ¶¶ 191(c), 199(c), 204(c); *compare* ECF No. 35 at 39-41, *with* ECF No. 53 at 31-32.) Should Plaintiffs reprise these claims on this round of briefing, Credit Acceptance expressly incorporates by reference its prior arguments supporting dismissal. (*See* ECF No. 35 at 39-41 (collecting authorities).)

[28] The Complaint does not allege that Credit Acceptance took "unreasonable advantage of" consumers' "reasonable reliance" on Credit Acceptance "to act in the[ir] interests." 12 U.S.C. § 5531(d)(2)(C).

abusiveness standard for each of their unsupportable and unprecedented theories.  Thus,

Plaintiffs' request to create new law and declare such acts "abusive" should be rejected.

A.  **The Complaint Does Not—and Cannot—Allege that Credit Acceptance Took Unreasonable Advantage of Consumers' Lack of Understanding**

As it relates to Plaintiffs' claim of abusiveness under 12 U.S.C. § 5531(d)(2)(A), the

Complaint fails to allege facts supporting a plausible inference that (i) consumers lacked an

understanding about the material risks, costs or conditions of their Contracts, or (ii) Credit

Acceptance took unreasonable advantage of such an inability to understand.

### 1.   The Complaint Fails to Allege a Lack of Understanding

Whether consumers lack an understanding of the material risks, costs or conditions of

their Contracts turns on "whether the consumers had a free and informed choice."  *Davis v.*

*HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1168 (9th Cir. 2012); *see also* Payday, Vehicle Title, &

Certain High-Cost Installment Loans, 85 Fed. Reg. 44,382, 44,395 (July 22, 2020) ("Payday

Rule") ("[F]ree and informed consumer choice [i]s the best regulator of the market.").[29]  "[A]

reasonable consumer is responsible for reading and familiarizing herself with the terms of an

agreement she freely enters into."  *Karakus v. Wells Fargo Bank, N.A.*, 941 F. Supp. 2d 318, 342

(E.D.N.Y. 2013); *see also Stamm v. Barclays Bank*, 960 F. Supp. 724, 731 (S.D.N.Y. 1997)

(same); *accord Upton v. Tribilcock*, 91 U.S. 45, 50 (1875).  And a "reasonable consumer" should

"know the state of her own finances and whether or not she can afford a certain monthly loan

payment."  *Karakus*, 941 F. Supp. 2d at 340; *see also Hayrioglu v. Granite Cap. Funding, LLC*,

794 F. Supp. 2d 405, 412-13 (E.D.N.Y. 2011) (same).

---

[29] After a notice-and-comment rulemaking process that revoked certain mandatory underwriting guidelines, the CFPB determined that this element of abusiveness under 12 U.S.C. § 5531(d)(2)(A) "should be treated as similar to the requisite level of understanding for reasonable avoidability" under 12 U.S.C. § 5531(c)(1), which governs claims for "unfairness."  Payday Rule, 85 Fed. Reg. at 44,422.  The CFPB's rationale for merging the "lack of understanding" and "reasonable avoidability" standards is sensible and should be applied.  *See id.* at 44,421-42.

For ordinary financial harms flowing from a consumer's own contractual non-compliance, a claim should be dismissed "if consumers 'have reason to anticipate the impending harm and the means to avoid it.'" *Davis*, 691 F.3d at 1168-69 (quoting *Orkin Exterminating Co. v. FTC*, 849 F.2d 1354, 1365-66 (11th Cir. 1988)). And, it is "well-established that consumers can reasonably avoid injury through . . . 'anticipatory avoidance'" of an allegedly injurious contract. Payday Rule, 85 Fed. Reg. at 44,397 (quoting *Orkin*, 849 F.2d at 1365); *see also Davis*, 691 F.3d at 1169 ("check the box" indication of "assent" to credit card terms "provided 'the means to avoid'" alleged injury from annual fee). Each of Plaintiffs' theories fails.

### (a)   Plaintiffs' "Hidden Finance Charge" Theory Is Fatally Flawed

First, Plaintiffs cannot allege that consumers were deprived "of the ability to make informed decisions" merely because the "cash price" reflected on their Contracts was the selling price they negotiated with Dealers rather than Plaintiffs' invented "cash price proxy." (Compl. ¶¶ 87, 184.) As shown above (*see supra* § I(A)(2)), these "hidden finance charge" allegations fail as a matter of law. The suggestion that any consumer lacked an understanding as to the "material risks, costs or conditions" of a Contract, 12 U.S.C. § 5531(d)(2)(A), is belied by the Contracts. Consistent with TILA, the Contracts clearly disclosed all of the material risks, costs and conditions of financing, including the (i) Contract term, (ii) monthly payment, (iii) total payments, (iv) security interest and (v) risk of late charges, repossession and sale in the event of nonpayment. (*See* Compl. ¶ 27; Ex. A at 1-4.) Plaintiffs do not allege that any Contract failed to reflect the bargain that the consumers struck with the Dealers.

The Complaint fails to allege any plausible reason that consumers could not understand their Contracts or their financial situations, or make informed choices as to whether the benefits of owning a vehicle were worth the costs and risks of financing. Although the Complaint asserts

32

that consumers should have been told how much Credit Acceptance paid to acquire their Contracts in its separate arrangement with Dealers (*see* Compl. ¶¶ 63-64, 184), this amount did not impact the Contracts, including the amount any consumer owed, and Credit Acceptance had no duty to disclose it.  Contracts disclose (and consumers acknowledge) that Credit Acceptance acquires them from Dealers at a "discount."  (*See id.* ¶ 42; Ex. A at 14.)

