UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------- X

CONSUMER FINANCIAL PROTECTION : 
BUREAU and THE PEOPLE OF THE STATE :
OF NEW YORK, by LETITIA JAMES, :
Attorney General of the State of New York, :

                Plaintiffs, :      Case No. 23 Civ. 0038 (JHR)

                :

       v. :

CREDIT ACCEPTANCE CORPORATION, :

              Defendant. :

---------------------------------------- X

*AMICI CURIAE* **BRIEF OF AMERICAN FINANCIAL SERVICES ASSOCIATION,
CONSUMER BANKERS ASSOCIATION,
AND CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA
IN SUPPORT OF DEFENDANT'S REVISED MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**Page**

IDENTITY AND INTEREST OF *AMICI CURIAE* ..................................................... 1

INTRODUCTION ........................................................................................... 2

ARGUMENT ................................................................................................ 7

I.   The Claims in This Case Continue a Long-Standing Pattern of Regulatory
     Overreach by the CFPB. ...................................................................... 7

  a.   The CFPB Has Overreached from its Inception, Taking Unsupported
       Legal Positions and Retroactively Changing Rules Applicable to Providers
       of Consumer Financial Services. ....................................................... 7

  b.   Historical Overview of TILA, and Congress's Deliberate Intent to Limit
       Assignee Liability. ........................................................................ 13

  c.   The CFPB's Theories of Liability in the Present Case Represent Four
       Instances of Regulatory Overreach or Reversals of Long-Settled Law ............... 15

    i.    The Dodd-Frank Act Explicitly Prohibits the Bureau from
          Exercising Regulatory Authority Over Vehicle Dealers. ...................... 15

    ii.   Dealer Discounts Are Specifically Excluded from the "Finance
          Charge" Under TILA. ................................................................ 17

    iii.  Liability for Dealer Conduct Relating to the Finance Charge May
          Only Be Imputed to Indirect Vehicle Finance Companies Under
          Limited Circumstances Not Alleged by Plaintiffs. ............................ 19

    iv.   The Court Should Not Allow the Plaintiffs to Leverage their
          UDAP/UDAAP Authority to Impose on Indirect Vehicle Finance
          Companies Ability-to-Repay Duties and Obligations that TILA
          Does Not Require ...................................................................... 21

II.  The Bureau's Novel Legal Theories Will Detrimentally Impact the Ability of
     Consumers to Obtain Credit and Dismantle an Important Component of the U.S.
     Economy. ....................................................................................... 23

CONCLUSION ............................................................................................... 26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Hosp. Ass'n v. Becerra*,
  596 U.S. 724 (2022)..................................................................................................7

*Balderos v. City Chevrolet*,
  214 F.3d 849 (7th Cir. 2000) ................................................................................20

*Biden v. Nebraska*,
  143 S. Ct. 2355 (2023)............................................................................................7

*Chamber of Commerce of United States v. Consumer Fin. Prot. Bureau*,
  691 F. Supp. 3d 730 (E.D. Tex. 2023)..................................................................12

*Consumer Fin. Prot. Bureau v. ITT Educ. Servs.*,
  219 F. Supp. 3d 878 (S.D. Ind. 2015) ..................................................................11

*Consumer Fin. Prot. Bureau v. Snap Fin. LLC*,
  No. 2:23-cv-00462-JNP-JCB, 2024 U.S. Dist. LEXIS 136828 (D. Utah Aug.
  1, 2024) ............................................................................................................12, 13

*Corner Post, Inc. v. Bd. of Gov'rs of Fed'l Reserve Sys.*,
  144 S. Ct. 2440 (2024)............................................................................................7

*Fridman v. NYCB Mortg. Co.*,
  780 F.3d 773 (7th Cir. 2015) ................................................................................18

*Loper Bright Enters. v. Raimondo*,
  144 S. Ct. 2244 (2024)........................................................................................3, 7

*Lorraine v. Wallin*,
  No. 3:16-cv-00409-MMD-WGC, 2016 U.S. Dist. LEXIS 108392 (D. Nev.
  Aug. 16, 2016) ......................................................................................................22

*Meyers v. Clearview Dodge Sales*,
  539 F.2d 511 (5th Cir. 1976) ................................................................................14

*National Automobile Dealers Association et al. v. Federal Trade Commission*,
  No. 24-60013 (5th Cir. 2024) ...............................................................................16

*PHH Corp. v. Consumer Fin. Prot. Bureau*,
  839 F.3d 1 (2016)............................................................................................ *passim*

*Poulin v. Balise Auto Sales*,
 No. 3:08-cv-0618 (CSH), 2010 U.S. Dist. LEXIS 33456 (D. Conn. Apr. 5,
 2010) ............................................................................................................................... 18

*Taylor v. Quality Hyundai*,
 150 F.3d 689 (7th Cir. 1998) ........................................................................................... 20

*West Virginia v. EPA*,
 597 U.S. 697 (2022) ..................................................................................................... 5, 12

**Statutes**

5 U.S.C. § 801(a) ........................................................................................................................ 9

12 U.S.C. § 5519 ....................................................................................................................... 16

12 U.S.C. § 5519(a) .................................................................................................................. 15

15 U.S.C. 1601 *et seq* ................................................................................................................ 17

15 U.S.C. § 1601(a) .................................................................................................................. 13

15 U.S.C. § 1637 ....................................................................................................................... 14

15 U.S.C. § 1641(a) .................................................................................................................. 20

Consumer Credit Protection Act title I (Pub. L. 90-321) ..................................................... 17

Dodd-Frank Act ................................................................................................................ *passim*

Equal Credit Opportunity Act ................................................................................................ 12

Federal Trade Commission Act ............................................................................................... 16

New York Motor Vehicle Retail Installment Sales Act ......................................................... 19

Pub L. No. 96-221, 94 Stat. 168, § 611 (1980) ...................................................................... 14

Real Estate Settlement Procedures Act .................................................................................... 9

94 Stat. 168, § 602 (1980) ........................................................................................................ 14

TILA .................................................................................................................................. *passim*

Truth in Lending Act ................................................................................................................. 1

**Other Authorities**

12 C.F.R. § 1026.2(a)(17) ......................................................................................................... 14

16 C.F.R. § 463 ...................................................................................................16, 23

12 CFR § 226(a)(1) ....................................................................................................17

12 CFR § 226.2(s) (1976) ..........................................................................................14

12 CFR § 1002.1(b) .....................................................................................................8

12 CFR § 1026.4(a) ....................................................................................................13

12 CFR § 1026.43(c) ..................................................................................................23

82 Fed. Reg. 54472 (Nov. 17, 2017) .........................................................................25

85 Fed. Reg. 44382 (July 22, 2020) .....................................................................25, 26

Consumer Financial Protection Bureau, *What things can I negotiate when shopping for a car or auto loan?* (Aug. 28, 2023), https://www.consumerfinance.gov/ask-cfpb/what-things-can-i-negotiate-when-shopping-for-a-car-or-auto-loan-en-2132/; ...................................................24

https://www.consumerfinance.gov/about-us/newsroom/statement-bureau-consumer-financial-protection-enactment-sj-res-57/ (May 21, 2018) ......................9

https://www.politico.com/magazine/story/2017/12/03/trump-cfpb-elizabeth-warren-215997/ ........................................................................................................7

New York State Attorney General, *Buying a car?* (last visited August 17, 2024), https://ag.ny.gov/publications/buying-car ............................................................24

Pursuant to the Court's April 26, 2023 order granting *amici* leave to file an amicus brief in support of Credit Acceptance Corporation's (CAC) motion to dismiss (*see* ECF No. 51) and the Court's July 1, 2024 order directing the parties to submit revised briefing on CAC's motion to dismiss (*see* ECF No. 71), *amici* respectfully submit this revised brief in support of CAC's revised motion to dismiss the complaint (*see* ECF No. 74).

