# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

CONSUMER FINANCIAL PROTECTION
BUREAU and THE PEOPLE OF THE STATE OF
NEW YORK, by LETITIA JAMES, Attorney
General of the State of New York,

         Plaintiffs,

         v.

CREDIT ACCEPTANCE CORPORATION,

         Defendant.

Case No. 23 Civ. 0038

## MEMORANDUM OF LAW IN OPPOSITION TO THE
## MOTION TO DISMISS OF CREDIT ACCEPTANCE CORPORATION

CONSUMER FINANCIAL
PROTECTION BUREAU

Vanessa Buchko
Phillip Harris
Amy Mix
*Enforcement Attorneys*
Consumer Financial Protection Bureau
1700 G Street, NW
202.256.1850

*Counsel for Plaintiff Consumer
Financial Protection Bureau*

LETITIA JAMES
Attorney General of the
State of New York

Christopher L. Filburn
Assistant Attorney General
Bureau of Consumer Frauds &
Protection
28 Liberty Street, 20th Floor
New York, New York 10005
212.416.8303

*Counsel for Plaintiff People of the State
of New York, by Letitia James, Attorney
General of the State of New York*

# <u>TABLE OF CONTENTS</u>

INTRODUCTION ................................................................................................ 1

FACTUAL BACKGROUND ............................................................................... 3

STATUTORY FRAMEWORK & LEGAL STANDARD ..................................... 7

ARGUMENT ...................................................................................................... 9

I.    THE COMPLAINT ALLEGES ACTIONABLE STATE AND FEDERAL
      CLAIMS BASED ON CAC'S DECEPTIVE ACTS AND PRACTICES ..................... 9

      A.    The Complaint adequately alleges that CAC acted deceptively by
            hiding the cost of credit in inflated loan amounts....................................... 9

            1.    The Complaint adequately alleges that CAC itself acted
                  deceptively.......................................................................................11

            2.    The Truth in Lending Act does not foreclose CAC's liability. ......... 14

            3.    There is no inconsistency with TILA because the Complaint
                  adequately alleges a hidden cost of credit using a reasonable
                  proxy for the cash price....................................................................17

      B.    The Complaint alleges that CAC deceptively promised benefits to
            consumers while projecting failure and protecting itself........................... 21

II.   THE COMPLAINT STATES AN ACTIONABLE CLAIM FOR ABUSIVE ACTS
      OR PRACTICES UNDER THE CFPA. .................................................................. 23

      A.    Plaintiffs adequately plead that CAC borrowers lack understanding
            and are unable to protect their interests. ................................................... 24

            1.    CAC uses the wrong legal standard. ................................................. 26

            2.    CAC's arguments that consumers understood its loans or could
                  protect their interests are unpersuasive. ......................................... 27

      B.    The Complaint adequately pleads that CAC "takes unreasonable
            advantage."................................................................................................29

III.  THE COMPLAINT ADEQUATELY ALLEGES THAT CAC SUBSTANTIALLY
      ASSISTED DEALER DECEPTION ....................................................................... 34

      A.    CAC can be liable for substantially assisting dealers even though the
            Bureau cannot exercise enforcement authority over dealers.................... 34

B.  The Complaint alleges that CAC substantially assisted its dealers in deceptively selling expensive add-on products to consumers. ..................35

  1.  Dealers' conduct was deceptive. ....................................................36

  2.  CAC substantially assisted dealers in deceptively selling add-on products...................................................................................38

  3.  CAC's conduct was knowing and reckless. ...................................40

IV.  The Bureau's funding is lawful................................................................42

V.  The Motion does not provide any independent bases to dismiss or limit Plaintiff OAG's state law claims ............................................................43

A.  The Complaint adequately alleges claims for fraud based on CAC's deceptive acts and its use of unconscionable contracts. ...........................44

B.  The Complaint alleges liability for CAC's repeated violations of New York's Motor Vehicle Retail Instalment Sales Act.....................................46

C.  CAC is independently liable for dealer misconduct as the holder of the consumer loan agreements. ........................................................................47

D.  Plaintiff OAG's Martin Act claim should not be dismissed.......................49

CONCLUSION....................................................................................................50

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)................................................................................8

*Avola v. Louisiana-Pac. Corp.,*
    991 F. Supp. 2d 381 (E.D.N.Y. 2013) .................................................22

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007) ...............................................................................8

*Books v. Avery,*
    4 N.Y. 225 (N.Y. 1850) .........................................................................45

*Brockington v. Dollar General Corp.,*
    695 F. Supp. 3d 487 (S.D.N.Y. 2023) .................................................22

*CAC v. Holness,*
    80 Misc. 3d 346 (N.Y. Sup. Ct. 2023) .................................................45

*CAC v. Traylor,*
    2024 WL 2273522 (N.Y. Sup. Ct. May 10, 2024) ................................45

*Calderone v. Sonic Houston JLR, L.P.,*
    879 F.3d 577 (5th Cir. 2018) ............................................................37n

*Colangelo v. Champion Petfoods USA, Inc.,*
    No. 18 Civ. 1228, 2020 WL 777462 (N.D.N.Y. Feb. 18, 2020)............22

*CFPB v. 1st Alliance Lending, LLC,*
    No. 21 Civ. 55, 2022 WL 993582 (D. Conn. Mar. 31, 2022)................ 12

*CFPB v. Certified Forensic Loan Auditors, LLC,*
    No. 19 Civ. 7722, 2020 WL 2556417 (C.D. Cal. May 20, 2020) .....................27, 32

*CFPB v. Cmty. Fin. Servs. Ass'n of Am.,*
    601 U.S. 416 (2024).............................................................................43

*CFPB v. D & D Mktg.,*
    No. 15 Civ. 9692, 2017 WL 5974248 (C.D. Cal. Mar. 21, 2017)...........33

*CFPB v. D & D Mktg.,*
    No. 15 Civ. 9692, 2016 WL 8849698 (C.D. Cal. Nov. 17, 2016)............. 36, 39, 40n

*CFPB v. Daniel A. Rosen, Inc.*,
  No. 21 Civ. 7492, 2022 WL 1514439 (C.D. Cal. Apr. 5, 2022) ............................... 10

*CFPB v. Frederick J. Hanna & Assocs., P.C.*,
  114 F. Supp. 3d 1342 (N.D. Ga. 2015) ..................................................................... 8

*CFPB v. Gordon*,
  819 F.3d 1179 (9th Cir. 2016) ................................................................................. 37

*CFPB v. Intercept Corp. Co.*,
  No. 16 Civ. 144, 2017 WL 3774379 (D.N.D. Mar. 17, 2017) .................................. 32n

*CFPB v. ITT Educ. Servs., Inc.*,
  219 F. Supp. 3d 878, 919 (S.D. Ind. 2015) ....................................................... 25, 29

*CFPB v. Law Offices of Crystal Moroney*,
  63 F.4th 174 (2d Cir. 2023) ...................................................................................... 9

*CFPB v. Navient Corp.*,
  No. 17 Civ. 101, 2017 WL 3380530 (M.D. Penn. Aug. 4, 2017) ..................... 27n, 33

*CFPB v. NDG Fin. Corp.*,
  No. 15 Civ. 5211, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) ........................... 10, 36

*CFPB v. Ocwen Fin. Corp.*,
  No. 17 Civ. 80495, 2019 WL 13203853 (S.D. Fla. Sept. 5, 2019) ......................... 37

*CFPB v. RD Legal Funding, LLC*,
  332 F. Supp. 3d 729 (S.D.N.Y. 2018) ............................................................. *passim*

*CFPB v. TCF Nat'l Bank*,
  No. 17 Civ. 166, 2017 WL 6211033 (D. Minn. Sept. 8, 2017) ........................... 15, 37

*CFPB v. Think Fin., LLC*,
  No. 17 Civ. 127, 2018 WL 3707911 (D. Mon. Aug. 3, 2018) ........................ 8, 24, 33

*CFPB v. Universal Debt & Payment Sols., LLC*,
  No. 15 Civ. 859, 2015 WL 11439178 (N.D. Ga. Sept. 1, 2015) .............. 36, 39, 40, 41

*CFPB v. Universal Debt & Payment Sols., LLC*,
  No. 15 Civ. 859, 2019 WL 1295004 (N.D. Ga. Mar. 21, 2019) ............................... 42

*Copley v. Bactolac Pharm., Inc.*,
  No. 18 Civ. 575, 2021 WL 918313 (E.D.N.Y. Mar. 10, 2021) ............................... 13n

*In re Ditech Holding Corp.*,
  No. 19 BR 10412, 2023 WL 6397900 (Bankr. S.D.N.Y. Sep. 29, 2023) .............. 15n

iv

*Elkind v. Revlon Consumer Prods. Corp.*,
No. 14 Civ. 2484, 2015 WL 2344134 (E.D.N.Y. May 14, 2015) .............................23

*Ellis v. Gen. Motors Acceptance Corp.*,
160 F.3d 703 (11th Cir. 1999) .................................................................... 41n

*FDA v. Brown & Williamson Tobacco Corp.*,
529 U.S. 120 (2000).................................................................................17

*Flatbush Auto Disc. Corp. v. McCarthy-Bernhardt Buick, Inc.*,
9 N.Y.2d 776, 777 (1961).................................................................15, 15n, 46

*FTC v. Five-Star Auto Club*,
97 F. Supp. 2d 502 (S.D.N.Y. 2000) .........................................................22

*FTC v. Fleetcor Techs., Inc.*,
No. 19 Civ. 5727, 2022 WL 3273286 (N.D. Ga. Aug. 9, 2022) .............................37

*FTC v. Grand Canyon Educ., Inc.*,
No. 23 Civ. 2711, 2024 WL 3825087 (D. Ariz. Aug. 15, 2024) .............................22

*FTC v. Instant Response Sys., LLC*,
No. 13 Civ. 976, 2015 WL 1650914 (E.D.N.Y. Apr. 14, 2015) ................................36

*FTC v. LeadClick Media, LLC*,
838 F.3d 158 (2d Cir. 2016) .................................................................... 12

*FTC v. Med. Billers Network, Inc.*,
543 F. Supp. 2d 283 (S.D.N.Y. 2008) ......................................................36

*Gallardo ex rel. Vassallo v. Marstiller*,
596 U.S. 420 (2022).................................................................................26

*Garcia v. Chrysler Corp.*,
No. 15 Civ. 5949, 2016 WL 5719792 (S.D.N.Y. Sep. 30, 2016).....................15n, 46

*Glover v. Bob's Discount Furniture, LLC*,
No. 20 Civ. 10924, 2022 WL 3353454 (S.D.N.Y. Aug. 12, 2022)........................ 12

*Goshen v. Mut. Life Ins. Co.*,
98 N.Y.2d 314 (N.Y. 1999) .................................................................... 23

*Grimmett v. Sunlight Fin. LLC*,
No. 23 Civ. 84, 2023 WL 6449447 (S.D.W. Va. Oct. 3, 2023) .............................14n

*Green v. Levis Motors, Inc.*,
179 F.3d 286 (5th Cir. 1999) .................................................................... 41n

v

*In re Hollis*,
　　No. 07 BR 22759, 2009 WL 3030125 (Bankr. D.N.J. Sept. 17, 2009) ............... 15n

*In re ITT Educ. Servs., Inc. Sec. & S'holder Deriv. Litig.*,
　　859 F. Supp. 2d 572 (S.D.N.Y. 2012) .................................................................. 22

*Irby-Greene v. M.O.R., Inc.*,
　　79 F. Supp. 2d 630 (E.D. Va. 2000) ...................................................................... 16

*Jackson v. So. Holland Dodge, Inc.*,
　　726 N.E.2d 1146 (Ill. App. Ct. 2000) ................................................................. 15n

*Joseph v. Excellence Auto Trade LLC*,
　　No. 16 Civ. 1534, 2017 WL 1157178 (E.D.N.Y. Feb. 10, 2017) ............................ 20

*Knapp v. Americredit Fin. Servs., Inc.*,
　　245 F. Supp. 2d 841 (W.D. Va. 2003) ............................................................ 14, 19n

*Kriger v. European Health Spa Inc.*,
　　363 F. Supp. 334 (E.D. Wis. 1973) ...................................................................... 18

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
　　572 U.S. 118 (2014) .......................................................................................... 32n

*Loper Bright Enterprises v. Raimondo*,
　　144 S. Ct. 2244 (2024) ......................................................................................... 7n

*Lorenzo v. SEC*,
　　587 U.S. 71 (2019) ............................................................................................. 37n

*Mayfield v. Gen. Elec. Capital Corp.*,
　　No. 97 Civ. 2786, 1999 WL 182586 (S.D.N.Y. Mar. 31, 1999) ............................. 16

*Miller v. Wells Fargo Bank, N.A.*,
　　994 F. Supp. 2d 542 (S.D.N.Y. 2014) .................................................................. 13n

*Moss v. BMO Harris Bank, N.A.*,
　　258 F. Supp. 289 (E.D.N.Y. 2017) ...................................................................... 13n

*Novak v. Kasaks*,
　　216 F.3d 300 (2d Cir. 2000) ................................................................................. 14

*Odier v. Hoffman School of Martial Arts, Inc.*,
　　619 F. Supp. 2d 571 (N.D. Ind. 2008) .................................................................. 18

*Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*,
　　85 N.Y.2d 20 (N.Y. 1995) .................................................................................... 10

vi

*Pelman ex rel. Pelman v. McDonald's Corp.*,
    396 F.3d 508 (2d Cir. 2005) ..................................................................8

*Pension Ben. Guar. Corp. v. Morgan Stanley Inv. Corp.*,
    712 F.3d 705 (2d Cir. 2013) ................................................................ 13

*People v. Applied Card Sys., Inc.*,
    27 A.D.3d 104 (N.Y. App. Div. 2007) ...............................................10, 21

*People v. College Network, Inc.*,
    Index No. 2978-15, 2016 WL 6330584 (N.Y. Sup. Ct. Aug. 19, 2016) .................48

*People v. Debt Resolve, Inc.*,
    387 F. Supp. 3d 358 (S.D.N.Y. 2019) ........................................... 8, 11, 12

*People v. Dell, Inc.*,
    Index No. 3778-07, 2008 WL 4531525 (N.Y. Sup. Ct. May 23, 2008) ................ 21

*People v. Greenberg*,
    27 N.Y. 3d 490 (N.Y. 2016) ..............................................................49

