# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF NEW YORK

---

|  |  |  |
|---|---|---|
| CONSUMER FINANCIAL PROTECTION BUREAU and THE PEOPLE OF THE STATE OF NEW YORK, by LETITIA JAMES, Attorney General of the State of New York, | : : : : : | Case No.: 1:23-cv-000038 (JHR) |
| Plaintiffs, | : : | |
| v. | : : | |
| CREDIT ACCEPTANCE CORPORATION, | : : | |
| Defendant. | : : | |

---

### *AMICUS CURIAE* REVISED BRIEF OF CONSUMER FEDERATION OF AMERICA, NATIONAL CONSUMER LAW CENTER, CONSUMER REPORTS, AND EMPIRE JUSTICE CENTER IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANT'S REVISED MOTION TO DISMISS

**Counsel for *Amici*:**

**Andrew W. Pizor, Bar No. AP4249**
John Van Alst (on brief)
Margot Saunders (on brief)
National Consumer Law Center
1001 Connecticut Ave, NW
Washington, DC 20036
apizor@nclc.org
202/452-6252 x104

**Erin Witte** (on brief)
Consumer Federation of America
1620 I St., NW, Suite 200
Washington, DC 20006

October 4, 2024

# TABLE OF CONTENTS

TABLE OF AUTHORITIES.................................................................................. ii

IDENTITY AND INTERESTS OF *AMICI CURIAE* ...................................................1

INTRODUCTION AND SUMMARY OF ARGUMENT ..........................................3

ARGUMENT .......................................................................................................3

    I.    The Complaint alleges that CAC exploits the needlessly complex and
        opaque auto sale and financing process to the detriment of highly
        vulnerable consumers...............................................................................5

        A.    Cars are essential but exorbitantly expensive for low-income
                consumers. ....................................................................................5

        B.    The existing complexity in the vehicle purchase and financing
                process is exacerbated by deceptive and abusive practices. .......................8

    II.    The Complaint has sufficiently alleged that CAC's conduct is unfair,
        abusive, and unconscionable...................................................................12

        A.    The CFPB Has authority to address abusive improvident lending...........13

        B.    Courts have repeatedly found improvident lending schemes to be
                illegal............................................................................................16

        C.    The court can consider the vulnerability of consumers and
                complexities of the law in evaluating abusiveness. ...................................18

        D.    CAC need not have communicated directly with consumers to be
                liable for the deception claims. ..............................................................20

    III.    Auto creditors do not need to resort to abusive and deceptive conduct to
        extend credit to credit-challenged, low-income consumers.................................22

        A.    Many auto creditors make loans to consumers like CAC's
                customers without engaging in the alleged misconduct. ..........................22

        B.    The loan failure rates pleaded in the Complaint are much higher
                than available data for other auto creditors................................................24

CONCLUSION....................................................................................................26

CERTIFICATE OF SERVICE .............................................................................28

# TABLE OF AUTHORITIES

## Cases

*Aquilina v. Certain Underwriters at Lloyd's,*
  465 F. Supp. 3d 1088 (D. Haw. 2020) ...................................................................... 19

*Carroll v. Fremont Inv. & Loan,*
  636 F. Supp. 2d 41 (D.D.C. 2009) ............................................................................. 16

*Colgate v. Juul Labs, Inc.,*
  402 F. Supp. 3d 728 (N.D. Cal. 2019) ...................................................................... 19

*Commonwealth v. Fremont Inv. & Loan,*
  897 N.E.2d 548 (Mass. 2008) .................................................................................... 18

*Consumer Fin. Prot. Bureau v. CashCall, Inc.,*
  2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) ......................................................... 19

*Consumer Fin. Prot. Bureau v. CashCall, Inc.,*
  Case No. 1:13-cv-13167-GAO (D. Mass. Mar. 21, 2014) ....................................... 19

*Consumer Fin. Prot. Bureau v. Credit Acceptance Corp.,*
  Case No. 1:23-cv-00038 (S.D.N.Y. Jan. 4, 2023) ...................................................... 4

*Consumer Fin. Prot. Bureau v. Credit Acceptance Corp.,*
  Case No. 1:23-cv-00038 (S.D.N.Y. Mar. 21, 2023) ................................................. 22

*Consumer Fin. Prot. Bureau v. Credit Acceptance Corp.,*
  Case No. 1:23-cv-00038 (S.D.N.Y. Mar. 14, 2023) ................................................... 4

*Consumer Fin. Prot. Bureau v. Golden Valley Lending, Inc.,*
  Case No. 1:17-cv-03155 (N.D. Ill. Apr. 27, 2017) .................................................... 19

*Consumer Fin. Prot. Bureau v. NDG Fin. Corp.,*
  2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) , *reconsideration denied,*
  2016 WL 7742784 (S.D.N.Y. Dec. 19, 2016) .................................................... 19, 20

*Consumer Fin. Prot. Bureau v. NDG Fin. Corp.,*
  No. 1:15-cv-05211-CM (S.D.N.Y. Feb. 1, 2019) ..................................................... 19

*Consumer Fin. Prot. Bureau v. RD Legal Funding, L.L.C.,*
  332 F. Supp. 3d 729 (S.D.N.Y. 2018) , *aff'd in part on other grounds, rev'd in part on*
  *other grounds,* 828 Fed. Appx. 68 (2d Cir. 2020), *on remand,* 592 F. Supp. 3d 258
  (S.D.N.Y. Mar. 16, 2022), *abrogated on other grounds by* Consumer Fin. Prot.
  Bureau v. Law Offices of Crystal Moroney, P.C., 63 F.4th 174 (2d Cir. 2023) ...................... 20

*Consumer Fin. Prot. Bureau v. Think Fin., L.L.C.*,
   2018 WL 3707911 (D. Mont. Aug. 3, 2018) ........................................................ 19

*Consumer Protection Bureau v. Colfax Capital Corp.*,
   CFPB No. 2014-CFPB-0009 (July 29, 2014) ....................................................... 19

*Coveal v. Consumer Home Mortg., Inc.*,
   2005 WL 704835 (E.D.N.Y. Mar. 29, 2005) ........................................................ 17

*De La Torre v. CashCall, Inc.*,
   422 P.3d 1004 (Cal. 2018) .................................................................................... 17

*Drakopoulos v. U.S. Bank*,
   991 N.E.2d 1086 (Mass. 2013) ............................................................................ 16

*Fed. Trade Comm'n v. Keppel & Bros.*,
   291 U.S. 304, 54 S. Ct. 423, 78 L. Ed. 814 (1933) .............................................. 19

*Findlay v. Cardwell*,
   2013 WL 12343710 (D.D.C. May 16, 2013) ........................................................ 16

*Forsythe Fin., L.L.C. v. Yothment*,
   2022 WL 3330471 (Ohio Ct. App. Aug. 12, 2022) .............................................. 17

*Frappier v. Countrywide Home Loans, Inc.*,
   645 F.3d 51 (1st Cir. 2011) , *on remand*, 2013 WL 1308602 (D. Mass. Mar. 31, 2013),
   *aff'd*, 750 F.3d 91 (1st Cir. 2014), *cert. denied*, 574 U.S. 827, 135 S. Ct. 179,
   190 L. Ed. 2d 51 (2014) ....................................................................................... 16

*FTC v. Med. Billers Network, Inc.*,
   543 F. Supp. 2d 283 (S.D.N.Y. 2008) .................................................................. 20

*Gilroy v. Kasper*,
   2008 WL 591049 (D.N.H. Mar. 3, 2008) ............................................................ 15

*Haymer v. Countrywide Bank*,
   2011 WL 2790172 (N.D. Ill. July 15, 2011) , *clarified by* 2011 WL 3205365
   (N.D. Ill. July 28, 2011) ....................................................................................... 16

*Hughes v. Abell*,
   634 F. Supp. 2d 110 (D.D.C. 2009) ..................................................................... 17

*In re Donohue*,
   2020 WL 419727 (Bankr. N.D. Cal. Jan. 27, 2020) ............................................ 17

*Johnson v. NovaStar Mortg., Inc.*,
   698 F. Supp. 2d 463 (D.N.J. Mar. 15, 2010) ............................................................ 16

*Kaur v. World Business Lenders, L.L.C.*,
   440 F. Supp. 3d 111 (D. Mass. 2020) ...................................................................... 18

*Moronta v. Nationstar Mortg., L.L.C.*,
   41 N.E.3d 311 (Mass. App. Ct. 2015) ..................................................................... 16

*Opportunity Management Co. v. Frost*,
   1999 WL 96001 (Wash. Ct. App. Feb. 16, 1999), *review denied*, 989 P.2d 1137
   (Wash. 1999) ........................................................................................................... 17

*Orcilla v. Big Sur, Inc.*,
   198 Cal. Rptr. 3d 715 (Cal. App. Ct. 2016) ............................................................ 16

*Schwartzbaum v. Emigrant Mortg. Co.*,
   2010 WL 2484181 (S.D.N.Y. Apr. 22, 2010) ......................................................... 16

*Solomon v. Falcone*,
   791 F. Supp. 2d 184 (D.D.C. 2011) ........................................................................ 16

*Till v. SCS Credit Corp.*,
   541 U.S. 465, 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004) ...................................... 10

*Vaughn v. Consumer Home Mortg., Inc.*,
   2003 WL 21241669 (E.D.N.Y. Mar. 23, 2003) ...................................................... 17

*Williams v. First Gov't Mortg. & Investors Corp.*,
   225 F.3d 738 (D.C. Cir. 2000) ................................................................................ 16

*Young v. Bank of N.Y. Mellon*,
   848 F. Supp. 2d 1182 (D. Haw. 2012) .................................................................... 16

**Statutes**

12 U.S.C. § 5531 .......................................................................................................... 13

Consumer Financial Protection Act of 2010 ("CFPA") ............................................... 15