The suggestion that consumers could not reasonably avoid injury from inflated vehicle prices (*see* Compl. ¶ 175) also belies sense.  The Complaint avers that "consumers were purchasing vehicles worth substantially less than the vehicles would fetch in a refinancing, resale, or when repossessed and sold at auction."  (*Id.* ¶ 185.)  But it does not allege that consumers could not ascertain this fact.  That Dealers sold vehicles at a markup from the wholesale value—an everyday reality in used-car sales in the United States—is readily apparent to every consumer based on the "cash price" disclosed in their Contracts.  (*See id.* ¶ 56; Ex. A at 2.)  The Complaint does not allege that consumers could not consult publicly available websites or vehicle value guides, such as the Kelley Blue Book, to compare prices.  Nor do Plaintiffs allege that consumers were in any way prevented from finding a better price at another dealer or obtaining financing elsewhere.  The consumers' acknowledgments that the "cash prices" on their Contracts reflected the prices negotiated with the Dealers (Ex. A at 14) should be dispositive. *See Davis*, 691 F.3d at 1169.[30]  Thus, even crediting the erroneous "hidden finance charge" allegations, the Complaint does not allege facts supporting a plausible inference that consumers lacked the ability to understand their Contracts or financial situations.[31]

---

[30] The Complaint also does not allege that any Contract failed to "ma[ke] clear what the[] monthly amounts would be" or that any consumer could not understand whether he or she could afford that monthly payment.  *Karakus*, 941 F. Supp. 2d at 340; *see also Hayrioglu*, 794 F. Supp. 2d at 411.

[31] According to the CFPB, "shopping for loans and trying to get the best rates and other terms, while complicated," is possible, "like other types of comparison shopping."  CFPB, *Shopping for your auto loan*,

Second, there is no merit to Plaintiffs' contention that consumers could not understand their Contracts or the magnitude of harm allegedly attributable to default because Credit Acceptance purportedly "us[ed] a lending model that is indifferent to whether consumers are unable to repay their loans in full and end up in default." (Compl. ¶ 186.) The Complaint speculates that, if consumers knew, based on the Score, that Credit Acceptance thought it might collect less than 100 percent of the total amounts owed under their Contracts, "at least some of them would likely have opted not to" enter into their Contracts. (*Id.* ¶ 109.)

As demonstrated above (*see supra* § II(A)(1)(a)), the Contracts clearly disclosed their terms and risks, including the risk of late charges, repossession and sale in the event of nonpayment. (*See* Compl. ¶ 27; Ex. A at 1-4.) The arguments *supra* apply with equal force here. Moreover, it is consumers—*not Credit Acceptance*—who are in the best position to assess their Contracts, their specific financial situations and the stability of their current sources of income to evaluate whether they can afford the monthly payment stated on their Contracts. *See Karakus*, 941 F. Supp. 3d at 341; *Hayrioglu*, 794 F. Supp. 2d at 411.

The Complaint appears to suggest that Credit Acceptance's failure to disclose the Score is "abusive" because subprime consumers are less likely than others to make on-time payments throughout the life of a Contract. (*See* Compl. ¶¶ 100-02.) But if a risk of nonpayment could render a Contract abusive *ab initio*, consumer finance would cease to exist. No consumer financing source can guarantee repayment in full. Not surprisingly, the CFPB has explained that when an alleged abusive practice "pertains to lender conduct when borrowers are making an

---

https://www.consumerfinance.gov/language/cfpb-in-english/shopping-for-your-auto-loan/ (last visited Aug. 13, 2024). When shopping for an "auto loan," the CFPB recommends that consumers research vehicle values using resources like Consumer Reports, Edmunds, Kelley Blue Book, NADA Guides and online classifieds. *See id.*

initial decision to take out a new loan," the fact that "some borrowers" may "suffer financial harm" during the repayment cycle is insufficient to establish that consumers cannot "reasonably avoid injury." Payday Rule, 85 Fed. Reg. at 44,397. This reasoning applies here as well. *See Hayrioglu*, 794 F. Supp. 2d at 413 ("the fact that the plaintiff sought and received a loan he could not afford does not mean that he" has a "claim against the party that made his mistake possible").

### 2. The Complaint Does Not Allege that Credit Acceptance Took Unreasonable Advantage of Consumers' Lack of Understanding

Even if Plaintiffs could allege that consumers lacked an understanding of any material risks or costs of financing (and they cannot), Plaintiffs fail to allege that Credit Acceptance took "unreasonable advantage" of any such lack of understanding. 12 U.S.C. § 5531(d)(2).

The Complaint does not allege any causal nexus between Credit Acceptance's conduct and any consumer's decision to enter into a Contract or default thereafter—a necessary element of this claim. *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 132-33 (2014) (injuries must be proximately caused by defendant's violation of statute); *see also, e.g.*, *CFPB v. Intercept Corp.*, No. 3:16-cv-144, 2017 WL 3774379, at *4 (D.N.D. Mar. 17, 2017) (dismissing CFPA claim when complaint failed to plead injury). Notably, Plaintiffs also do not allege that Credit Acceptance—an *indirect* finance company that is not present at the dealership (Compl. ¶¶ 32, 48)—"materially interfere[d] with the ability of a consumer to understand a term or condition of" any Contract. 12 U.S.C. § 5531(d)(1). Nor does the Complaint allege that Credit Acceptance exercised undue influence over highly susceptible classes of consumers. *Cf. CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 916-17, 919 (S.D. Ind. 2015).

Allegations that Credit Acceptance "*allowed and incentivized* dealers to increase the disclosed selling price of vehicles it financed" (Compl. ¶ 184), do not create even a "sheer possibility that [Credit Acceptance] has acted unlawfully." *Iqbal*, 556 U.S. at 678; *see also*

*Pennsylvania v. Think Fin., Inc.*, No. 14-cv-7139, 2016 WL 183289, at *25 (E.D. Pa. Jan. 14, 2016) (CFPA claim was insufficient when complaint "fail[ed] to connect the [d]efendants' incentivizing electronic payments with a lack of understanding on the part of the consumer").