## IDENTITY AND INTEREST OF *AMICI CURIAE*

*Amici* are the American Financial Services Association (AFSA), the Consumer Bankers Association (CBA) and the Chamber of Commerce of the United States of America (the Chamber). *Amici* and their members have a strong interest in the issues raised in this litigation.

Many of *amici's* members extend credit to consumers through business models that were carefully constructed to comply with the long-standing definition of the term "finance charge" defined in the Truth in Lending Act (TILA) and the Consumer Financial Protection Bureau's (CFPB or Bureau) Official Staff Commentary to TILA's implementing regulation, Regulation Z. *Amici's* members also extend credit to a broad spectrum of consumers, including consumers whose credit histories may be less than perfect, but who still need access to credit. Finally, *amici's* members engage in a variety of financing arrangements for retail sales. Because Plaintiffs' legal theories contradict TILA and Regulation Z, they will lead to regulatory uncertainty, threaten the long-settled business practices of *amici's* members, and significantly impair consumers' access to credit.

Established in 1916, AFSA is a not-for-profit organization and the predominant trade association for the consumer credit industry. With a membership roster of over 450 companies, AFSA serves as a valuable resource for businesses that offer consumer credit through a range of channels, such as mortgages, credit cards, traditional installment loans, and direct and indirect vehicle financing. AFSA and its membership have a wealth of expertise and knowledge of legal

issues relating to consumer credit and have made significant contributions to consumer welfare through their provision of free web-based personal finance courses.

Founded in 1919, CBA is the voice of the retail banking industry. CBA is a financial services trade association whose membership is exclusively comprised of retail banking institutions including national banks, regional banks, industrial banks, and commercial banks. CBA's members operate in all 50 states, serve more than 150 million Americans, and hold two thirds of the United States' total depository assets. Eighty-five percent of CBA's corporate members are financial institutions holding more than $10 billion in assets, and among them are some of the nation's largest retail banks.

The Chamber is the world's largest business federation. It represents approximately 300,000 direct members and indirectly represents the interests of more than three million companies and professional organizations of every size, in every industry sector, and from every region of the country. An important function of the Chamber is to represent the interests of its members in matters before Congress, the Executive Branch, and the courts. To that end, the Chamber regularly files *amicus curiae* briefs in cases, like this one, that raise issues of concern to the nation's business community.

## INTRODUCTION

*Amici* sought permission to participate in this case for two principal reasons. First, Plaintiffs are attempting to rewrite settled law that the financial services industry has been operating under, and relying on, for decades, and they are doing so outside of the formal notice-and-comment rulemaking process (and indeed, contrary to the plain language of federal statutes regulating credit terms and disclosure) by filing suit against a single finance company, CAC. The consequences of Plaintiffs' attempt to regulate by litigation are a lack of transparency, a failure to

gather necessary data and input from key industry stakeholders, and the potential for consumers to be subject to severe and unintended harms.  The Supreme Court, in its recent decision in *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024), warned administrative agencies and courts that agency actions must be limited to the authority granted to them by Congress.  The Court overruled the *Chevron* doctrine, because, *inter alia*, "*Chevron* … allows agencies to change course even when Congress has given them no power to do so," and thus "fosters unwarranted instability in the law, leaving those attempting to plan around agency action in an eternal fog of uncertainty."[1] This case is a prime example of what the Supreme Court seeks to prevent by overruling *Chevron* in *Loper Bright*.

Second, the rules that Plaintiffs attempt to promulgate through litigation, would, if accepted, have a substantial negative impact on the retail sales finance industry, as well as the consumers that Plaintiffs are tasked with protecting.  Among other things, the claims asserted by Plaintiffs would create uncertainty not only for other vehicle finance companies, but also the broader retail sales finance industry involved in all sectors of the American economy, because the Plaintiffs' allegations attack commercial practices (like the use of retailer/dealer discounts) that are used widely in many contexts.  Plaintiffs' claims could be used against a variety of entities that provide credit for consumers to purchase goods and services from retailers or dealers, including, among others, vehicle finance companies, banks, credit unions, buy-now pay-later companies, and home improvement finance providers.  In evaluating the merits of Plaintiffs' claims, *amici* believe that it is important for the Court to be aware of the significant negative impact Plaintiffs' theories of liability pose to the retail sales finance industry.  Those impacts include decreased competition amongst members of the industry, higher financing costs, and a diminished availability of credit

---

[1] *See Loper Bright Enters.*, 144 S. Ct. at 2272.

for consumers across a broad spectrum.  If Plaintiffs' claims advance past the pleading stage, those claims are likely to persist, given Plaintiffs' track record of misusing litigation to extract exorbitant settlements from industry stakeholders who would rather resolve enforcement actions early to avoid being subject to the Bureau's virtually unlimited civil monetary penalty authority.  If Plaintiffs' claims are sustained by the Court, the widespread chilling effects underlying Plaintiffs' theories will persist well into the future.

The case at hand concerns indirect vehicle financing, which typically involves three parties: (1) a dealership (and the original creditor under a retail installment contract); (2) a consumer (purchaser of the vehicle and obligor under the retail installment contract); and (3) a financial institution such as an indirect vehicle finance company, bank, or credit union (purchaser and assignee of the retail installment contract from the dealer).  When a consumer opts to buy a vehicle from a dealership employing indirect financing, the dealership typically forwards the consumer's credit application to prospective financial institutions, to allow them to determine whether they would be willing to accept assignment of the consumer's retail installment contract, if it is originated by the dealer on terms agreed to between the consumer and the dealer, and if so, on what terms.  If a financial institution agrees to accept assignment of a contract on terms that are acceptable to the dealer, the dealership assigns the contract to the financial institution (and the financial institution becomes an *assignee* of the contract originally consummated by the dealer and the consumer), in exchange for an agreed-upon payment.  Frequently, there is a difference between the amount financed by the dealer and the price paid by the financial institution providing financing.  Where the amount financed exceeds the price paid by the financial institution providing financing, this difference is known in the vehicle finance industry as the "dealer discount."  Dealer (or retailer) discounts have long been common across retail sales finance programs, including in

situations where retailer discounts make it possible for the products to be offered to consumers, and without them, certain categories of retail sales financing could cease to exist.