*People v. Greenberg*,
    95 A.D. 474 (N.Y. App. Div. 2012) ...................................................... 10

*People v. N. Leasing Sys., Inc.*,
    169 A.D.3d 527 (N.Y. App. Div. 2019) ...................................................44

*People v. Orbital Publishing Grp., Inc.*,
    169 A.D.3d 564 (N.Y. App. Div. 2019) ................................................... 21

*Pescia v. Auburn Ford-Lincoln Mercury Inc.*,
    68 F. Supp. 2d 1269 (M.D. Ala. 1999) ................................................14n

*Poulin v. Balise Auto Sales, Inc.*,
    647 F.3d 36 (2d Cir. 2011) ...........................................................14, 18

*Rombach v. Chang*,
    355 F.3d 164 (2d Cir. 2004) ..............................................................8

*Salvate v. Auto. Restyling Concepts, Inc.*,
    No. 13 Civ. 2898, 2014 WL 6901788 (D. Minn. Dec. 5, 2014) ............................38

*Schacter v. Sunrise Senior Living Mgmt., Inc.*,
    No. 18 Civ. 953, 2020 WL 1274601 (D. Conn. Mar. 16, 2020)............................ 12

*Schneider v. Phelps*,
    41 N.Y.2d 238 (N.Y. 1977) ...............................................................44

*SEC v. Apolant,*
   411 F. Supp. 2d 271 (E.D.N.Y. 2006) ................................................................42

*Simpson v. Anthony Auto Sales, Inc.,*
   32 F. Supp. 2d 405 (D. La. 1998) .......................................................................48

*State v. Ford Motor Co.,*
   136 A.D.2d 154 (N.Y. App. Div. 1988) .............................................................48

*Sulaiman v. Laram,*
   No. 16 Civ. 8182, 2017 WL 11659746 (S.D.N.Y. Apr. 4, 2017) ...................... 8

*Szerdahelyi v. Harris,*
   67 N.Y.2d 42 (1986) ...........................................................................................44

*Thompson v. Connex Credit Union,*
   2021 WL 1117166 (Conn. Super. Ct. Mar. 3, 2021) ....................................... 16

*Thompson Medical Co. v. FTC,*
   791 F.2d 189 (D.C. Cir. 1986) .......................................................................... 21

*United States v. Moseley,*
   980 F.3d 9 (2d Cir. 2020) .............................................................................44, 45

*Vincent v. The Money Store,*
   736 F.3d 88 (2d Cir. 2013) .................................................................................47

*West Virginia v. EPA,*
   597 U.S. 697 (2022) ............................................................................................17

**STATUTES**

12 U.S.C. § 289 ...........................................................................................................42

12 U.S.C. § 5481 ....................................................................................................33, 34

12 U.S.C. § 5497 .........................................................................................42, 42n, 43

12 U.S.C. § 5531 ................................................................................................*passim*

12 U.S.C. § 5536 ............................................................................................34, 35, 42

12 U.S.C. § 5552 ....................................................................................................7, 37n

12 U.S.C. § 5564 ..........................................................................................................33

15 U.S.C. § 45 ..............................................................................................................33

N.Y. Exec. Law § 63(12) ............................................................................ *passim*

N.Y. Gen. Bus. Law § 349 ......................................................................... *passim*

N.Y. Gen. Bus. Law § 352 ................................................................................ 7

## RULES & REGULATIONS

12 C.F.R. § 226.4 ............................................................................................ 19n

16 C.F.R. § 433.2 ............................................................................................. 48

Authority of States to Enforce the Consumer Financial Protection Act of 2010,
  87 Fed. Reg. 31940 (May 26, 2022) ...................................................... 37n

Payday, Vehicle Title & Certain High-Cost Installment Loans,
  85 Fed. Reg. 44382 (Sep. 17, 2021) ......................................................... 26

Preservation of Consumers' Claims and Defenses
  40 Fed. Reg. 53506 (Nov. 18, 1975) ........................................................ 48

Fed. R. Civ. P. 8 .................................................................................................. 7

Fed. R. Civ. P. 9 .................................................................................................. 8

## OTHER AUTHORITIES

156 Cong. Rec. S5902-01 ................................................................................ 35n

1965 Laws of N.Y., ch. 328 .............................................................................. 46

1980 Laws of N.Y., ch. 883 .............................................................................. 46

Black's Law Dictionary (12th ed. 2024) ......................................................... 42

Fed. Trade Comm., *FTC Policy Statement on Deception* (Oct. 14, 1983) ........ 39

N.Y. Dep't of Fin. Servs., *General Obligation Law 5-501* (Mar. 14, 2011) ......... 44, 45

N.Y. Dep't of Fin. Servs., *Maximum Rate of Interest – Auto Loans* (Aug. 13, 2009) ..... 45

Office of the Comptroller Currency, *Advisory Letter 2003-2* (Feb. 21, 2003) ......... 30

Pub. L. No. 111-203 ........................................................................................ 33n

Restatement (Third) Torts ............................................................................. 40n

Senate Report No. 111-176 (Apr. 30, 2010)...............................................................33n, 43

Webster's Third New Int'l Dictionary (3d ed.1993) ..........................................................29

## INTRODUCTION

This case is about a subprime lender's predatory scheme to make money even when it predicts *before origination* that nearly half of its borrowers will fail. Plaintiffs' claims, which are based on the established, legislative prohibitions in the Consumer Financial Protection Act and New York law, stem from defendant's creation and operation of a deceptive and abusive lending model.

In the usual auto-lending model at issue in the cases that Credit Acceptance Corporation (CAC or the Company) cites, the lender varies a loan's interest rate based on the borrower's credit risk—as borrowers may expect. But the model created by CAC is unusual and unexpected. CAC's interest rate is typically at or near state usury limits and does not vary based on credit risk. Rather, a borrower's enhanced credit risk is buried in the loan principal through an inflated selling price and expensive add-on products that borrowers are tricked into purchasing. These inflated loans set consumers up to fail. Indeed, CAC *predicts* that outcome, expecting that borrowers in almost 40% of its loans will not be able to pay back the full principal, let alone any interest. But CAC still profits even when its expectation that borrowers will default and lose their cars comes true. This lies at the heart of its predatory scheme.

In its Motion, CAC emphasizes the role of dealers and pleads with this Court to pay no attention to what happens behind the curtain. But really, from the moment a credit-constrained consumer walks onto a CAC dealer's lot, their entire experience is orchestrated by CAC's unseen hand. CAC requires that its dealers feed specific information about the consumer into CAC's software. In moments, CAC's complex algorithms, trained on dozens of years of CAC's data from millions of other loans, project down to the penny what CAC expects to collect from the consumer—not only

from principal and interest, but also from auctioning their car and collecting a deficiency judgment *after the borrower defaults and CAC repossesses the car*. No individual borrower—or independent dealer—could make such a precise prediction.

CAC does not use its projections to make decisions about approving the loan or setting the interest rate, since CAC guarantees approval to everyone and does not vary interest rates based on credit risk. Instead, CAC uses its algorithms to determine with mathematical precision an amount of money—the CAC Payment—to offer the affiliated dealer to accomplish two specific goals: (i) provide the dealer a profit so it will complete the sale, and (ii) make sure CAC profits even when the borrower will not be able to repay the whole loan. Dealers rely on the CAC Payment to select the vehicles to sell and to set the selling price. Dealers understand that the CAC Payment increases as the loan amount increases, through an increased vehicle price, the inclusion of add-on products, or both. The result is a systematic inflation of vehicle costs and forced imposition of add-ons. And because CAC protects its profits by paying dealers less for riskier borrowers, CAC's model causes dealers to inflate prices higher for consumers with more credit risk—to achieve the same goal typical lenders reach by raising interest rates. But in this case, CAC hides the added cost of credit from the borrower.

Considering the true cost of credit, some borrowers have loans with APRs over one hundred percent—paying the entire selling price in interest every year for multiple years. As a result, borrowers suffer extraordinarily high rates of default, often losing their vehicles to repossession and then facing deficiency judgments and aggressive collections practices. The fallout from CAC loans can impact borrowers for years.

These facts and others, as alleged in the Complaint, state plausible claims for relief. Plaintiffs adequately allege that CAC acted deceptively by hiding the real cost of

credit in inflated loan amounts and promising financial benefits the Company projects that most of its borrowers will never obtain. Plaintiffs adequately allege that CAC acted abusively by profiting off borrowers' lack of understanding of CAC's loans and inability to protect themselves. Plaintiffs adequately allege that CAC substantially assisted dealers who forced add-on products on consumers without their knowledge or consent. And Plaintiff New York State Office of the Attorney General (Plaintiff OAG) adequately alleges that CAC used unconscionable contract provisions, violated auto lending disclosure laws, and engaged in securities fraud when reselling its loans.

In its Motion, CAC tries to remain behind the curtain and evade responsibility by arguing that indirect auto lenders are beyond the reach of the Consumer Financial Protection Act and Plaintiffs' jurisdiction. Rather than address the legal merit of the claims, CAC disputes Plaintiffs' factual allegations. Rather than address whether the facts support plausible claims for relief under the consumer-protection laws at issue, CAC argues that it cannot be held liable for violations of a *different* law. And in the few instances where CAC does address Plaintiffs' actual claims, it ignores the plain statutory text Plaintiffs apply to the alleged facts. For these reasons and as detailed below, CAC's attempt to distract from its own culpability fails, and its Motion should be denied.

## FACTUAL BACKGROUND

### *CAC controls the financing process*

When a prospective borrower walks onto the lot of a CAC-affiliated dealer, CAC is already working behind-the-scenes and directs the dealer to ask the borrower for limited financial and demographic information. But—unbeknownst to the borrower—CAC does not use that information for traditional underwriting purposes, such as approving the loan or setting the interest rate. (Compl. ¶¶ 3, 26, 28-30.) As it proudly declares in its

marketing (including signage it provides for dealers to display), CAC guarantees approval for all borrowers, and its interest rates are nearly uniform. (*Id.* ¶¶ 2, 90-93.)

CAC also is not collecting this information to determine if the borrower will likely be able to repay the full loan. (*Id.* ¶ 29.) Indeed, CAC does not ask for information about the borrower's recurring debt obligations, rent or mortgage payments, or any other regular, monthly expenses such as the cost of food, healthcare, or childcare. (*Id.* ¶ 30.)

Rather, CAC feeds the prospective borrower's information into its algorithm to calculate the borrower's score. (*Id.* ¶¶ 3-4, 25-27.)  The score is a projection of what CAC expects to collect from making a loan to a particular borrower, for a particular vehicle, from (i) payments, (ii) late fees incurred during the loan term, (iii) fees for repossession, (iv) auction proceeds, and (v) post-judgment garnishment and collections. (*Id.* ¶¶ 3, 26.) This analysis benefits CAC, not the consumer. (*Id.* ¶¶ 26-28, 36-40, 60-64.)

From there, CAC's software quickly generates proposed CAC Payments to the dealer for a sale to this particular borrower for particular vehicles. (*Id.* ¶¶ 47-48.) CAC calculates proposed CAC Payments to protect its bottom line: if CAC expects to collect less on the loan, the borrower gets a lower score, and CAC offers a lower CAC Payment. (*Id.* ¶¶ 39, 63, 69.) To profit on the loan, CAC need only collect more than what it paid to the dealer; CAC does not need to collect the full selling price of the vehicle or the full amount of its loan. (*Id.* ¶¶ 8, 41, 61, 186.) This lending model ensures that CAC will make a profit even when borrowers are unable to repay the loan in full. (*Id.* ¶ 40.)

CAC's software system also shows dealers how much more CAC will pay if the dealer includes add-on products. (*Id.* ¶¶ 122-23, 125-26.) In addition to paying dealers for including add-ons, CAC paves the way for dealers to impose add-ons on consumers without their knowledge or consent, including by allowing dealers to use electronic

signatures. (*Id.* ¶¶ 131-33.) According to CAC's loan data, 90% of CAC loans include a CAC-approved add-on product, often adding thousands of dollars to the costs of the loans. (*Id.* ¶¶ 114-16, 128.) Despite staggeringly high sales numbers for these products for the past several years and more than a thousand consumer complaints saying that dealers forced consumers to buy them, CAC has taken no concrete steps to ensure that dealers do not trick consumers into purchasing them. (*Id.* ¶¶ 129-35.)

*Expensive vehicle prices and the hidden cost of credit*

Dealers must wait for CAC to propose CAC Payments before the dealers can identify which vehicles, at what selling prices, will generate them an adequate profit. (*Id.* ¶¶ 34-37, 48.) Unlike with other indirect auto lenders, CAC dealers cannot adjust the interest rate, which CAC sets at or near state usury limits. (*Id.* ¶¶ 2, 32.) This leads dealers to increase selling prices and push or hide expensive add-ons to increase their profits. (*Id.* ¶¶ 32-34, 39, 55-58.) The result: CAC loans are larger than other used car loans, on comparable vehicles, because CAC dealers mark up the selling prices far beyond industry norms. (*Id.* ¶¶ 55-56, 58.) And the need to inflate prices is stronger for borrowers with worse credit because CAC usually projects it will collect less from them and so offers a lower CAC Payment. (*Id.* ¶¶ 55, 63, 69.) Thus, CAC's loans are even larger, relative to vehicle value, for higher-risk, lower-scoring borrowers. (*Id.* ¶ 100.)

Once a dealer has identified vehicles and prices to offer based on proposed CAC Payments, they present the terms and monthly payments on vehicles available to that consumer. (*Id.* ¶ 34.) Consumers are unaware of CAC's algorithm that drives systematic price inflation to account for how much CAC expects to collect from them. (*Id.* ¶¶ 39, 47-48.) In the final step, CAC's software generates a term sheet and loan agreement. (*Id.* ¶¶ 48, 50-54, 120.) In almost all cases, the consumer signs electronically. (*Id.* ¶ 132.) Yet

despite hundreds of consumers complaining that they were not allowed to read the contract on the computer or control the mouse, CAC has not put additional safeguards in place and continues to allow dealers to use e-sign software. (*Id.*)

*Consequences of default*

When borrowers drive CAC-financed vehicles off the lot, their problems are often just beginning. Due in part to inflated principals, CAC borrowers are saddled with exceptionally high payments and are at elevated risk for default, repossession, and post-repossession collections. (*Id.* ¶¶ 3, 10, 28-30, 64, 74, 86.) When CAC borrowers do default, they often owe significantly more than the vehicle is worth. This is particularly true for lower-scoring borrowers, as their vehicle prices are the most inflated. (*Id.* ¶ 99.) The inflated selling prices mean that borrowers can't escape the loan by selling the vehicle, and even when the vehicle is repossessed and auctioned, the proceeds often do not satisfy the loans. (*Id.* ¶¶ 10, 74.) CAC is aggressive in collecting even after an auction, through deficiency suits and wage garnishments. (*Id.* ¶¶ 77-85.) Borrowers lose the trade-in value, down payments, payments to date, and use of the vehicle. (*Id.* ¶ 10.)