New York Executive Law ("EL") § 63(12) .................................................................. 16

New York General Business Law ("GBL") § 349 ........................................................ 16

Other Authorities

Brian Bucks & Karen Pence, Fed. Reserve Board, Do Homeowners Know Their House Values and Mortgage Terms? (2006) .......................................................................... 11

CFPB Consumer Laws and Regulations ..................................................................... 11

Raj Chetty & Nathaniel Hendren, Harvard University and NBER, *The Impacts of Neighborhoods on Intergenerational Mobility: Childhood Exposure Effects and County-Level Estimates* (May 2015) ............................................................................ 5

Jasper Clarkberg, Jack Gardner, & David Low, Consumer Fin. Prot. Bureau, Data Point: Subprime Auto, Loan Outcomes by Lender Type, Data Point No. 2021-10 (Sept. 2021) ........ 23

Consumer Fed'n of Am., Lower-Income and Minority Consumers Most Likely to Prefer and Underestimate Risks of Adjustable Mortgages (July 26, 2004) ......................... 11

Consumer Fin. Prot. Bureau, Consumer Voices on Automobile Financing (June 2016).............. 10

Cox Automotive, Data Point, *Spring Selling Season Kicks off Early with Used-Vehicle Supply Low* (Mar. 17, 2023) ........................................................................................ 6

Ben Eisen & Gina Heeb, *More Auto Payments Are Late, Exposing Cracks in Consumer Credit*, The Wall St. J., Feb. 18, 2023 .......................................................................... 25

Federal Reserve Bank of N.Y., Research & Statistics Group, Quarterly Report on Household Debt and Credit 2023: Q1 (May 2023) ................................................... 25

Federal Trade Comm'n, Motor Vehicle Dealers Trade Regulation Rule, Notice of Proposed Rulemaking, 87 Fed. Reg. 42,012, 42,012-42,013 (July 13, 2022)............................ 8

Finra Investor Educ. Found., Financial Capability in the United States—2012 Report of National Findings (May 2013), .............................................................................. 11

Adam Hardy, Money, *Who Gets the Option to Work From Home? There's a Huge Disparity Tied to Income* (June 27, 2022) .................................................................. 7

Inclusiv, CDFI Credit Unions Build Inclusive Economies (Spring 2021).................................... 24

Ryan Kelly, Chris Kukla, Ben Litwin, & Ashwin Vasan, Consumer Fin. Prot. Bureau Blog, Enhancing Public Data on Auto Lending (Nov. 17, 2022) ............................................. 25

David A. King, Michael J. Smart, & Michael Manville, *The Poverty of the Carless: Toward Universal Auto Access,* 42(3) Journal of Planning Education and Research 464 (Feb. 2019) ................................................................................................................. 5

Amy Loftsgordon, Nolo, Understanding the Foreclosure Crisis ................................................... 15

Annamaria Lusardi & Olivia S. Mitchell, *Baby Boomer Retirement Security: The Roles of Planning, Financial Literacy, and Housing Wealth*, 54 J. Monetary Econ. 205 (2007) ........... 10

Annamaria Lusardi & Olivia S. Mitchell, *Financial Literacy and Planning: Implications for Retirement Wellbeing*, Pension Research Council, Working Paper No. 1 (2006)................ 10

Jonathan C. Martinez, Jeanne M. Clark, & Kimberly A. Gudzune, Preventive Medicine Reports, *Association of Personal Vehicle Access With Lifestyle Habits and Food Insecurity Among Public Housing Residents* (Mar. 2019) ........................................................ 5

Patricia A. McCoy, Rethinking Disclosure in a World of Risk-Based Pricing, 44 Harv. J. on Legis. 123 (2007)................................................................................................................ 12

Macro Int'l Inc., Design and Testing of Effective Truth in Lending Disclosures 52 (2007)........ 10

MacroTrends, Credit Acceptance Market Cap 2010-2023/CACC .............................................. 26

Danna Moore, Wash. State Univ., Soc. & Econ. Sci. Research Ctr., Tech. Rep. No. 03-39, Survey of Financial Literacy in Washington State: Knowledge, Behavior, Attitudes, and Experiences (2003)................................................................................................................. 10

New York State Dep't of Fin. Servs. Hearing on Consumer Protection (Feb. 2020) (testimony of Daniel Apfel, Chief Operating Officer of Genesee Co-op Federal Credit Union)...................................................................................................................................... 24

Jessica Samega & Melissa Kollar, United States Census Bureau, Income in the United States 2021, at Fig. 1 (Sept. 13, 2022)........................................................................................ 6

United States Dep't of Justice, Press Release, Deutsche Bank Agrees to Pay $7.2 Billion for Misleading Investors in its Sale of Residential Mortgage-Backed Securities (Jan. 17, 2017) ..................................................................................................................... 15

United States Dep't of the Treasury, Community Development Financial Institutions Fund.......................................................................................................................................... 23

Melinda Zabritsky, Experian, Automotive Industry Insights: Finance Market Report Q4 2020 (Mar. 2021) ..................................................................................................................... 25

Melinda Zabritsky, State of the Automotive Finance Market Q4 2017 (Mar. 2018)................... 25

Zhengfeng Guo, Yan Zhang, & Xinlei Zhao, Office of the Comptroller of the Currency, *A Puzzle in the Relation Between Risk and Pricing of Long-Term Auto Loans* (June 2020).......... 7

## IDENTITY AND INTERESTS OF *AMICI CURIAE*

This brief is submitted by Consumer Federation of America, the National Consumer Law Center on behalf of its low-income clients, Consumer Reports, and Empire Justice Center. Each party advocates for consumer protections in auto- and credit-related issues, particularly for low-income consumers and consumers of color, and has extensive knowledge and expertise regarding the consumer experience of purchasing and financing a motor vehicle.

Consumer Federation of America (CFA) is a national association of over 250 nonprofit organizations that advances the consumer interest through research, advocacy, education, and service. CFA investigates consumer issues and publishes research that assists policymakers and individuals, and it advances pro-consumer legislation at the national and state levels. CFA has worked with federal and state enforcement agencies to provide research and perspective about the need for additional consumer protections in the purchase and financing of motor vehicles.

The National Consumer Law Center (NCLC) is a national nonprofit research and advocacy organization that works for consumer justice and economic security for low-income and other disadvantaged people, including consumers who have purchased and financed motor vehicles. NCLC provides information, legal research, and policy analysis to Congress, state legislatures, administrative agencies, and courts, and has long been a leading advocate for consumers in the auto finance space, striving to protect them against unfair practices. NCLC has a particular interest in this case because it has important implications for low-income people buying cars. NCLC publishes a 21-volume Consumer Credit and Sales Legal Practice Series, including Unfair and Deceptive Acts and Practices (10th ed. 2021) and Automobile Fraud (7th ed. 2022). NCLC frequently appears as *amicus curiae* in consumer law cases before trial and appellate courts throughout the country. NCLC seeks to bring transparency and fairness to the

markets for cars and car finance. Through its Working Cars for Working Families project, NCLC seeks to ensure that the lack of a car does not stand in the way of families' ability to become economically successful and to promote solutions to help car-ownership efforts for struggling families to get and keep a car.

Consumer Reports (CR) is an independent, nonprofit, and nonpartisan organization that works with consumers to create a fair and just marketplace. Known for its rigorous testing and ratings of products, CR also advocates for laws and corporate practices that are beneficial for consumers. CR is dedicated to amplifying the voices of consumers to promote safety, digital rights, financial fairness, and sustainability. The organization surveys millions of Americans every year, reports extensively on the challenges and opportunities facing today's consumers, and provides ad-free content and tools to six million members across the United States.  As a core part of its work, Consumer Reports engages in extensive research, testing, and reporting to help consumers make informed choices regarding cars and auto financing, and advocates for strong consumer financial protections in the car-buying process.

Empire Justice Center advocates for consumer protections to advance economic justice. In 1993, Empire Justice Center launched the Greater Rochester Community Reinvestment Coalition to promote access to safe and affordable credit and fair lending patterns in Rochester. Empire Justice Center met with numerous banks and with state and federal regulators during Community Reinvestment Act exams and mergers and submitted dozens of data-driven comments to the regulators responsible for overseeing the banks. Empire Justice Center documented Credit Acceptance Corporation's pattern of abusive subprime auto lending by identifying borrowers with loans designed to fail. Empire Justice Center shared this information

on numerous occasions in testimony and meetings with the New York Attorney General's office, the New York Department of Financial Services, and the Consumer Financial Protection Bureau.

## INTRODUCTION AND SUMMARY OF ARGUMENT

As leading advocates for low-income consumers generally, and for those purchasing and financing motor vehicles, *Amici* write to explain three points. First, that even as cars are essential to economic well-being in the United States, escalating costs have made acquiring them an increasingly opaque and risky process, exacerbated by deceptive activities, as those alleged of Credit Acceptance Corporation (CAC or Defendant) in the Complaint. Low-income consumers, such as those the Complaint describes as CAC's typical consumers, are particularly vulnerable because of their relatively low rates of financial literacy and limited understanding of complex financial transactions. Second, that creditor behaviors such as those alleged in the Complaint have been found by numerous courts to be unfair, deceptive, or unconscionable, and the CFPB's enforcement of its statutory authority to pursue unfair, deceptive and abusive conduct is wholly consistent with the intent of Congress when it created the CFPB. Finally, contrary to the hyperbolic conclusory statements made in the Revised *Amicus* brief provided in support of the Defendant, that if this case were to result in a ruling that the alleged behaviors are illegal, financing of used cars for low-income borrowers will still be available from the many other creditors currently doing business without engaging in the behaviors alleged in the Complaint.