Insofar as the Complaint asserts that Credit Acceptance "took unreasonable advantage" of consumers by failing to "use the [S]core to conduct an individualized ability-to-pay analysis for" consumers or "seek additional information in order to do so" (Compl. ¶ 186(b)), this theory also fails. Unlike in the residential mortgage and credit card contexts, *see* 15 U.S.C. §§ 1639c, 1665e, Congress has not required auto finance companies to consider consumer ability to repay. Nor do TILA's extensive disclosure rules require a finance company to disclose its internal risk assessment to anyone. Courts have rejected efforts by litigants to impose such obligations where none are imposed by statute. *See, e.g.*, *Anderson v. Franklin*, No. 2:09-cv-11096, 2010 WL 742765, at *8 (E.D. Mich. Feb. 26, 2010) (collecting cases); *accord Muncy v. Centex Home Equity Co.*, No. 1:14CV00016, 2014 WL 5326436, at *4 (W.D. Va. Oct. 20, 2014); *Bradshaw v. SLM Corp.*, No. C 12-06376 JSW, 2014 WL 12629968, at *4 (N.D. Cal. May 29, 2014).

It bears emphasis that the CFPB has not sought to promulgate such requirements through notice-and-comment rulemaking. Indeed, the CFPB *revoked* regulations, promulgated less than three years before their revocation, that declared "unfair" and "deceptive" the practice of making certain payday, vehicle title and high-cost installment loans without reasonably determining consumer ability to repay. *See* Payday Rule, 85 Fed. Reg. at 44,382. The CFPB's flip-flopping on an issue with profound implications for the consumer credit markets underscores why major policy decisions about the appropriate balance of consumer protection and access to credit are best left to the elected legislature. *See West Virginia*, 597 U.S. at 723 ("We presume that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'").

And Plaintiffs' suggestion that the CFPA should be interpreted to incorporate ability-to-repay requirements is entitled to no deference whatsoever. *See Loper Bright*, 144 S. Ct. at 2263.

Finally, as demonstrated above (*see supra* § I(B)), the Complaint cannot state a claim by twisting Credit Acceptance's marketing statements beyond recognition into promises that "CAC's loans were safe and borrowers likely would be able to repay them in full." (Compl. ¶ 186(c).) In any event, a consumer who "simply accepts another party's assertions that she will be able to afford clearly stated monthly fees acts unreasonably if she cannot, in fact, afford those payments." *Karakus*, 941 F. Supp. 2d at 340; *accord Utreras v. Aegis Funding Corp.*, No. 13-cv-00291 (DLI)(LB), 2013 WL 789614, at *3 (E.D.N.Y. Mar. 1, 2013).

## B.     Plaintiffs Fail to Allege that Credit Acceptance Took Unreasonable Advantage of Consumers' Inability to Protect Their Own Interests

The Court also should dismiss Plaintiffs' assertion that Credit Acceptance took unreasonable advantage of consumers' inability to protect their own interests in violation of 12 U.S.C. § 5531(d)(2)(B). (*See* Compl. ¶ 185.) The pleading deficiencies that doom Plaintiffs' lack-of-understanding theory apply equally here. (*See supra* § II(A).) In addition, the Complaint does not contain a single factual allegation showing how or why consumers could not protect their interests in connection with their Contracts. (*See* Compl. ¶¶ 11, 183, 185-86.)

Moreover, it is beyond dispute that consumers have myriad reasonable options to avoid the supposed "injury" from nonpayment and protect their interests. (*See supra* § II(A)(1)(a).) That some consumers may "encounter payment stress during the repayment term" (Compl. ¶ 74) does not mean that consumers could not protect their interests at the time of contracting. Finally, for the reasons set forth above (*see supra* § II(A)(2)), Plaintiffs fail to allege that Credit Acceptance took "unreasonable advantage" of consumers' purported inability to protect their own interests. 12 U.S.C. § 5531(d)(2). Accordingly, Count II should be dismissed.

## III.    THE COMPLAINT DOES NOT STATE A CLAIM
FOR "SUBSTANTIAL ASSISTANCE" UNDER THE CFPA

In Count VII, the Complaint seeks to hold Credit Acceptance vicariously liable for the alleged deceptive practices of independent, third-party Dealers because Credit Acceptance purportedly "allow[ed]" Dealers obtaining financing through Credit Acceptance "to sell two pre-approved add-on products." (Compl. ¶ 113.) The Complaint conspicuously fails to allege any instance where Credit Acceptance was aware of misconduct *at the time of assignment*. Rather, Plaintiffs attempt to transform the financing of lawful add-on products into a "substantial assistance" claim by contending that Credit Acceptance "turned a blind eye to trends" that supposedly should have alerted the Company to the fact that, for certain Contracts that had been assigned to Credit Acceptance, Dealers allegedly had "misrepresent[ed] the voluntary nature of add-on products," "hid[] the add-on products in loan paperwork" and "fail[ed] to disclosure [sic] to [consumers] that add-on products were included in their" Contracts. (*Id.* ¶¶ 219, 221).

To state a "substantial assistance" claim, Plaintiffs must plead facts showing that Credit Acceptance "knowingly or recklessly provide[d] substantial assistance to a covered person" that violated the CFPA's prohibition of unfair, deceptive and abusive acts or practices. 12 U.S.C. § 5536(a)(3). As shown below, Count VII fails for three separate reasons.