The Plaintiffs' Complaint is premised on two key contentions: (1) CAC's business model allegedly incentivizes vehicle dealers to inflate vehicle prices such that, according to Plaintiffs, the true finance charges in the retail installment contracts that vehicle dealers originate are hidden from consumers; and (2) CAC allegedly fails to assess consumers' ability to make payments under a retail installment contract prior to extending credit. Plaintiffs assert that these practices violate federal and New York laws relating to deceptive and abusive acts and practices. Remarkably, in making their claims, Plaintiffs completely ignore the Dodd-Frank Act's prohibition on regulating vehicle dealers and the clear language of TILA—the statute that squarely governs Plaintiffs' disclosure claims. In addition to the Supreme Court making clear that "'enabling legislation' is generally not an 'open book to which the agency may add pages and change the plot line,'"[2] *amici* emphasize that Plaintiffs' claims are also inconsistent with the Bureau's own regulations and Official Commentary.

The Dodd-Frank Act expressly excludes dealerships from the Bureau's rulemaking, enforcement, and supervisory authority, but the Bureau attempts to contravene the statute and indirectly regulate an exempted industry by attempting to impose liability on finance companies for the alleged actions of vehicle dealers. In addition, neither vehicle dealers nor finance companies are required to disclose dealer discounts as a finance charge under TILA unless those discounts are separately imposed on consumers. Indeed, the implementing regulation for TILA, Regulation Z, and the plain language of the CFPB's own Official Commentary to Regulation Z, explicitly provide that *no such disclosure is required*. Finally, unless a dealer's violation of TILA

---

[2] *See West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

is apparent on the face of the TILA disclosure—which Plaintiffs do not allege—TILA precludes a dealership's improper disclosure of the finance charge, even if proven, from being imputed to an indirect vehicle finance company, regardless of the finance company's involvement in the transaction.  Plaintiffs attempt to sidestep these clear provisions of TILA by characterizing conduct that TILA *explicitly authorizes* as "illegal" under statutes that generally prohibit unfair, deceptive or abusive practices.

Regarding Plaintiffs' effort to manufacture a new ability-to-repay claim, Congress chose in TILA to expressly require two categories of creditors—credit card issuers and residential mortgage lenders—to conduct individualized assessments of a consumer's ability-to-repay before extending credit.  Congress conspicuously chose *not* to impose such a requirement on any other creditors.  Plaintiffs now seek the Court's assistance in substituting their judgment for that of Congress and adding ability-to-repay requirements where Congress chose not to enact them.

The consumer credit industry has relied on the explicit provisions of TILA and Regulation Z for decades in constructing their programs.  Market participants are entitled to know what is expected of them when conducting their day-to-day operations.[3]  If the Court endorses the Plaintiffs' effort to perform an about-face on well-settled provisions of law, it will threaten to severely impede competition and consumers' access not "just" to vehicle financing but also to credit from other sources, including home improvement finance companies and fintech companies that offer buy-now-pay-later products.  Congress charged the Bureau with enforcing consumer protection laws to ensure that all consumers have access to financial products and services that are

---

[3] During his nomination hearing, CFPB Director Rohit Chopra declared that " . . . the CFPB . . . should be focused on fixing harms [and] making it clear to market participants what is expected of them."  Director Chopra further noted that "[regulatory clarity] is what creates a vibrant market, and that is something that the CFPB must do, adhering to all the procedures Congress has laid out," which is an obligation that Director Chopra presumably remains "absolutely committed" to.  *See* S. Hrg. 117-76 (March 2, 2021).

fair, transparent, and competitive. Rulemaking through litigation accomplishes none of these statutorily-mandated objectives. Particularly considering the Supreme Court's recent clear directive that agencies must enforce legislation as written by Congress—as opposed to enforcing legislation as the agencies ostensibly would prefer[4]—the Court should dismiss the Plaintiffs' claims because they are contrary to settled law and the express limitations on Plaintiffs' authorities.

## ARGUMENT

I.    **The Claims in This Case Continue a Long-Standing Pattern of Regulatory Overreach by the CFPB.**

a.    *The CFPB Has Overreached from its Inception, Taking Unsupported Legal Positions and Retroactively Changing Rules Applicable to Providers of Consumer Financial Services.*

Before examining the nature of the Plaintiffs' claims in this case, and how they represent a departure from settled law that has governed the credit industry for decades, it is important to point out that the CFPB has made regulatory overreach a part of its operations in numerous instances since its inception, with this lawsuit being just one recent example. As the first Director of the Bureau, Richard Cordray, commented, "[p]ushing the envelope is a loaded phrase, but that's absolutely what we did."[5] Four clear examples illustrate this point and provide needed context for the present case as being yet another example of the CFPB "[p]ushing the envelope."

*First,* in 2013, the Bureau sought to circumvent the Dodd-Frank Act's prohibition on regulating vehicle dealers and the formal notice-and-comment rulemaking process by publishing

---

[4] *See, e.g.*, *Loper Bright Enters.*, 144 S. Ct. at 2273 ("[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it."); *Biden v. Nebraska*, 143 S. Ct. 2355, 2368 (2023) ("[S]tatutory permission to 'modify' does not authorize 'basic and fundamental changes in the scheme' designed by Congress." (citation omitted)); *see also Corner Post, Inc. v. Bd. of Gov'rs of Fed'l Reserve Sys.*, 144 S. Ct. 2440, 2448 (2024) (statute of limitations for challenging agency action does not begin to run until the plaintiff is injured by the action); *Am. Hosp. Ass'n v. Becerra*, 596 U.S. 724, 733 (2022) ("This Court has long recognized a 'strong presumption' in favor of judicial review of final agency action." (citation omitted)).

[5] https://www.politico.com/magazine/story/2017/12/03/trump-cfpb-elizabeth-warren-215997/

the "Indirect Auto Lending and Compliance with the Equal Credit Opportunity Act" (2013 Bulletin).  The Equal Credit Opportunity Act (ECOA), and its implementing regulation, Regulation B, protect credit applicants from discrimination on prohibited bases such as race, color and religion.[6]  Indirect vehicle finance companies and dealerships were the subject of the Bureau's 2013 Bulletin.  There, the Bureau concluded that an indirect vehicle finance company's practice of "allowing" the dealership discretion to "mark up" the interest rate term of a prospective retail installment contract above the creditor's designated interest rate would likely result in a violation of ECOA.  Stated differently, although indirect vehicle finance companies were not themselves increasing the interest rate terms of consumer contracts at loan consummation, and vehicle dealers are completely independent of the finance companies,[7] the Bureau's position was that the vehicle dealers' conduct in setting the interest rates on the retail installment contracts they entered into with consumers violated ECOA and Regulation B, and that indirect vehicle finance companies would be held responsible for the independent actions of the vehicle dealers—a claim with remarkable similarity to the Bureau's claims in the present case.  The 2013 Bulletin mandated a series of actions to be taken by indirect vehicle finance companies to "limit fair lending risk," on pain of enforcement actions that might be (and in fact, were) brought by the Bureau.  Five years later, in 2018, Congress invalidated the 2013 Bulletin under the Congressional Review Act (CRA), disapproving the legal theory asserted by the Bureau.

Amongst other things, the CRA requires the Bureau to submit to Congress a report containing a general statement of any proposed rule, and to submit to the Comptroller General a

---

[6] 12 CFR § 1002.1(b).