*Set up to fail*

These outcomes are not a surprise to CAC, as CAC predicts *before origination* that many of its borrowers won't repay their loans in full. Indeed, CAC predicts that nearly 40% of borrowers nationwide, and about 25% in New York, will not even repay the loan principal, let alone a cent of interest. (*Id.* ¶¶ 8, 44.) And an analysis of those loans in New York where CAC projected to collect less than the amount financed shows that nearly 70% were either 60 or more days past due, resulted in a repossession, or resulted in an auction. (*Id.* ¶ 44.) Lower-scoring borrowers face default earlier and in greater numbers. (*Id.* ¶¶ 102-04.) But for CAC, borrower outcomes are of limited

6

consequence, as its lending model is designed to generate profits even when these borrowers fail. (*Id.* ¶¶ 3, 8, 111-112, 186.)

## **STATUTORY FRAMEWORK & LEGAL STANDARD**

Plaintiffs assert claims under the Consumer Financial Protection Act ("CFPA"), which authorizes them to bring enforcement actions to prevent unfair, deceptive, or abusive acts or practices in consumer markets.[1] 12 U.S.C. §§ 5531, 5552. Plaintiff OAG further asserts claims under New York's Executive Law, which empowers Plaintiff OAG to prevent persistent fraud or illegality in the transacting of business in New York, N.Y. Exec. Law. § 63(12), New York's General Business Law ("GBL"), which authorizes Plaintiff OAG to sue to stop deceptive acts or practices, N.Y. G.B.L. § 349(b), and the Martin Act, New York's securities law, N.Y. G.B.L. § 352.

These broad, remedial, consumer-protection laws govern a wide array of conduct beyond fraud, and Plaintiffs may assert claims under these laws without pleading elements, such as scienter or reliance, required for common-law fraud. As a result, claims asserted under these laws are subject to the pleading requirements set forth in Rule 8 of the Federal Rules of Civil Procedure. *CFPB v. RD Legal Funding, LLC*, 332 F. Supp. 3d 729, 751 (S.D.N.Y. 2018). Rule 8 requires only a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). On a motion to dismiss, "a court must accept all factual allegations in a complaint as true and construe all reasonable inferences in the plaintiff's favor." *RD Legal*, 332 F. Supp. 3d at

---

[1] CAC's brief is littered with citations to *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). (Mot. 1, 16, 24, 28, -37, 39.) But that case has no relevance because Plaintiffs have not asked for deference and seek instead only to enforce statutory prohibitions that CAC has violated. Similarly, CAC invokes the dealer-focused CARS Rule and argues that it somehow precludes the Bureau from seeking to hold CAC accountable for its violations of the CFPA. (Mot. 11-12, 16-17, 20.). As alleged, Plaintiffs Complaint relates directly to CAC, its predatory lending scheme, and its deceptive and abusive acts and practices.

751. A claim should be dismissed only where the facts alleged fail to establish a "plausible" claim for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56 (2007). A claim is plausible if the plaintiff alleges facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This liberal pleading standard does not require detailed factual allegations but merely notice. *Sulaiman v. Laram*, No. 16 Civ. 8182, 2017 WL 11659746, at *4 (S.D.N.Y. Apr. 4, 2017). It is satisfied if a complaint alleges some facts that plausibly support the elements of the claim. *Id.*

Though the Complaint satisfies the burden placed on a plaintiff by Rule 9(b), that rule does not apply, and CAC's argument that it should is contrary to the "overwhelming weight of precedent." *CFPB v. Think Fin., LLC*, No. 17 Civ. 127, 2018 WL 3707911, at *8 (D. Mont. Aug. 3, 2018). That is because, "[u]nlike a fraud claim," the CFPA and New York laws at issue do not "require proof of intentional violation." *CFPB v. Frederick J. Hanna & Assocs., P.C.*, 114 F. Supp. 3d 1342, 1371-72 (N.D. Ga. 2015). Thus, courts have declined to apply Rule 9(b) to claims under the CFPA due to the "remedial nature of consumer protection statutes" and the fact that Rule 9(b) exists to require the particular pleading of intent, which is not required here. *RD Legal*, 332 F. Supp. 3d at 768 (collecting cases). The Second Circuit itself, after *Rombach v. Chang*, 355 F.3d 164 (2d Cir. 2004), similarly held that a GBL § 349 claim "need only meet the bare-bones notice-pleading requirements" of Rule 8. *Pelman ex rel. Pelman v. McDonald's Corp.*, 396 F.3d 508, 511 (2d Cir. 2005). And multiple courts in this Circuit have declined to apply Rule 9(b) to Plaintiff OAG's Executive Law § 63(12) actions. *RD Legal*, 332 F. Supp. 3d at 769; *see also People v. Debt Resolve, Inc.*, 387 F. Supp. 3d 358, 365 (S.D.N.Y. 2019). The

few outlier cases cited in the Motion that suggest a different conclusion do so without analysis or even discussion of this great weight of contrary authority.

<u>**ARGUMENT**</u>

## I.    THE COMPLAINT ALLEGES ACTIONABLE STATE AND FEDERAL CLAIMS BASED ON CAC'S DECEPTIVE ACTS AND PRACTICES

CAC tries to frame Plaintiffs' deception claims as attacking the Company for "sell[ing] cars at prices Plaintiffs believe are too high" and driving consumers into bad bargains. (Mot. 18.) But this is an over-simplification. Plaintiffs have alleged that (i) selling prices in CAC loans are marked up higher than industry norms because (ii) CAC's lending model forces this markup and add-ons as the only way for dealers to achieve an acceptable Dealer Compensation (the CAC Payment and down payment dealers receive in a CAC-financed deal), and (iii) the markup is tightly correlated with credit risk. The Complaint then alleges that CAC hides this true cost of credit in inflated loan amounts, rather than disclosing it in the interest rate as consumers would reasonably expect.

These allegations state claims for deception and fraud under the CFPA and state law. CAC's contention that these claims are inadequately pleaded ignores substantial portions of the Complaint and is unsupported by precedent. CAC's repeated invocation of the Truth-in-Lending Act (TILA) is inapplicable and counterfactual. And CAC's puffery and omission arguments disregard the entire course of alleged deception.

### A.  The Complaint adequately alleges that CAC acted deceptively by hiding the cost of credit in inflated loan amounts.

Plaintiffs seek to halt CAC's deceptive lending model under authority granted in the CFPA and New York's Executive Law and General Business Law. The purpose of the CFPA is to ensure "that markets for consumer financial products and services are fair, transparent, and competitive." *CFPB v. Law Offices of Crystal Moroney*, 63 F.4th 174,

184 (2d Cir. 2023); *see also CFPB v. Daniel A. Rosen, Inc.*, No. 21 Civ. 7492, 2022 WL 1514439, at *2 (C.D. Cal. Apr. 5, 2022) (noting the CFPA's "broad purpose and expansive language"). The Executive Law is "liberally construed to 'defeat all unsubstantial and visionary schemes whereby the public is fraudulently exploited.'" *People v. Greenberg*, 95 A.D. 3d 474, 483 (N.Y. App. Div. 2012). And the General Business Law empowers Plaintiff OAG to protect the "right to an honest market place." *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25 (N.Y. 1995).

To plead deception under the CFPA and GBL § 349, Plaintiffs must plead acts that are "likely to mislead consumers acting reasonably under the circumstances" and are material. *CFPB v. NDG Fin. Corp.*, No. 15 Civ. 5211, 2016 WL 7188792, at *14 (S.D.N.Y. Dec. 2, 2016). Executive Law § 63(12) protects not only the average consumer "but also 'the ignorant, the unthinking and the credulous'" and provides a fraud claim for acts that have "the capacity or tendency to deceive" or that create "an atmosphere conducive to fraud." *People v. Applied Card Sys., Inc.*, 27 A.D.3d 104, 106 (N.Y. App. Div. 2005) (quoting *People v. Gen. Elec. Co.*, 302 A.D.2d 314, 314 (N.Y. 2003)).

Here, the Complaint alleges the following about CAC's lending business:

- CAC proposes CAC Payments that are tied to credit risk. Because CAC does not alter interest rates to account for this risk, the credit risk is accounted for by the systematic inflation of selling prices and forced imposition of add-on products, which together lead to inflated loan principals. Where other lenders increase *interest rates* to account for credit risk, CAC's lending model increases *loan amounts* to account for credit risk. Thus, borrowers whom CAC views as riskier pay vehicle prices that are more inflated than borrowers whom CAC views as less risky. (Compl. ¶¶ 4, 29-30, 32, 37-39, 47-48, 55-63, 69-71, 89-100, 112.)

- CAC deceptively hides, in its term sheets and loan agreements, the cost of credit within inflated loan amounts, not as interest. (*Id.* ¶¶ 33, 50-54, 65, 95, 112, 175.)

- While consumers may have expected to pay a higher *interest rate* to account for their credit risk, consumers had no way of knowing that the *loan amounts* in those documents were inflated to include a hidden cost of credit. (*Id.* ¶ 73, 176.)

- CAC takes these actions while promising consumers paths to financial freedom and despite knowing many loans will never be repaid. (*Id.* ¶¶ 89-96.)

These are more than sufficient facts to plead CAC's direct liability for its own deceptive acts and practices. *See, e.g.*, *Debt Resolve*, 387 F. Supp. 3d at 369-70 (allegations that defendant "provided the financing to consumers" to purchase plans that "lack required disclosures and require consumers to pay . . . usurious interest rates" sufficient).

CAC does not dispute that the cost of credit is material or that consumers acting reasonably would likely be misled by a hidden cost of credit. Rather, CAC argues that it made no misstatements actionable under the CFPA or New York law. CAC also argues that another statute (the Truth in Lending Act) forecloses its liability and that Plaintiffs did not adequately plead a hidden cost of credit. These arguments are unavailing.

### 1. The Complaint adequately alleges that CAC itself acted deceptively.

CAC argues that it did not make a misrepresentation or omission because it had no direct contact with consumers and that allegations that CAC controls the lending process and causes selling price inflation are inadequate. (*See* Mot. 17-20.)

CAC's argument fails. The Complaint alleges that CAC created, operated, and controlled a lending scheme that was likely to mislead borrowers and made misrepresentations and omissions to consumers by creating the misleading documents

11

that were provided to consumers, including loan agreements and disclosures. (E.g.,

Compl. ¶¶ 33, 38, 50-54, 65, 95, 175.) Direct contact with the consumer is not required.

A defendant may be liable for deceptive acts either when it "directly participates" by

"engag[ing] in deceptive acts or practices that are injurious" or "has the authority to

control" deceptive acts or practices but fails to do so. *FTC v. LeadClick Media, LLC*, 838

F.3d 158, 169-70 (2d Cir. 2016). This standard has been applied to fraud and deception

claims brought under the laws at issue here. *See CFPB v. 1st Alliance Lending, LLC*, No.

21 Civ. 55, 2022 WL 993582, at *6-7 (D. Conn. Mar. 31, 2022) (federal CFPA claims);

*Debt Resolve*, 387 F. Supp. 3d at 369 (state law claims).

The Complaint meets this standard. It does not rely on "[c]onclusory allegations"

of control (Mot. 19), and therefore stands in stark contrast to the precedent upon which

CAC relies. *See, e.g.*, *Glover v. Bob's Discount Furniture, LLC*, No. 20 Civ. 10924, 2022

WL 3353454, at *6 (S.D.N.Y. Aug. 12, 2022) (single allegation that sales reps had

"incentives to misrepresent the scope of" insurance coverage was "entirely conclusory");

*Schachter v. Sunrise Senior Living Mgmt., Inc.*, No. 18 Civ. 953, 2020 WL 1274601, at

*5 (D. Conn. Mar. 16, 2020) (lone reference to "alleged 'monetary and other incentives'"

was "the epitome" of conclusory). Rather, the Complaint describes in detail the

deceptive mechanics of how CAC dictates the proposed CAC Payments to dealers

(Compl. ¶¶ 33-45), which is supports with analyses of years of data (*id.* ¶¶ 67-71), and it

alleges precisely how CAC controls the lending process and information provided to

borrowers in order to hide the cost of credit in inflated loan amounts (*id.* ¶¶ 46-64).

CAC's characterization of the control allegations as "cursorily assert[ed]" (Mot.

18) ignores broad swaths of the Complaint, including that: CAC employs an ineffective

selling-prices limit (Compl. ¶ 57); CAC requires dealers to employ its software (*id.* ¶ 33);

12

dealers must attend CAC-run trainings and follow CAC-imposed guidelines (*id.* ¶ 90); the Company provides marketing materials and licenses key slogans for use by dealers (*id.*)*;* and CAC requires dealers to provide to consumers deceptive term sheets and agreements that CAC generates (*id.* ¶¶ 33, 38, 95). These allegations are sufficient "to infer more than the mere possibility of misconduct" on CAC's part. *Pension Benefit Guar. Corp. v. Morgan Stanley Inv. Mgmt.*, 712 F.3d 705, 718 (2d Cir. 2013).

The three private-litigant cases that CAC cites—which concern GBL § 349(h), not GBL § 349(a) under which Plaintiff OAG sues—do not hold that direct contact with the consumer is required. The courts there dismissed the deception claims due to a failure to allege (i) an "actual misrepresentation or omission" whatsoever,[2] (ii) materiality or causation,[3] and (iii) that "the transaction []or the alleged deception occurred in New York."[4] Here, in contrast, the Complaint alleges (i) a deceptive lending model that misstates the cost of credit (Compl. ¶¶ 175-76), (ii) the materiality of these deceptions, which cause consumers to obtain costly loans (*id.* ¶ 177), and (iii) tens of thousands of CAC transactions that occurred in New York (*id.* ¶ 23).