## ARGUMENT

The heart of the factual allegations and claims made in the Complaint filed by the Consumer Financial Protection Bureau (CFPB) and the New York Attorney General is that CAC created a business model to finance the purchase of used vehicles with blatant disregard for

whether the consumer-borrowers could successfully complete these transactions.[1] Indeed, the Complaint alleges that CAC developed an algorithm to determine the percentage CAC could expect to collect from each consumer that would dictate the terms of the transaction with that consumer, including the price for the car, to ensure that CAC profited from each financing transaction.[2] The result, the Complaint alleges, is that for 39% of the financing made nationwide, and 25% of the financing made in New York State, CAC *expected the transactions to fail.*

Plaintiffs also allege that CAC's borrowers were typically low-income, with limited credit options,[3] and that CAC took unreasonable advantage of these consumers' lack of understanding about the secretly inflated cost of the loans.[4] Defendant responds by stating that its consumers were capable of understanding the contracts and their own financial situations, and had the ability to compare the price of vehicles offered with CAC to a comparable "Blue Book" value to deduce the disproportionately high price, concluding that consumers therefore had "free and informed choice" to seek a vehicle or financing elsewhere.[5] However, CAC's arguments are contrary to decades of well-established research about the economic realities of purchasing and financing a vehicle. The effect of CAC's behavior, as alleged by the Plaintiffs, on low-income consumers, for whom access to private transportation is essential yet increasingly out-of-reach, is to compound the difficulties faced by CAC's consumers.

---

[1] *See, e.g.,* Complaint, *Consumer Fin. Prot. Bureau v. Credit Acceptance Corp.*, Case No. 1:23-cv-00038, at ¶¶ 8, 9 (S.D.N.Y. Jan. 4, 2023) [hereinafter Complaint].

[2] *See id.* at ¶¶ 25, 26, 27.

[3] *Id.* at ¶ 25.

[4] *Id.* at ¶¶ 183-185.

[5] Memorandum of Law in Support of Credit Acceptance Corporation's Revised Motion to Dismiss, *Consumer Fin. Prot. Bureau v. Credit Acceptance Corp.*, Case No. 1:23-cv-00038, at 31-32 (S.D.N.Y. Mar. 14, 2023) [hereinafter CAC Rev. Motion to Dismiss].

I.      **The Complaint alleges that CAC exploits the needlessly complex and opaque auto sale and financing process to the detriment of highly vulnerable consumers.**

A.      **Cars are essential but exorbitantly expensive for low-income consumers.**

Plaintiffs describe CAC's consumers as highly financially vulnerable, having a median credit score of 546, and a median income of $35,000.[6] This median consumer credit score is considered deep subprime by most metrics, and the income level is only approximately $10,000 higher than the federal poverty line for a family of three.[7] It is a well-established fact that people rely on cars for economic mobility; but for CAC's highly vulnerable consumers, cars are a means to survival and often the key to escaping poverty.[8] Cars provide access to work, decrease reliance on public transportation,[9] contribute to higher household incomes,[10] and they provide access to health care, food security,[11] and educational opportunities. Cars are critical for economic mobility, and they facilitate survival for the typical low-income, credit-stressed CAC consumer, such as Ms. B. cited in the Complaint, who earned $9 per hour while supporting two minor children.[12]

For these lower-income consumers who financed their car through CAC, the purchase of a vehicle is often their most significant financial transaction. For most Americans, only buying a

---

[6] Complaint, *supra* note 1, at ¶ 20.

[7] *Id*.

[8] Raj Chetty & Nathaniel Hendren, Harvard University and NBER, *The Impacts of Neighborhoods on Intergenerational Mobility: Childhood Exposure Effects and County-Level Estimates* 70 (May 2015), *available at* https://scholar.harvard.edu/files/hendren/files/nbhds_paper.pdf.

[9] The Chetty & Hendren study showed that shorter commute times, which are often possible only with a car, are one of the strongest factors in helping families escape poverty. *Id*.

[10] *See* David A. King, Michael J. Smart, & Michael Manville, *The Poverty of the Carless: Toward Universal Auto Access,* 42(3) Journal of Planning Education and Research 464–481 (Feb. 2019), *available at* https://journals.sagepub.com/doi/abs/10.1177/0739456X18823252.

[11] *See* Jonathan C. Martinez, Jeanne M. Clark, & Kimberly A. Gudzune, Preventive Medicine Reports, *Association of Personal Vehicle Access With Lifestyle Habits and Food Insecurity Among Public Housing Residents* (Mar. 2019), *available at* https://www.sciencedirect.com/science/article/pii/S221133551830158X###.

[12] Complaint, *supra* note 1, at ¶ 31.

house is more expensive. The cost of vehicles is also steadily increasing, particularly for used vehicles, which CAC primarily finances.[13] The average price of used cars is over $25,000, up approximately 29% in just the past five years, which is only $8,000 less than the median annual gross income of CAC's consumers.[14] Even very old cars with substantial mileage have increased significantly in price, and the supply of these vehicles is particularly limited.[15] The negative impact on CAC's consumers caused by the steady increases in used vehicle prices is exacerbated by the alleged behavior of CAC that further inflates prices.

These increased costs create higher levels of risk for CAC's borrowers. The average amount financed for car purchases by consumers with very low credit scores (necessitating what is described as "subprime" or even "deep subprime" transactions) is between $19,950 and $21,918; and monthly payments for used cars average over $500 (a substantial proportion of the income of a consumer such as Ms. B described in the Complaint, who earned $9 an hour). The average term for these transactions is now over sixty months.[16] Longer payment terms may lower the monthly payments to an amount these consumers can afford, but this also increases their risks. These longer terms on older used cars enlarge the risk that the cars will mechanically fail before the loans have been repaid. It also means that, for most of the loan term, consumers will

---

[13] *Id.* at ¶ 1.

[14] Cox Automotive, Data Point, *Notable Increase in Reported Sales Drives Used-Vehicle Inventory Lower in July*, (Aug. 16, 2024), *available at* https://www.coxautoinc.com/market-insights/used-vehicle-inventory-july-2024/ .

In 2024, this average used car sale price of $25,000 represents 100% of the annual income for a family of three living at the federal poverty line ($25,820), and 1/4 of the annual median income for a family living in the U.S. ($102,800) *See* Gloria Guzman & Melissa Kollar, United States Census Bureau, Income in the United States: 2023, at Fig. 1 (Sept., 2024), *available at* https://www2.census.gov/library/publications/2024/demo/p60-282.pdf.

[15] *See* Cox Automotive Data Point, *supra* note 14 (noting that "affordability remains challenging for consumers, and supply is more constrained at lower price points and that the lower the price the tighter the inventory with vehicles priced under $15,000 having just a 31-day supply.)

[16] Melinda Zabritski, Experian, State of the Automotive Finance Market: Q2 2024, at 44 (Sept. 5, 2024). 2023), *available at* https://www.experian.com/content/dam/noindex/na/us/automotive/finance-trends/2024/experian-safm-q2-2024.pdf [hereinafter Experian Q2 2024].

owe more for their cars than they are worth. This situation, described as having negative equity, creates long-term cascading effects for these consumers. A recent report from the CFPB found that consumers who financed negative equity from a prior loan into a new vehicle loan were more than twice as likely to have their account assigned to repossession within two years.[17] These cost factors exacerbate the risk of default, repossession, judgment, and garnishment of income and wages to pay off deficiency balances.[18]

The Complaint describes the high rates of default and the financial harms consumers suffered when they were not able to pay their loan contracts, including the loss of their vehicle and a cycle of remaining debt obligations.[19] For CAC consumers, losing a car also means losing access to jobs, and other facets of economic mobility, contributing to the very cycle of financial distress that Plaintiffs allege brought consumers to CAC at the outset.[20] Plaintiffs allege that CAC has structured a business model to target consumers who are the most likely to need a vehicle[21] and the least likely to be able to afford the exorbitantly high prices charged.[22]

---

[17] Consumer Fin. Prot. Bureau, Negative Equity in Auto Lending 16 (June 2024), *available at* https://files.consumerfinance.gov/f/documents/cfpb_negative-equity-in-auto-lending-report_2024-06.pdf. The report also found that the consumers who financed negative equity had monthly payments that were over 25% higher than those without negative equity or with positive equity, had lower credit scores, lower income, and longer loans terms, and had higher loan-to-value and payment-to-income ratios.

[18] Zhengfeng Guo, Yan Zhang, & Xinlei Zhao, Office of the Comptroller of the Currency, A Puzzle in the Relation Between Risk and Pricing of Long-Term Auto Loans 2, 4-5, 20 (June 2020), *available at* https://www.occ.gov/publications-and-resources/publications/economics/working-papers-banking-perf-reg/pub-econ-working-paper-puzzle-long-term-auto-loans.pdf (finding motor vehicle financing with six-plus-year terms have higher default rates than shorter-term financing during each year of their lifetimes, after controlling for borrower and loan-level risk factors).

[19] Complaint, *supra* note 1, at ¶ 10.

[20] *Id.* at ¶¶ 88-93.

[21] *See* Adam Hardy, Money, *Who Gets the Option to Work From Home? There's a Huge Disparity Tied to Income* (June 27, 2022), *available at* https://www.nasdaq.com/articles/who-gets-the-option-to-work-from-home-theres-a-huge-disparity-tied-to-income (noting that while 75% of workers making $150,000 or more have the option to work from home, only 47% of people earning between $25,000 and $49,999 have this option).

[22] *See* Complaint, *supra* note 1, at ¶ 25 (alleging that the median CAC borrower had an annual gross income of $35,000).