### A.    The CFPB Cannot Regulate Dealer Conduct through Secondary Liability Claims

Plaintiffs' substantial assistance claims confirm that the true target of Plaintiffs' claims are non-party Dealers who are exempted from the CFPB's jurisdiction. *See* 12 U.S.C. § 5519(a). The legislative history of the CFPA makes clear that Congress adopted the dealer exclusion to prevent the CFPB from "engag[ing] in regulatory overreach that will hurt our economy," including by "abolish[ing] third-party financing." 156 Cong. Rec. 13,178-79 (statement of Sen. Brownback). But that is exactly what Plaintiffs are seeking to do here. Foreclosed from

regulating the 12,000 Dealers implicated here, the CFPB instead seeks to attack their funding source by asserting secondary liability claims. The CFPB should not be permitted to claim power specifically withheld from it by Congress. *See* 12 U.S.C. § 5519(c); *see also Loper Bright*, 144 S. Ct. at 2263 (the court must "fix[] the boundaries of . . . delegated authority" and "ensur[e] the agency has engaged in reasoned decisionmaking within those boundaries").[32]

**B.** **The Complaint Fails to Allege a Primary Violation Under the CFPA**

Plaintiffs' secondary liability claims should also be dismissed because the Complaint lacks sufficient factual content to allow the Court to draw the reasonable inference that any Dealers engaged in deceptive practices with respect to add-on products. *See Iqbal*, 556 U.S. at 678. The Complaint does not allege a single instance where any Dealer hid an add-on product in a Contract or failed to disclose that one was included in a Contract. (*See* Compl. ¶ 219.) Nor does the Complaint allege any specific instances where a Dealer told a consumer that an add-on product was a condition of financing. (*See id.*) Courts have rejected efforts to plead that auto dealers misrepresented the voluntary nature of an add-on product when, as here, "the documents signed by [the consumer] clearly state otherwise." *Salvate v. Auto. Restyling Concepts, Inc.*, Civ. No. 13-2898 ADM/FLN, 2014 WL 6901788, at *3 (D. Minn. Dec. 5, 2014). As shown in Ms. B's Contract, consumers receive and acknowledge *at least three separate disclosures* stating that add-on products are optional and not a condition of financing. (*See* Ex. A at 1, 6, 14; *supra* at 13-14.) Plaintiffs' failure to allege a primary violation of the CFPA precludes them from pleading an aiding-and-abetting claim. *See Lorenzo v SEC*, 587 U.S. 71, 81-84 (2019).

---

[32] Plaintiffs have sought to avoid the limitations on their delegated authority by arguing that states or other federal agencies can bring the claims against Dealers that the CFPB cannot, enabling Plaintiffs to bring secondary liability claims premised on alleged Dealer misconduct. (*See* ECF No. 53 at 47-48.) Plaintiffs' argument demonstrates that the alleged misconduct should be pursued by the states against Dealers, if anyone.

**C.    The Complaint Does Not Allege that Credit Acceptance**
**Substantially Assisted Any Dealers in Any Alleged Wrongdoing**

Even assuming *arguendo* that the Complaint stated a claim for a primary CFPA violation,

Count VII still should be dismissed because the Complaint fails to allege that Credit Acceptance

provided "substantial assistance" to Dealers.  To state a claim, "the Government must establish

that the aider and abettor in some way associated himself with the venture, that he participated in

it as something he wished to bring about, and that he sought by his action to make it succeed."

*RD Legal Funding*, 332 F. Supp. 3d at 772.  Credit Acceptance also must have provided

substantial assistance "knowingly or recklessly."  12 U.S.C. § 5536(a)(3).  Pleading

"recklessness" requires allegations of "conduct that is highly unreasonable and represents an

extreme departure from the standards of ordinary care."  *RD Legal Funding*, 332 F. Supp. 3d at

772.  Allegations of "[m]ere negligence" are insufficient to state a claim.  *Id.*

### 1.    The Complaint Identifies No "Substantial Assistance"

Plaintiffs aver that Credit Acceptance provided "substantial assistance" to Dealers

because it allegedly (i) "allows dealers to sell two pre-approved add-on products" and provides

"financial incentives to dealers to include add-on products in CAC transactions," (ii) "created

and controls the process for selling add-on products," and (iii) "allows its dealers to use e-sign"

for add-on product disclosures.  (Compl. ¶¶ 113, 118, 132.)  This is insufficient to state a claim.

First, providing financing to Dealers, "without more," is not "substantial assistance."  *RD*

*Legal Funding*, 332 F. Supp. 3d at 772.  Like the Complaint's other efforts to transform lawful

business dealings into unlawful conduct (*see supra* §§ I(A)(1), II(A)(2)), these allegations do not

support an inference that the Company "incentivize[d]" Dealers to act *unlawfully* by either

misrepresenting the voluntary nature of add-on products or sneaking them into Contracts without

consumers' knowledge.  (Compl. ¶¶ 7, 219.)  And they certainly do not support an inference that

Credit Acceptance "sought by [its] action" to help Dealers "succeed" in any such unlawful practices. *RD Legal Funding*, 332 F. Supp. 3d at 772.

Second, the facts alleged do not support a plausible inference that Credit Acceptance "controls the process for selling add-on products." (Compl. ¶ 118.) The Complaint makes clear that *Dealers* negotiate and sell the add-on products, and Credit Acceptance has no interaction with consumers concerning such purchases. (*See id.* ¶¶ 39, 122, 126; *supra* § I(A)(1).) And the aspect of the process "determine[ed]" by Credit Acceptance—"the form and substance of financial disclosures provided to consumers" (Compl. ¶ 51)—should inhibit misconduct. As reflected in Ms. B's Contract, consumers and Dealers attest that any add-on product purchases were voluntary and "not required" for Contracts assigned to Credit Acceptance. (Ex. A at 1, 14.)