[7] The Complaint repeatedly refers to CAC's "affiliated" dealers, *see, e.g.*, Compl. ¶¶ 2; 22; 23; 33, but nowhere explains the nature of the supposed affiliation.

copy of the Bureau's cost-benefit analysis of any proposed rule.[8]  The Bureau did neither prior to publishing the 2013 Bulletin, but it did leverage the 2013 Bulletin to file enforcement actions against four indirect vehicle finance companies and banks before its repeal in 2018.  Before the 2013 Bulletin could be fully assessed on the merits through litigation, the CFPB extracted significant settlements from these enforcement targets that required payments of more than $150 million.[9]  In response to Congress' disapproval of the 2013 Bulletin, then-acting Director of the CFPB thanked Congress for correcting this "instance of Bureau overreach."[10]  Against this backdrop, *amici* are compelled to weigh in now to ward off yet another attempt by the Bureau to institute sweeping regulatory reform outside of the formal, transparent, and congressionally mandated notice-and-comment rulemaking channel.

*Second*, during 2016, the Bureau engaged in regulatory overreach through enforcement proceedings involving a mortgage lender, PHH.  The U.S. Court of Appeals for the D.C. Circuit published an opinion that rebuked the Bureau's decision to lodge an improper enforcement action against PHH under the Real Estate Settlement Procedures Act (RESPA).  The case, *PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1 (2016), involved captive mortgage reinsurance arrangements by which a mortgage lender would refer borrowers to certain mortgage insurers, who in turn would purchase mortgage reinsurance from a wholly-owned subsidiary of the referring

---

[8] *See generally* 5 U.S.C. § 801(a).

[9] Against the backdrop of the 2013 Bulletin, the Bureau launched four civil enforcement actions against members of the indirect vehicle finance industry: (1) in 2013, the Bureau ordered Ally Bank to pay an $18 million civil penalty and $80 million in restitution to minority auto loan borrowers for allegedly engaging in discriminatory practices; (2) in 2015, the Bureau ordered American Honda Finance Corporation to pay $24 million in restitution to minority auto loan borrowers for allegedly engaging in discriminatory practices; (3) also, in 2015, the Bureau ordered Fifth Third Bank to pay $18 million in restitution to minority auto loan borrowers for allegedly engaging in discriminatory practices; and (4) in 2016, the Bureau ordered Toyota Motor Credit Corporation to pay $21.9 million in restitution to minority auto loan borrowers for allegedly engaging in discriminatory practices.  The instant case before the Court poses the same risk if not dismissed.

[10] https://www.consumerfinance.gov/about-us/newsroom/statement-bureau-consumer-financial-protection-enactment-sj-res-57/ (May 21, 2018).

mortgage lender.[11]  The defendant, PHH, pointed out that RESPA and long-standing guidance from the U.S. Department of Housing and Urban Development (HUD) expressly permitted these types of reinsurance arrangements so long as the mortgage insurer paid no more than reasonable market value for the reinsurance.[12]  However, the Bureau departed from this previously well-settled law and contended—for the first time ever—that RESPA prohibited these types of reinsurance arrangements altogether, and it retroactively applied its new interpretation of the law to "remediate" conduct that PHH had engaged in well before the Bureau's change of heart. Alternatively, PHH further argued that the Bureau's enforcement action was untimely because the alleged misconduct occurred outside of the three-year statute of limitations set forth by RESPA. In response, the Bureau contended that its administrative enforcement powers under the Dodd-Frank Act are boundless, and as a result, the three-year statute of limitations imposed by RESPA (or any of the other consumer protection statutes that the Bureau can enforce) only applied to enforcement actions the Bureau chooses to bring in court as opposed to enforcement actions the Bureau decides to effectuate through administrative proceedings.[13]  Ultimately, the D.C. Circuit disapproved of the Bureau's interpretation of RESPA and the Dodd-Frank Act and noted that its decision to retroactively apply this new interpretation against PHH "violated bedrock principles of due process," which is a constitutional right the Bureau is infringing upon in the present matter through an unsupported application of its UDAP/UDAAP authority to circumvent the clear text of TILA.[14]  By examining HUD's longstanding interpretation of RESPA, its implementing regulation, Regulation X, and Congress's goals under RESPA, the D.C. Circuit concluded that

---

[11] *PHH Corp. v. Consumer Fin. Prot. Bureau*, 839 F.3d 1, 40 (D.C. Cir. 2016).

[12] *See id.* at 40.

[13] *See id.* at 50.

[14] *See id.* at 9.

RESPA permitted captive mortgage reinsurance arrangements.[15]  But, the D.C. Circuit made clear that even if the Bureau's interpretation of RESPA was correct (which it was not), the Bureau's interpretation would have amounted to an "about-face from the Federal Government's longstanding prior interpretation of [RESPA and Regulation X]."[16]  Furthermore, the court concluded that the Bureau's statute of limitations argument was rooted in a misunderstanding of "the enforcement provisions of the Dodd-Frank Act," the text of which makes clear the Bureau may enforce federal consumer protection laws "*unless* such Federal law [and any statute of limitations provisions embedded in such laws] specifically limits the Bureau from conducting a hearing or adjudication proceeding."[17]  The panel opinion in PHH was ultimately replaced by an *en banc* opinion from the D.C. Circuit that addressed the constitutionality of the Bureau Director's "for cause" removal provision, but the panel's holding regarding RESPA and the statute of limitations remained intact.[18]

There are striking parallels between the Bureau's conduct in *PHH* and its theories in the instant action.  Had the D.C. Circuit not stepped in and corrected the Bureau's erroneous understanding of the applicable law and regulations, and its unfair reversal of settled law that the industry had relied on, the Bureau's interpretation of RESPA—and its retroactive application of that interpretation—would have had a deterrent impact on the mortgage industry nationally, and

---

[15] See id.

[16] *Id.* at 44.

[17] *See id*. at 51. It is important to note that this is not the first time the Bureau has attempted to advance that the Dodd-Frank Act affords it *carte blanche* to commence administrative proceedings—even those that are time-barred.  In *Consumer Fin. Prot. Bureau v. ITT Educ. Servs.*, 219 F. Supp. 3d 878, 923 (S.D. Ind. 2015), the Bureau argued that the one-year statute of limitations imposed by TILA's civil liability provision did not apply to it, but the court declined to read that exception into the statute.

[18] *See generally PHH Corp. v. Consumer Fin. Prot. Bureau*, 881 F.3d 75, 77 (D.C. Cir. 2018).

PHH would have been required to make a $109 million payment as punishment for violating the Bureau's new, retroactive interpretation of RESPA.[19]

Today, the Bureau continues to adhere to the "pushing the envelope" mandate it advanced in *PHH* just eight years ago, as evidenced by two more examples of the Bureau's regulatory overreach.