CAC's contention that dealers, and not CAC, control the loan process (Mot. 19) is unsupported. To the contrary, the Complaint extensively pleads dealers' limited agency: Dealers must use and cannot modify CAC's systems (Compl. ¶¶ 33, 51), and dealers "cannot alter" the loan terms that are determined by those systems, but rather merely present those terms to consumers. (*Id.* ¶¶ 38, 50.) Indeed, a dealer cannot even decide to close on a CAC-financed deal until *after* it inputs information about a consumer, CAC

---

[2] *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 289, 309-10 (E.D.N.Y. 2017).

[3] *Miller v. Wells Fargo Bank, N.A.*, 994 F. Supp. 2d 542, 558 (S.D.N.Y. 2014).

[4] *Copley v. Bactolac Pharm., Inc.*, No. 18 Civ. 575, 2021 WL 918313, at *2 (E.D.N.Y. Mar. 10, 2021).

proposes a CAC Payment, and the dealer employs CAC's real-time feedback to adjust vehicles and pricing levels.[5] Plaintiffs' theories thus are not "irreconcilable" (Mot. 20 n.14) but intertwined: CAC tightly controls the lending process, which in turn inflates loan amounts to account for credit risk. Whatever supporting role dealers play does not excuse CAC's liability for its own deceptive practices.

### 2. The Truth in Lending Act does not foreclose CAC's liability.

CAC argues that Plaintiff's claims are foreclosed by TILA's limitations on assignee liability. (Mot. 26-28.) In doing so, the Motion addresses a different complaint than what Plaintiffs filed, which does not include a TILA claim. The laws that empower Plaintiffs are flexible, broad, and intended to ensure that consumer markets are fair, honest, and equitable, and the relevant inquiry is whether "plaintiffs have pleaded facts giving rise to" an inference of deceptive conduct. *Novak v. Kasaks*, 216 F.3d 300, 311 (2d Cir. 2000). The Complaint inarguably does so. TILA, in contrast, is "a disclosure statute." *Poulin v. Balise Auto Sales, Inc.*, 647 F.3d 36, 38 (2d Cir. 2011).

CAC cannot avoid liability by calling itself a TILA assignee, as Plaintiffs seek to hold CAC liable under the CFPA and New York law for its own active conduct, not liable as a passive assignee under TILA. In *Knapp v. Americredit Fin. Servs., Inc.*, for example, the court granted summary judgment for the defendant-assignee under TILA but then denied summary judgment on the deception claims, explaining that "Plaintiffs

---

[5] For these reasons, though unnecessary to resolve the Motion, the Complaint does plausibly allege that dealers are CAC's agents for the purpose of presenting loan terms to consumers. Unlike in *Grimmett v. Sunlight Fin. LLC* or *Pescia v. Auburn Ford-Lincoln Mercury Inc.*, two out-of-circuit decisions cited by CAC, the Complaint here alleges that CAC retains exclusive control over how the terms of the loan agreements are presented. *See Grimmett*, No. 23 Civ. 84, 2023 WL 6449447, at *7 (S.D.W. Va. Oct. 3, 2023) (finding no agency existed when plaintiff admitted that defendant exercised no control over its purported agent); *Pescia*, 68 F. Supp. 2d 1269, 1282 (M.D. Ala. 1999) (holding, on summary judgment, that the Ford Motor Credit Company gave only one instruction to a dealer and thus did not control how that dealer decided to sell its vehicles).

do not seek to hold [defendant] liable as an assignee" but rather that liability "is predicated upon the direct involvement" of the defendant's employees and agents "in the planning and execution of the scheme" to impose hidden finance charges. 245 F. Supp. 2d 841, 851-52 (S.D. W. Va. 2003).[6] CAC can be held liable under consumer-protection laws for its own conduct: it lures customers with its marketing; it trains dealers and binds them to its lending program; it employs dynamic, real-time pricing that drives systematic price inflation; it prohibits dealers from negotiating credit terms or interest rates; and it misstates the cost of credit in a term sheet and final documents. *See, CFPB v. TCF Nat'l Bank*, No. 17 Civ. 166, 2017 WL 6211033, at *3 (D. Minn. Sept. 8, 2017) (CFPA addresses "the entire... transaction or course of dealing").

CAC cites no case holding that TILA forecloses liability under consumer-protection laws for a lender's creation and control of a deceptive lending scheme. CAC argues that Plaintiffs cannot change a "*bona fide* car sale into a deceptive device" (Mot. 19), but the cited precedent involved no allegations about a lender's effect on how the dealer determines the selling price—to the contrary, the dealer had already "agreed to sell an automobile" to the buyer *before* financing was negotiated. *See Flatbush Auto Disc. Corp. v. McCarthy-Bernhardt Buick, Inc.*, 9 N.Y.2d 776, 777 (1961).[7] And while CAC cites a laundry-list of other supposed authority (Mot. 19 n.13), those cases all

---

[6] *See also, e.g.*, *In re Hollis*, No. 07 BR 22759, 2009 WL 3030125, at *11 (Bankr. D.N.J. Sept. 17, 2009) ("[A]n assignee is liable for its own direct and active unconscionable commercial practices."); *Jackson v. So. Holland Dodge, Inc.*, 726 N.E.2d 1146, 1155 (Ill. App. Ct. 2000) (holding that "an assignee would be liable for its own pre-assignment fraud" because such liability "would be independent of and separate from the TILA assignee exemption"). Tellingly, in a recent decision cited by CAC, the court, after finding an entity was not liable as an assignee, then *separately* assessed the entity's liability for its "own action." *In re Ditech Holding Corp.*, No. 19 BR 10412, 2023 WL 6397900, at *8 (Bankr. S.D.N.Y. Sep. 29, 2023).

[7] *Flatbush* also involved no discussion of deception at all. 9 N.Y.2d at 776–77. Nor did the other case CAC cites, in which the court merely declined to exercise supplemental jurisdiction of state-law fraud claims. *See Garcia v. Chrysler Cap. LLC*, No. 15 Civ. 5949, 2016 WL 5719792, at *8 (S.D.N.Y. Sept. 30, 2016).

concern a different business model in which dealers adjust interest rates to increase their profits. *E.g.*, *Thompson v. Connex Credit Union*, 2021 WL 1117166, at \*1 (Conn. Super. Ct. Mar. 3, 2021) (alleging business practice of adjusting interest rates based on haircut agreed to between dealer and assignee). Here, by contrast, the Complaint alleges that CAC does *not* permit any adjustment in interest rates to account for credit risk—as consumers might expect—but instead drives inflated selling prices and the inclusion of add-ons to account for credit risk—as consumers would not expect.

Finally, the remainder of CAC's purported authority on this point holds merely that there is no liability *under TILA* for assignees, which is not at issue here. *See Irby-Greene v. M.O.R., Inc.*, 79 F. Supp. 2d 630, 633-34 (E.D. Va. 2000); *Mayfield v. Gen. Elec. Cap. Corp.*, No. 97 Civ. 2786, 1999 WL 182586, at \*4 (S.D.N.Y. Mar. 31, 1999).

CAC also argues that Plaintiffs' enforcement of the CFPA is inconsistent with TILA. (Mot. 27-28.) But a lender can be liable for its acts and practices in violation of a number of consumer-protection statutes, none of which are mutually exclusive. Here, Plaintiffs' claims do not contradict TILA; they complement it. The CFPA prohibits a lender from deceptively hiding the cost of credit in an inflated selling price, while TILA requires lenders to properly disclose the cost of credit.[8] CAC complains that, with Plaintiffs' claims, a lender cannot comply with both TILA and the CFPA. (Mot. 3.) But a lender can readily comply with the requirements of both by keeping separate the selling price (uninflated by a hidden cost of credit) and the fully-disclosed financing terms.

---

[8] If CAC were to disclose its full cost of credit, as it should, it would make transparent that it violates state usury laws. Rather than showing any tension in the governing laws, it shows their consistency: the laws require that lenders do not deceive customers by hiding the cost of credit (CFPA and New York law), transparently disclose finance charges (TILA), and keep the charges below a certain rate (usury laws). Similarly, the CARS Rule (Mot. 11-12) will complement these statutes by clarifying dealers' consumer-protection obligations.

In addition, CAC argues that Plaintiffs cannot "ask the Court to enact mandatory underwriting guidelines where no legislature has done so or impose on assignees . . . an unprecedented and impractical duty of oversight over the business operations of creditors." (Mot. 3.) Plaintiffs request no such thing. Rather, Plaintiffs simply seek to stop CAC from concealing, through its unusual lending model, the cost of credit from consumers. As such, this enforcement action is not remotely akin to the rulemaking and regulatory actions in cases CAC cites, such as the effort to "restructure the American energy market" in *West Virginia v. EPA*, 597 U.S. 697, 724 (2022), or the actions to ban a product that Congress had declared "one of the greatest basic industries of the United States" in *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 137 (2000).

### 3. There is no inconsistency with TILA because the Complaint adequately alleges a hidden cost of credit using a reasonable proxy for the cash price.

Invoking TILA, CAC argues that Plaintiffs "do not allege" a "hidden finance charge" (Mot. 20-21) and attacks the Complaint's use of Dealer Compensation as a proxy for a vehicle's cash price (Mot. 20-26). These arguments are beside the point, since TILA does not apply, as shown above. But even so, the Complaint is not contrary to TILA. Its allegations support an inference of a hidden finance charge by containing ample facts to establish that: (i) Dealer Compensation reflects the amount that dealers would accept in a cash purchase; and (ii) CAC, through its lending model, hid the cost of credit in inflated loan amounts above this cash price.

The Complaint alleges that Dealer Compensation is equivalent to a vehicle's cash price. This is an amount set in real-time at levels necessary to "induc[e] the dealer to complete the deal" (*id.* ¶ 37) and constitutes everything the dealer expects to receive from the sale (*id.* ¶¶ 35-36, 49). Dealer Compensation therefore "reflects the precise

amount of money that a dealer required to sell a particular vehicle, on a particular day, to a particular borrower, and under particular market conditions." (*Id.* ¶¶ 35, 59.) When a dealer sells a vehicle (including any add-ons) for cash, the dealer receives the cash price, and no more. Here, when a dealer sells a vehicle (including any add-ons) financed by CAC, the dealer typically receives the Dealer Compensation, and no more. And the Complaint provides further reason to infer that Dealer Compensation is equal to the cash price: looking at the portion of the Dealer Compensation that is related to the sales price of the vehicle, dealers generally make the same on CAC deals as on other used-vehicle sales. (*Id.* ¶ 56.) Thus, the Complaint adequately alleges that Dealer Compensation reflects the selling price in an ordinary cash transaction.

CAC argues that the Complaint does not allege a "cash price" as used in TILA's regulations, which define that term as the price "offer[ed]" "in the ordinary course of business." (Mot. 23-26.) But TILA does not require Plaintiffs to allege a cash offer, since that would allow creditors to evade the law entirely by operating non-cash businesses or adopting illusory pricing schemes. *See Odier v. Hoffman School of Martial Arts, Inc.*, 619 F. Supp. 2d 571, 579 (N.D. Ind. 2008) (TILA covers "goods normally sold by installment contract" including those rarely if ever sold for cash); *Kriger v. European Health Spa Inc.*, 363 F. Supp. 334, 337-38 (E.D. Wis. 1973) (requiring a cash offer would permit creditors to "effectively abolish TIL[A]"). Plaintiffs have pleaded facts showing "purchase price discrimination based on credit status." *Poulin*, 647 F.3d at 40.

Contrary to CAC's claim (Mot. 24-25), the Second Circuit in *Poulin* (which considered only a TILA claim) did not declare a blanket rule against employing a proxy for cash price. Rather, the court merely held that a rote comparison of the disclosed selling price to industry-book value, standing alone, establishes only a "bad bargain" *in*

*the absence of* "facts from which to infer that that bad bargain stemmed from an undisclosed finance charge." 647 F.3d at 40. Here, the Complaint alleges an abundance of facts to show that the bad bargain—that is, the inflated loan amount—in fact stems from a hidden cost of credit, including allegations that the inflated loan amounts increase as credit risk increases. (Compl. ¶¶ 55-63, 69-71.)[9]

CAC asserts that the Complaint's cash-price allegations would be impossible to implement or lead to absurd outcomes. (Mot. 25-26.) But these policy arguments have no bearing on whether the Complaint adequately alleges that CAC hid the cost of credit in this particular case. In any event, they are meritless. There is no circularity or "*post hoc* normative judgment" required (Mot. 25) to infer that Dealer Compensation, the readily-calculable amount dealers expect to receive, is a reasonable cash-price proxy. Plaintiffs do allege the consumer's score is one factor determining the CAC Payment and ultimately the Dealer Compensation. (Compl. ¶ 47.) But there's no circularity because, as also alleged, setting a selling price and setting financing terms are not distinct steps in the CAC process; dealers receive real-time feedback on CAC Payments (based in part on the particular borrower's score), permitting them to present increased prices[10] and push add-ons for borrowers with more credit risk (*Id.* ¶¶ 48, 69.)

Finally, CAC suggests that additional payments to dealers in the form of earnout make determining a cash-price proxy impossible. (Mot. 25-26.) But the fact that dealers may receive a small amount of additional compensation from time-to-time—akin to a

---

[9] For these same reasons, the hidden finance cost described in the Complaint is not a generalized cost of doing business but rather it is "separately imposed" on each borrower based on borrower creditworthiness— "the weaker the customer, the higher the fee." *Knapp*, 245 F. Supp. 2d at 846-47. *See also* 12 C.F.R. § 226.4.

[10] It is not the Dealer Compensation, as a cash-price proxy, that hinges on creditworthiness (Mot. 26 n.23) but the alleged selling price and total loan amount—as borrower creditworthiness falls, the loan principal rises to ensure the Dealer profits. (Compl. ¶¶ 32, 39, 63, 69.)

performance bonus—does not change the fact that they are willing to sell vehicles for an amount equal to Dealer Compensation. In any event, the Complaint alleges that earnout is rare and small, and thus is immaterial. (Compl. ¶¶ 35, 36, 59.)

In addition to adequately alleging that Dealer Compensation is a reasonable cash-price proxy, the Complaint also adequately alleges that CAC, through its lending model, hid the cost of credit in inflated loan amounts above this cash-price proxy:

- The magnitude of price inflation in CAC transactions "increased as borrower credit risk increased" and that the hidden cost "applied only to financing customers, not cash buyers." (Compl. ¶ 175.)

- The mechanism for this inflation is CAC's real-time CAC Payment proposals based on credit status, which result in inflated selling prices based on credit status. (*Id.* ¶¶ 4, 37-39, 47-48, 56-63, 69-71, 99-100.)