**B.**    **The existing complexity in the vehicle purchase and financing process is exacerbated by deceptive and abusive practices.**

In response to the Plaintiffs' claims that Defendant's algorithm that secretly inflated vehicle prices was deceptive and abusive to consumers, Defendant takes the position that its consumers were capable of ascertaining and declining to pay a disproportionately high sales price on their own. But the Complaint alleges that CAC hid from them the components that went into the pricing.[23] Regardless, CAC's argument is contradicted by the Federal Trade Commission's (FTC) extensive research and analysis about how consumers purchase and finance a vehicle.[24] Throughout the FTC's Combating Auto Retail Scams rulemaking proceeding, the FTC has described the arduous process involved in purchasing a car:

> In addition to the expense, the process of buying or leasing a vehicle is often time-consuming and arduous. It can take several hours or days to finalize a transaction, on top of the hours it can take, particularly in rural areas, to drive to a dealership. Consumers may need to take time off work or arrange childcare, and families with a single vehicle may be forced to delay other important appointments due to the length of the vehicle-buying or -leasing process.[25]

The FTC acknowledges the harm to consumers when they cannot compare vehicle prices or when the prices are hidden from them. Consumers waste time responding to deceptive advertising ploys and end up paying more for the vehicle because they are unable to accurately comparison shop.[26] These disadvantages described by the FTC in the "normal" auto marketplace do not account for the aggravating factors alleged in the Complaint: that the finance company has pulled the levers to set the price for the dealer, incentivize add-on packing, and hide the true

---

[23] *See, e.g.*, Complaint, *supra* note 1, at ¶¶ 2, 5, 7, 60, 62-64, 67, 69, 76, 87, 131, 175.

[24] Federal Trade Comm'n, Combating Auto Retail Scams Trade Regulation Rule, 89 Fed. Reg. 590 (Jan. 4, 2024) [hereinafter FTC CARS Rule].

[25] *Id.* at 593.

[26] Federal Trade Comm'n, Motor Vehicle Dealer Trade Regulation Rule, Notice of Proposed Rulemaking, 87 Fed. Reg. 42,012, 42,022 (July 13, 2022).

costs of financing from the consumer, as alleged by the Plaintiffs in this case. Comparison shopping is therefore impossible when the price is only provided after the consumer has provided their personal information to a dealer who then relies on an algorithm to generate a customer-specific price. It is not an overstatement to conclude that CAC's consumers were fighting with both arms tied behind their backs.

In this case, Plaintiffs allege that Defendant CAC's software generates vehicle pricing information based on each consumer's personal information[27] -- information that is not shared with the consumer. Consumers are presented with a "vehicle price" that does not only represent the price of the vehicle but inflates the price to include (but hide) the cost of credit for that consumer. CAC's position that consumers had "free and informed choice" to simply obtain and review a comparable "Blue Book" value to avoid paying CAC's secretly inflated vehicle prices[28] is unrealistic, given the time-consuming, expensive, and confusing array of information currently endemic in the process, including not only car prices but condition of the vehicle. It further belies reality to expect that a low-income, credit-stressed consumer is on equal footing with a dealership and one of the largest subprime creditors in the country to simply negotiate a better price. Essentially, CAC is alleged to have deliberately exploited this informational and situational imbalance in ways that are very damaging to its consumers.

However, determining the purchase price charged for the car is only the first part of the transaction. The financing process presents numerous additional opportunities to capitalize on consumers' confusion and lack of bargaining power. Credit transactions by their very nature are

---

[27] Complaint, *supra* note 1, at ¶ 48.

[28] *See* CAC Rev. Motion to Dismiss, *supra* note 5, at 31.

9

complicated and beyond most consumers' ability to understand.[29] The overwhelming majority of

the population in the United States does not understand how to calculate how much interest will

be charged on a simple loan with a specific number of payments.[30] Yet the process of financing a

vehicle involves multiple separate decisions, each of which impacts the monthly cost and total

cost of the transaction. These include the basic purchase price of the car, the interest rate charged,

the duration of the financing, the amount of the down payment (and how it will be paid), whether

more is owed on a trade-in than it is worth, if add-ons will be added to the transaction, and, if so,

at what price.[31] Each of these multiple pricing variables is complex, subject to negotiation, yet

impacts the costs to consumers.[32] These transactions perplex even sophisticated consumers.

Both the FTC and the CFPB have recognized the complexities of auto financing. The

FTC's CARS Rule is designed to bring some clarity to the auto financing process, because that

federal agency has determined that "[p]roviding consumers with accurate and timely pricing and

financing information is critical, especially in the context of motor vehicle sales and leasing,

---

[29] *See Till v. SCS Credit Corp.*, 541 U.S. 465, 481-482, 124 S. Ct. 1951, 158 L. Ed. 2d 787 (2004) (recognizing that the subprime auto finance market is not "perfectly" competitive and that creditors have much more information about the market than do consumers).

[30] National Ctr. for Educ. Statistics, Adult Literacy in America 100 (Sept. 1993) (the advertisement included all the information necessary to make the calculation: number and amount of monthly payments, and loan principal). *Cf.* Annamaria Lusardi & Olivia S. Mitchell, *Baby Boomer Retirement Security: The Roles of Planning, Financial Literacy, and Housing Wealth*, 54 J. Monetary Econ. 205, 207, 216 (2007) (fewer than 18% of surveyed adults between the ages of 51 and 56 could calculate compound interest at 10% on $200 over two years); Macro Int'l Inc., Design and Testing of Effective Truth in Lending Disclosures 52 (2007), *available at* http://www.federalreserve.gov/newsevents/press/bcreg/bcreg20081218a8.pdf; Annamaria Lusardi & Olivia S. Mitchell, *Financial Literacy and Planning: Implications for Retirement Wellbeing*, Pension Research Council, Working Paper No. 1, at 4, 7 (2006) (noting that only 67% of surveyed adults, many over fifty, could correctly determine whether, after five years of interest at 2% on $100, they would have less than, more than, or exactly $102), *available at* https://pensionresearchcouncil.wharton.upenn.edu/wp-content/uploads/2015/09/PRC-WP-2006-1.pdf; Danna Moore, Wash. State Univ., Soc. & Econ. Sci. Research Ctr., Tech. Rep. No. 03-39, Survey of Financial Literacy in Washington State: Knowledge, Behavior, Attitudes, and Experiences (2003) (finding approximately 30% of respondents do not understand that if interest compounds, it builds on itself), *available at* https://www.sesrc.wsu.edu/sesrcsite/papers/files/dfi-techreport-FINAL2-16-04.pdf.

[31] *See* Consumer Fin. Prot. Bureau, Consumer Voices on Automobile Financing 3 (June 2016), *available at* https://files.consumerfinance.gov/f/documents/201606_cfpb_consumer-voices-on-automobile-financing.pdf [hereinafter CFPB Consumer Voices study].

[32] *Id.* at 4.

where such information has proved singularly confusing to consumers."[33] Similarly, a CFPB

study about the consumer experience of auto financing found that many consumers are baffled

by the vehicle financing process.[34] The CFPB study explains how each of the single, interrelated

pieces of an auto financing transaction (like the interest rate or a longer financing term) can

impact multiple parts of the financing arrangement.[35] Notably, even during standard (as opposed

to subprime) negotiations about auto financing, the interest rate may change several times.

       Defendant CAC is in a powerful position to take unfair advantage of these complexities

because lower-income consumers who are desperate to finance the purchase of a vehicle are

more likely to take on riskier, expensive credit products without fully understanding the

transaction than are more sophisticated consumers. Multiple analyses show that consumers with

lower levels of financial literacy are more susceptible to financial abuse and are also the most

likely to use the most expensive forms of credit.[36] Consumers with less education are also more

likely than those with more education not to shop for credit,[37] often because they are not aware

that credit shopping is possible, or they do not know how to do it. Also, a significant number of

consumers who use alternative financial services (such as high-cost credit products) assume that

---

[33] Federal Trade Comm'n, Motor Vehicle Dealer Trade Regulation Rule, Notice of Proposed Rulemaking, 87 Fed. Reg. 42,012, 42,022 n. 23 (July 13, 2022)

[34] CFPB Consumer Voices study, *supra* note 29, at 9, 14, 23.

[35] *See id.* at 7-9.

[36] This relationship has been studied extensively in the mortgage context. *See, e.g.*, Brian Bucks & Karen Pence, Fed. Reserve Board, Do Homeowners Know Their House Values and Mortgage Terms? 18–22 (2006) (borrowers, particularly low-income borrowers, underestimate caps on life time interest rates in adjustable rate mortgages), *available at* http://www.federalreserve.gov/pubs/FEDS/2006/200603/200603pap.pdf; Consumer Fed'n of Am., Lower-Income and Minority Consumers Most Likely to Prefer and Underestimate Risks of Adjustable Mortgages 3 (July 26, 2004) (consumers cannot calculate the increase in the payment in an adjustable rate mortgage, and they minimize the interest rate risk by understating the increase in the payment; problem is present for all categories, but particularly pronounced for younger, poorer, less educated, and non-white consumers), *available at* http://www.consumerfed.org/elements/www.consumerfed.org/file/housing/072604_ARM_Survey_Release.pdf.

[37] Finra Investor Educ. Found., Financial Capability in the United States—2012 Report of National Findings 22 (May 2013), *available at* https://finrafoundation.org/sites/finrafoundation/files/NFCS-2012-Report-Natl-Findings.pdf.

those are their only option. *Amici* know from experience and research that consumers often are not aware of available credit choices and are simply responding to the best-advertised product.

The Complaint alleges that Defendant CAC takes unreasonable advantage of these consumers and implements a marketing strategy designed to capitalize on the insecurity of highly vulnerable consumers who have even less ability to comparison shop.[38] The Complaint points to Defendant's use of advertisements such as "10 Dealerships. 10 Denials. 1 Easy Solution."[39] Plaintiffs allege that consumers respond to CAC's solicitations believing that their precarious financial situation limits their options for the purchase and financing of a vehicle, and CAC seizes on this business opportunity by training its dealers to emphasize "that CAC is the consumer's only opportunity to secure financing."[40] The findings by federal agencies and other researchers underscore how these statements impact the consumers that CAC targets.