Finally, allegedly "allow[ing]" electronic signatures on Contract documents does not constitute substantial assistance. (Compl. ¶ 132.) Electronic signatures are expressly authorized by federal law. *See* 15 U.S.C. § 7001; 12 C.F.R. § 1026.17(a)(1). And consumers acknowledge in wet ink that they consented to electronic signatures. (*See* Ex. A at 15 (Ms. B's consent).)

## 2. The Complaint Does Not Allege Knowledge or Recklessness

The Complaint also does not allege facts supporting a plausible inference that, *at the time Credit Acceptance accepted assignment* of any Contract containing an add-on product, it either (i) knew that the Dealer had engaged in the alleged misconduct or (ii) exhibited an "extreme departure from the standards of ordinary care." *RD Legal Funding*, 332 F. Supp. 3d at 772.

Plaintiffs allege that over *one million* Contracts potentially at issue in the Complaint contained an add-on product. (*See* Compl. ¶ 128.) Yet they do not identify a single instance where Credit Acceptance allegedly knew or recklessly disregarded Dealer misconduct prior to accepting assignment. The Contracts assigned to Credit Acceptance, including numerous Dealer

and consumer attestations as to the optional nature of the add-on products (*see supra* at 13-14), foreclose any inference of knowledge or recklessness. *See Salvate*, 2014 WL 6901788, at *3.

The Complaint generally avers that, *after origination*, Credit Acceptance received "more than one thousand consumer complaints related to add-on products," *only some of* which suggested that Dealers had required consumers "to purchase add-on products." (Compl. ¶ 129.) Based on these post-origination complaints, which concern less than 0.1 percent of the Contracts allegedly at issue, the Complaint implausibly alleges that Credit Acceptance "turned a blind eye to trends in consumer complaints" regarding the alleged Dealer practices. (*Id.* ¶ 221.) The Complaint also faults Credit Acceptance for failing to "punish or reprimand dealer behavior." (*Id.* ¶ 222.) Plaintiffs' attempt to manufacture knowledge or recklessness by pointing to Credit Acceptance's alleged failure to police Dealers suffers from several fatal defects.

First, it is illogical to suggest that Credit Acceptance acted knowingly or recklessly *at origination* based on an analysis of *post-origination* consumer complaints. Second, in the truth-in-lending context, courts have repeatedly rejected attempts by plaintiffs to impose a "duty of inquiry" on *indirect* auto finance assignees, like Credit Acceptance, that are not at the dealerships or involved in any negotiation with consumers. *See Green v. Levis Motors, Inc.*, 179 F.3d 286, 295 (5th Cir. 1999); *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 709-10 (11th Cir. 1998); (*supra* § I(A)(3)). Plaintiffs identify no legal basis for imposing such a duty here. And the Complaint fails to allege sufficient "information or factual detail" concerning any "red flags" that would have alerted Credit Acceptance to wrongdoing underlying any Contract *at the time of assignment*. *Intercept*, 2017 WL 3774379, at *4.[33]

---

[33] That Credit Acceptance received consumer complaints that certain Dealers "wouldn't allow the [consumer] to control the mouse" during the e-sign process or did not print a paper copy of the e-signed documents does not support a plausible inference that Credit Acceptance either knew or was reckless in not knowing that these Dealers were "hid[ing] the add-on products" in Contract paperwork. (Compl. ¶¶ 132-33, 219.)

It bears emphasis that, despite the Complaint's efforts to assert that Credit Acceptance "controls the process for selling add-on products" (Compl. ¶ 118), this case differs radically from those where the "substantial assistance" providers were owners and officers that managed and controlled the primary violators' business operations.[34]  In stark contrast to these cases, the Complaint does not (and cannot) allege that Credit Acceptance had "significant responsibility in managing [Dealers] and [their] operations." *D & D Mktg.*, 2016 WL 8849698, at *12.  Thus, knowledge or recklessness cannot plausibly be inferred.

## IV.    THE CFPB'S PARTICIPATION IN THIS ACTION IS IMPROPER

Although the Supreme Court recently rejected a challenge under the Appropriations Clause to the CFPB's funding scheme, *see CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 441 (2024) ("*CFSA*"), the CFPB's participation here remains improper.  First, because the Federal Reserve System has not had a surplus of funds since before Plaintiffs filed this lawsuit, the CFPB is *not* using appropriated funds to fund this lawsuit, U.S. Const. art. I, § 9, cl. 7.[35]  Thus, its use of federal funds is unconstitutional.  *Compare* 12 U.S.C. § 5497(a)(1) (appropriation of funds "from the combined earnings of the Federal Reserve System"), *with CFSA*, 601 U.S. at 425 (CFPB "draws money from . . . surplus funds in the Federal Reserve System [that] would otherwise be deposited into the general fund of the Treasury").  Second,

---

[34] *Cf. CFPB v. Nexus Servs., Inc.*, No. 5:21-cv-00016, 2024 WL 1461382, at *6 (W.D. Va. Apr. 2, 2024) (parent company approved subsidiaries' policies, exercised control over call center, and oversaw employee training); *RD Legal Funding*, 332 F. Supp. 3d at 774 ("founder and owner" of each alleged primary violator had "substantial control over [their] operations"); *CFPB v. D & D Mktg.*, No. CV 15-9692 PSG (Ex), 2016 WL 8849698, at *12-14 (C.D. Cal. Nov. 17, 2016) (C-suite executives, founders and majority owner all had "significant responsibility in managing [the alleged primary violator] and its operations").