In *Chamber of Commerce of United States v. Consumer Fin. Prot. Bureau*, 691 F. Supp. 3d 730 (E.D. Tex. 2023), the Chamber objected to the Bureau's March 2022 amendment to its Supervision and Examination Manual. The amendment announced the Bureau's intent to utilize its amorphous UDAAP authority to encompass broadly any forms of discrimination—even discrimination that was not the subject of the only anti-discrimination statute under which the Bureau has authority (the Equal Credit Opportunity Act). In essence, the CFPB was unsatisfied with the fact that Congress only prohibited discrimination in connection with credit transactions, and the Bureau sought to expand its authority by using the word "unfair" in the Dodd-Frank Act to prohibit discrimination in non-credit transactions such as deposit accounts, payment processing, debt collection and credit reporting. Citing the "major questions" doctrine applied by the Supreme Court in *West Virginia v. EPA*, the court disposed of the Bureau's contention that it possesses "sweeping antidiscrimination authority" because the Dodd-Frank Act does not contain "exceedingly clear language" supporting that notion.[20]

Finally, in *Consumer Fin. Prot. Bureau v. Snap Fin. LLC*, No. 2:23-cv-00462-JNP-JCB, 2024 U.S. Dist. LEXIS 136828, at *20 (D. Utah Aug. 1, 2024), the Bureau argued, *inter alia*, that

---

[19] The $109 million disgorgement penalty the Bureau imposed on PHH was initially $6.4 million, but after reversing, in part, an administrative law judge's decision on PHH's appeal of the Bureau's administrative enforcement action, the Bureau dramatically increased the judge's monetary penalty award. *See id.* at 82.

[20] *See Chamber of Commerce of United States v. Consumer Fin. Prot. Bureau*, 691 F. Supp. 3d 730, 743 (E.D. Tex. 2023).

certain rent-to-own agreements were the "functional equivalent of purchase finance arrangements," and, if true, these rent-to-own contractual arrangements constituted "financial products" under the Dodd-Frank Act and were subject to the Bureau's authority.  Again, the Bureau's novel and expansive interpretation of the Dodd-Frank Act was rejected by the court:

> "The CFPB, by inviting this court to search for functional equivalents of purchase finance agreements without more, ignores Congress' policy decisions and fine-tuning of the CFPA and, as a result, a*sks this court to step beyond interpretation and into the business of legislating*. It declines to do so."

> *Id.* at *30 (emphasis added).

Like the courts in *PHH, Chamber of Commerce of the United States,* and *Snap Finance*, this Court must not permit the Bureau to step into the shoes of Congress (or infringe upon the judiciary's role as the exclusive interpreter of legislation) by advancing theories that are contradicted by the express text of TILA, its implementing regulation, Regulation Z, and its accompanying Official Commentary.

> b.    *Historical Overview of TILA, and Congress's Deliberate Intent to Limit Assignee Liability.*

Congress enacted TILA to promote clear, accurate, and standardized disclosures of credit terms.[21]  TILA's principal purpose is to mitigate the uninformed use of credit and to strengthen the ability of consumers to compare and evaluate the variety of credit terms available to them.[22] In Congress's judgment, the disclosures mandated by TILA ensure that everyday consumers, including low-income, credit-challenged consumers, are capable of understanding the terms of credit being offered in consumer finance transactions.  To that end, TILA requires a "creditor" to

---

[21] *See* 15 U.S.C. § 1601(a).

[22] *Id*.

conspicuously disclose, among other things, (i) any "finance charge"[23] that it imposes on consumers (i.e., interest) expressed as both an annual percentage rate and a total dollar amount, (ii) the "amount financed" (i.e., total debt obligation), (iii) the "total of payments" (comprised of principal and interest) the consumer must pay through the life of the credit term, and (iv) the "number, amount, and the due dates or period of payments scheduled to repay the total of payments."[24]

Also pertinent to the present case, TILA and Regulation Z clearly define who is responsible for providing the required disclosures: "creditors." Originally, the laws defined the term "creditor" as a person "who in the ordinary course of business regularly extends *or* arranges for the extension of consumer credit, *or* offers to extend or arrange for the extension of such credit . . . ."[25] By defining a "creditor" as multiple parties under TILA, this version of the term "creditor" crippled complex financing arrangements and assignments of contractual rights, as parties often were forced to litigate whether an original creditor and a subsequent assignee were jointly required to furnish TILA-compliant disclosures—including the finance charge—to consumer borrowers.[26] However, in 1980, Congress reconciled this definitional uncertainty by amending certain sections of TILA through the Truth in Lending Simplification and Reform Act (Reform Act).[27] The Reform Act modified TILA to require only one "creditor" to provide disclosures in a given

---

[23] Regulation Z generally defines the term "finance charge" as "any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit." 12 CFR § 1026.4(a).

[24] *See generally* 15 U.S.C. § 1637.

[25] *See* 12 CFR § 226.2(s) (1976) (emphasis added).

[26] *See, e.g., Meyers v. Clearview Dodge Sales*, 539 F.2d 511, 515 (5th Cir. 1976) (disagreeing with defendant-indirect vehicle finance company's claim that, as a "subsequent assignee," it was not liable for violative TILA disclosures furnished to the plaintiff-consumer by defendant-original creditor since there was "little doubt that in [the] transaction [that] credit . . . was extended by [defendant-indirect vehicle finance company] and arranged for by [defendant-original creditor.]") (internal quotations omitted).

[27] *See* Pub L. No. 96-221, 94 Stat. 168, § 611 (1980).

-14-

transaction,[28] and Regulation Z was amended to define the "creditor" as the party "to whom the obligation is initially payable, either on the face of the note or contract, or by agreement when there is no note or contract."[29] Plaintiffs' claims in this case are an effort to reverse this amendment to TILA, by making an assignee liable for alleged misstatements of the finance charge by vehicle dealers—the original creditor in an indirect vehicle finance transaction and the only party required to make TILA disclosures.

Further, Plaintiffs' claims appear to be based on the faulty premise that consumers cannot understand the TILA disclosures they receive in connection with a vehicle purchase. Moreover, Congress made the determination in TILA of what information was needed to ensure that consumers could understand financing transactions. By arguing that consumers provided with TILA-required disclosures are confused, Plaintiffs are arguing against the policy determination made by Congress. But any such argument must be made to—and resolved by—Congress. Agencies are not free to substitute their judgment for that of Congress. They—like courts—are bound by what Congress adopted.

      c.    *The CFPB's Theories of Liability in the Present Case Represent Four Instances of Regulatory Overreach or Reversals of Long-Settled Law.*

          i.    *The Dodd-Frank Act Explicitly Prohibits the Bureau from Exercising Regulatory Authority Over Vehicle Dealers.*

With very limited exceptions not applicable here, "the Bureau may not exercise any rulemaking, supervisory, enforcement or any other authority … over a motor vehicle dealer."[30] But without question, it is the regulation of vehicle dealers that is the Bureau's intention in bringing this lawsuit—the same intention the Bureau attempted to bring to fruition through the 2013

---

[28] *See id.*

[29] 94 Stat. 168, § 602 (1980); 12 C.F.R. § 1026.2(a)(17).

[30] 12 U.S.C. § 5519(a).