- An analysis of nearly two million loans demonstrates a clear link between the relative cost of credit and creditworthiness. (*Id.* ¶¶ 65-73.)

- Ms. B. incurred a "hidden cost" of "more than $2,600." (*Id.* ¶¶ 61-63.)

- With no legal avenue to increase interest rates enough to equal the revenue from inflated prices, CAC used hidden finance charges to skirt usury laws. (*Id.* ¶ 65.)

- The inflated prices do not reflect the vehicles' market value. (*Id.* ¶¶ 56, 69.)

These allegations are sufficient to infer a hidden cost of credit. *Joseph v. Excellence Auto Trade LLC*, No. 16 Civ. 1534, 2017 WL 1157178, *4 (E.D.N.Y. Feb. 10, 2017).

For these reasons, even were the Court to look to TILA for guidance, defendant's arguments still fail.

### B. The Complaint alleges that CAC deceptively promised benefits to consumers while projecting failure and protecting itself.

The Complaint alleges that CAC deceptively enticed consumers with benefits that the Company projected they would not obtain. Under New York law, the Court must assess CAC's advertisements to determine whether they created an "overall misleading impression," regardless of disclaimers or caveats. *People v. Orbital Publishing Grp., Inc.*, 169 A.D.3d 564, 566 (N.Y. App. Div. 2019); *see also Thompson Medical Co. v. FTC*, 791 F.2d 189, 197 (D.C. Cir. 1986) (deception "is determined by the net impression" and thus "literally true statements may nonetheless be found deceptive"). Here, as alleged, CAC promised borrowers enhanced credit outcomes (Compl. ¶¶ 88-96) even though CAC projected rates of default that would make these outcomes impossible for many borrowers and took steps to protect itself from inevitable failures (*id.* ¶¶ 33-45, 76, 98, 112). That is sufficient to state a claim. *See People v. Dell, Inc.*, Index No. 3778-07, 2008 WL 4531525, at *3 (N.Y. Sup. Ct. May 23, 2008) (finance company acted deceptively by advertising terms for which it knew a "great majority" of consumers would not qualify); *see also Applied Card*, 27 A.D.3d at 107-08 (sustaining deception claim based on marketing for pre-approval of a "credit limit up to $1,000 or $2,500" because "a reasonable consumer would be misled in believing that the 'up to' amount . . . was representative of a likely amount that a consumer would receive").

Crucially, CAC promised these benefits *at the same time* that it projected that borrowers would not make timely payments and would not repay loans on their terms. (Compl. ¶ 71.) CAC thus did not merely parrot explainers for improving credit, as it claims (Mot. 29); it made claims about obtaining "more traditional financing" or "financial freedom" that it projected borrowers would not achieve. For example, CAC

projected that two out of every five borrowers would not repay the (purported) principal

on their loans, let alone any interest (Compl. ¶ 44)—which by definition is a projection

of default. And even borrowers who did pay their loans in full often did not pay on time.

(*Id.* ¶ 104.) It is illogical to suggest that consumers' choice to obtain CAC loans would

not be affected by this information. *See FTC v. Five-Star Auto Club*, 97 F. Supp. 2d 502,

528-29 (S.D.N.Y. 2000) (it is "reasonable for consumers to have assumed that the

promised rewards were achieved by the typical . . . participant"); *see also FTC v. Grand

Canyon Educ., Inc.*, No. 23 Civ. 2711, 2024 WL 3825087, *18-19 (D. Ariz. Aug. 15, 2024)

(allegation that defendant "very rarely awards doctoral degrees to students upon

completion of 60 credits" was sufficient to sustain deception claim based on statement

that 60 credits "would be required to obtain a doctoral degree").

CAC argues that its marketing was mere puffery (Mot. 29-30), citing cases

involving statements made to investors, *e.g.*, *In re ITT Educ. Servs., Inc. Sec. & S'holder

Deriv. Litig.*, 859 F. Supp. 2d 572, 580 (S.D.N.Y. 2012). But whether a statement "might

deceive the reasonable consumer" involves "a question of fact." *Brockington v. Dollar

General Corp.*, 695 F. Supp. 3d 487, 504 (S.D.N.Y. 2023). For this reason, courts are

"reluctant to label claims non-actionable puffery" as a matter of law. *Colangelo v.

Champion Petfoods USA, Inc.*, No. 18 Civ. 1228, 2020 WL 777462, at *8 (N.D.N.Y. Feb.

18, 2020) (statements, such as that dog food was "guaranteed to keep your dog healthy,

happy and strong," was "not so obviously puffing"). This is particularly true where, as

here, the net impression created by CAC's marketing is to build "confidence that the

transaction will enhance the consumer's financial life" (Compl. ¶ 96)—which will

"reasonably influence the buyers and shape their expectations," *Avola v. Louisiana-Pac.

Corp.*, 991 F. Supp. 2d 381, 393-94 (E.D.N.Y. 2013) (collecting cases).

22

The Court also must assess the full statements in context: the same disclosure that promises to "change your life" and a path to "financial freedom" points to clear and identifiable outcomes associated with these benefits, such as purchasing a home or obtaining a credit card (Compl. ¶ 95)—the very sort of "objective, measurable" benchmarks that typical puffery lacks. *See Elkind v. Revlon Consumer Prods. Corp.*, No. 14 Civ. 2484, 2015 WL 2344134, at *13 (E.D.N.Y. May 14, 2015) (upholding claim based on alleged misstatement that product was "age defying with DNA advantage").

Finally, CAC repeats its prior argument that the Complaint "does not allege that any consumer was injured." (Mot. 30.) New York's Executive Law contains no such requirement. And New York's Court of Appeals previously held that Plaintiff OAG need not plead injury under GBL § 349(a), *Goshen v. Mut. Life Inc. Co.*, 98 N.Y.2d 314, 324 (N.Y. 2002)— a fact that CAC conceded on reply (*see* ECF No. 58, at 12 n.14 ("[T]he NYAG may 'seek injunctive relief without a showing of actual injury"). In any event, the Complaint alleges that CAC's marketing built "trust" and "confidence" (Compl. ¶ 96) and influenced consumers to obtain loans (*id.* ¶ 92). It also alleges that had consumers understood CAC's financial incentives, some would have opted not to enter into CAC loans, and that the net result of obtaining CAC loans for most consumers is financial ruin. (*Id.* ¶¶ 64, 76, 103-09.) Nothing more is required to plausibly plead injury.

## II.  THE COMPLAINT STATES AN ACTIONABLE CLAIM FOR ABUSIVE ACTS OR PRACTICES UNDER THE CFPA.

An act or practice is abusive if it takes unreasonable advantage of (i) consumers' lack of understanding of a product or service's material risks, costs, or conditions, or (ii) the inability of the consumer to protect their own interest in selecting or using a

consumer financial product or service. 12 U.S.C. § 5531(d)(2)(A)-(B). The Complaint sufficiently pleads both of these independent ways to show abusiveness.

### A. Plaintiffs adequately plead that CAC borrowers lack understanding and are unable to protect their interests.

<u>Lack of understanding</u>: The Complaint describes the specific risks, costs, and conditions of CAC-financed loans that consumers do not understand, including:

*Inflated and unaffordable prices:* CAC borrowers do not understand that CAC relies on inflated selling prices to protect against credit risk, and hides the inflation and forced add-ons in the principal; that CAC transactions are more expensive than other deals (particularly for lower-scoring borrowers); that it would be difficult to sell or refinance the vehicle to pay off the loan; or that CAC itself projects that nearly 40% of consumers nationwide will not repay their loans in full. (Compl. ¶¶ 8, 9, 44, 55-64, 100.)

*High likelihood of delinquency and default:* CAC borrowers do not understand at origination the significant odds against them and that, because the CAC model results in inflated loans, borrowers are saddled with exceptionally high payments that they cannot afford and have an increased risk of default and repossession. (*Id.* ¶¶ 3, 28-30, 64.)

*Collateral consequences of default:* CAC borrowers do not understand at origination that, if they default, they will likely owe significantly more than the vehicle is worth and may face aggressive post-default collection actions. (*Id.* ¶¶ 10, 74, 77-85, 99.)

*CAC's ability to profit even when consumers default:* CAC borrowers do not understand that there is an extraordinarily unequal level of risk in CAC-financed loans such that CAC profits even when these borrowers fail. (*Id.* ¶¶ 3, 8, 9, 40, 186.)

These facts are more than sufficient to infer that consumers do not understand material risks, costs, or conditions of CAC loans. *See, e.g.*, *Think Fin., LLC*, 2018 WL

3707911 at *8 (CFPB's allegations that consumers did not understand the law applicable to Defendants' loans sufficiently pled abusiveness claim).

Inability to protect interests: Many of these same facts also support that CAC consumers were unable to protect their interests in selecting or using a CAC loan. The loans were inflated and unaffordable, carrying a high likelihood of default, and there was an inequitable and undisclosed risk favoring the lender over the consumer, giving CAC an advantage, in information and power, over credit-constrained consumers. (*Compl.* ¶¶ 5, 9, 58, 64, 73-74.) Consumers also lacked choice; the dealer, not the consumers, selected CAC and used CAC's systems to generate loans. (*Id.* ¶¶ 33, 48, 125.) Consumers also could not meaningfully compare vehicle prices with non-CAC dealers: (i) prices are not set until dealers use CAC's real-time system to determine the vehicles the Company will finance for each individual borrower and what the corresponding CAC Payment will be (*id.* ¶¶ 47-48); (ii) subprime, used car dealers are very unlikely to carry identical inventory, so even the potential borrower who has an offer from a CAC dealer would be hard pressed to compare that price in a meaningful way to another offer from another dealer; and finally, (iii) even in the extraordinarily unlikely event that consumers could somehow figure out that CAC hid the cost of credit in an inflated loan amount and expected them to fail, CAC targeted consumers with limited credit options, and so they may not have been able to go elsewhere (*id.* ¶ 25).

These allegations support an inference that CAC's consumers could not protect their own interests. *See, e.g.*, *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 919 (S.D. Ind. 2015) (inability to protect interests exists "when a consumer is unable to protect herself not in absolute terms, but *relative to* the excessively stronger position of

25

the defendant") (emphasis in original). CAC's arguments that consumers understood the risks and could protect their interests (Mot. 30-38) are unavailing.

### 1. CAC uses the wrong legal standard.

CAC cites to the 2020 amendments to the 2017 Payday Lending Rule (2020 Rule) to try to import the "reasonable avoidability" prong of unfairness into the Bureau's abusiveness claim. This attempt falls flat for three reasons.

First, the plain text of the CFPA includes reasonable avoidability as a requirement for unfairness but not for abusiveness. *Compare* 12 U.S.C. § 5531(c)(1) (unfairness standard) *with* § 5531(d) (abusiveness standards).

Second, the statutory "lack of understanding" abusiveness standard does not incorporate all components of "reasonable avoidability," which in part is why the 2020 Rule expressly recognized that "abusiveness could prohibit some conduct that unfairness would permit." *See* 85 Fed. Reg. 44382, 44422-23 (Sep. 17, 2021). Specifically, the 2020 Rule did not purport to incorporate into CFPA § 1031(d)(2)(A) a requirement that consumer's lack of understanding be objectively "reasonable." Unlike the unfairness standard under § 1031(c)(1)(A), which expressly states the phrase "*reasonably* avoidable," Congress in § 1031(d)(2)(A) did not require that the consumer's "lack of understanding" for purposes of abusiveness be "reasonable." This Court must "give effect to … Congress' choice to include [such] limiting language in some provisions but not others." *Gallardo ex rel. Vassallo v. Marstiller*, 596 U.S. 420, 431 (2022).

Third, the 2020 Rule was limited to certain types of small-dollar loans, does not apply to auto purchase loans, and provides no barrier to the exercise of the Bureau's enforcement authority to challenge abusive practices. 85 Fed. Reg. 44382, at 44422 and 44415, n. 286.

Thus, there is no reasonable avoidability requirement here.[11]

### 2. CAC's arguments that consumers understood its loans or could protect their interests are unpersuasive.

CAC also argues that consumers must have understood relevant terms because they were disclosed in the contract. (Mot. 32-33.) But the Bureau's claim is about CAC's inflated loan amounts and the consequences of those inflated loans, not about whether the disclosed terms are facially accurate. In any event, the Complaint describes in detail why the disclosed terms carry a hidden finance charge and so are in and of themselves misleading. This supports an inference that consumers do not understand the terms. *See, e.g.*, *CFPB v. Certified Forensic Loan Auditors, LLC*, No. 19 Civ. 7722, 2020 WL 2556417, at *4 (C.D. Cal. May 20, 2020) (CFPB sufficiently pled abusiveness by alleging that company sent consumers misleading information such that they did not understand what the company offered). And as shown above, even if CAC's disclosures satisfied TILA, CAC would not be absolved of liability under the CFPA. *See* above Section I.A.2.

CAC tries to blame its borrowers for not informing themselves, suggesting that they could have consulted guides, like the Kelley Blue Book, to determine whether selling prices were fair, or looked for better prices with other dealers. (Mot. 33.) But as discussed above, consumers cannot research fair pricing beforehand since CAC dictates which vehicles to offer only after receiving the consumer's information. *(*Compl. ¶¶47-48.) Moreover, it would be very difficult, if not impossible, to use a pricing guide to establish a fair price (especially for a used vehicle) without detailed information about

---

[11] Even if reasonable avoidability were an element of an abusiveness claim (which it is not), Plaintiffs allege that CAC borrowers could not have reasonably avoided the harm. In particular, borrowers did not have a free and informed choice because they received misleading information from CAC and its dealers. *See, e.g.*, *CFPB v. Navient Corp.*, No. 17 Civ. 101, 2017 WL 3380530, at *21 (M.D. Pa. Aug. 4, 2017) (unfairness stated against servicer who gave borrowers incomplete information about payment plans).

the condition of the vehicle, including any history of accidents or major repairs—which consumers would not know. CAC's argument also assumes that all borrowers had the ability to compare prices on the internet (in real time on the showroom floor) and interpret complicated online pricing guides such as the Blue Book.