## II.    The Complaint has sufficiently alleged that CAC's conduct is abusive and deceptive.

Defendant and its *Amici* attempt to distract the Court from analyzing whether the Plaintiffs have plead facts sufficient to support claims for relief in the Complaint with protracted analyses of unrelated CFPB enforcement actions and the Truth in Lending Act (TILA). The Complaint includes allegations of deceptive and abusive conduct – not violations of TILA. Scattered citations to U.S. Supreme Court ruling in *Loper-Bright* as a sweeping critique on the CFPB cannot form the basis for a dismissal of the Complaint. The Complaint alleges facts sufficient to support the claims that Defendant CAC's conduct is abusive and deceptive.

---

[38] Patricia A. McCoy, *Rethinking Disclosure in a World of Risk-Based Pricing*, 44 Harv. J. on Legis. 123, 139–149 (2007) (noting that subprime consumers are subject to "risk-based pricing," whereby they do not receive financing terms until much later in the negotiation process, limiting their ability to effectively comparison shop).

[39] Complaint, *supra* note 1, at ¶ 92.

[40] *Id*. at ¶ 93.

**A. The CFPB has authority to address abusive improvident lending.**

The CFPB has authority, articulated in 12 U.S.C. § 5531, to bring enforcement actions concerning unfair, deceptive, or abusive acts or practices (UDAAP). Abusive acts include those which take unreasonable advantage of consumers' lack of understanding about the material risks, costs, or conditions of a product or service. [41] The Complaint alleges that Defendant CAC took unreasonable advantage of consumers' lack of understanding about (i) the costs of the loans, which CAC obscured by hiding part of the cost of credit in the amount financed, (ii) the magnitude of the harm that would result upon default, and (iii) the risk of defaulting and suffering negative consequences as a result. [42]

Defendant and its *Amici* distract from the abusiveness and deception claims and argue that the Court should dismiss the claims because Defendant CAC purportedly complied with TILA. However, the Complaint does not allege that CAC is liable for violations of TILA, and its claims are grounded in deception and abuse. Moreover, the CFPB has made it abundantly clear to lenders like CAC that technical compliance with TILA does not insulate them from liability for UDAAP violations. [43]

Despite Defendant's reliance on its position that TILA does not require it to consider the consumer's ability to repay the loan, a critical feature of the abusiveness alleged in the

---

[41] 12 U.S.C. § 5531(d).

[42] Compl. 181.

[43] *See* CFPB Consumer Laws and Regulations 10, *available at*
https://files.consumerfinance.gov/f/documents/cfpb_unfair-deceptive-abusive-acts-practices-udaaps_procedures.pdf
("[A] transaction that is in technical compliance with other federal or state laws may nevertheless violate the prohibition against UDAAPs. For example, an advertisement may comply with TILA's requirements, but contain additional statements that are untrue or misleading, and compliance with TILA's disclosure requirements does not insulate the rest of the advertisement from the possibility of being deceptive.").

Complaint is that CAC did not merely *ignore* consumers' ability to repay the financing.[44] Rather, CAC is alleged to have created a lending model that maximizes its own income from the credit extended even when it predicted that a substantial proportion of its consumers would not be able to pay their financing in full.[45] The Complaint explains that CAC uses the information about consumers, obtained from the dealers before the credit is extended, to establish an amount that CAC will incentivize the dealer to charge a particular consumer for the car.[46] CAC's analysis of the amount they can expect the consumer to pay to CAC throughout the life of the transaction is thus used to determine the price of the car, rather than its condition or any other objective criteria.[47] While CAC has capped prices at 115% of the highest Black Book or Blue Book value since 2019, such a cap is inadequate to provide any real limit to the price increase in the vehicle due to financing. The result, according to data included in the Complaint, is that 39% of CAC's extensions of credit made nationally and 25% of CAC's financings made in New York State are expected to fail,[48] and this projected failure rate is borne out by actual defaults.[49]

There is a name for these transactions: *improvident lending*. The idea that a creditor would enter into transactions with a high expectation of default and repossession seems counter intuitive, however some creditors find it profitable to do so. This was evidenced by the

---

[44] *See, e.g.,* Complaint, *supra* note 1 at ¶¶ 3 ("CAC's lending model is indifferent as to a consumers' [sic] ability to repay loans . . ..") and 28 ("CAC does not use the information it collects from potential borrowers, the score, or the projected net collections to assess the consumer's ability to repay loans in full.").

[45] *See id* at ¶¶ 26 ("Rather than assess its borrowers' reasonable ability to repay, CAC uses the personal and financial data that it gathers from them to predict the net expected collections on each transaction.") and 27 ("The score represents CAC's best estimate, at origination, of the percentage of total amounts owed that CAC expects to collect.").

[46] Complaint, *supra* note 1, at ¶¶ 33, 34, 35.

[47] *Id.* at ¶¶ 46–55.

[48] *Id.* at ¶ 8.

[49] *Id.* at ¶¶ 44, 109.

nationwide explosion of irresponsible lending that led to the subprime mortgage meltdown in the early years of the twenty-first century.[50] As CFPB Director Chopra explained:

> Usually, lenders make money when people pay their bills. The incentives are aligned… Some lenders exploited that indifference [to consumer failure] by profiting handsomely off making loans to people who lacked understanding that they would not be able to make their payments.[51]

This crisis, of course, spurred Congress to pass the Consumer Financial Protection Act of 2010, create the CFPB and provide it with the statutory authority to address abusive conduct. Rather than a "regulatory overreach," Plaintiff's Complaint and the abusiveness claims are consistent with (and in fact underscore) the very reason that Congress passed this legislation and created a federal agency to address these market failures. Members of Congress at that time explicitly acknowledged that the 2007-08 financial crisis was caused by conduct that is strikingly similar to the allegations in this case: insufficiently underwritten loans that included abusive terms, and intentional structuring consumer debt obligations to benefit certain investors when consumers were unable to pay their loans and suffered tremendous harm.[52] It designed the CFPB in the wake of this nationwide financial collapse, giving it a third, distinct authority to address abusive conduct to add to other federal law prohibiting deceptive and unfair conduct.

---

[50] *See, e.g.*, United States Dep't of Justice, Press Release, Deutsche Bank Agrees to Pay $7.2 Billion for Misleading Investors in its Sale of Residential Mortgage-Backed Securities (Jan. 17, 2017), *available at* https://www.justice.gov/opa/pr/deutsche-bank-agrees-pay-72-billion-misleading-investors-its-sale-residential-mortgage-backed ("[T]he Bank's conduct encouraged shoddy mortgage underwriting and improvident lending that caused borrowers to lose their homes because they couldn't pay their loans."); Amy Loftsgordon, Nolo, Understanding the Foreclosure Crisis, *available at* https://www.nolo.com/legal-encyclopedia/understanding-the-foreclosure-crisis.html ("In fact, between 2007 and 2012, more than 12 million homes went into foreclosure. What led to this wave of foreclosures? Many factors contributed. But, mainly, the sheer number of abusive, predatory, and unaffordable subprime mortgage loans made in the early 2000s led to the crisis.").

[51] Rohit Chopra, *Enforcing the Post-Financial Crisis Ban on Abusive Conduct* 14 U.C. Irvine L. Rev. 625, 634 (May 1, 2024).

[52] *See* S. Rep. No. 111-176, at 11, available at: https://www.congress.gov/congressional-report/111th-congress/senate-report/176/1; *see also* Financial Crisis Inquiry Commission, The Financial Crisis Inquiry Report, at 191-192 (2011), available at: https://www.govinfo.gov/content/pkg/GPO-FCIC/pdf/GPO-FCIC.pdf

**B. Courts have repeatedly found improvident lending schemes to be illegal.**

CAC argues that the Complaint should be dismissed for failure to state a claim because, *inter alia,* the Complaint asserts "unprecedented theories of deceptive acts and practices under the Consumer Financial Protection Act of 2010 ("CFPA"), New York General Business Law ("GBL") § 349 and New York Executive Law ("EL") § 63(12)."[53] These statements are misleading at best, as many courts have found improvident lending to be illegal.

Courts have found improvident lending schemes to constitute unfair or deceptive acts and practices (UDAPs) on multiple occasions.[54] Often, the courts have determined that a creditor violated a statutory UDAP prohibition because the creditor "knew or should have known" that the debt would not be repaid.[55] For example, the Eastern District of New York held that

---

[53] CAC Rev. Motion to Dismiss, *supra* note 5, at 3-4.