[35] *See* Fed. Rsrv. Bd., *Fed. Rsrv. Banks Combined Quarterly Fin. Report Unaudited* at 25 (Mar. 31, 2024) (showing combined Federal Reserve System operating at a deficit Q1 2024); Fed. Rsrv. Bd., *Fed. Rsrv. Banks Combined Fin. Statements as of and for the Years Ended Dec. 31, 2023 and 2022 and Independent Auditors' Report* at 62 (Mar. 18, 2024) (showing combined Federal Reserve System operating at a deficit during 2023).  "The Court may take judicial notice of publicly available documents and information on official government websites."  *Collins v. City Univ. of N.Y.*, No. 21 Civ. 9544 (NRB), 2023 WL 1818547, at *1 n.1 (S.D.N.Y. Feb. 8, 2023).

because the CFPB is funded "from the combined *earnings* of the Federal Reserve System," 12 U.S.C. § 5497(a)(1), the CFPB cannot receive and use funds from the Federal Reserve System when, as now, the Federal Reserve System is operating at a deficit, and thus has no "earnings."

## V.     THE NYAG'S ANCILLARY STATE-LAW CLAIMS ALL FAIL

In Counts III, IV, V, VI and VIII, the NYAG asserts four more theories of liability under GBL § 349, EL § 63(12) and GBL § 352.  As shown below, each of these theories of liability fails to state a claim as a matter of law, and should be dismissed.

### A.     New York's Usury Laws Do Not Apply to Retail Installment Sales

The NYAG alleges that Credit Acceptance violated EL § 63(12) by accepting assignment of "unconscionable" Contracts that "exceed New York's criminal interest rate caps."  (Compl. ¶ 192.)  As a threshold matter, this claim fails because it assumes that certain Contracts incorporate "hidden finance charges," which the Complaint does not allege.  (*See supra* § I(A)(2).)  Thus, there is no merit to the NYAG's assertion that any Contracts are "unconscionable" because they "conceal the true interest rate" or "misstate other key terms of the parties' financing agreement." (Compl. ¶ 192.)  This theory also fails because the New York Legislature has determined in the MVRISA that New York's usury laws do not apply to motor vehicle retail installment sales.  *See* N.Y. Pers. Prop. Law ("PPL") § 303(1).

"For over a century, New York courts have held that a sale of personal property on credit is not subject to the state's usury laws."  *Garcia*, 2016 WL 5719792, at *1 (citing *Brooks v. Avery*, 4 N.Y. 225, 228 (1850)); *see also Napoleon v. 5665 Sunrise Highway Corp.*, No. 18-CV-05703 (DG) (SIL), 2021 WL 3469991, at *8 (E.D.N.Y. July 7, 2021) ("New York's usury laws do not apply to 'retail [installment] contracts.'"); *Credit Acceptance Corp. v. Traylor*, No. E2023005976, 2024 WL 2273522, at *4 (N.Y. Sup. Ct. Monroe Cnty. May 10, 2024) (vacating prior order that retail installment contract was usurious).  And since 1980, the MVRISA has

"allow[ed] car dealers to collect a credit charge at whatever rate the seller and buyer agreed upon." *Garcia*, 2016 WL 5719792, at *2 (citing N.Y. L. 1980, c. 883, §§ 73-74); *see also* PPL § 303(1).[36] The MVRISA also provides for broad assignability of retail installment contracts, allowing a "financing agency" to "purchase a retail [installment] contract from a seller on such terms and conditions and for such price as may be mutually agreed upon." PPL § 302(10)(a).[37]

Judge Ramos's well-reasoned decision in *Garcia* is directly on point. There, the court applied the plain language of the MVRISA to reject a consumer's allegations that a finance company "use[d] the form of [a retail installment contract] as an artifice to disguise its intention to extend a usurious loan." *Garcia*, 2016 WL 5719792, at *3. The court reasoned that there was "no dispute that the [c]ontract was entered into by [the consumer] and [the dealer], that both parties agreed to the 26.32% credit charge, and that the [c]ontract resulted in a *bona fide* sale of a car." *Id.* at *4. It made no difference that the finance company "informed the [dealer] of the terms upon which it would purchase the [c]ontract" or that the contract "was immediately assigned to [the finance company] upon execution." *Id.* at *4-5; *see also Flatbush Auto*, 9 N.Y.2d at 777 ("sale of an automobile on time" by dealer to buyer, "coupled with a prearranged sale" of deal papers by dealer to finance company, did not change lawful nature of transaction).

Recent efforts to "extend[] New York's usury laws to all financing arrangements" have not progressed past infancy, N.Y. Assembly Bill A9585 (Mar. 21, 2024); N.Y. Senate Bill S9275 (May 8, 2024), and efforts to enact legislation that would limit the maximum allowable credit

---

[36] The 1980 amendment was part of a legislative reform effort "to deregulate the rates of interest on most forms of consumer credit" and expand the availability of consumer credit to New Yorkers. Sponsor's Mem., Bill Jacket, L. 1980, c. 883, at 2; *see also* Governor's Approval Mem., Bill Jacket, L. 1980, c. 883, at 2.

[37] The term "seller" is statutorily defined as the "person who sells a motor vehicle to a retail buyer under or subject to a retail [installment] contract." PPL § 301(3).

service charge under New York law have repeatedly failed.[38]  Thus, "regardless of whether the

MVRISA is sound policy," the Legislature has "regulate[d] vehicle credit sales, and yet did not

enact the restrictions sought by" the NYAG.  *Garcia*, 2016 WL 5719792, at *8.  The NYAG

cannot use EL § 63(12) to "read into the statute restrictions that do not exist."  *Id.*

## B.    The NYAG's MVRISA Claims Fail as a Matter of Law

In Count VI, the NYAG claims that Credit Acceptance violated EL § 63(12) by

"repeatedly violat[ing]" the MVRISA.  (Compl. ¶ 212.)  The alleged violation of the MVRISA is

that "[t]he [Contracts] used by [Credit Acceptance] . . . do not disclose as part of the credit

service charge the difference between the CAC Payment . . . and amount financed"—*i.e.*, the

discount.  (*Id.* ¶ 210.)  No such disclosure is required under the MVRISA.  Indeed, since 2015, at

least six attempts have been made in the New York Legislature in four different legislative

sessions to amend the MVRISA to require disclosure of "all fees imposed by a lender upon the

dealer or buyer related to financing the purchase of the motor vehicle," such as the assignment

discount.[39]  None has succeeded.  The Court should reject the NYAG's efforts to use EL

§ 63(12) to amend the MVRISA to include disclosure obligations that have not been enacted by

the New York Legislature.  *See Garcia*, 2016 WL 5719792, at *8; (*supra* § V(A)).