Bulletin that was later invalidated by Congress.  The Bureau alleges that vehicle dealers charged prices for vehicles that were too high, or improperly sold optional products.  But to avoid its obvious absence of authority over vehicle dealers, the Bureau instead seeks to hold financial institutions directly liable for vehicle dealer conduct, in hopes that the indirect finance companies, banks, or credit unions will fulfill the role of regulating the vehicle dealerships that the CFPB is prohibited by law from regulating.  But the contrived legal theories in this case cannot hide the fact that suing a vehicle finance company based on dealer conduct is an obvious attempt by the Bureau to circumvent the law and do what Congress explicitly prohibited it from doing— regulating vehicle dealers.  It is unsurprising that the Federal Trade Commission (FTC), which was expressly given authority to regulate vehicle dealers under Section 5 of the Federal Trade Commission Act and under Dodd-Frank, *is in fact* regulating the motor vehicle marketplace.[31] And although the FTC's most recent motor vehicle dealer-related rulemaking is being contested by industry participants through litigation,[32] these industry participants *have not* advanced the position that the FTC lacks authority to regulate the motor vehicle industry.  The same cannot be said about the Bureau.  The same section of the Dodd-Frank Act confirming the FTC's regulatory authority over vehicle dealers also unambiguously provides that the Bureau "may not exercise any rulemaking, supervisory, enforcement or any other authority" over vehicle dealers.[33]  The Bureau cannot attempt to circumvent this very clear restriction on its regulatory powers through the present lawsuit.

---

[31] *See generally* 16 C.F.R. § 463, "Combating Auto Retail Scams Trade Regulation Rule (CARS Rule)."

[32] *See National Automobile Dealers Association et al. v. Federal Trade Commission*, No. 24-60013 (5th Cir. 2024).

[33] 12 U.S.C. § 5519.

The Bureau's claims should be rejected for these reasons alone, but even a cursory examination of the merits of the claims shows that the grounds for dismissal are numerous.

        ii.     *Dealer Discounts Are Specifically Excluded from the "Finance Charge" Under TILA.*

Because it is fatal to their theory, Plaintiffs noticeably avoid any discussion of TILA in their Complaint.  Instead, Plaintiffs cite to their UDAP/UDAAP authority in support of the proposition that failure to disclose a dealership's compensation misleads the consumer as to the true cost of credit, despite TILA—which has governed consumer-credit disclosures for more than 50 years—permitting the conduct at issue.  This represents another attempt by Plaintiffs to whipsaw industry for relying on long-settled law.  TILA specifically addresses, *and excludes*, dealer discounts from the scope of the term "finance charge" unless separately imposed on consumers—which is not alleged in the Complaint.  As a result, neither indirect vehicle finance companies nor dealerships are required to include generally imposed dealer discounts when disclosing finance charges and/or calculating the Annual Percentage Rates of their credit agreements.

Before the CFPB's inception under the Dodd-Frank Act, Regulation Z was administered by the Board of Governors of the Federal Reserve System (Federal Reserve).[34]  The Federal Reserve published Regulation Z in 1968.[35]  The express text of the Federal Reserve's Official Staff Interpretation relating to certain costs that are excluded from TILA's "finance charge" definition reads as follows:

> *Costs of doing business.* **Charges absorbed by the creditor as a cost of doing business are not finance charges**, even though the creditor may take such costs into consideration in determining the interest rate to be charged or the cash price of

---

[34] *See generally* 12 CFR § 226(a)(1).

[35] TILA, 15 U.S.C. 1601 *et seq*., was enacted on May 29, 1968, as title I of the Consumer Credit Protection Act (Pub. L. 90-321).  TILA, implemented by Regulation Z (12 CFR 1026), became effective July 1, 1969.

the property or service sold. However, if the creditor separately imposes a charge on the consumer to cover certain costs, the charge is a finance charge if it otherwise meets the definition. For example:

i. **A discount imposed on a credit obligation when it is assigned by a seller-creditor to another is not a finance charge as long as the discount is not separately imposed on the consumer**.[36]

On July 11, 2011, the Dodd-Frank Act transferred the Federal Reserve's rulemaking authority under TILA and Regulation Z to the Bureau. Since that date, the Bureau has not modified the Federal Reserve's prior interpretation of the "costs of doing business" exemption. Indeed, the Bureau's own Official Staff Commentary of this exemption—which mirrors the Federal Reserve's Official Staff Interpretation of the same exemption—has been in existence for the entirety of the Bureau's tenure as a regulatory agency.[37] Both the Federal Reserve's Official Staff Interpretation and the Bureau's Official Staff Commentary provide that a creditor-seller is not required to disclose to a consumer that the creditor plans on selling the retail installment contract at a discount *so long as* the creditor does not separately impose the cost of the discount on the consumer.[38] There is no allegation that retail installment contracts purchased by CAC separately impose dealer discounts or any portion thereof on consumers and, thus, Plaintiff should be foreclosed from pursuing their claims under the plain language of the Bureau's own Official Commentary. The introduction of the Bureau's Official Commentary under Regulation Z provides that "[g]ood faith

---

[36] Supplement I to Part 226, cmt. 4(a)-2 (emphasis added).

[37] Supplement I to Part 1026, cmt. 4(a)-2; *see also Fridman v. NYCB Mortg. Co.*, 780 F.3d 773, 776 (7th Cir. 2015) (noting that the "[t]he [Bureau's] Official Interpretations for Regulation Z were adopted in wholesale form, minus a few technical changes, from the Federal Reserve Board . . . Staff Commentary . . . on Regulation Z.").

[38] *See, e.g., Poulin v. Balise Auto Sales*, No. 3:08-cv-0618 (CSH), 2010 U.S. Dist. LEXIS 33456, at *13 (D. Conn. Apr. 5, 2010) (dismissing plaintiffs' "inflated purchase price" theory under TILA and noting "[p]laintiffs' complaint fails to state a viable TILA claim because it does not allege or describe the existence of a separately imposed charge payable by them in connection with these credit transactions. Stripped of conclusory verbiage, Plaintiffs' claim is that they paid more for their financed vehicles than the retail values listed for them . . . *and that excess amount should be characterized as a hidden finance charge.* This theory does not fit within TILA's statutory and regulatory scheme, and is contrary to the spirit, if not the letter, of the [Federal Reserve Board's Official Staff Commentary.]") (emphasis added).

compliance with this commentary affords protection from liability under section 130(f) of the Truth in Lending Act. Section 130(f) (15 U.S.C. 1640) protects creditors from civil liability for any act done or omitted in good faith in conformity with any interpretation issued by a duly authorized official or employee of the Bureau of Consumer Financial Protection."[39]   Here, however, Plaintiffs seek to ignore the safe harbor that the Bureau provides in its Official Commentary, and punish CAC under a disingenuous UDAP/UDAAP theory for conduct the Bureau must concede is *expressly permitted* by TILA and Regulation Z.  The unfairness and lack of merit in this course of action is self-evident—particularly considering that Congress has specifically charged the Bureau with enforcing TILA and its implementing regulations according to their terms.

iii.    *Liability for Dealer Conduct Relating to the Finance Charge May Only Be Imputed to Indirect Vehicle Finance Companies Under Limited Circumstances Not Alleged by Plaintiffs.*

Although Plaintiffs' Complaint only makes a single and indirect reference to TILA as being incorporated within the New York Motor Vehicle Retail Installment Sales Act, Plaintiffs essentially argue that "sell[ing] vehicles at inflated prices"[40] and the sale of vehicle add-on products constitute finance charges that must be expressly disclosed to consumers as part of the interest rate and not be included in the principal amount disclosed in retail installment sales contracts.  Notably, indirect finance companies like CAC do not sell cars or vehicle add-on products to consumers.  Thus, the essence of Plaintiffs' claim is that CAC should have been aware of these practices by virtue of its business dealings with dealers, and as a result, Plaintiffs intend to hold CAC liable for the dealers' alleged conduct.