CAC also suggests that the abusiveness claim is predicated on CAC's failure to disclose to borrowers their score, which is not problematic in CAC's view because borrowers are in the best position to know whether they can repay. (Mot. 33-34.) Contrary to CAC's argument, Plaintiffs' claims are not predicated on CAC's failure to disclose the score, but rather on CAC's entire hidden scheme of inflating loan amounts to account for credit risk and setting consumers up to fail. But more to the point, CAC's assertion that borrowers can better predict outcomes runs contrary to the allegations in the Complaint. The Complaint sufficiently alleges that CAC, with its powerful algorithms using historical performance data on millions of actual loans, predicts exactly how much it will extract from each borrower—something that no individual borrower can predict. (Compl. ¶¶ 26, 186.) Like a single pixel on a high-resolution screen, CAC borrowers see only themselves, while CAC sees the entire screen and knows precisely where the borrower fits within the complete image. CAC also ignores that individuals, who will always have less information and experience related to loan performance, may not fully account for unexpected financial crises, such as surprise medical costs, job loss, vehicle repairs, or death of a wage-earning family member.

In addition, because CAC's scheme hides the traditional signal of a loan's riskiness—the cost of credit—within the loan amount, consumers are hindered in their ability to predict, as well as CAC can, whether they will succeed. Indeed, the Complaint alleges that, if CAC had disclosed the true cost of credit to its consumers, giving them a

chance at an informed decision, they might not have taken out the loans. (*Id.* ¶¶ 109, 184.) But they were misled and took out the loans, causing CAC's profits to soar while borrowers suffered any number of negative consequences. (*Id.* ¶¶ 10, 75, 86.) Finally, the fact that CAC predicts that roughly two out of every five borrowers will not be able to repay even the principal, and that these consumers do end up struggling (*Id.* ¶ 44), further shows how well CAC understands the risks of its loans (unlike its consumers). The cases CAC cites in support of its argument that consumers can predict outcomes better than CAC are inapposite, as they do not involve such a fine-tuned prediction of the consumer's (in)ability to repay.

### B. The Complaint adequately pleads that CAC "takes unreasonable advantage."

"To take advantage of" is "to make use of for one's own benefit," to "use to advantage," or to "profit by." *CFPB v. ITT Educ. Servs., Inc.*, 219 F. Supp. 3d 878, 918 (S.D. Ind. 2015) (citing Webster's Third New Int'l Dictionary 2331 (3d ed.1993)). That advantage is unreasonable when it is obtained in an unjust way. *Id.*

Here, the Complaint adequately alleges that CAC took an advantage—millions of dollars in profit—in an unreasonable way by operating a predatory lending scheme that generated profits even when the Company expected borrowers to fail. (Compl. ¶¶ 1, 37-40, 111-112.) As explained above, CAC uses complex algorithms incorporating information from millions of past loans—in great contrast to the limited information available to each individual borrower—to profit on borrowers even when they can't repay their loans. (*Id.* ¶¶ 32, 90.) CAC does so by predicting how much it will earn not only from the payments, but also post-default auction and deficiency collections.

CAC targets credit-constrained consumers by guaranteeing approval for everyone and painting a rosy picture, telling them that a loan with CAC will increase their credit scores and financial well-being. (*Id.* ¶¶ 1, 11, 90-93.) In fact, for approximately 741,000 loans (or 39% of all CAC loans nationwide during the Covered Period), CAC predicted that the borrower would not be able to repay the full principal. (*Id.* ¶¶ 8, 44.) And when borrowers failed to pay the loans in full, they faced repossession, loss of the vehicles, loss of the value of any trade-in or down payment, loss of the value of any payments made, worsening credit history, and aggressive post-default collections by CAC. (*Id.* ¶¶ 10, 75, 86.) Consumers, especially lower-scoring borrowers, also faced deficiency balances following repossession and auction, and these deficiencies were higher than they would have been if the cost of credit had been accurately reflected in the interest rate rather than hidden in the principal. (*Id.* ¶¶ 106-08.)

In short, CAC is profiting from predatory lending. *See* Office of the Comptroller Currency, *Advisory Letter 2003-2: Guidelines for Nat'l Banks to Guard Against Predatory and Abusive Lending Practices* (Feb. 21, 2003) (a "fundamental characteristic of predatory lending is the aggressive marketing of credit to prospective borrowers who simply cannot afford the credit" while underwriting "predominantly on the basis of the liquidation value of the collateral"). This is sufficient to infer that CAC took unreasonable advantage of consumers.

Even apart from lending to consumers it expected to fail, CAC's advantage was unreasonable for another reason: it earned profits by hiding the cost of credit from consumers. CAC boldly cries "no harm, no foul" because, even if it had accurately calculated and disclosed the finance charge, its honesty would not have changed the consumers' monthly payments or total amount due. But requirements that protect

consumer understanding exist so that consumers can make informed decisions about credit—an opportunity CAC denied its borrowers. (Compl. ¶ 109.) And of course, CAC neglects to mention that if the interest rates were accurately calculated and disclosed, many loans would show rates that exceed state-law limits. The disclosures in Ms. B's contract, for example, show an annual percentage rate of 23.99% (*Id.* ¶ 27.) But if the hidden cost of $2,678.10 had been included in the finance charge (as shown in the marked-up version below), the disclosures would show an APR of 48.29%, well beyond the Michigan legal limit of 25%:

| TRUTH IN LENDING DISCLOSURES | | | | |
|---|---|---|---|---|
| **ANNUAL PERCENTAGE RATE** The cost of Your credit as a yearly rate. <br> **48.29%** | **FINANCE CHARGE** The dollar amount the credit will cost You. <br> $7,687.31 | **Amount Financed** The amount of credit provided to You or on Your behalf. <br> $5,614.38 | **Total of Payments** The amount You will have paid after You have made all payments as scheduled. <br> $ 13,301.31 | **Total Sale Price** The total cost of Your purchase on credit, including Your down payment of <br> $ 2,250.00   is <br> $ 15,551.31 |

| Payment Schedule: Your payment schedule will be: | | |
|---|---|---|
| No. of Payments | Amount of Payments | When Payments Are Due |
| 51 | $260.81 | March 12, 2016   and same date of each following month. |

Moreover, had CAC's own risk protection been reflected honestly in the interest rate rather than hidden in her inflated principal, Ms. B would have owed less after her car was repossessed and auctioned. That is, Ms. B would have been liable only for the true, un-inflated principal balance and not for unaccrued interest. But because CAC hid the cost of credit in an inflated principal, Ms. B remained liable for that amount even after repossession and auction. By hiding the cost of credit, CAC profited off Ms. B (and other consumers) in an unreasonable way.

CAC's arguments that it does not take unreasonable advantage are unpersuasive. CAC first argues that the Complaint does not allege that CAC caused any injury. (Mot. 35.) But injury is not an element of liability for an abusiveness claim. *Compare* 12 U.S.C. § 5531(c)(1) (unfairness standard, which requires substantial injury) *with* § 5531(d)

(abusiveness standards, which do not). *See also, e.g.*, *Certified Forensic, LLC*, 2020 WL 2556417 at *4 ("substantial injury [is] not [a] requisite element of the Bureau's . . . claims for deceptive and abusive acts or practices").[12] And in any event, Plaintiffs allege many forms of harm caused by CAC's conduct, including consumers paying loan amounts that were inflated with a hidden cost of credit (*id.* ¶¶ 55-64, 69-73), obtaining loans that exceed state interest-rate caps when the finance charge is calculated correctly (*id.* ¶¶ 66-68), falling into default or experiencing repossession, auction, or other negative results (*id.* ¶¶ 74, 86, 102-108), and being deprived of the ability to make informed choices (*id.* ¶ 87).

CAC also argues that it did not take unreasonable advantage because "Congress has not required auto finance companies to consider consumer ability to repay." (Mot. 36.) Plaintiffs are not seeking to impose an ability-to-repay requirement on CAC – Plaintiffs seek to end defendant's abusive acts and practices. Plaintiffs allege that CAC took unreasonable advantage by operating a scheme in which it reaped millions in profits from loans that were inflated with a hidden cost of credit to protect itself, including from customers that it knew would not be able to repay them. In other words, CAC predicted exactly what it would collect, including that nearly 40% of its borrowers would not be able to repay their loans on their terms, setting consumers up to fail.

CAC fares no better in suggesting that it can't be held liable because the Bureau has not promulgated a law or rule prohibiting the precise behaviors outlined in the Complaint. (Mot. 36.) The CFPA authorizes the Bureau to "commence a civil action

---

[12] The cases cited by CAC do not say otherwise. (Mot. 36.) *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014) (holding that defendant's action must be proximate cause of injury *in a deception claim* under a trademark statute); *CFPB v. Intercept Corp. Co.*, No. 16 Civ. 144, 2017 WL 3774379 (D.N.D. Mar. 17, 2017) (dismissing *unfairness and substantial assistance* claims under the CFPA because plaintiff did not plead facts sufficient to show consumers were injured or likely to be injured).

against" any person that violates a federal consumer financial law, including the Act's prohibitions against unfair, deceptive, and abusive acts and practices. 12 U.S.C. §§ 5564(a), 5481(14). Nothing in these—or any other—provisions suggests that the Bureau can enforce the prohibition on unfair, deceptive, and abusive practices only if it first declares the practices unlawful in a rulemaking. The FTC, moreover, has enforced a similar prohibition, *see* 15 U.S.C. § 45(a)(1), for decades without declaring in advance every violation that is unfair or deceptive. Unsurprisingly, the courts that have considered the issue agree that the CFPA "does not impose a requirement on the Bureau to engage in rulemaking before bringing an enforcement action" to address unfair, deceptive, and abusive conduct. *Navient Corp.*, 2017 WL 3380530 at *7; *see also Think Fin., LLC*, 2018 WL 3707911 at *3; *CFPB v. D & D Mktg.*, No. 15 Civ. 9692, 2017 WL 5974248, *5 (C.D. Cal. Mar. 21, 2017).

The CFPA's prohibition on abusive acts and practices was intended to encompass the ways in which businesses can take advantage of consumers.[13] Unlike regulations designed for specific situations (*e.g.*, TILA), the CFPA doesn't include a laundry list of precise behaviors that constitute violations. Instead, the law proscribes illegal conduct by considering the effects of a practice. And here, Plaintiffs have adequately pleaded that CAC's business model took unreasonable advantage of its borrowers.

---

[13] *See* S. Rep. No. 111-176, at 172 (Apr. 30, 2010), https://www.congress.gov/congressional-report/111th-congress/senate-report/176/1 ("Current law prohibits unfair or deceptive acts or practices. The addition of 'abusive' will ensure that the Bureau is empowered to cover practices where providers unreasonably take advantage of consumers."); Pub. L. No. 111-203, pmbl. (listing, in the preamble to the Dodd-Frank Act, one of the purposes of the Act as "protect[ing] consumers from abusive financial services practices").

### III. THE COMPLAINT ADEQUATELY ALLEGES THAT CAC SUBSTANTIALLY ASSISTED DEALER DECEPTION

The CFPA prohibits any person from "knowingly or recklessly provid[ing] substantial assistance to a covered person or service provider" who violates the CFPA. 12 U.S.C. § 5536(a)(3). For the reasons stated below, Plaintiffs have stated a claim that CAC substantially assisted its dealers in deceiving consumers in the sale of add-on products.

### A. CAC can be liable for substantially assisting dealers even though the Bureau cannot exercise enforcement authority over dealers.

The plain language of the CFPA establishes that CAC can be held liable for substantially assisting its dealers' deceptive activity. The CFPA makes it unlawful for any person to knowingly or recklessly provide substantial assistance to a "covered person" or "service provider" who violates the CFPA. 12 U.S.C. § 5536(a)(3). Certain auto dealers are excluded from the Bureau's enforcement authority *against them*. *See* 12 U.S.C. § 5519(a). But they are not exempt from the CFPA's definitions of "covered persons" or "service providers." Here, dealers (and CAC) are "covered persons" because they "engage in offering or providing a consumer financial product or service," namely, vehicle loans. *See* 12 U.S.C. § 5481(6)(A) (definition of covered person); § 5481(5) (consumer financial product or service includes any enumerated financial product or service offered or provided to consumers primarily for personal, family, or household purposes); § 5481(15)(A)(i) (extending credit is a financial product or service). Dealers are also "service providers" because they "provide[] a material service to a covered person [namely, CAC] in connection with the offering or provision by such covered person of a consumer financial product or service." *See* 12 U.S.C. § 5481(26).

Plaintiffs have adequately alleged that CAC-affiliated dealers provide material services to CAC by: (i) directly advertising CAC and its financing to consumers, (Compl.

¶¶ 90, 93-94, 218); (ii) facilitating borrowers' entry into CAC-generated loan agreements, (*id.* ¶¶ 33, 46-48, 51-52, 218); and (iii) selling add-on products to borrowers which CAC must approve and from which CAC profits (*id.* ¶¶ 7, 113, 117, 121). CAC does not dispute that the Complaint adequately alleges facts showing that its affiliated dealers are covered persons and service providers under the CFPA. [14]

Through the Bureau's explicit authority under the CFPA, Plaintiffs have established all the required statutory elements to bring a claim against CAC for substantially assisting dealers in deceiving consumers about add-on products. *See* 12 U.S.C. § 5536(a)(3). Nothing cited by CAC suggests otherwise.[15]

## B. The Complaint alleges that CAC substantially assisted its dealers in deceptively selling expensive add-on products to consumers.

To state a claim for substantial assistance under the CFPA, Plaintiffs must plead (i) a primary violation by CAC-affiliated dealers, (ii) CAC's substantial assistance, and (iii) knowing or reckless conduct by CAC. In *RD Legal*, the court applied the standard used in securities fraud cases to the substantial assistance element: "the Government must establish that the aider and abettor in some sort associated himself with the venture, that he participated in it as something he wished to bring about, and that he sought by his action to make it succeed." 332 F. Supp. 3d at 772 (citations omitted).

---

[14] CAC has abandoned its arguments that Plaintiffs must bring an action against the CAC-affiliated dealers who committed the primary violation (as there is no such requirement in the CFPA) and that because dealers face no liability under the CFPA, CAC cannot be held liable for deceptive dealer conduct. *Compare* (ECF No. 35 at 39-40) *with* (Mot. 38-39). If CAC attempts to reanimate these specious arguments, Plaintiffs incorporate by reference its prior opposition. (ECF No. 53 at 36-38)

[15] If CAC is correct that the Bureau has no authority to bring this claim against a covered person subject to the CFPA, CAC or any similarly situated covered person can violate the CFPA by offering and providing any unfair, deceptive, or abusive product or service and launder those violations through dealers. That has never been the case and was not contemplated by Congress. 156 Cong. Rec. S5902-01, S5911 (Sen. Brownback stating: "And the provisions of my [dealer exclusion] amendment keep auto loans convenient and affordable *while retaining existing consumer protection laws and policies*.") (emphasis added).