[54] *Frappier v. Countrywide Home Loans, Inc.*, 645 F.3d 51 (1st Cir. 2011) (Mass. law; genuine issue of material fact as to whether lender was liable under UDAP law), *on remand*, 2013 WL 1308602 (D. Mass. Mar. 31, 2013) (finding that mortgagor was not liable under UDAP law), *aff'd*, 750 F.3d 91 (1st Cir. 2014), *cert. denied*, 574 U.S. 827, 135 S. Ct. 179, 190 L. Ed. 2d 51 (2014);); *Young v. Bank of N.Y. Mellon*, 848 F. Supp. 2d 1182, 1192–1194 (D. Haw. 2012) (allowing consumer to go to trial on claim that lender violated UDAP statute by making unaffordable mortgage loan to older disabled woman); Solomon v. Falcone, 791 F. Supp. 2d 184, 190–191 (D.D.C. 2011) (denying motion to dismiss); *Haymer v. Countrywide Bank*, 2011 WL 2790172, at *4 (N.D. Ill. July 15, 2011) (denying motion to dismiss claim that lender and broker violated UDAP statute by giving consumer unaffordable mortgage loan) , *clarified by* 2011 WL 3205365 (N.D. Ill. July 28, 2011); *Schwartzbaum v. Emigrant Mortg. Co.*, 2010 WL 2484181 (S.D.N.Y. Apr. 22, 2010) (Mag.) (refusing to dismiss UDAP claim; citing allegation that lender offered loan without regard to consumer's inability to repay it), *adopted in relevant part, rejected in part on other grounds*, 2010 WL 2484116 (S.D.N.Y. June 16, 2010); *Johnson v. NovaStar Mortg., Inc.*, 698 F. Supp. 2d 463 (D.N.J. Mar. 15, 2010) (lender may have violated UDAP unconscionability prohibition by funding foreclosure rescue transaction, manipulating appraisal, concealing costs, and issuing mortgage without regard to homeowner's repayment ability); *Gilroy v. Kasper*, 2008 WL 591049 (D.N.H. Mar. 3, 2008) (denying motion to dismiss claim that lender violated prohibition against unfair and deceptive practices by, *inter alia*, making mortgage loan while knowing consumer could not repay it); *Orcilla v. Big Sur, Inc.*, 198 Cal. Rptr. 3d 715 (Cal. App. Ct. 2016) (reversing dismissal of complaint alleging that mortgage loan for which payments exceeded borrowers' income was unconscionable, and its enforcement was UDAP violation); *Drakopoulos v. U.S. Bank*, 991 N.E.2d 1086 (Mass. 2013) (origination of a home mortgage loan that the lender should recognize at the outset that the borrower is not likely to be able to repay violates UDAP statute); *Moronta v. Nationstar Mortg., L.L.C*., 41 N.E.3d 311 (Mass. App. Ct. 2015) (citing balloon payment, among other things, as indication of unaffordability).

[55] *Williams v. First Gov't Mortg. & Investors Corp.*, 225 F.3d 738 (D.C. Cir. 2000). *See also Findlay v. Cardwell*, 2013 WL 12343710 (D.D.C. May 16, 2013) (fact question whether loan broker knew that homeowner had no reasonable ability to repay loan); *Carroll v. Fremont Inv. & Loan*, 636 F. Supp. 2d 41 (D.D.C. 2009) (denying motion to dismiss UDAP claim that lender knew or should have known of inflated appraisal and falsified income, imposed numerous unreasonable costs that it knew the borrowers could not afford, and took advantage of

consumers stated a claim by alleging that the defendants induced them to enter into a home mortgage loan by submitting an inflated appraisal and misrepresenting that the payments would be affordable.[56]  In *Opportunity Management Co. v. Frost,*[57] a Washington intermediate appellate court upheld a jury's verdict that a lender committed a UDAP violation by lending money to a borrower it knew did not have the income to repay. Instead, the lender relied on the loan-to-value ratio, *i.e.*, the fact that the value of the property securing the loan was sufficient to repay it. The court applied the FTC definition of unfairness: whether the practice offends public policy; whether it is immoral, unethical, oppressive, or unscrupulous; and whether it causes substantial injury to consumers. The court held that the jury could reasonably conclude that making the loan based on the value of the collateral was unethical or unscrupulous and caused substantial consumer injury. More recently, courts have repeatedly applied unconscionability standards to find loan terms illegal, even when state lending law did not expressly prohibit the charges or terms.[58]

> While much of the development of the concept of improvident lending as a UDAP violation has taken place in the context of mortgage cases, a number of cases address such claims

---

consumers' age and disability); *Hughes v. Abell*, 634 F. Supp. 2d 110 (D.D.C. 2009) (denying motion to dismiss claim that creditor violated UDAP statute by making loan that would consume almost half of borrower's income and could adjust upward after two years), *lender's motion for summary judgment denied on same grounds*, 867 F. Supp. 2d 76 (D.D.C. 2012).

[56] *Vaughn v. Consumer Home Mortg., Inc*., 2003 WL 21241669 (E.D.N.Y. Mar. 23, 2003). *See also Coveal v. Consumer Home Mortg., Inc*., 2005 WL 704835 (E.D.N.Y. Mar. 29, 2005) (denying motion to dismiss on similar allegations).

[57] 1999 WL 96001 (Wash. Ct. App. Feb. 16, 1999), *review denied*, 989 P.2d 1137 (Wash. 1999).

[58] *See In re Donohue*, 2020 WL 419727, at *3 (Bankr. N.D. Cal. Jan. 27, 2020) (finding procedural and substantive unconscionability where lender charged 240% interest on a $4,000 line of credit; loan's "240% interest rate shocks the conscience"); *De La Torre v. CashCall, Inc.*, 422 P.3d 1004, 1009–1010 (Cal. 2018) (interest rate is a contract term subject to the unconscionability doctrine even in the absence of a usury ceiling); *Forsythe Fin., L.L.C. v. Yothment*, 2022 WL 3330471 (Ohio Ct. App. Aug. 12, 2022) (reversing dismissal of UDAP claim against credit services organization that arranged a small-dollar loan for a fee of double the loan proceeds; noting that unaffordable lending and excessive price are factors in determining unconscionability under UDAP statute).

outside of the mortgage context.  For instance, the United States District Court District of

Massachusetts, in *Kaur v. World Business Lenders, L.L.C.*,[59] found that the doomed to fail

doctrine, previously largely addressing mortgage cases in Massachusetts, represented a common

law concept of unfairness relevant to a business loan secured by the business owner's house.  An

appellate court in Connecticut held that it was an unfair practice under the state UDAP statute

make a loan with knowledge that the borrower could not repay it unless it was refinanced by a

second loan, and refusing to allow the borrower an opportunity to discuss or evaluate the terms

of the second loan.[60]

### C. The Court can consider the vulnerability of consumers and complexities of the law in evaluating abusiveness.

In considering whether Defendant CAC took "unreasonable advantage," of consumers'

lack of understanding, the Court is required to "evaluate the facts and circumstances that may

affect the nature of the advantage."[61] It is therefore appropriate for the Court to consider the

circumstances described in this brief, including the vulnerability of the consumers Defendant

CAC targeted.

The Complaint alleges that most of CAC's consumers are low-income "with limited

credit options," and we explain that consumers with these characteristics are generally less

financially literate, less able to shop for credit, and are at a significant disadvantage when

purchasing a vehicle. Other courts have similarly considered the circumstances of the consumer

in UDAP cases. A 1933 United States Supreme Court case, interpreting "unfair methods of

competition," (the FTC Act was subsequently amended to prohibit "unfair practices") found

---

[59] 440 F. Supp. 3d 111 (D. Mass. 2020). See also *Commonwealth v. Fremont Inv. & Loan*, 897 N.E.2d 548 (Mass. 2008).

[60] Monetary Funding Group, Inc. v. Pluchino, 867 A.2d 841 (Conn. App. Ct. 2005)

[61] Consumer Fin. Prot. Bureau, Statement of Policy Regarding Prohibition on Abusive Acts or Practices, 88 Fed. Reg. 21,883, 21,886 (Apr. 12, 2023).

unfair the sale of candy involving games of chance because the practice exploits a *category of consumers*—in that case, children—who are unable to protect themselves and because the amount of candy received for the purchase price depends on chance or a lottery, long deemed contrary to public policy.[62] This Court should consider the vulnerability of the consumers involved,[63] such as the low-income, credit-challenged consumers targeted by CAC.

The complexities of auto financing described in Section I are also relevant to the Court's consideration of circumstances creating an "unreasonable advantage." For example, a federal court found that the CFPB adequately pleaded claims of abusiveness where it alleged that borrowers lacked an understanding of the law applicable to the loans in question and how those laws affected repayment obligations.[64] This conclusion was based on the fact that the loans were void under state law and that the creditor sought to collect on these loans, which the consumers did not understand that they did not owe. This was actionable even when the creditor did not interfere with the borrower's understanding and did not fail to disclose material loan terms,

---

[62] *Fed. Trade Comm'n v. Keppel & Bros*., 291 U.S. 304, 54 S. Ct. 423, 78 L. Ed. 814 (1933). *See also Colgate v. Juul Labs, Inc.*, 402 F. Supp. 3d 728 (N.D. Cal. 2019) (denying motion to dismiss unfairness claim against electronic cigarette manufacturer for targeting minors by luring them into addiction before they are mature enough to make informed decisions).

[63] *See, e.g.*, *Aquilina v. Certain Underwriters at Lloyd's*, 465 F. Supp. 3d 1088, 1100–1102 (D. Haw. 2020) (refusing to dismiss unfairness complaint; insurers should have been aware of homeowners' unique vulnerabilities and concerns and should not have provided insurance that excluded lava damage without searching for insurance that provided this coverage).

[64] *See Consumer Fin. Prot. Bureau v. Think Fin., L.L.C.*, 2018 WL 3707911 (D. Mont. Aug. 3, 2018). *See also* Proposed Stipulated Final Judgment & Order, *Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, Case No. 1:15-cv-05211-CM (S.D.N.Y. Feb. 1, 2019), *available at* https://files.consumerfinance.gov; Complaint, *Consumer Fin. Prot. Bureau v. Golden Valley Lending, Inc.*, Case No. 1:17-cv-03155 (N.D. Ill. Apr. 27, 2017), available at https://files.consumerfinance.gov; Complaint, *Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, No. 1:15-cv-05211-CM (S.D.N.Y. July 31, 2015), *available at* www.nclc.org/unreported; Consent Order, *Consumer Protection Bureau v. Colfax Capital Corp.*, CFPB No. 2014-CFPB-0009 (July 29, 2014), *available at* https://files.consumerfinance.gov; Complaint, *Consumer Fin. Prot. Bureau v. CashCall, Inc.*, Case No. 1:13-cv-13167-GAO (D. Mass. Mar. 21, 2014), *available at* www.nclc.org/unreported. *Cf. Consumer Fin. Prot. Bureau v. NDG Fin. Corp.*, 2016 WL 7188792 (S.D.N.Y. Dec. 2, 2016) (finding that practice could be abusive because it materially interferes with consumers' ability to understand; court did not reach question of whether it takes unreasonable advantage of a consumer's ability to understand), *reconsideration denied*, 2016 WL 7742784 (S.D.N.Y. Dec. 19, 2016); *Consumer Fin. Prot. Bureau v. CashCall, Inc*., 2016 WL 4820635 (C.D. Cal. Aug. 31, 2016) (finding practice deceptive, so not having to reach whether practice was also unfair or abusive).

because the court found that the creditor was taking advantage of the consumers' lack of understanding.