The NYAG acknowledges that the MVRISA's disclosure requirements track those in

TILA.  (*See* Compl. ¶¶ 144-50); *see also* PPL § 302(5).  As shown above (*see supra* § I(A)(2)),

the Complaint fails to allege that any assignment discounts should have been disclosed under

TILA.  Insofar as the NYAG contends that the definition of "credit service charge" should be

---

[38] *See* N.Y. Assembly Bill A4485 (Feb. 16, 2023); N.Y. Senate Bill S4774 (Feb. 14, 2023); N.Y. Senate Bill S3237 (Jan. 28, 2021); N.Y. Assembly Bill A0819 (Jan. 6, 2021); N.Y. Senate Bill S5947 (May 16, 2019); N.Y. Assembly Bill A7585 (May 10, 2019).

[39] N.Y. Assembly Bill A5997 (Mar. 4, 2021); N.Y. Assembly Bill A4856 (Feb. 5, 2019); N.Y. Senate Bill S5274 (Mar. 20, 2017); N.Y. Assembly Bill A4619 (Feb. 3, 2017); N.Y. Assembly Bill A7866 (May 28, 2015); N.Y. Senate Bill S5490A (May 14, 2015).

interpreted differently than the definition of "finance charge" in TILA, as implemented by Regulation Z (*see* Compl. ¶ 211), the NYAG's claim is foreclosed by the MVRISA and expressly preempted by TILA.  *See* PPL § 302(5); 15 U.S.C. § 1610(a)(1).

The NYAG's MVRISA-based claim under EL § 63(12) is also preempted because it seeks to impose assignee liability where TILA expressly precludes it.  (*See supra* § I(A)(3).) "The ordinary principles of preemption include the well-settled proposition that a state law is preempted where it stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."  *Arizona v. United States*, 567 U.S. 387, 406 (2012). Congress enacted TILA's limitation on assignee liability to "eliminate confusion . . . as to the responsibilities of assignees."  *Vincent*, 736 F.3d at 107.  Congress chose a "simpl[e] mechanical rule" by which creditors would be solely responsible for making TILA's required disclosures, and plaintiffs could not circumvent TILA's liability scheme by "claim[ing] that the assignee had 'knowledge' of the violation."  *Id.* at 107-08.  Courts have thus held that TILA preempts state-law claims that would impose disclosure-based liability on assignees where none exists under TILA.  *See, e.g.*, *Alexiou v. Brad Benson Mitsubishi*, 127 F. Supp. 2d 557, 564 (D.N.J. 2000). Because the NYAG's interpretation of the MVRISA would "stand[] as an obstacle" to TILA's bright-line liability demarcations, Count VI should be dismissed.  *Arizona*, 567 U.S. at 406.

## C.     The NYAG's "Holder Rule" Claims Fail as a Matter of Law

The NYAG also seeks to hold Credit Acceptance vicariously liable under EL § 63(12) and GBL § 349 for three alleged "fraudulent" and "deceptive" acts and practices of New York Dealers: (i) "[a]dding on vehicle service contracts without the knowledge or consent of consumers"; (ii) "[m]isrepresenting that vehicle service contracts were required to purchase a vehicle"; and (iii) "[s]elling vehicles that malfunction shortly after purchase."  (Compl. ¶¶ 194,

200, 205.)  The NYAG's claims rely on the "Holder Rule" notice in the Contracts:

> NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES
> WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT
> HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED
> AMOUNTS PAID BY THE DEBTOR HEREUNDER.

(*Id.* ¶ 153.)  As shown below, the NYAG's attempt to step into the shoes of consumers and use
the Holder Rule as a sword to impose vicarious liability fails as a matter of law.[40]

### 1.    The NYAG's "Holder Rule" Claims Are Improper

As an initial matter, the NYAG lacks authority to pursue "Holder Rule" claims.  GBL
§ 349 provides that whenever "any person . . . *has engaged in or is about to engage in*" deceptive
acts or practices, the NYAG may bring suit "to enjoin *such unlawful acts or practices* and to
obtain restitution of any moneys or property obtained directly or indirectly *by any such unlawful
acts or practices*."  GBL § 349(b).  Similarly, EL § 63(12) provides that "[w]henever any *person
shall engage* in repeated fraudulent or illegal acts," the NYAG may commence an action seeking
relief concerning "*such business activity or of any fraudulent or illegal acts*."  EL § 63(12).