---

[39] *See generally* Supplement I to Part 226.

[40] *See* Compl. ¶ 175.

But, here again, TILA governs this precise issue, and its plain language is directly contrary to Plaintiffs' claims. Under TILA, "any civil action for a violation of this title … which may be brought against a creditor may be maintained against any assignee of such creditor *only if the violation for which such action or proceeding is brought is apparent on the face of the disclosure statement*."[41] The very nature of the violations alleged by Plaintiffs is that the dealers imposed *hidden* finance charges in the form of heightened vehicle sale prices and in vehicle add-on products—each of which would never be apparent on the face of the TILA disclosure statements in the dealers' retail installment contracts, later purchased by CAC. TILA neither imposes a duty of inquiry on indirect vehicle finance companies,[42] nor is it possible for those companies to discern whether a vehicle is purportedly overpriced, or whether a dealer has misrepresented to a consumer that vehicle add-on products are mandatory, by solely examining the TILA disclosures contained in a credit agreement. Plaintiffs are attempting to leverage their UDAP/UDAAP authority to advance a legal theory that transforms a financial institution's alleged knowledge of a dealer's sales practices into strict liability for the practices of third parties. But this is exactly the type of argument that TILA forecloses.[43]

Plaintiffs' theory also seeks to override Congress' amendment of TILA in 1980 to limit the duty to make disclosures to only the original creditor to whom the obligation is initially payable (in this case, the dealer). By using their UDAP/UDAAP authority to attempt to impose TILA disclosure obligations on assignees like CAC, Plaintiffs are attempting to reverse the policy

---

[41] *See* 15 U.S.C. § 1641(a) (emphasis added).

[42] *Cf. Balderos v. City Chevrolet*, 214 F.3d 849, 853 (7th Cir. 2000) (holding that knowledge that is apparent only by virtue of special knowledge is not apparent on the face of a document itself).

[43] *Cf. Taylor v. Quality Hyundai*, 150 F.3d 689, 694 (7th Cir. 1998) ("Even though we do not assume that assignees approach their tasks with blank minds, we cannot agree that awareness of the practices of some creditors can be equated to knowledge that a particular disclosure on a particular TILA form is inaccurate or incomplete.").

decision made by Congress in 1980—in reaction to excessive litigation under TILA—to limit the duty to make disclosures to only the original creditor in a transaction. But Plaintiffs are not free to ignore this legislative choice made by Congress. To the contrary, the Bureau is statutorily obligated to *enforce* the legislative choices reflected in TILA.

This is not to say that a dealer's improper disclosure of the finance charge cannot be pursued against the dealers themselves. If, in fact, the dealers understated the finance charge (which Plaintiffs have not alleged), they would be directly liable for those violations, and the assignee liability provision of TILA would not protect them. But the Bureau cannot take enforcement action against dealers, and the New York Attorney General might find it inconvenient to pursue dealers on a piecemeal basis, and so to circumvent the Bureau's lack of authority and to make this lawsuit more expedient, Plaintiffs attempt to hold CAC liable for the dealers' alleged TILA violations. But departing from the well-settled rule on assignee liability under TILA is not justified by either the Bureau's desire to expand its authority to areas placed off-limits by Congress or Plaintiffs' desire to avoid suing the parties whose conduct they truly complain of.

      iv.    *The Court Should Not Allow the Plaintiffs to Leverage their UDAP/UDAAP Authority to Impose on Indirect Vehicle Finance Companies Ability-to-Repay Duties and Obligations that TILA Does Not Require.*

The Complaint is saturated with "ability to repay" allegations, suggesting that a consumer credit contract is unlawful if the creditor does not assess a consumer's ability to repay his or her credit obligation in the manner Plaintiffs are attempting to apply retroactively in this litigation. Critically, although credit card issuers and mortgage lenders are required to consider a consumer's ability to repay prior to loan origination under TILA, that is not the case for other forms of credit such as auto financing. It is clear that the Plaintiffs are trying to unlawfully extend TILA's ability-

to-repay rules to non-mortgage, closed-end creditors who are unequivocally not subject to that rule. Certain allegations within the Complaint makes this point abundantly clear:[44]

- "CAC claims that it requires proof of income for every borrower and will not approve a loan if the monthly payment exceeds 25% of the applicant's gross income . . . [b]ut CAC does not engage in any meaningful analysis for the purpose of developing loan terms that are likely to result in **repayment in full by the borrower**."[45]

- "CAC does not consider . . . **the borrower's recurring debt obligations, rent or mortgage payment, or any of the other necessary expenses an individual incurs each month, including the cost of food, healthcare, or childcare**. Nor does CAC calculate **the borrower's monthly debt-to-income ratio or residual income**, and its payment-to-income guideline does not adjust according to an applicant's number of dependents."[46]

In essence, Plaintiffs ask the Court to hold that the law requires all creditors to assess credit applications in a particular way articulated in the Complaint (but not appearing in any published law or regulation), even though Congress has expressly considered which types of creditors are required by law to engage in an ability to repay analysis. In TILA, Congress mandated that two types of creditors do so: closed-end mortgage lenders and credit card issuers. And even in these contexts, Congress did not choose to mandate the specific way creditors construct their

---

[44] *See Lorraine v. Wallin*, No. 3:16-cv-00409-MMD-WGC, 2016 U.S. Dist. LEXIS 108392, at *21 (D. Nev. Aug. 16, 2016) (noting plaintiff's allegation that a dealership violated TILA by failing to consider her ability to pay was inapposite given that "[p]laintiff was not bringing a claim against a credit card issuer.").

[45] *See id.* at ¶ 29 (emphasis added).

[46] *See id.* at ¶ 30 (emphasis added).

underwriting models, but rather simply required creditors to assess a consumer's ability to repay in general terms by considering relevant information. Even the CFPB's own Regulation Z and Official Commentary provide creditors with significant flexibility in how they assess a consumer's ability to repay in the two contexts in which it is actually required.[47]

Plaintiffs ask the Court to disregard this Congressional policy choice and mandate even more prescriptive ability-to-repay rules for other creditors on the theory that it is "abusive" not to evaluate credit applications in precisely the way Plaintiffs now announce they should be evaluated. But this legal theory amounts to nothing more than an attempt to override Congress' policy choice in TILA, by amending the law to add requirements that Congress chose not to enact. The Court should reject this regulatory overreach.

## II.     The Bureau's Novel Legal Theories Will Detrimentally Impact the Ability of Consumers to Obtain Credit and Dismantle an Important Component of the U.S. Economy.