"Courts have found that the substantial assistance doctrine does not impose a demanding standard." *CFPB v. D & D Mktg*., No. 15 Civ. 9692, 2016 WL 8849698, at *12 (C.D. Cal. Nov. 17, 2016). Rather, the law requires that assistance only be "more than mere casual or incidental dealing with" the primary violator "unrelated to the violation." *Id. (citing FTC v. Consumer Health Benefits Ass'n*, No. 10 Civ. 3551, 2011 WL 3652248, at *5 (E.D.N.Y. Aug. 18, 2011)); *see also CFPB v. Universal Debt & Payment Sols., LLC*, No. 15 Civ. 859, 2015 WL 11439178, at *13 (N.D. Ga. Sept. 1, 2015) ("innocuous business practices" can be substantial assistance "as long as the aider or abettor knows of or is reckless to the risk of the primary violation."). Here, Plaintiffs have adequately pleaded that CAC substantially assisted dealers' deceptive sales of add-on products.

### 1.  Dealers' conduct was deceptive.

A statement or omission is deceptive if it misleads, or is likely to mislead, a reasonable consumer, and is material. *RD Legal*, 332 F. Supp. 3d at 772-73 (citing *NDG Fin. Corp.*, 2016 WL 7188792 at *14). It is material if it is likely to affect a consumer's choice of, or conduct regarding, the product or service. *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 304 (S.D.N.Y. 2008). And express misrepresentations that are false are presumed material. *Id.*; *see also FTC v. Instant Response Sys., LLC*, No. 13 Civ. 976 ILG, 2015 WL 1650914, at *5 (E.D.N.Y. Apr. 14, 2015).

Plaintiffs have sufficiently alleged a primary violation: CAC-affiliated dealers misled consumers into purchasing add-on products with material statements and omissions. First, Plaintiffs pleaded that CAC-affiliated dealers didn't tell consumers that add-on products were voluntary. (Compl. ¶¶ 11, 129, 219.) Second, CAC-affiliated dealers falsely told consumers that add-on products were a condition of financing and were required to make the deal. (*Id.* ¶¶ 129, 221.) Third, CAC-affiliated dealers hid the terms

of the loan contracts as they controlled the computer mouse during the loan process so that consumers were unable to read the contract before signing. (*Id.* ¶¶ 132, 221.) And in further support of these allegations, Plaintiffs allege that consumers submitted more than a thousand complaints to CAC describing these three areas of dealer deceptive conduct. (*Id.* ¶¶ 129, 132.) Thus, contrary to CAC's assertions (Mot. 39), Plaintiffs' allegations are sufficient to establish that CAC-affiliated dealers deceptively sold these products to consumers.[16] *See, e.g.*, *CFPB v. Ocwen Fin. Corp.*, No. 17 Civ. 80495, 2019 WL 13203853, at *37 (S.D. Fla. Sept. 5, 2019), (denying motion to dismiss deception claim where Bureau alleged that defendants failed to disclose the material terms of add-on products); *TCF Nat'l Bank*, 2017 WL 6211033 at *3 (denying motion to dismiss where Bureau alleged that, despite provision of written notice, bank employees deceptively enrolled consumers in overdraft protection plan).

It is of no moment that consumers signed contracts that said the purchase of the add-on products were optional or were not a condition of financing. (Mot. 39.) Courts have consistently rejected the argument that a later writing can excuse deceptive behavior. *See CFPB v. Gordon*, 819 F.3d 1179, 1194 (9th Cir. 2016) (granting summary judgment in favor of the Bureau on deception claim where court noted "[a] later corrective written agreement does not eliminate a defendant's liability for making deceptive claims in the first instance"); *FTC v. Fleetcor Techs., Inc.*, No. 19 Civ. 5727,

---

[16] Even if the court were to determine that the case cited by CAC, *Lorenzo v. SEC*, 587 U.S. 71, 84 (2019), which dealt with a securities law, requires that the primary violator "could [] be held liable" in order to assert a substantial-assistance claim, that requirement would be met here: the CFPA allows states and other governmental agencies to bring an action against dealers, the primary violators. 12 U.S.C. § 5552(a)(1) (providing that state AG may bring a civil action under the CFPA); *see* Authority of States to Enforce the Consumer Financial Protection Act of 2010, 87 Fed. Reg. 31940, 31940-01 (May 26, 2022) (dealer exemption applies to the Bureau only and not states). *See also Calderone v. Sonic Houston JLR, L.P.*, 879 F.3d 577, 580-81 (5th Cir. 2018) (Department of Labor can sue dealers for CFPA violations).

2022 WL 3273286, at *12 (N.D. Ga. Aug. 9, 2022) ("But post-hoc disclosures cannot cure earlier misleading representations.") (citations omitted); *see also FTC Policy Statement on Deception*, Fed. Trade Comm. (Oct. 14, 1983) ("[T]he law may be violated even if the truth is subsequently made known to the purchaser."). Notably, Plaintiffs pleaded that many CAC borrowers did not have an opportunity to read the contracts beforehand. (Compl. ¶ 132.) CAC's citation to one inapposite case, *Salvate v. Auto. Restyling Concepts, Inc.*, No. 13 Civ. 2898, 2014 WL 6901788 (D. Minn. Dec. 5, 2014), does not change the law here, particularly where that case concerned a TILA claim and fraud claims that hinged on an analysis of whether the plaintiff could establish reasonable reliance, which is not an element of the claims here.

### 2. CAC substantially assisted dealers in deceptively selling add-on products.

Plaintiffs also have sufficiently pleaded that CAC substantially assisted its dealers in deceptively selling add-on products to consumers because they allege that CAC participated in the venture as something it wished to bring about. *RD Legal Funding, LLC*, 332 F. Supp. 3d at 772 (citation omitted). As to participation, Plaintiffs allege:

- CAC created the system used by dealers to offer the add-on products to consumers (Compl. ¶¶ 113, 118-19) and requires dealers to use it (*id.* ¶ 33).

- CAC mandates the products that could be sold and selected the third-party administrator. (*Id.* ¶ 119.)

- CAC drafts the contract templates (*id.* ¶ 120) and does not allow dealers to alter the documentation generated by CAC's systems (*id.* ¶ 50).

38

- CAC trains dealers and provides operational guidelines on how to sell add-on products, including how to explain the products to borrowers and how to respond to borrower questions. (*Id.* ¶¶ 90, 121.)

- CAC offers clear financial incentives to dealers who include add-on products in the loans, including by showing dealers the profit they would receive in the CAPS system if they included one or both products. (*Id.* ¶¶ 122-26.)

- CAC assigns ratings to dealers based, in part, on how many add-ons they sell, and those ratings affect dealers' future profits. (*Id.* ¶¶ 122-27.)

And as to CAC's desire to see the venture—that is, the sale of profitable add-on products—succeed, Plaintiffs allege:

- CAC encourages its dealers to use an e-sign system despite numerous consumer complaints indicating that this method impeded their ability to review the contract documents. (*Id.* ¶¶ 131-32, 221.)

- CAC ignored consumer complaint trends about its dealers requiring borrowers to purchase add-on products in connection with their loans. (*Id.* ¶¶ 129-30, 221.)

- CAC frequently fails to penalize or reprimand dealers that improperly required borrowers to purchase add-on products. (*Id.* ¶ 135.)

- And CAC profits on the add-ons sold to consumers. (*Id.* ¶¶ 115-17.)

These allegations are more than sufficient to infer substantial assistance. *See, e.g.*, *D & D Mktg.*, 2016 WL 8849698 at *13 (denying motion to dismiss substantial-assistance claim because of plausible inference that defendant was "more than incidentally involved in [the primary violator's] business."); *Universal Debt*, 2015 WL 11439178 at

*13 (denying motion to dismiss substantial-assistance claim against company that approved applications and processed payments for debt-collector).

CAC ignores all these facts, focuses on a few others—for example that CAC financed the add-ons—and argues that its chosen facts, each in isolation, would not by itself establish substantial assistance. (Mot. 40-41.) Plaintiffs do not rely on CAC's cited facts in isolation, but rather on all the above-cited facts in totality.

### 3. CAC's conduct was knowing and reckless.

Plaintiffs have adequately alleged that CAC's conduct was either knowing or reckless. Plaintiffs claim that CAC knew of its dealers' ongoing deception because CAC received more than one thousand complaints from consumers about misrepresentations related to the sale of add-on products. Consumers told CAC that they did not receive a copy of their agreement showing the material terms, (*id.* ¶ 133), they were unable to control the mouse during the e-sign process (and thus were unable to read the application at their leisure), (*id.* ¶¶ 129, 221), and dealers told them they were required to purchase add-on products or did not tell them that add-on products were included in the contract, (*id.* ¶¶ 129, 221, 129). Despite this knowledge of these complaints, CAC frequently fails to take corrective action against dealers. (*Id.* ¶¶ 134-135.)

Plaintiffs also allege that CAC acted unreasonably and in a manner that was an extreme departure from the standards of ordinary care by creating a system that incentivized packing add-on products into loans.[17] It assigned ratings to dealers based,

---

[17] In *RD Legal*, the court defined recklessness as an "extreme departure from the standards of ordinary care," 332 F. Supp. 3d at 772; however, other courts have applied the plain meaning of recklessness to the CFPA. *See D & D Mktg.*, 2016 WL 8849698 at *12 (Recklessness means "an unjustifiably high risk of harm that is either known or so obvious that it should be known."); *see also, e.g.*, Restatement (Third) Torts § 2 (stating that a person acts recklessly where they "know[] of the risk of harm created by the conduct or know[] facts that make the risk obvious to another in the person's situation"). Based on the

in part, on selling add-on products, and those ratings affected dealers' subsequent profits from CAC transactions. (*Id.* ¶¶ 122-27.) In addition, CAC's computer system shows dealers the profit they would receive if they added the products to the vehicle sale. (*Id.*) CAC knew that almost 90% of its loan agreements contained an add-on. (*Id.* ¶ 128.) And, as noted above, CAC ignored the consumer complaints about add-on products, even though it kept track of the high volume of add-on products sold and did nothing to penalize or reprimand dealers even when presented with complaints. (*Id.* ¶¶ 127, 135, 222.) This is more than sufficient at this stage. *See Universal Debt*, 2015 WL 11439178 at *9 (finding a defendant's "ignoring obvious signs . . . of fraud" highly unreasonable and "an extreme departure from the standards of ordinary care").

CAC argues that it had no duty with respect to dealers' deceptive conduct because its agents are not present at the dealership when these deceptive acts take place and courts have rejected a "duty of inquiry" on indirect auto finance companies. (Mot. 42.) But the cases cited by CAC relate to whether assignees were liable for alleged deficiencies in TILA disclosures,[18] and as shown above, CAC cannot use TILA's assignee provisions to shield itself in this action. Here, in contrast, Plaintiffs allege liability for CAC's substantial assistance in dealers' deception, which is not an analogous claim. Nor can deceptive acts be papered over by a later writing. *See* above Section III.B.1.

Finally, CAC suggests that it cannot be held liable because it does not own or manage the primary violator's business. (Mot. 43.) But a substantial assistance claim is

---

alleged facts, the Complaint establishes a plausible claim that CAC's conduct was reckless under any standard.

[18] *See* Mot. 43 (citing *Green v. Levis Motors, Inc.*, 179 F.3d 286, 295 (5th Cir. 1999) (finding no TILA violation by assignee where the violation was not apparent on the face of the contract); *Ellis v. Gen. Motors Acceptance Corp.*, 160 F.3d 703, 709-10 (11th Cir. 1999) (same)).

not limited to "owners and officers" of the primary violator. *See* 12 U.S.C. § 5536(a)(3) (prohibiting "any person" from substantially assisting); *CFPB v. Universal Debt & Payment Sols., LLC*, No. 15 Civ. 859, 2019 WL 1295004 at *11 (N.D. Ga. Mar. 21, 2019) (defendants were liable for substantial assistance under the CFPA even though they were not officers or owners of the companies at issue); *see also SEC v. Apolant*, 411 F. Supp. 2d 271, 278 (E.D.N.Y. 2006) (denying motion to dismiss aiding and abetting claim where defendant received shares in exchange for services as a "creative writer").

Because Plaintiffs have established every element of a claim for substantial assistance, the Motion should be denied as to the seventh cause of action.

## IV.    THE BUREAU'S FUNDING IS LAWFUL.

Defendant again tries to change the subject from its violations to the Bureau's funding, this time claiming that the Bureau cannot receive funds when the Federal Reserve System is "operating at a deficit." ECF No. 75 at 43-44. But the Bureau is funded from the Federal Reserve's "combined earnings." 12 U.S.C. § 5497(a)(1). That means the Federal Reserve's income—not what is left of that income after paying expenses and other obligations. *See, e.g.*, *Earnings*, Black's Law Dictionary (12th ed. 2024) ("Revenue gained from labor or services, from the investment of capital, or from assets. See INCOME."). Indeed, by statute the Federal Reserve first pays "all necessary expenses," 12 U.S.C. § 289(a)(1)(A)—a category that includes the Bureau's budget[19]—and then other obligations (such as dividends to shareholders) *before* remitting the rest to Treasury, *see id.* § 289(a)(3)(B). The Federal Reserve continues to generate billions of

---

[19] *See* 12 U.S.C. § 5497(a)(1) (requiring that the Federal Reserve Board make transfers to fund the Bureau); *id*. § 243 (providing that the Board draws its funds via assessments on the Federal Reserve Banks).

dollars in income each year.[20] The Bureau is validly funded from those earnings.

Defendant's barely developed counterargument is wrong. It finds no support in *CFPB v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416 (2024), which *upheld* the Bureau's funding. That decision did not interpret the term "earnings." It merely noted, when addressing the "threshold" question of whether the Bureau's funding is even "subject to the requirements of the Appropriations Clause"—which applies to money "drawn from the Treasury"—that by statute, excess earnings of the Federal Reserve are "deposited in the general fund of the Treasury." *Id.* at 425. That is not in dispute. It also sheds no light on the meaning of "earnings" in Section 5497. Defendant does not otherwise attempt to defend its wholly implausible interpretation, which if accepted would seem to mean that the Congress that created the Bureau set up the new agency so that it would be intermittently and unexpectedly defunded. *But see* S. Rep. No. 111-176, at 163 (2010) (describing "the assurance of adequate funding" as "absolutely essential" for the Bureau).