The allegations that Defendant CAC then hid the cost of credit along with the magnitude and risk of harm from these consumers under these circumstances are sufficient to allege that it took unreasonable advantage.

### D. CAC need not have communicated directly with consumers to be liable for the deception claims.

The CFPB's authorizing statute does not include a definition of "deception," but the Court has applied the longstanding interpretation of the FTC in such instances.[65] The FTC's Deception Policy Statement explains that deception includes a misrepresentation of a material fact that is likely to mislead a consumer acting reasonably in the circumstances.[66] The Complaint alleges that Defendant CAC deceived consumers by misrepresenting the true cost of credit and key financing terms. Defendant and its *Amici* argue that the deception claims fail because Complaint does not allege that CAC had direct contact with consumers. However, a party need not have direct contact with consumers to be liable for fraud, UDAP, or deception.

In denying an auto finance company's motion for summary judgment on a UDAP claim, the United States District Court of the Southern District of West Virginia explained that the assignee's alleged liability derives from its action in allegedly planning, managing, and executing a scheme involving the creation of false pay stubs, false down payments, and charging an

---

[65] *See* Consumer Fin. Prot. Bureau v. RD Legal Funding, L.L.C., 332 F. Supp. 3d 729, 772–73 (S.D.N.Y. 2018) (relying on *CFPB v. NDG Fin. Corp.,* 2016 WL 7188792, at *14 (S.D.N.Y. Dec. 2, 2016), which quotes the elements of deception in *FTC v. Med. Billers Network, Inc.*, 543 F. Supp. 2d 283, 303 (S.D.N.Y. 2008)), *aff'd in part on other grounds, rev'd in part on other grounds*, 828 Fed. Appx. 68 (2d Cir. 2020), *on remand*, 592 F. Supp. 3d 258 (S.D.N.Y. Mar. 16, 2022), *abrogated on other grounds by* Consumer Fin. Prot. Bureau v. Law Offices of Crystal Moroney, P.C., 63 F.4th 174 (2d Cir. 2023).

[66] Fed. Trade Comm'n, FTC Policy Statement on Deception (Oct. 14, 1983), *available at* http://www.ftc.gov/bcp/policystmt/ad-decept.htm.

acquisition fee hidden in the vehicle price.[67]  It rejected the arguments made here by CAC that UDAP statutes do not provide for derivative liability against those who do not deal directly with consumers.

The party devising the deceptive scheme can be held liable even if they did not directly make the misrepresentation to the consumer.[68] The Maryland Court of Appeals, examining the liability of a loan officer and an appraiser in a property flipping scheme, found both liable to the consumer for fraud and UDAP violations. The loan officer met with the speculator at the beginning of the scheme, advised the speculator about how to secure FHA loans for the home buyers, and gave them paperwork to use to falsify the source of down payments and closing costs. The loan officer then worked with the speculator to generate inflated sales prices. At closings, the loan officer's conduct helped confirm the buyers' impression that the speculator was working for them. The appraiser's role was to issue inflated appraisals that exaggerated the homes' features and compared them to non-comparable properties. These acts established that the loan officer and appraiser were liable for fraud and UDAP violations. The court was not troubled by the fact that the appraisals were not communicated directly to the home buyers, because the appraiser's deception so infected the transaction that it would be deemed to have been committed in the sale.[69]

Third parties that can be liable for their involvement in deceptive schemes even where the mechanics are carried out by others. One example is an FTC enforcement action against a

---

[67] Knapp v. Americredit Fin. Servs., Inc., 245 F. Supp. 2d 841 (S.D. W. Va. 2003).
[68] Cain v. Arthrocare Corp., 2006 WL 1892545 (E.D. Mo. July 10, 2006) (communication with ultimate consumer is unnecessary; denying motion to dismiss UDAP claim against manufacturer based upon misrepresentation by omission of a material fact for failure to disclose medical device's propensity to fail)
[69] Hoffman v. Stamper, 867 A.2d 276, 294–295 (Md. 2005)

company that developed computer software intended to deceive consumers through a program used by merchants to fictitiously represent car loans as advantageous over cash purchases.[70]

Another court has found an automobile finance company liable "without question" for UDAP violations when it trained dealership employees to use a bait-and-switch tactic that deceived consumers about the true costs of leasing a car as opposed to buying it.[71] However, it still upheld denial of the claim because the consumer failed to introduce evidence showing that the training sessions had actually caused the dealership to use the bait-and-switch tactic in the sale to the plaintiff. The Plaintiffs' government enforcement action targeting a host of sales by CAC here does not require the proof of causation required in that matter.

## III. Auto creditors do not need to resort to abusive and deceptive conduct to extend credit to credit-challenged, low-income consumers.

### A. Many auto creditors make loans to consumers like CAC's customers without engaging in the alleged misconduct.

Defendant CAC's *Amici* argue that the Plaintiffs' enforcement of the consumer protection regulations as plead in the Complaint would "significantly restrict the availability of credit to consumers, particularly those in the subprime market."[72] This argument is simply wrong, as it is rooted in an incorrect characterization of the allegations in the Complaint. Rather than hurting consumers, denying the motion to dismiss and finding that the facts in the Complaint form the basis for claims that Defendant's conduct was deceptive and abusive will significantly improve the fairness and transparency in the auto credit market for consumers in subprime credit transactions.

---

[70] Automatic Data Processing, 5 Trade Reg. Rep. (CCH) ¶ 23,049 (F.T.C. 892 3107 1992) (consent order).

[71] General Motors Acceptance Corp. v. Laesser, 718 So. 2d 276 (Fla. Dist. Ct. App. 1998). (creditor's instruction of dealership employees in bait-and-switch tactics and methods of concealing transaction's true cost violates UDAP statute, but claim fails because causation not shown).

[72] *Amicus Curiae* Brief of American Fin. Servs. Ass'n et al., *Consumer Fin. Prot. Bureau v. Credit Acceptance Corp.*, Case No. 1:23-cv-00038, at 19 (S.D.N.Y. Mar. 21, 2023).

The deceptive and abusive conduct pleaded in the Complaint is *not* standard across the industry, and it is certainly not a necessary business model to extend credit for the successful purchase of vehicles by credit-stressed consumers. Banks, credit unions, finance affiliates of large auto manufacturers, and buy-here-pay-here dealers also finance the purchase of cars for these consumers; recent data shows that finance companies as a whole represent only about 14% of motor vehicle financing in the U.S., while captive lenders provide the largest share of auto financing.[73] Even for consumers with subprime credit scores, large finance companies like CAC provide about 19% of the financing, roughly the same as banks.[74]

Many other lenders that specialize in providing vehicle financing for subprime consumers do so without the need to inflate vehicle prices deceptively and abusively as the Complaint alleges CAC does. Community development financial institution (CDFI) credit unions[75] also work directly with lower-income, credit stressed consumers to provide access to affordable vehicle financing. For example, the Genesee Co-op Federal Credit Union, a CDFI located in Rochester, New York, recently testified to the New York Department of Financial Services about the success of its auto lending program, which refinances abusive auto loans and makes new loans to credit-challenged consumers with affordable, success-driven terms:

> You may hear from other lenders that it is impossible to lend to people at rates similar to ours because of the risk. We have demonstrated over many years, that we are able to have a loan portfolio of auto loans to these exact same people at substantially lower rates that perform exceptionally well. We believe lenders and

---

[73] Experian Q2 2024 at 7.

[74] Jasper Clarkberg, Jack Gardner, & David Low, Consumer Fin. Prot. Bureau, Data Point: Subprime Auto, Loan Outcomes by Lender Type, Data Point No. 2021-10 (Sept. 2021) *available at* https://files.consumerfinance.gov/f/documents/cfpb_subprime-auto_data-point_2021-09.pdf.

[75] Community development financial institutions are private sector financial intermediaries that focus on providing financial services to economically disadvantaged communities. They are funded through the U.S. Department of the Treasury by the CDFI Fund, which was created in 1994 to promote "economic revitalization and community development through investment in and assistance to Community Development Financial Institutions (CDFIs)." United States Dep't of the Treasury, Community Development Financial Institutions Fund, *available at* https://www.cdfifund.gov/.

dealers are not only stripping wealth from low-income New Yorkers but are discriminating specifically against people of color.[76]

One Detroit credit union, a Michigan CDFI, also specializes in refinancing predatory auto loans through a program called "Refi My Ride."[77] This program has helped over 1,000 consumers save $4.7 million by refinancing their auto loans to a lower rate (sometimes even reducing the rate by 50%) and structuring the terms of the loan to facilitate consumer success instead of failure.

High-cost creditors, like those whose interests are represented by Defendant's *Amici,* frequently claim, as a way to justify their high-cost credit, that providing financing to subprime consumers is more expensive and riskier. However, the Plaintiffs allege in this Complaint that Defendant CAC goes a step further, predicting that its consumers would experience significant rates of failure, and using that information about particular consumers to encourage dealers to set car prices that include that risk, thus ensuring its profits regardless of the outcome to consumers. This additional level of planned disregard for its consumers is what separates CAC's conduct from that of most other creditors who extend subprime credit to consumers.