Under a plain reading of the statutes, the NYAG may pursue persons who have engaged
in unlawful acts or practices.  The statutes do not authorize vicarious liability claims, such as
those the NYAG seeks to pursue under the Holder Rule.  Indeed, an "essential" element of a
GBL § 349 claim is causation: "[t]he plaintiff must show that *the defendant's* material deceptive
act caused the injury."  *Miller*, 994 F. Supp. 2d at 557.  But the Complaint is clear that it is
seeking redress under GBL § 349 and EL § 63(12) for the "acts and practices of . . . *dealers*,"
and not those of Credit Acceptance.  (Compl. ¶¶ 194, 200, 205.)  Consequently, Counts III, IV

---

[40] The Complaint also asserts that the allegedly wrongful conduct of *Dealers* included "requiring that *dealers*
include vehicle service contracts even where not agreed to by the consumer."  (Compl. ¶¶ 194, 200, 205.)  If this is
intended to suggest that the Company requires Dealers to include VSCs even where not agreed to by the consumer,
the specific allegations of the Complaint do not support that general, conclusory assertion.  (*See supra* § III(B).)
"General, conclusory allegations need not be credited . . . when they are belied by more specific allegations of the
complaint."  *Hirsch v. Arthur Andersen & Co.*, 72 F.3d 1085, 1092 (2d Cir. 1995).

and V should be dismissed as far as they hinge on Credit Acceptance's mere status "as the holder of consumer contracts." (*Id.* ¶¶ 194, 200, 205.)

In any event, the NYAG's claims under EL § 63(12) still fail because they are not claims that any consumer could ever have against a Dealer. The Holder Rule is expressly limited to "claims and defenses *which the debtor could assert* against the seller." (*Id.* ¶ 153.) But no debtor could assert such claims under EL § 63(12), which "authorizes only the attorney general to take certain actions, not private parties." *Pennicott v. JPMorgan Chase Bank, N.A.*, No. 21 Civ. 4575 (LGS), 2022 WL 4226025, at *3 (S.D.N.Y. Sept. 13, 2022); *accord Ogbolu v. Trs. of Columbia Univ.*, No. 21-CV-1697 (JPO), 2022 WL 280934, at *4 (S.D.N.Y. Jan. 31, 2022), *aff'd*, 2023 WL 2579044 (2d Cir. Mar. 21, 2023). Thus, at a minimum, the "Holder Rule" claims in Counts III and IV should be dismissed. (Compl. ¶¶ 194, 200.)

### 2. The Complaint Is Devoid of Any Allegations Showing that the NYAG Is Entitled to Relief Under the "Holder Rule"

The NYAG's "Holder Rule" claims also should be dismissed because the Complaint simply "does not provide factual allegations sufficient 'to give [the Company] fair notice of what the claim is and the grounds upon which it rests.'" *Myers v. Moore*, 326 F.R.D. 50, 59 (S.D.N.Y. 2018) (quoting *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 50 F.3d 117, 121 (2d Cir. 2007)). For example, the NYAG asserts that New York Dealers "[s]ell[] vehicles that malfunction shortly after purchase." (Compl. ¶¶ 194(c), 200(c), 205(c).) It supports this conclusory assertion with only another one: "[T]he vehicles sold frequently malfunction shortly after purchase, leaving consumers without a functioning vehicle. Consumers often take the vehicle back to the dealer for repairs that never happen, or the vehicle gets repossessed by CAC." (*Id.* ¶ 154(h).) While Rule 8 "does not require detailed factual allegations," it certainly requires more than a "naked assertion" that unspecified Dealers sold defective vehicles to unspecified consumers at

some point in the seven years that preceded this lawsuit. *Iqbal*, 556 U.S. at 678; *see also Utts v. Bristol-Myers Squibb Co.*, 226 F. Supp. 3d 166, 186-87 (S.D.N.Y. 2016) ("A bare allegation that [a] product had a manufacturing defect is too conclusory to plead a plausible claim . . . .").

The two remaining "Holder Rule" claims related to New York Dealer practices with respect to VSCs fare no better. (*See* Compl. ¶¶ 194(a)-(b), 200(a)-(b), 205(a)-(b).) While the Complaint's allegations about add-on products on a national scale are insufficient to state a plausible claim (*see supra* § III(B)), allegations concerning New York VSCs are non-existent. (*See* Compl. ¶¶ 128-29.) The Complaint does not allege that (i) a single New York Contract contained a VSC, (ii) any New York consumers complained that a New York Dealer required them to purchase a VSC as a condition of financing or (iii) a single instance where a New York Dealer told a New York consumer that a VSC was a condition of financing.[41]

## D.     The Complaint Fails to State a Claim Under the Martin Act

Finally, in Count VIII, the NYAG attempts to bootstrap its allegations of deceptive and abusive consumer acts or practices into claims for securities fraud under the Martin Act. (*See* Compl. ¶ 226.) The NYAG contends that, based on the Complaint's other allegations, Credit Acceptance misrepresented in private securities offerings that the Contracts underlying the securities "complied with all applicable law." (*Id.*) Count VIII is entirely derivative of, and should be dismissed with, the other counts in the Complaint. (*See supra* §§ I-III, V(A)-(C).)

## CONCLUSION

For all these reasons, the Court should dismiss the Complaint with prejudice.

---

[41] Insofar as the NYAG's "Holder Rule" claims are based on any Dealer deceptive acts or practices not alleged in Counts III, IV or V, including the allegations listed in paragraph 154 of the Complaint, the Complaint similarly fails to plead facts sufficient to state a plausible claim. *See Iqbal*, 556 U.S. at 678.

Dated: New York, New York
      August 14, 2024

Anand S. Raman (*pro hac vice*)
Darren M. Welch (*pro hac vice*)
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
1440 New York Avenue, N.W.
Washington, D.C. 20005
(202) 371-7000
anand.raman@skadden.com
darren.welch@skadden.com

Respectfully submitted,

  */s/ Patrick G. Rideout*
Patrick G. Rideout
Jeffrey S. Geier
Christopher R. Fredmonski
SKADDEN, ARPS, SLATE,
   MEAGHER & FLOM LLP
One Manhattan West
New York, New York 10001
(212) 735-3000
patrick.rideout@skadden.com
jeffrey.geier@skadden.com
christopher.fredmonski@skadden.com

*Attorneys for Defendant*
*Credit Acceptance Corporation*