The legal theories advanced by the Bureau in this case threaten to undermine the well-established commercial relationships in the indirect vehicle finance industry and significantly restrict the availability of credit to consumers, particularly those in the subprime market. Industry participants have relied on long-standing guidance and settled law in structuring their relationships, and the claims asserted by the Bureau represent an unjust attempt to penalize industry members for adhering to these principles. By attempting to make finance companies liable for alleged dealer (or retailer) violations of TILA and to characterize dealer discounts as *per se* hidden finance

---

[47] For open-end card issuers, the CFPB makes clear that these issuers of credit satisfy their duty in considering a consumer's "current obligations" by analyzing the information provided by the consumer or assessing the consumer's credit report. For closed-end mortgage issuers, the CFPB requires that these issuers of credit simply make "a reasonable and good faith determination at or before consummation that the consumer will have a reasonable ability to repay the loan according to its terms" and the accompanying Official Staff Commentary notes that this rule does not dictate any "comprehensive underwriting standards to which creditors must adhere." *See* 12 CFR § 1026.43(c); Supplement I to Part 1026, cmt. 43(c).

charges, Plaintiffs' claims would make it riskier—and therefore less likely—for finance sources to make credit available to retail purchasers across the American economy.

Making matters worse, Plaintiffs' "hidden finance charge" theories of liability appear to be based on the incorrect assumption that consumers are unable to ascertain that the prices of the cars they are buying are "inflated."[48]  It is common knowledge that consumers price shop for cars and can consult readily available guides, such as the Kelley Blue Book.  Indeed, both the Bureau and the New York Attorney General publicly *encourage* consumers to price shop for cars and financing terms and to consult guides such as the Kelley Blue Book before buying a car and financing that purchase.[49]  Consumers will be irreparably harmed if deprived of necessary access to credit based on the false premise that they are unable to understand or compare vehicle prices.

Plaintiffs' ability-to-repay theory similarly threatens negative consequences for all stakeholders within the auto finance industry.  Plaintiffs take the position that it violates the law for a creditor to make financing available to consumers who pose a risk of non-payment they deem unduly high.  But those consumers certainly have credit needs, and the need for transportation is a critical need for most people.  Moreover, even among consumers with a higher risk of non-payment, there is no way for a creditor to know in advance which of those consumers will repay (even though many of them will), and which will not.  If Plaintiffs' view prevails, creditors would be legally required to deny access to credit to less-creditworthy applicants, making credit unavailable to *all of them* because *some of them* may be unable to pay (or choose not to pay) their

---

[48] *See, e.g.*, Compl. ¶¶ 55-64.

[49] *See* Consumer Financial Protection Bureau, *What things can I negotiate when shopping for a car or auto loan?* (Aug. 28, 2023), https://www.consumerfinance.gov/ask-cfpb/what-things-can-i-negotiate-when-shopping-for-a-car-or-auto-loan-en-2132/; *see also* New York State Attorney General, *Buying a car?* (last visited August 17, 2024), https://ag.ny.gov/publications/buying-car; *see also* FTC, Combatting Auto Retail Scams Trade Regulation Rule, 89 Fed. Reg. 590, 602 (2024) (codified at 16 CFR § 463) (recognizing that consumers "comparison shop" with respect to vehicle prices "before selecting and visiting a particular dealership.").

obligations in the future due to circumstances that neither consumers, nor creditors, can definitively predict at the point in time in which the creditor chooses to provide financing. This position will harm the very consumers Plaintiffs claim to protect and ignores that these consumers should be permitted to make their own informed financial decisions based on their unique circumstances and the straightforward contracts that contain all disclosures mandated by TILA.

If Plaintiffs' claims are not dismissed, other vehicle finance companies will necessarily have to restrict the availability of credit to avoid the allegation that they "abusively" made credit available to more risky consumers. And because Plaintiffs' claims are based on generalized assertions of "abusiveness," there will be uncertainty among industry members about what lending activities would be permissible and those that would be illegal in a *post hoc* evaluation by regulatory agencies about whether an "abusive" practice occurred because a consumer ultimately did not satisfy his or her contractual obligations or complained that the vehicle dealer should have offered a lower sales price. This would lead more conservative companies to restrict access to credit even further, that is, *if* those companies decide to remain in the market at all. With less competition in a once vibrant marketplace and more rigid credit requirements, borrowers with subprime credit scores will find it increasingly difficult to secure financing for vehicle purchases and terms of such financing are likely to be less favorable. In turn, this will adversely affect those borrowers' ability to obtain transportation for work, school, and other essential activities, thereby limiting opportunities for upward mobility for a consumer demographic that would be deprived of financing if Plaintiffs' theories are adopted by the Court.

Previously, the CFPB exercised its UDAAP authority to adopt burdensome ability-to-repay requirements on short-term lenders.[50] However, it subsequently recognized problems with this

---

[50] *See* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 82 Fed. Reg. 54472 (Nov. 17, 2017).

approach and revoked those ability-to-repay requirements.[51]  Importantly, the Bureau effectuated both the implementation of those ability-to-repay requirements, as well as the revocation of those requirements, through the formal notice-and-comment rulemaking process after compiling and analyzing relevant industry data and obtaining input from key industry stakeholders.[52]  Here, attempting to adopt new ability-to-repay requirements through enforcement proceedings, without the benefit of a detailed analysis of potential costs and purported benefits, is particularly misguided.

## CONCLUSION

*Amici* are deeply concerned about Plaintiffs' theories for two reasons.  First, they are unfair reversals of settled law, or efforts to override clear mandates from Congress, the Federal Reserve, and the Bureau itself, which would unravel the basis for commercial relationships devised in reliance on black-letter law.  Second, they would make retail sales financing less available across the economy, because of the breadth of the potential applicability of Plaintiffs' theories and the uncertainty they would create.  *Amici* appreciate the opportunity to bring these factors to the Court's attention.

For these reasons, *amici* respectfully urge the Court to grant CAC's motion to dismiss.

---

[51] *See* Payday, Vehicle Title, and Certain High-Cost Installment Loans, 85 Fed. Reg. 44382 (July 22, 2020).

[52] *See id.*

Dated: New York, New York.
   August 21, 2024

Respectfully submitted,

TROUTMAN PEPPER HAMILTON
SANDERS LLP
875 Third Avenue
New York, NY  10022
212.704.6000


By:*/s/ James Kim*
  James Kim, Bar No. 3018397
  Christopher Willis (*pro hac vice*)
  Jeremy Rosenblum (*pro hac vice*)
  Addison J. Morgan (*pro hac vice*)
  *Attorneys for Amici Curiae*
  *American Financial Services Association,*
  *Consumers Banking Association, and U.S.*
  *Chamber of Commerce*

## CERTIFICATE OF SERVICE

I hereby certify that on this 21st day of August 2024, a true and correct copy of the foregoing was filed with the Clerk of the United States District Court for the Southern District of New York via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

By: */s/ James Kim*
       James Kim, Bar No. 3018397
       *Attorneys for Amici Curiae*
       *American Financial Services Association,*
       *Consumers Banking Association, and U.S.*
       *Chamber of Commerce*