## V.    THE MOTION DOES NOT PROVIDE ANY INDEPENDENT BASES TO DISMISS OR LIMIT PLAINTIFF OAG'S STATE LAW CLAIMS

Plaintiff OAG also alleges that CAC (i) is liable under New York's Executive Law for use of unconscionable contracts, (ii) violated New York's disclosure laws, (iii) is liable for dealers' deceptive conduct as the holder of the loans, and (iv) violated New York's securities law. The Motion fails to show why these claims should be dismissed.

---

[20] *See, e.g.*, Federal Reserve, *Federal Reserve Board announces preliminary financial information for the Federal Reserve Banks' income and expenses in 2023* (Jan. 12, 2024) (reporting that the Federal Reserve's interest income on securities alone "totaled $163.8 billion in 2023"), https://www.federalreserve.gov/newsevents/pressreleases/other20240112a.htm.

A. **The Complaint adequately alleges claims for fraud based on CAC's deceptive acts and its use of unconscionable contracts.**

Count three sets forth Plaintiff OAG's claim under Executive Law § 63(12) for fraud, which is primarily based on CAC's deceptive lending practices and its promises of financial benefits that it knows consumers will not obtain, as discussed in Section I.

In addition, the Executive Law defines fraud to include "unconscionable contract provisions." Exec. Law. § 63(12); *see People v. N. Leasing Sys., Inc.*, 169 A.D.3d 527, 530 (N.Y. App. Div. 2019) ("Insofar as it is based on unconscionable contract terms, the Executive Law § 63(12) claim states a cause of action."). Under New York law, contracts that are "contrary to public policy" are unconscionable and thus void. *Szerdahelyi v. Harris*, 67 N.Y.2d 42, 48 (1986). Here, Plaintiff OAG alleges that CAC loan agreements are unconscionable because they "conceal the true interest rate" while charging "interest rates that exceed New York's criminal interest rate caps." (Compl. ¶ 192.)

New York's usury laws reflect its longstanding policy "to protect desperately poor people from the consequences of their own desperation." *Schneider v. Phelps*, 41 N.Y.2d 238, 243 (N.Y. 1977); *see United States v. Moseley*, 980 F.3d 9, 22 (2d Cir. 2020) ("[W]e identify a longstanding public policy in New York in favor of enforcing its usury laws to protect those of its residents who enter into consumer debt contracts.").

CAC argues that its loans are not subject to usury laws based on the time-price doctrine and the Motor Vehicle Retail Installment Sales Act ("MVRISA"). (Mot. 44-46.) But this misses the point. Plaintiff OAG has not asserted violations of civil usury. And CAC's discussion of the 1980 amendments to the MVRISA does not speak to criminal liability. *See* N.Y. Dep't of Fin. Serv., *General Obligation Law 5-501*, *available at* https://www.dfs.ny.gov/legal/interpret/ lo110314.htm (analogous Banking Law

44

Sections permitting lenders to make loans "at a greater interest than . . . permitted" allow rates in excess of civil usury but do not permit violation of penal caps because "a greater rate . . . is not an illegal one"). Nor does *CAC v. Traylor*, which involved an interest rate below 25%. 2024 WL 2273522 (N.Y. Sup. Ct. May 10, 2024). By contrast, in *CAC v. Holness*, a New York court held that CAC entered into "sham" usurious contracts as a "wolf" that "comes as a wolf." 80 Misc. 3d 346, 352 (N.Y. Sup. Ct. 2023), *overruled on other grounds*, 81 Misc. 3d 133(A) (N.Y. App. Term 2023) (holding without comment on substantive holding below that the "usury defense . . . was not raised").

As the Second Circuit has observed, New York's "legislation of a felony usury offense" is "particularly persuasive in demonstrating that the New York legislature considers usury to be a matter of serious public concern." *Moseley*, 980 F.3d at 21. Thus, if CAC wishes to impose rates that exceed the 25% penal cap and seek refuge in the time-price doctrine, it must be forthright about doing so to permit consumers to consider whether to accept criminal rates of interest and to permit New York financial regulators to evaluate CAC's practices. *See* N.Y. Dep't of Fin. Servs., *Maximum Rate of Interest - Auto Loans* (Aug. 13, 2009), *available at* https://www.dfs.ny.gov/legal/interpret/lo090813.htm (opining that maximum rate bank may charge for auto loans is 25%). Indeed, the time-price doctrine imposes this same requirement: to disclose "a sum in cash equal to the sum he is willing to sell for being paid in hand" *and* a "price on time." *Books v. Avery*, 4 N.Y. 225, 229 (N.Y. 1850). Here, however, CAC loans contain inflated selling prices that do not accurately reflect the true cash "in hand" for which dealers would sell the vehicles. By depriving consumers of the ability to make informed choices while simultaneously imposing interest in excess of the Penal Law, CAC's loans are unconscionable and void as a matter of New York policy. (*See* Compl. ¶ 192.)

45

Finally, while the Court need not reach the issue to resolve the Motion, CAC's reliance on *Garcia* (Mot. 45) misses the mark. *Garcia* does not discuss the Penal Law at all, and for good reason: the "26.32%" interest rate that CAC quotes is a typo; the actual "23.67%" rate is correctly stated in the opinion's recitation of facts, *Garcia*, 2016 WL 5719792 at *2, and appears on the loan itself, *Garcia*, No. 15 Civ. 5949 (S.D.N.Y.), ECF No. 32-1. Moreover, the 1980 amendments expressly stated that they were not intended to authorize rates above the Penal Law "in connection with the type of transactions to which such sections of the penal law previously applied." 1980 Laws of N.Y., ch. 883 § 96. Indeed, CAC carefully avoids disclosing APRs above 25% (Compl. ¶ 24)—though, as alleged, those APRs systematically understate the true cost of credit. *See* Section I. Finally, CAC's other "new" authority—*Flatbush*, a 1961 opinion—was written four years *before* enactment of the criminal usury statute. 1965 Laws of N.Y., ch. 328.

## B. The Complaint alleges liability for CAC's repeated violations of New York's Motor Vehicle Retail Instalment Sales Act.

In count six, Plaintiff OAG alleges that CAC is liable under the Executive Law for repeated violations of the MVRISA based on two false disclosures: inflated selling prices (*id.* ¶ 211) and a credit service charge that does not reflect the inflation (*id.* ¶ 210). On selling prices, CAC's response—that the MVRISA disclosures must track disclosures set forth in TILA (Mot. 46)—is of no consequence, as the Complaint alleges that the "cash sale price" is the same as the TILA "cash price" (Compl. ¶¶ 146, 148), and the true cash price is Dealer Compensation. (*Id.* ¶ 211.) On the credit service charge, CAC argues that New York law does not require disclosure of "all fees imposed by a lender" (Mot. 46)—but Plaintiff OAG is not seeking such disclosure. Rather, count six is based on alleged inflation in vehicle selling prices based on credit status, making the inflation a finance

46

charge under TILA and a credit service charge under New York's MVRISA that must be disclosed as such. (*See* Compl. ¶ 210.) As described in detail above, the Complaint adequately alleges facts sufficient to support such a claim. *See* Section I.B.2.

Nor do TILA's assignee provisions limit CAC's liability. As noted above, Plaintiff OAG seeks to hold CAC liable for its direct participation in the hidden finance charge scheme, as CAC controls the form and content of the disclosures, and not by virtue of its legal status. (Compl. ¶¶ 32-33, 38, 50-54, 73, 112, 211-12.) Moreover, though the Court need not reach the issue, Plaintiff OAG has pled that CAC is a creditor and not merely an assignee in its loan transactions. In particular, "TILA establishes a straightforward, objective inquiry for determining the identity of the creditor: it is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the" loan agreement. *Vincent v. The Money Store*, 736 F.3d 88, 106 (2d Cir. 2013). The Complaint alleges that CAC's unique New York loan agreements (Compl. ¶ 142) define the terms "us" and "we" to include CAC as of their execution (*id.* ¶ 137), and that, as a result, "borrowers' contractual obligations to CAC are immediate" (*id.* ¶¶ 140-41), even though the legal assignment of the loan takes place later (*id.* ¶¶ 138-39). Plaintiff OAG thus has alleged that CAC is an entity to whom a borrower's debt is initially payable.

## C. CAC is independently liable for dealer misconduct as the holder of the consumer loan agreements.

In counts three, four and five, Plaintiff OAG alleges that CAC is liable for conduct of its dealers by virtue of the "Holder Rule." The Holder Rule requires consumer contracts to include disclosures that state that any purchaser of that contract is "subject to all claims and defenses" that the consumer "could assert against the seller of goods or

services obtained." 16 C.F.R. § 433.2. The Complaint alleges—and CAC does not dispute—that CAC loan agreements contain such disclosures. (Compl. ¶ 153.)

The Holder Rule "compels creditors to either absorb seller misconduct costs or return them to sellers," thereby discouraging "predatory practices and schemes." Preservation of Consumers' Claims and Defenses, 40 Fed. Reg. 53506, 53523 (Nov. 18, 1975); *see Simpson v. Anthony Auto Sales, Inc.*, 32 F. Supp. 2d 405, 409 (D. La. 1998) (Holder Rule "designed to reallocate the cost of seller misconduct to the creditor"). Thus, CAC's argument that Plaintiff OAG cannot invoke the rule because it seeks redress "for the 'acts and practices of . . . *dealers*,' and not those of" CAC (Mot. 48) is nonsensical: the entire purpose of the Holder Rule is to permit a consumer (or, here, Plaintiff OAG) to hold a creditor (CAC) liable for a sellers' (dealers') wrongdoing. *See People v. College Network, Inc.*, Index No. 2978-15, 2016 WL 6330584, at *6 (N.Y. Sup. Ct. Aug. 19, 2016) (finding argument that OAG "lacks standing to obtain relief for consumers based on the 'Holder Rule'" to be "without merit").

The Motion argues without citation to any authority that Plaintiff OAG is not empowered to invoke the Holder Rule because Executive Law § 63(12) and GBL § 349 do not provide a textual basis to do so. (Mot. 48-49.) Not so. In fact, both the Executive Law and General Business Law empower Plaintiff OAG to bring actions on behalf "of the people" and to seek restitution, among other relief. N.Y. Exec. Law § 63(12); N.Y. G.B.L. § 349(b). Thus, a central purpose of these laws is to empower Plaintiff OAG to bring claims on behalf of consumers so that they need not do so themselves. *See State v. Ford Motor Co.*, 136 A.D.2d 154, 158 (N.Y. App. Div. 1988) (OAG's authority to seek restitution is "a vehicle by which aggrieved consumers could recover the money which is due them without resorting to costly litigation"), *aff'd* 74 N.Y.2d 495 (1989).

48

For these same reasons, CAC's argument that the Holder Rule is inapplicable because consumers cannot bring claims under the Executive Law is meritless. The Executive Law is the vehicle through which Plaintiff OAG is empowered to seek broad equitable relief for injured consumers. *People v. Greenberg*, 27 N.Y.3d 490, 497-98 (N.Y. 2016). Here, consumers could pursue CAC for dealers' unlawful conduct via the Holder Rule. Plaintiff OAG can do the same through the Executive Law.

Finally, CAC's assertion (Mot. 49-50) that the Complaint does not adequately plead dealer misconduct is not supportable. The Complaint alleges that dealers sell poorly maintained vehicles that malfunction shortly after purchase, and then they fail to repair those vehicles, which often are repossessed. (Compl. ¶¶ 154(h), 194(c), 200(c), 205(c).) This is sufficient to provide notice of the grounds upon which the claim— frequent consumer complaints that dealers sold substandard vehicles and then failed to repair them—is based. Further, with respect to add-on products, the Complaint alleges in detail the process of selling add-on products and dealers' misconduct. (*Id*. ¶¶ 113-35.) CAC objects that the allegations are not specific to New York, but the Complaint is clear that the allegations are nationwide—which includes New York—and they are more than sufficient to describe dealers' deceptions. *See* Section III. Indeed, when there are relevant distinctions between nationwide and New York allegations, the Complaint makes that clear. (*See, e.g.*, *id*. ¶ 119 ("GAP is not available in New York").)

**D. Plaintiff OAG's Martin Act claim should not be dismissed.**

In count eight, Plaintiff OAG alleges that CAC violated the Martin Act by falsely representing to investors and others that CAC loans were made in compliance with all applicable laws. (*Id*. ¶¶ 155-70, 224-26.) CAC argues that this claim must be dismissed with the other claims (Mot. 50), but as shown above, Plaintiffs have adequately alleged

49

violations of state and federal laws. Moreover, CAC advances certain arguments (such as its invocation of TILA's assignee provisions) that, according to CAC, mean that it cannot be liable here but that do not reach the legality of the loans themselves. While these arguments are meritless, *see* Section I.B, even if accepted they do not require dismissal of count eight, as CAC is independently liable under the Martin Act for its false statements and omissions regarding its loans' lack of compliance with applicable laws.

## <u>CONCLUSION</u>

For the foregoing reasons, CAC's Motion should be denied in its entirety.

Dated:        September 27, 2024                    Respectfully submitted,

CONSUMER FINANCIAL                    LETITIA JAMES
PROTECTION BUREAU                     Attorney General of the State of New York

Eric Halperin                        By:  */s/ Christopher L. Filburn*
*Enforcement Director*               Christopher L. Filburn
                                     *Assistant Attorney General*
Richa Dasgupta                       Bureau of Consumer Frauds & Protection
*Deputy Enforcement Director*        28 Liberty Street, 20th Floor
                                     New York, New York 10005
Michael Posner                       Tel.: 212.416.8303
*Assistant Litigation Deputy*        Email: christopher.filburn@ag.ny.gov

By: */s/ Vanessa Buchko*             Of counsel:
Vanessa Buchko
Phillip Harris                       Jane M. Azia
Amy Mix                              *Bureau Chief*
*Enforcement Attorneys*
Consumer Financial Protection Bureau Laura J. Levine
1700 G Street, NW                    *Deputy Bureau Chief*
Washington, DC 20552
Telephone (Buchko): 202-295-7246
Telephone (Harris): 202-285-7439
Telephone (Mix): 202-256-1850
Fax: 202-435-7722
E-mail: Vanessa.Buchko@cfpb.gov
E-mail: Phillip.Harris@cfpb.gov
E-mail: Amy.Mix@cfpb.gov