**B.    The loan failure rates pleaded in the Complaint are much higher than available data for other auto creditors.**

To the extent that the Court considers the potential impact of this ruling on other auto creditors, some of whose interests are represented by Defendant's *Amici*, it is notable that CAC's

---

[76] *See* New York State Dep't of Fin. Servs. Hearing on Consumer Protection (Feb. 2020) (testimony of Daniel Apfel, Chief Operating Officer of Genesee Co-op Federal Credit Union), attached as EXHIBIT 1.

[77] *See* Inclusiv, CDFI Credit Unions Build Inclusive Economies 9 (Spring 2021), *available at* https://www.inclusiv.org/wp-content/uploads/2021/06/CDFI-CUs-Build-Inclusive-Economies-2021.pdf.

delinquency, default and repossession rates are significantly higher than those of other auto creditors.[78] Plaintiffs allege that for consumers with a CAC score of 70 or lower:[79]

- Approximately 20% had experienced at least one repossession,
- 60% experienced a 30-day delinquency within the first year, and
- 39% experienced a 60-day delinquency within the first year.[80]

Contrast this with data about other auto lenders. The Federal Reserve Bank of New York's quarterly data reflects that from 2015 to 2021 (the relevant period in the Complaint), no more than 5% of all auto financing contracts were ninety-plus days delinquent.[81] This is the point at which many creditors will repossess the vehicle. Data from Experian's automotive finance market reports indicate that between 2016 and 2020, only 3.5 to 5.2% of financing transactions from finance companies (like CAC) were in a 30-day delinquency, and 1.4 to 2.0% were in a sixty-day delinquency.[82] Even data about subprime auto borrowers reflects that thirty-day delinquency rates have not been higher than 9.3% since 2010 for this population of consumers.[83] While the data comparisons are not perfectly aligned, it is clear that CAC's rate of delinquencies

---

[78] Unfortunately, unlike student loans or mortgages, there is a dearth of robust, publicly available data about auto lending. Therefore, although the comparisons here are not perfect, they merit attention by the Court simply because of the size of the gap in the delinquency rates between CAC's lending contracts and other auto lending contracts. This is the subject of an ongoing initiative by the CFPB to enhance publicly available auto lending data. *See* Ryan Kelly, Chris Kukla, Ben Litwin, & Ashwin Vasan, Consumer Fin. Prot. Bureau Blog, Enhancing Public Data on Auto Lending (Nov. 17, 2022), *available at* https://www.consumerfinance.gov/about-us/blog/enhancing-public-data-on-auto-lending/.

[79] Complaint, *supra* note 1, at ¶¶ 25-26 (describing the CAC borrower "score").

[80] *Id.* at ¶¶ 103-104.

[81] Federal Reserve Bank of N.Y., Research & Statistics Group, Quarterly Report on Household Debt and Credit 2023: Q1, at 12 (May 2023), *available at* https://www.newyorkfed.org/medialibrary/interactives/householdcredit/data/pdf/HHDC_2023Q1.

[82] Melinda Zabritsky, Experian, Automotive Industry Insights: Finance Market Report Q4 2020, at 17 (Mar. 2021), *available at* https://www.autofinancenews.net/wp-content/uploads/2021/03/2020-Q4-Auto-Finance-News-Industry-Pulse.pdf; Melinda Zabritsky, State of the Automotive Finance Market Q4 2017, at 6, 8 (Mar. 2018), *available at* https://www.experian.com/assets/automotive/quarterly-webinars/2017-q4-safm.pdf.

[83] Ben Eisen & Gina Heeb, *More Auto Payments Are Late, Exposing Cracks in Consumer Credit*, The Wall St. J., Feb. 18, 2023, *available at* https://www.wsj.com/articles/more-auto-payments-are-late-exposing-cracks-in-consumer-credit-3cbc2382.

is much higher than other auto creditors, *even than those lending to the same type of credit-challenged consumers*.[84] These statistics show that Defendant's *Amici* clearly do not represent all auto creditors.

Even worse, Plaintiffs allege that while consumers suffered the disastrous consequences of these disproportionately high rates of delinquency, default, repossession, auction, judgments and garnishments, CAC managed to predictably earn a profit.[85] Publicly available data indicates that between December 2009 and December 2021 CAC's market value increased dramatically from less than $1.3 billion to over $10 billion.[86]

## CONCLUSION

The Court should deny Defendant's motion to dismiss. The Plaintiffs' enforcement of the consumer protection laws as plead in the Complaint will improve the fairness and transparency in the auto credit market by addressing the problematic practices of CAC. Allowing this matter to proceed to discovery and a determination on the merits will ensure that the abusive and deceptive conduct at issue in the Complaint is no longer permitted to plague the auto credit marketplace and punish lower income car buyers.

---

[84] Most available data points to delinquency and default percentages at a single moment in time rather than the percentage of consumers who had experienced a delinquency or default during their contract term, as alleged by the Plaintiffs. Regardless, the differences in the statistics for other auto creditors are significant.

[85] Complaint, *supra* note 1, at. ¶ 111.

[86] MacroTrends, Credit Acceptance Market Cap 2010-2023/CACC, *available at* https://www.macrotrends.net/stocks/charts/CACC/credit-acceptance/market-cap.

DATED: October 4, 2024

Respectfully submitted,

NATIONAL CONSUMER LAW CENTER

By: /s/ *Andrew W. Pizor*
**Andrew Pizor, Bar No.: AP4249**
John Van Alst (on brief)
Margot Saunders (on brief)
National Consumer Law Center
1001 Connecticut Ave, NW
Washington, DC 20036
apizor@nclc.org
202/452-6252 x104


Erin E. Witte (on brief)
Consumer Federation of America
1620 I St., NW, Suite 200
Washington, DC 20006

*Counsel for Amicus Curiae Consumer Federation of America, the National Consumer Law Center on behalf of its low-income clients, Consumer Reports, and Empire Justice Center*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 9th day of October 2024, a true and correct copy of the foregoing was filed with the Clerk of the United States District Court for the Southern District of New York via the Court's CM/ECF system, which will send notice of such filing to all counsel who are registered CM/ECF users.

By: /s/ Andrew Pizor

Counsel for *Amici*:
Andrew Pizor, Bar #AP4249
National Consumer Law Center
1001 Connecticut Ave, NW
Washington, DC 20036
apizor@nclc.org
202/452-6252 x104

EXHIBIT 1



# Genesee Co-op
Federal Credit Union

www.genesee.coop

395 Gregory Street
Rochester, NY 14620-1327
Phone: 585.461.2230
Fax: 585.461.3189

**TESTIMONY OF DANIEL APFEL, CHIEF OPERATING OFFICER of
GENESEE CO-OP FEDERAL CREDIT UNION at
NEW YORK STATE DEPARTMENT OF FINANCIAL SERVICES HEARING**

Date: Thursday, February 20
Time: 5:30 -7:30 p.m.
Location: M. Dolores Denman Courthouse
50 East Avenue, Rochester, NY 14604

Thank you for having me here. My name is Daniel Apfel and I am the Chief Operating Officer at Genesee Co-op Federal Credit Union. Genesee Co-op FCU is a community development credit union with almost 4,000 members based here in Rochester, serving people from across the entire community. We especially focus on serving the low-income community, including people of color and refugees. I am here tonight to raise awareness of the disparities based on race we see in auto-lending. We hold a portfolio of 262 used car loans and made 95 loans in 2019. Approximately 40% of those loans were refinances.

The vast majority of these refinanced auto loans are made to people who received their car loan at a dealership, often at high interest and loaded with service contracts or mechanical car repair coverage. Although borrowers of all kinds come in with these high-priced loans, a consistent pattern of discrimination has emerged. We see that while white members receive subprime loans of 12, 13, or 14 percent, Black and Latinx members with a similar credit profile usually are paying higher rates of 18, 19 or 20%, often up to the auto loan cap of 24.99%.

As an example, I want to share the stories of two members whose financial profiles were similar when they came to us, one white, one a person of color. The first member, who I will call Jennifer, is the person of color. She had a credit score of 650. Her loan rate was 16.59 percent. Another member, who I will call Jane, was white and had a credit score of 633. Jane's rate from the dealer was 12—4.59 % less even though she had worse credit. We refinanced their loans at 6.24% and 8.24% respectively.

This is a common occurrence. The credit profile of the borrower and the loan have similar attributes, even when the loan-to-value of the car and the debt-to-income ratio of the borrower are virtually identical.  We believe the primary, or even only difference is the race/ethnicity of the borrower.  So, for low, moderate- and middle-income borrowers, being Black or Latinx results in a 5-10% markup. We believe that this is almost certainly discrimination based on race. We see enough of these to believe this practice is widespread and not limited to a few dealers who are bad actors.



**Genesee Co-op**
Federal Credit Union

www.genesee.coop

395 Gregory Street
Rochester, NY 14620-1327
Phone: 585.461.2230
Fax: 585.461.3189

Abusive auto loan rates are increasingly being identified as an issue that needs the attention of regulators. The mainstream press, as well as research, has identified the increased prevalence of auto loans with very high LTVs. These cars stop running before the loan is paid. When the consumer then buys another car, dealers refinance the unpaid balance into the new loan. That leads to higher and higher loan to values ratios and higher payments for low-income borrowers. Dealers also add products like the maintenance contracts that I discussed earlier to the price of the car, thus inflating the loans and making them even more unaffordable.

Such practices trap consumers in a cycle of subprime credit that is almost impossible to break. These lenders are stripping wealth from the communities that most need them. This practice makes it impossible for families to take the first step to develop savings, build assets and wealth, and eventually become homeowners.

You may hear from other lenders that it is impossible to lend to people at rates similar to ours because of the risk. We have demonstrated over many years, that we are able to have a loan portfolio of auto loans to these exact same people at substantially lower rates that perform exceptionally well. We believe lenders and dealers are not only stripping wealth from low-income New Yorkers but are discriminating specifically against people of color.

On behalf our Board and Membership, thank you for your visit to Rochester and your attention to this important issue.